*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

| | |
|---|---|
| JOHN BETTENCOURT,<br><br>                              Plaintiff,<br><br>vs.<br><br>THE TOP-FLITE GOLF COMPANY,<br><br>                              Defendant. | CIVIL ACTION NO. 05-30179-KPN<br><br>**DEFENDANT THE TOP-FLITE GOLF COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

## I.    Introduction and Overview

Plaintiff, John Bettencourt, ("Plaintiff" or "Bettencourt") has filed a two count Complaint, alleging that his 2004 termination was due to his age, in violation of the Age Discrimination in Employment Act and M.G.L. c. 151B. Defendant, following extensive discovery by Plaintiff, has filed a Motion for Summary Judgment.

The undisputed evidence demonstrates that Bettencourt had worked as an exempt office employee working for Spalding Sports Worldwide, Inc. (hereinafter "Spalding"), a global golf and sporting goods company, at its corporate headquarters in Chicopee, Massachusetts, before that entity sold off large portions of its business and, soon thereafter, filed for bankruptcy. After the bankruptcy filing, at the beginning of September 2003, Spalding's assets were auctioned off by order of the bankruptcy court.

Bettencourt, was one of 367 exempt office employees hired by The Top-Flite Golf Company, a wholly owned subsidiary of Callaway Golf Company (hereinafter "TFGC" or "Defendant") in mid-September of 2003. TFGC was a new company established at the time, after Callaway Golf Company ("Callaway") at auction, purchased many of

1

Spalding's golf business assets through TFGC.[1]  Like all but about twenty exempt salaried office employees hired by TFGC not involved directly in the golf ball manufacturing process, Bettencourt's position was subsequently eliminated, and Bettencourt was laid off, as the new company struggled to stop ongoing financial losses and integrate its remaining business with that of its new owner.[2]

The subsequent changes affecting TFGC office employees of TFGC have been pervasive, and the result of many business factors that do not implicate federal or state discrimination laws.  Thus, as one court noted, "…it is inevitable that when management changes so will some of the circumstances surrounding employment", changes not precluded by the ADEA, which "… is a discrimination statute and is not intended to handcuff the managers and owners of businesses to the status quo."  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3rd Cir. 1992).

It is obvious, and not indicative of a discriminatory intent, that changes would be all the more expected when the *status quo* had resulted in the prior company being forced, due to economic necessity, to sell off large portions of its business, its corporate name, and then still need to file for bankruptcy.  At a minimum, the new company would be expected to bring in some high level managers who had worked for a successful company that was the new owner, to replace those who, at a minimum, had overseen the predecessor's waning days.

---

[1]This is a somewhat abbreviated version of the corporate transactions that occurred in 2003.  The full scope of the changes is contained in the accompanying Statement of Undisputed Facts.

[2]The full scope of the changes affecting Defendant and Callaway employees are outlined in the Statement of Facts.  (Facts ¶¶1-48)

2

Moreover, personnel changes, in the form of a reduction of force, could be expected, and does not raise suspicion of a discriminatory goal, where the undisputed facts show that prior to its bankruptcy petition, and notwithstanding the divestiture of large portions of its business, Spalding's management team, although aware that its salaried exempt workforce was larger than necessary to support the remaining business, had elected not to effectuate staff reductions to match the size of its workforce to the size of its remaining businesses.

Significant layoffs become all but inevitable, and do not raise the specter of discriminatory intentions, when the newly formed company, after hiring virtually the entire Spalding workforce, found itself losing millions of dollars. Indeed, the record reveals that between its creation in September, 2003 and the end of calendar year 2003, the Defendant lost nearly nine million ($9,000,000) dollars, and during the first quarter of 2004 it found itself on pace to lose even more. These losses clearly precipitated a need to effectuate cost reductions, including reductions in force amongst what was perceived to be a bloated exempt salaried staff.

Furthermore, the evidence shows that Callaway's original plans to have TFGC operate as a standalone business were modified, and ultimately largely abandoned. This occurred due to the continuing financial losses and to the fact that its chief proponent, Ronald Drapeau, Callaway's CEO at the time of the auction, was removed from his position in the summer of 2004.

The undisputed facts show that the integration of Defendant with its owner, Callaway, has, within three years, resulted in numerous changes affecting employees who had worked for Spalding prior to its bankruptcy. This included a plant closing of the

3

Ben Hogan facility in Texas and the movement of virtually all remaining corporate executive, managerial, financial, sales and marketing functions previously done in Chicopee for a far reaching golf and sporting goods company to Carlsbad, California, where Callaway is based.  The simple truth is that whereas prior to the spring of 2003 Spalding managed numerous business operations, and several off-site manufacturing facilities as well as International Divisions, from its Chicopee headquarters,  the local facility has become solely a manufacturing plant, managed by Callaway personnel in California.  This has resulted in Bettencourt being one of literally hundreds of exempt office employees hired by TFGC in September 2003 to subsequently lose his position. Of the 367 originally hired there are now only a total of 91, five of whom are in Research & Development and have received their layoff notifications.  Most of those 91 are engaged in the direct manufacture of golf balls; less than 20 are exempt office employees, as was Plaintiff prior to his layoff.   No one has been performing the duties previously performed by Plaintiff for a considerable period of time.

It is inevitable in such circumstances that some good employees, some of whom worked for Spalding for many years, would lose their positions.  It is inevitable that some of these individuals might be employees earning a high salary that was no longer justified.  It may be harsh, but it is an inescapable truism that TFGC, confronted with the economic realities, had absolutely no legal duty to minimize the disruption to the former Spalding employees.  TFGC was not legally obligated to make business and personnel decisions to enhance the job security of those that previously worked for a company that had gone bankrupt.  TFGC did not have to continue to retain former Spalding employees in their existing positions (often at considerable expense) if, after a transition

4

and assessment period, the new company concluded that it did not make business sense to do so.  Nor was the new company legally obligated to transfer employees into other positions, including lower rated and paid positions if such a position was all that remained necessary to run the new company, even if an employee targeted for layoff was able to perform the job.  Rather, TFGC's only legal obligation was to refrain from making decisions based on discriminatory factors, including age.  See Pages-Cahue v. Iberia Lineas Aereeas De España, 82 F.3d 533, 538 (1st Cir. 1996), Holt v. Gamewell Corp., 797 F.2d 36, 38 (1st Cir. 1986) citing, inter alia, Parcinski v. Outlet Co., 673 F.2d 34, 37 (2d Cir. 1982) (failure to retain and transfer not evidence of discrimination even if, "there were lower echelon, poorer paying jobs in the restructured enterprise which [appellants] were qualified to fill"), and Ridenour v. Lawson Co., 791 F.2d 52, 57 (6th Cir. 1986) (stating that "[w]here an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company").[3]

Forty one Chicopee based office employees were notified of their layoff on April 15, 2004.  This included three of the four individuals, Bettencourt included, who were performing cost accounting work.  The sole cost accountant retained by the company was the *oldest* of the four. Bettencourt, after being notified of his job elimination,

---

[3]"[A]n employer has no duty under ADEA to permit an employee to transfer to another position or displace workers with less seniority when the employee's position is eliminated as part of a workforce reduction."  See, Barnes v. GenCorp Inc., 896 F.2d 1457, 1469 (6th Cir. 1990); Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 517 (6th Cir. 1991).  "[T]he ADEA does not mandate that employers establish an interdepartmental transfer program during the course of a RIF; an employer incurs no duty to transfer an employee to another position when it reduces its workforce for economic reasons. *See, e.g.,* Earley v. Champion Int'l Corp., 907 F.2d 1077, 1083 (11th Cir. 1990); Rose v. Wells Fargo & Co., 902 F.2d 1417, 1422 (9th Cir. 1990); Simpson v. Midland-Ross Corp., 823 F.2d 937, 942 n.6 (6th Cir. 1987)"; Taylor v. Canteen Corp., 69 F.3d 773, 780 (7th Cir. 1995).

5

understanding the document's meaning, signed a release of claims in exchange for severance payments.  The agreement signed by Bettencourt expressly released Defendant "from all debts, liabilities or obligations to you whatsoever, whether known or unknown, which may now exist, including without limitation, any arising under any federal, state, or local law regarding employment discrimination or termination."  Although he received the promised severance payments, notwithstanding the signed release, Bettencourt commenced this action.  Defendant submits that the Plaintiff's claim under M.G.L. c. 151B must be dismissed because Plaintiff entered into a binding agreement releasing such claims.

Further, the undisputed facts demonstrate that no genuine issue of material fact exists that would allow a reasonable factfinder to conclude that the Plaintiff was terminated due to his age.  Accordingly, the ADEA claim (and the M.G.L. c. 151B claim, if not precluded by the release) should be dismissed.

Lastly, even if the court refuses to dismiss the age claims, partial summary judgment should issue limiting Plaintiff's putative damages.  Thus, *inter alia*, partial summary judgment should enter precluding recovery of backpay for any period after Bettencourt's alleged "replacement" ceased working for Defendant (and was not replaced).

## II.  The Release Bars All Claims Except Those Brought Under the ADEA

### A.   A Failure to Comply With OWBPA Does Not Negate the Release of Claims  Under M.G.L. c. 151B

The release signed by the Plaintiff, while generally compliant with the release provisions of the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f),

did not, Defendant concedes, comply with the special provisions applicable to group waivers which are part of a group exit incentive plan.  Specifically, Plaintiff was provided with the standard 21 days to review the release (not the 45 applicable to group exit plans) and was not provided with information specifying the group covered and the job titles and ages of both eligible and ineligible individuals.  For this reason, and this reason alone, Plaintiff's ADEA claim is not barred by the release that he signed, and consideration that he received and retained.

However, it is clear that these special release provisions are not applicable when assessing the enforceability of a release of statutory claims other than those brought under the ADEA, which are the only claims governed by OWBPA.  Thus, a failure to comply with the specific requirements of OWBPA does not nullify the validity of a release of other employment related claims.  <u>American Airlines</u>, 133 F.3d 111 (1st Cir. 1998) (finding that failure to inform Complainant to seek counsel negated the release of the ADEA claims, but remanding the case to determine if there was an enforceable release of other employment related claims).  See, also, <u>Rivera-Flores v. Bristol-Meyers Squibb Carribean</u>, 112 F.3d 9 (1st Cir. 1997) ("Where Congress has wanted to insure particular protections for the employees in the procedures for obtaining releases, it has done so, for example, in the Older Workers Benefits Protection Act amendments to the ADEA.  No such special procedures are set forth in the ADA.").  Congress did not make the OWBPA requirements applicable to state laws any more than it did to the ADA or Title VII.  There is, therefore, no basis for finding the OWBPA requirements, already found not applicable to claims under Title VII or the ADA, as a grounds for nullifying state law relating to release of state law claims, including M.G.L. c. 151B claims.

7

Indeed, our courts have recognized that agreements of employment disputes serve a salutary effect, allowing parties to resolve potential differences without the costs of litigation.  <u>Dorn, et. al. v. Astra U.S.A. et. al.</u>, 975 F. Supp. 388 (D. Mass. 1997).  Thus, "[p]ublic policy strongly favors encouraging voluntary settlement of employment discrimination claims".  <u>Equal Employment Opportunity Commission v. Astra USA</u>, 94 F.3d 738, 744 (1st Cir. 1996).  Many, if not all, such agreements contain a release of claims aimed at avoiding litigation, and "[c]ourts have, in the employment law context, commonly upheld releases given in exchange for additional benefits.  Such releases provide a means of voluntary resolution of potential and actual legal disputes, and mete out a type of industrial justice." <u>Rivera-Flores v. Bristol-Meyers Squibb Carribean</u>, 112 F.3d 9 (1st Cir. 1997).  Releases of statutory employment claims should be honored in all but the rarest of circumstances.  <u>Melanson v. Browning-Ferris Industries, Inc.</u>, 281 F.3d 272 at 274 (1st Cir. 2002) ("… our precedent leaves little room for doubt that such a release, like a release of other federal statutorily-created rights, must be knowing and voluntary, as evidenced by the totality of the circumstances, and that, if it is, the terms of the release will ordinarily be given their legal effect.)  <u>Rivera-Flores v. Bristol-Meyers Squibb Caribbean</u>, 112 F.3d 9, 11 (1st Cir. 1997).

Given the benefits of encouraging such resolution, in non-ADEA cases, the determinative factor in deciding the issue is whether the execution of the release by Complainant was knowing and voluntary.  <u>Morais v. Central Beverage Corporation Union Employees' Supplemental Retirement Plan</u>, 167 F.3d 709 (1st Cir. 1999); <u>Smart v. Gillette Company Long-Term Disability Plan</u>, 70 F.3d 173 (1st Cir. 1995)

In determining whether there had been an effective release, courts look at the totality of the circumstances, looking generally, albeit not exclusively, at six factors specifically:  (1) the Complainant's education, business experience, and sophistication; (2) the parties' respective roles in deciding the final terms of the arrangement; (3) the agreement's clarity; (4) the amount of time available to the Complainant to study the agreement before acting on it; (5) whether the Complainant had independent advice-- such as the advice of counsel--when she signed the agreement; and (6) the nature of the consideration tendered in exchange for the waiver discussed in detail below.  Smart v. Gillette Company Long-Term Disability Plan, 70 F.3d 173 (1st Cir. 1995)".  "It is not necessary that each be satisfied before a release can be enforced.  The essential question is whether, in the totality of the circumstances, the individual's waiver of [his] right can be characterized as "knowing and voluntary."  Melanson v. Browning-Ferris, 281 F.3d at 276 (emphasis added).

The clear language of the agreement releases claims under "*federal, state, or local law regarding employment discrimination or termination*."  The written language, when clear and unambiguous is controlling, and extrinsic evidence will not be sufficient to create a dispute as to the effectiveness of a release.  "Morais v. Central Beverage Corporation Union Employees' Supplemental Retirement Plan, 167 F.3d 709.

Moreover, Plaintiff is a well-educated, sophisticated employee, who has acknowledged that he understood the terms of the document that he elected to sign. He had been given ample opportunity to review it, and see counsel of his choosing. There is no basis for finding that Plaintiff could not fully comprehend the clear import of the words, *i.e.,* that he was giving up any claims based on discrimination and his

9

termination.  Courts are appropriately unwilling to allow a claim that the competent

employee did not understand its import and there is no basis for such a finding here.

*Cf*.  Morais v. Central Beverage Corporation Union Employees' Supplemental

Retirement Plan, 167 F.3d at 715; Melanson v. Browning-Ferris, Inc., *supra* at 277.

      The consideration tendered in exchange for the release was, quite clearly,

sufficiently substantial.  *See,* Melanson v. Browning-Ferris, Inc., *supra,* 281 F.3d at 278

(holding that $1,600 was sufficient to release sexual harassment claims).  Nor is there

any evidence that Plaintiff was coerced into signing the agreement, merely because he

was facing unemployment and loss of income if he did not agree to the terms of the

separation letter and release.  Courts have been unwilling to allow a claim of financial

hardship to negate the clear import of a release.  *Cf.*  Melanson v. Browning-Ferris, Inc.,

*supra,* 281 F.3d at 276 (no coercion although Plaintiff was "under financial stress and

was a young, depressed, single mother.")  Any employee losing his employment

undoubtedly faces financial stress by the uncertainty ahead.  But, "incapacity or duress

[may not], without more, be inferred from merely the emotional and financial stress

associated with loss of a job.  To hold otherwise would be to make it virtually impossible

for employers and employees to enter into binding settlements of employment disputes

occasioned by job losses, lay-offs and the like."  Melanson v. Browning-Ferris, *supra* at

277.

      Under Massachusetts state law, a release of employment claims in exchange for

severance or other benefits will be enforced.  White v. Commissioner of the Department

of Employment and Training, 40 Mass. App. Ct. 249, 662 N.E.2d 1048 (1996) (Lump

sum payment in return for release of any and all claims arising out of his employment

constituted legal release of claims against employer); <u>Smith v. Fallon Clinic, Inc.</u>, 1998 WL 296900 (Mass. Super., Toomey J.) (1998) (Plaintiff precluded from bringing suit against employer where she accepted offer of severance pay in return for general release of all claims against employer).  The executed document precludes Bettencourt from pursuing his claims under M.G.L. c. 151B.

   B.  Plaintiff Has Ratified The Agreement By Retaining the Consideration

   Even assuming *arguendo* that the Agreement was signed under duress, or with insufficient time to consider whether to execute, a contract or release executed under economic duress is voidable, not void.  <u>In re Boston Shipyard Corp.</u>, 886 F.2d 451, 455 (1st Cir. 1989).  *Accord*, <u>Vasapolli v. Rostoff</u>, 39 F.3d 27, 35 n.5 (1st Cir. 1994) ("A contract signed under duress is voidable, but not automatically void.  By accepting the funds and failing to seek a remedy based on duress within a reasonable period of time . . ., the Complainants forfeited any entitlement to relief on this basis.") (citations omitted).[4]  See, also, <u>Abbadessa v. Moore Business Forms, Inc.</u>, 987 F.2d 18, 24 (1st Cir. 1993), where the First Circuit succinctly stated:

> By accepting the benefits of their respective resignation agreements and by failing to notify Moore promptly that they intended to repudiate the agreements, Abbadessa and Mariotti treated the agreements as binding. After having done so, they now wish to treat the agreements as rescinded. That . . . they may not do.

   The record shows that Bettencourt accepted salary continuation consistent with

[4]<u>Fleming v. United States Postal Service AMF O'Hare</u>, 27 F.3d 259 (7th Cir. 1994) ("[T]he principle that a release can be rescinded only upon a tender of any consideration received is not a peculiarity of Illinois law; it is a general principle of contract law . . . and would surely be a component of any federal common law of releases.")  See also, <u>O'Shea v. Commercial Credit Corp.</u>, 930 F.2d 358, 362 (4th Cir.), *cert. denied*, 112 S. Ct. 177 (1991) ("It is a well-established proposition that retention of the benefits of a voidable contract may constitute ratification"); <u>Grillet v. Sears, Roebuck & Co.</u>, 927 F.2d 217 (5th Cir. 1991).

the terms of his separation agreement and release.  He continues to retain the funds

received as consideration for a release that, on its face, clearly precludes a lawsuit

based on state discrimination laws.[5]  By doing so Bettencourt ratified the agreement in

two ways, "by intentionally accepting benefits under the contract" and "by remaining

silent for a period of time after he has the opportunity to avoid it."  In Re Boston

Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989).  Bettencourt's failure to repudiate the

agreement promptly precludes any claim of coercion.

 Further, Plaintiff has never tendered back the consideration he received.  Failure

to tender back the consideration received in exchange for his waiver of claims

constitutes a ratification of the release.  In Re:  Boston Shipyard Corp., 886 F.2d 451,

455 (1st Cir. 1989).[6]  See, also, Deren v. Digital Equipment Corp., 61 F.3d 1, 3 (1st Cir.

1995) (Barring ERISA and holding that whether or not the releases initially were

secured through duress, plaintiffs ratified them by their subsequent conduct.).

 To now require Defendant to defend a state law claim for discriminatory

termination, with its enhanced potential damages when such claim is clearly released by

---

  [5]Should the Plaintiff contend that the release is invalid in its entirety, Defendant urges the court to utilize the procedure followed by the district court in Kristoferson v. Otis Spunkmeyer, Inc., 965 F. Supp. 545 (S.D.N.Y. 1997).  In that case, the employee was retaining the benefits obtained in exchange for a release, while pursuing a Title VII claim.  The court ruled that henceforth "…before a Title VII plaintiff who has previously received benefits for signing a release from such liability can go forward with such an action, the plaintiff must execute a formal undertaking that requires the plaintiff, if the release is later found to be invalid, to return the consideration to the employer, in an amount (including possible interest) and on a schedule and other terms to be determined by the Court at the conclusion of the case, regardless of whether the plaintiff thereafter prevails on her Title VII."

  [6]The Supreme Court's rejection of ratification of tender back of ADEA releases under OWBPA, in Oubre v. Entergy Operations, Inc., 522 U.S. 422, 75 FEP 1255 (1998), has no effect.  That decision held that the Congressional mandated OWBPA, rather than common law principles, covered releases under the ADEA, regardless of how her claim would be resolved under common-law contract principles.  That decision does not, as shown by the cases cited, affect the law regarding releases of claims under state law.

the straightforward application of the agreement, would constitute unfair prejudice to Defendant and have a chilling effect on such agreements in the future since employers are not likely to want to provide employees with additional severance and benefit packages only to have them accept the monies and later pursue a claim.  That would undermine, rather than support, public policy.  Carson v. American Brands, 450 U.S. 79, 88 n.14, 101 S. Ct. 993, 998 n.14, 67 L. Ed. 2d 39 (1981).  The state law claim under M.G.L. c. 151B is precluded by the executed release of claims, subsequently ratified.

### III.  No Reasonable Jury Could Conclude That Plaintiff Was Laid-Off Due To Age

### A.  Burden of Proof

In ADEA discrimination lawsuits, plaintiffs bear the ultimate burden of proving that their ages were the determinative factor in their discharge, "that is, that [they] would not have been fired but for [their] age." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994). To begin the process Plaintiff must establish a *prima facie* case.  Typically, in the context of a reduction in force[7], to establish a *prima facie* case, the Plaintiff must demonstrate that:  (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered adverse job action; and (4) defendant did not treat age neutrally in the layoffs, or that a younger person was retained in the same position. Currier v. United Technologies Corp., 393 F.3d 246, 254 (1st Cir. 2004), Lewis v. City of Boston, 321 F.3d 207, 214 (1st Cir. 2003).  However, ultimately, the question to be

---

[7]A workforce reduction occurs when business considerations cause an employer to eliminate one or more positions within the company." LeBlanc v. Great American Insurance Co., 6 F.3d 836, 845 (1st Cir. 1993) (*quoting*, Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).

determined when finding whether a *prima facie* case has been established depends on whether the evidence is sufficient to establish a "legally mandatory, rebuttable presumption" of discrimination.  O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311- 312, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996); Knight v. Avon Products, 438 Mass. 413, 780 N.E.2d 1255 (2003).  When assessing a *prima facie* case, "[t]he central question is whether the plaintiff has established a logical basis for a jury to find that the employer would not have taken the same action had the employee been of a younger age."  Id. at 426, 1265.

As discussed below, Defendant denies that the fourth element of the *prima facie* case has been satisfied.  Thus, the evidence shows that the layoffs *were* age neutral, and that Bettencourt was not "replaced" with a younger employee.[8]  Ultimately however, whether a *prima facie* case has been met may be of small consequence.  Thus, establishing a *prima facie* case does not end the summary judgment assessment, it merely requires that the employer articulate (and under M.G.L. c. 151B produce evidence of) a non-discriminatory reason for its decision.  In the case of a termination relating to a reduction in force, even if the employee has been "replaced" and can establish a *prima facie* case, the employer may justify a termination as non-discriminatory on the ground that it dismissed the employee because the other existing employees could adequately perform the plaintiff's work.  Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 59 (1st Cir. 2005).  Once "…the employer articulates a legitimate, nondiscriminatory basis for its adverse employment

---

[8]In this context, the term "replacement" is used to describe a person retained in the position after the layoff, transferred into the position to assume new duties after the layoff, or hired to fill the position soon after the layoff.

decision, the plaintiff, 'before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age.' [cites omitted] 'Direct or indirect evidence of discriminatory intent may suffice, but "the evidence as a whole ... must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by age animus."' Connell v. Bank of Boston, 924 F.2d 1169, 1172 n.3 (1st Cir. 1991); see, LeBlanc, 6 F.3d at 836; Goldman, 985 F.2d at 1117; Rodriguez-Torres, 399 F.3d at 56-57; Sullivan v. Liberty Mutual Insurance Company, 444 Mass. 34, 54, 825 N.E.2d 522, 545 (SJC 2005).

While the court must view all the evidence in the light most favorable to the nonmoving party, to defeat a properly supported motion for summary judgment there must be evidence that would permit a rational factfinder to return a verdict in Plaintiff's favor "'without resorting to conclusory allegations, improbable inferences, and unsupported speculation,' Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 12 (1st Cir. 1998); Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129-130 (1997).  See, also, Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999) (refusing, on motion for summary judgment, "to indulge rank speculation or unsupportable hyperbole"); Finney v. Madico, Inc., 42 Mass. App. Ct. 46, 49, 674 N.E.2d 655 (1997)."

Where,  as here, Defendant has produced evidence of a lawful reason for its actions, to avoid summary judgment the totality of the evidence must be sufficient to support a finding that there was actual discrimination.  Zapata-Matos v. Reckitt & Colman, Inc., f/k/a L & F Products, 277 F.3d 40, 45 (1st Cir. 2002); Lipchitz v. Raytheon

15

Company, 434 Mass. 493, 505, 751 N.E.2d 360 (2001) (in order for the alleged victim of discrimination to prevail, the factfinder must determine that the facts warrant a finding that "the employee has satisfied her ultimate burden of proving that the decision was made "*because of*" the unlawful discrimination. Weber v. Community Teamwork, Inc., 434 Mass. 761, 775, 752 N.E.2d 700 (2001); Lewis v. City of Boston, 321 F.3d 207 (1st Cir. 2003). The undisputed facts[9] here preclude a finding that Plaintiff was terminated due to his age.

### B. Penicka's Chamber of Commerce Comment Is Not Probative of A Claim that the Decision to Terminate Bettencourt was Based on His Age

Plaintiff will presumably cite Penicka's comment at the Chicopee Chamber of Commerce, in June of 2004, to assert that there is a genuine dispute as to whether his *termination* was due to his age. The comment, by someone not involved in the selection of Bettencourt for layoff does not suffice to establish a genuine dispute about a material issue of fact.

There is, of course, no dispute that a comment was made about the youth of the OCM, and at this stage the court must credit the version of the statement most supportive of Plaintiff's assertions. Presumably[10], that is the recollection of Paul Duval, who asserted that Penicka said, "you all look up at the head table [where OCM members were seated], you'll notice a lot of young faces up here and that's not by

---

[9]In assessing the evidence, "minor quibbles are insufficient to create 'genuine issues of material fact' precluding summary judgment." Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 181-82 (1st Cir. 1989).

[10]In the Statement of Facts, all the variations of the comment are set forth, so the court can determine which is most beneficial to Plaintiff's assertions.

16

accident, that's by design and in some cases, the people that are in the jobs they're in may not even be qualified to be in them yet." (Facts ¶ 63)

While the court must credit Duval's assertions, by the same token the court does not have to disregard the context of Penicka's comments. To the contrary, the court must assess the context when assessing if the comment would, either alone or taken together with other evidence, allow a reasonable factfinder to conclude that Bettencourt, who was never a member of senior management, had been selected for termination by Andrew Kelleher, several months earlier, due to Bettencourt's age. *See, e.g.,* Straughn v. Delta Airlines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (generalized "stray remarks" arguably probative of *bias* against a protected class, normally are not *probative of pretext* absent some discernable evidentiary basis for assessing their temporal and contextual relevance.") Respectfully, even accepting Duval's version of the statement, this clearly isolated stray remark[11] cannot support a finding that the discharges of OCM members, much less the discharges of non-OCM members including Bettencourt, were based on age.

By all accounts, the Chamber comment related to the OCM team, not the office staff in general. Moreover, Penicka, who was not involved in the selection of Bettencourt for layoff, was not discussing termination of the OCM members (much less the non-OCM members). Indeed, he was not addressing the termination process at all.

The statement itself was not made in the context of internal deliberations of who to layoff, or even in discussion about the reductions in force in general. Rather, the

---

[11]There is no evidence of any other alleged ageist remark by Penicka. Penicka himself was clearly upset, as he complained at the time, that his comments were taken out of context and were being perceived as ageist.

statement was made at a public meeting where, it is clear, Penicka was addressing a crowd of community business people (and TFGC employees brought to the meeting by TFGC as a show of support) with the undisputed goal of convincing an anxious business community that Defendant was in business in Chicopee "for the long haul".  In that context, and amidst other discussion about TFGC and Callaway's intention to continue to support local charities and the local business community, a solitary mention of the youth of its new senior management team, "by design" is not probative of an intent to *terminate* older employees, in general, or Bettencourt in particular.  Indeed, an isolated comment regarding the purported youth of his OCM[12], uttered at what was essentially a pep-rally, cannot support a conclusion that Robert Penicka laid off any OCM member because of his or her age, or in order to allow him to hire younger employees.  It certainly cannot support the conclusion that another person, a manager who was the decision maker in the decision to layoff Bettencourt, decided to lay off Bettencourt, a non-OCM employee, due to Bettencourt's age.  McMillan v. M.S.P.C.A., 140 F.3d 288, 301 (1st Cir. 1998) (under state and federal law, "stray comments, particularly when they are ambiguous and uttered outside the decision-making process," do not support a finding of discrimination).  See, also, Young v. Dillon Companies, __F 3d. __, ___ ,2006 WL 3236297 (10th Cir. November 9, 2006) (to demonstrate intentional

---

[12]Even with the new hires, the senior management team was not disproportionately young as compared to the general population or workforce.  Rather, it was fairly representative, with three members between thirty-five and forty (Fry, Bosworth, and Kelleher), one in his sixties (Rist), two in their fifties (Arturi and Rousseau), and two in their forties (Penicka and Kennedy).  It was only young, by design or otherwise, when compared to what people might stereotypically expect of OCM members.  (Facts ¶ 63)

discrimination plaintiff must show connection between discriminatory comment and decision to terminate her.).

Obviously, the earlier April 2004 selection of Behaylo, Bettencourt, Lonczak and 38 others clearly could not have been affected by the subsequent comments made at the Chamber of Commerce breakfast itself.  While Penicka, as president, clearly was in a position to induce his subordinates to create a younger workforce by selecting older employees for layoff, not only is there is no evidence that Penicka ever encouraged them to do so,[13] Penicka's own actions belie any rationale inference that he did so. Thus, following his appointment as president, Penicka had exercised his authority to reshape his own senior team, but had terminated only the two youngest, Louis Tursi, age 42, and Michael Esch, age 47.  On the other hand, Penicka retained on the OCM staff Vaughn Rist, age 62; Peter Arturi, age 50; Tom Kennedy, age 48; and Christine Rousseau, age 52.  The two youngest OCM members were terminated by Penicka, and replaced with former Callaway managers.  On the other hand, the four oldest OCM members were retained.[14]  (Facts ¶ 63)

Moreover, the claim that there was ever such influence applied by Penicka to weed out older employees so that the company could get younger is definitively negated by the simple and undisputed fact that *the substantial layoffs that occurred simply have never resulted in the creation of a younger staff*.  The April 2004 layoffs resulted in the average age of the Chicopee office staff becoming slightly *older*.  (Facts

---

[13]But see Arturi Affidavit ¶ 71.

[14]Penicka also terminated two highly paid, but relatively youthful, marketing vice presidents, age 43 and 38.  (Facts ¶ 63)

¶ 97)  Between the time TFGC was formed and the time it answered interrogatories in May of 2006, the percentage of office employees in the protected age bracket has *increased.*  Even after the elimination of hundreds of office positions, in 2006 one third (1/3) of the office workforce was over fifty years of age.  (Facts ¶ 97-99)

In assessing Penicka's ambiguous comment, the context shows that the prime reason for Defendant sponsoring the event, to which it brought several tables of employees, was not to announce a propensity to engage in age discrimination in reduction of force situations, but to allay fears in the Chicopee business community that its largest employer would not be around much longer.  Penicka, in attempting to allay those fears simply noted the youth of his own OCM staff, which in reality included both the oldest of the former OCM members and individuals newly *hired* by Penicka to fill vacancies that had either occurred due to a resignation or the termination of the two youngest OCM members.[15]  In the context they were made, and in light of the fact that there was no youth movement in the office staff as a consequence of the layoffs, there is no basis for finding that the public comment was an indication that either Penicka or anyone of his senior management team had, or was prepared to, discharge any individual based on age.

This court should not be swayed into disregarding the mountain of undisputed facts disproving the existence of age animus as a cause for the termination, in reliance upon a solitary remark taken out of context.  See, <u>Fortier v. Ameritech Mobile</u>

---

[15]In another context, the statement would be relevant.  Thus, it arguably would justify a rationale inference that Penicka had a preference to *hire* relatively young OCM staff when there were vacancies on his senior staff, not that he was discharging OCM members due to their age. If this was a refusal to hire case brought by a fifty year old who had applied to the position on the OCM staff, the statement might be probative.  It is not in a case relating to the *termination* of lower level office staff.

Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998); Blackwell v. Cole Taylor
Bank, 152 F.3d 666, 671 (7th Cir. 1998); Richter v. Hook-SupeRx, Inc., 142 F.3d 1024,
1032 (7th Cir. 1998) (holding that employer's statements that employee had a "low
energy level" and was "resistant to change" did not raise an inference of age
discrimination); see, also, EEOC v. Clay Printing Co., 955 F.2d 936, 942 (4th Cir. 1992)
(holding that statements referring to "young blood" are not probative of age
discrimination or a discriminatory purpose); Gagne v. Northwestern Nat'l Ins. Co., 881
F.2d 309, 314 (6th Cir. 1989) (holding that a supervisor's statement that he "needed
younger blood" was insufficient to create a genuine issue of material fact regarding age
discrimination); Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1994) (where the
court affirmed summary judgment in an age discrimination case despite evidence of
comments by supervisors such as "we don't necessarily like gray hair" and "we don't
want unpromotable 50-year olds around".  See, also, Tenthoff v. McGraw-Hill, Inc., 808
F. Supp. 403, 407 (E.D.Pa. 1992) aff'd, 981 F.2d 1248 (3d Cir. 1992); Melnyk v. Adria
Laboratories, a Div. of Erbamont Inc., 799 F. Supp. 301, 319 (W.D.N.Y., 1992)
("Therefore, plaintiff's age discrimination claim is reduced to a reliance on one piece of
direct evidence that Adria's decision to terminate her was motivated by her age:  a
statement she heard Komenda make to a pharmacist that Adria was looking for a
"young and energetic" sales representative to take control of its Syracuse territory.
However, this isolated statement, which was not directed at plaintiff, does not satisfy
plaintiff's burden.").

21

### C.  The Undisputed Facts Would Not Allow A Finding That Bettencourt's Termination Was Due to His Age

"There is little doubt that an employer, consistent with its business judgment, may eliminate positions during the course of a downsizing without violating Title VII even though those positions are held by members of protected groups (pregnant women included).  *See, e.g.*, LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 844-45 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994); Goldman v. First Nat'l Bank, 985 F.2d 1113, 1118-19 (1st Cir. 1993); [other citations omitted]  This is merely a reflection of a central theme that permeates the relevant jurisprudence:  insofar as Title VII is concerned, an employer can hire or fire one employee instead of another for any reason, fair or unfair, provided that the employer's choice is not driven by race, gender, pregnancy, or some other protected characteristic; [citations omitted]; see, also, Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir. 1988) (elucidating similar proposition in ADEA case)."

Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 422 (1st Cir. 1996).  In the instant case, there simply are no facts that would allow the conclusion that the employer's decision to include Bettencourt amongst those being laid-off was driven by his age.

Thus, as noted, as a result of the numerous changes that have occurred, the employer's office staff has gotten *smaller*, and is now merely a shadow of its former size.  It has not, however, gotten *younger*.  That simple fact demonstrates that the reduction in force in general was age neutral.[16]  Thus, the issue, *vis a vis* the existence of a *prima facie* case, becomes whether "younger employees remained in the same position".  If so, and given the employer's articulated reason, the court would then turn to whether there is a basis to find the employer's articulated explanations for what had occurred is a pretext, and that Bettencourt was terminated because of his age.

---

[16]Of course, it would be Plaintiff's burden to show that the layoffs were not age neutral with statistically relevant demographic information.  See, Shenker v. Lockheed Sanders, Inc., 919 F. Supp. 55, 59-60 (D. Mass. 1996).

Bettencourt can meet the first three prongs of the *prima facie* case.  However, he can get no further; Plaintiff will not be able to prove that a younger person was retained in his position, or that a younger person was assigned his job duties, as required to satisfy the fourth prong of the *prima facie* case.  Currier v. United Technologies Corp., 393 F.3d 246, 254 (1st Cir. 2004), Lewis v. City of Boston, 321 F.3d 207, 214 (1st Cir. 2003).

Bettencourt, who had been the Manager of the Cost Accounting Department before Levandowski, had been made the Manager of Cost/Industrial Engineering from 2000, reporting to the Executive Vice-President of Manufacturing, until shortly after Kelleher arrived in December of 2003.  That position had never before existed in the company, and Kelleher believed that it had been created by the former Executive Vice-President of Manufacturing, Michael Esch, to help Esch explain away manufacturing variances. Kelleher believed that cost accountants, who in part are performing oversight on manufacturing variances, should be reporting to Finance, not manufacturing, and moved him back into the Finance Department in the winter of 2003.  Bettencourt was earning close to $78,000, retained his "rank" of manager, reported directly to Kelleher and had the title of Manager of Manufacturing Cost Accounting.[17]  (Bettencourt Facts ¶¶ 112-113)  Kelleher viewed Bettencourt as competent, but essentially performing the

---

[17]There is no indication that following the transfer and layoffs anyone performed the work that Bettencourt performed for the manufacturing department other than cost accounting work. No one had been assigned those duties before Esch had created the job, and no one was hired by Manufacturing to perform any component of Bettencourt's duties.

23

same job as Richard Levandowski, who was the incumbent Manager of Cost Accounting. [18]   (Bettencourt Facts ¶ 115)

In April of 2004, as Andrew Kelleher overlooked the landscape in his organization, to reduce unnecessary positions he saw a total of four employees performing cost accounting duties.  Two, Bettencourt (49) and Levandowski (55), were managers, receiving a manager's pay.  The other two, both within the cost accounting department, were the Cost Accountants Michael Behaylo (48), and David Norman (38). *The only cost accountant (whether a manager or not) retained after April 15, 2004, was Levandowski, the oldest of the four*.

Indeed, for several months Levandowski alone performed all cost accounting work, as Kelleher envisioned when he decided who to layoff in April 2004.  Thus, no younger employee was retained in the position of Manager of Manufacturing Cost Accounting, Cost Accounting Manager, or even Cost Accountant.  No younger employee assumed any duties previously performed by the laid off manager or either non-managerial cost accountants.[19]  Levandowski simply did all cost accounting work.

Clearly, absent subsequent developments, it would be absolutely clear that regardless of whether the decision to retain Levandowski rather than Plaintiff was wise or unwise, it could not, given their respective ages, even conceivably be a case of age

---

[18]The undisputed facts show that oftentimes the "manager" of the department is the individual viewed as the best cost accountant.

[19]Of course, even if some younger employee performed some of Bettencourt's duties in addition to his or her own, that would not be to assist Behaylo.  Lewis v. City of Boston, 321 F.3d 207 at 216 (1st Cir. 2003) ("Merely demonstrating that, as a result of the reduction in force, the employer consolidated positions or allocated duties of discharged employees to other existing employees does not itself raise a reasonable inference that the employer harbored discriminatory animus toward any one employee.")

discrimination.  Indeed, the selection of Levandowski as the sole "survivor" in April, a decision made by Kelleher, belies any finding of discriminatory animus by Kelleher in effectuating the layoffs.  Had Kelleher been desirous of utilizing the economically justified reductions to create a younger workforce, he certainly could rationally have selected Bettencourt, six years Levandowski's junior, to be the sole survivor.  Thus, Bettencourt had more seniority than Levandowski and his competency (unlike Behaylo's) was not in doubt.  While Bettencourt clearly would have preferred for Kelleher to retain the younger of the two managers, whether based on seniority, competency or perhaps just his good looks, the fact that the older of the two cost managers was selected as the only individual being retained unequivocally demonstrates that Kelleher's decision making process was not tainted by age bias.  Moreover, had getting younger been the goal, Kelleher could have decided that no manager was needed, and retained either Norman (sixteen years Levandowski's junior) or Behaylo (eight years his junior).  He did none of the above, and retained the oldest cost accountant in the pool.

The remaining issue is the effect, if any, of the mid-July hiring of Sharon Lally.[20] The undisputed facts show that Lally, a new college graduate, age 23, was hired as an entry level Staff Accountant, with a salary of $33,000.  She worked half-time as a general accountant, duties not performed by Plaintiff, and half-time as a cost

---

[20]While another entry level accountant was hired, she was hired as a financial analyst, a different area that had suffered its own employment losses in April of 2004.  That individual, who worked for a year, did not perform *any* cost accounting work, and cannot be viewed, in any sense, as a replacement.  (See, Bettencourt Facts ¶ 131)  Nor does the fact that Plaintiff was not considered for hire in an unrelated entry level position evidence of discriminatory animus.

25

accountant.  Nevertheless, Behaylo and Bettencourt[21] both claim that they were effectively "replaced" by this mid-July hire.  Defendant submits that it is patently absurd to argue that the July hiring of an entry level staff accountant to work part-time in cost accounting, at a total salary of $33,000[22], (with cost savings far in excess of $100,000 for Bettencourt and Behaylo alone), done by a company looking to reduce its losses, hardly raises the specter, even if unexplained, that is the hallmark of whether a *prima facie* case has been established.

The preliminary question of whether such hiring, occurring four months after the respective layoff, is sufficient to satisfy the fourth prong of the *prima facie* case.  Defendant submits that even for *prima facie* purposes, Lally cannot be deemed a replacement for either Bettencourt or Behaylo, much less both.  Thus, she was not even a full-time cost accountant, working only ½ the time assisting Levandowski with some *rudimentary* cost accounting functions.  (Bettencourt Facts ¶ 128)  The balance of the time she worked with the ledgers doing general accounting work, duties that he had not performed by Bettencourt.

Moreover, Lally's was an entry level position, with a salary of $33,000 per annum reflective of its duties.  Even if she was hired at the same time Plaintiff was laid off, replacing a high cost manager position with an entry level position deemed sufficient to meet the employer's requirements as a cost savings measure would not violate the ADEA.  *See, e.g.,* Sperling v. Hoffmann-La Roche, 924 F. Supp. 1396, 1405 (D.NJ.

---

[21]Presumably, under plaintiff's view, this new graduate was also a "replacement" for Norman, the third of the cost accountants let go on April 15, 2004.

[22]This comparison attributes Lally's entire salary to "cost accounting."  In fact, the organization was paying that and half of her time was spent in general accounting.  Thus, the more accurate salary comparison would be Lally, $16,500, Behaylo $48,000.

1996) ("[i]f Employer fired him because of his high salary … does not state a cause of action for which relief can be granted under the ADEA.")  In Sperling, supra, the district court noted since that subsequent to the Supreme Court's decision in Hazen Paper Company v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993), "while, on average, those workers with the highest salaries are older workers, high salary and age are nonetheless analytically distinct, and therefore, termination decisions based on the employee's level of compensation are not violative of the ADEA."  Id.[23]  Assuming arguendo that in April of 2004 Kelleher had decided to keep only one experienced accountant and immediately hired a part-time entry level accountant, it would have been lawful to make such a change, and neither experienced accountant would have a bona fide claim to such an entry level job.  Thus, even if one were to ignore the time delay, reorganizing staffing so as to replace three relatively high paid employees with one low paid entry employee who also performed general accounting work, effectuated by a company losing millions of dollars, is not an indication that age discrimination rather than costs savings motivated the decisions.  See, e.g., Parcinski v. Outlet Co., 673 F.2d

---

[23]The court cited:  Thomure v. Phillips Furniture Company, 30 F.3d 1020, 1024 (8th Cir. 1994) (stating that the defendant could 'take account of one [salary] while ignoring the other [age]' ... even though there happened to be a correlation between the two in several cases"), cert. denied, 513 U.S. 1191, 115 S. Ct. 1255, 131 L. Ed. 2d 135 (1995); Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125-26 (7th Cir. 1994) (noting that Hazen's "rationale applies with equal force to cases where workers are discharged because of salary considerations"); Chiano v. Dimension Molding Corporation, 1993 WL 326687 *2 n.3 (N.D. Ill. August 25, 1993) Bornstad v. Sun Company, Inc., 1993 WL 257310 *2 (E.D. Pa. June 28, 1993) (citing, Hazen Paper for the proposition that "equat[ing] alleged seniority cost-saving motivation with age discrimination" is an approach that is "no longer viable"), aff'd, 19 F.3d 642 (3d Cir. 1994) (TABLE).  See also, Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 117 (2d Cir. 1991) ("there is nothing in the ADEA that prohibits an employer from making employment decisions that relate to an employee's salary to contemporaneous market conditions and the responsibilities entailed in particular positions and concluding that a particular employee's salary is too high[,]" even though "high salary and age may be related").

27

34, 37 (2d Cir. 1982) cited with approval in <u>Pages-Cahue v. Iberia Lineas Aereeas De Espana</u>, 82 F.3d 533, 538 (1ˢᵗ Cir. 1996).

Of course, Lally was not hired at the time of the layoffs, she was hired four months later.  Even if, assuming *arguendo,* Lally can be construed as a replacement, it would not be sufficient to carry the ultimate burden, or show pretext.  Thus, the subsequent hiring of an entry level Staff Accountant (who would help out part-time in cost accounting) simply does not demonstrate that the reasons cited by Kelleher for his April 2004 decision, *i.e.,* the need to reduce costs and his belief that Levandowski could handle all remaining cost accounting work alone, was merely a pretext for age discrimination.  To decide that question the focus must be on the mindset of the decision maker *at the time the disputed decision was made*, *i.e.,* spring of 2004.  Thus, even if a hiring later is legally sufficient to establish a *prima facie* case, it does not prove that the articulated reason for the action, the decision maker's conclusion as of April 2004 that Plaintiff's job was redundant to Levandowski's, is merely a pretext to disguise a discriminatory intent based on age.

As noted, Kelleher's decision to retain Levandowski, when there were viable *younger* options, belies any such illegal plan.  And in fact, for several months after the layoffs, as Kelleher had foreseen, Levandowski did do all the cost accounting work that needed to be done.  Even at that point, the hiring of Lally was not precipitated by Kelleher reaching the conclusion that he had misjudged[24] Levandowski's abilities to handle the entire cost accounting work load.  Rather, James Laughlin, the Controller

---

[24]Merely proving that Kelleher's April belief was wrong would not suffice.  Rather, there would have to be facts that would, if credited, show that even when making the decisions Kelleher knew that he would need additional personnel to do the cost accounting function. There is not one iota of such evidence.

28

responsible for the General Accounting function, requested additional help for his General Accounting department.  Kelleher approved of the hiring of an entry level Staff Accountant who would do the required General Accounting work and, in addition, on a part-time basis, help Levandowski perform certain rudimentary cost accounting duties. (Behaylo Facts ¶ 131)  The hiring of Lally in July, to fill a need in General Accounting, is not evidence that Kelleher's reason for terminating Norman, Bettencourt and Behaylo in April was not, as he alleged, a belief that the cost accounting functions could be performed by Levandowski alone, was a pretext for age discrimination.

Nor was the decision not to seek Bettencourt's return, rather than hire Lally, indicative of discriminatory intent.  Bettencourt had been a manager of one area or another since 1990.  His salary had been $78,000 ($1,500 per week).  Lally was paid appropriately for an entry level staff accountant, with a salary of $33,000 ($635 per week).  When Lally was hired Bettencourt was receiving, and would continue through January 2004, severance benefits of about $1,500.00 per week.  (Facts ¶ 123)  His severance package nearly doubled the amount that Lally earned during her entire tenure with Defendant, which lasted less than a full year.  (Behaylo Facts ¶ 129)

It is hardly indicative of age discrimination not to have offered Bettencourt an entry level job paying approximately 42% of his former salary, especially in light of the fact that he was receiving more in severance than would be paid for employment.  The idea of asking Bettencourt to return to TFGC four months after his layoff, to assume an entry level position was simply, and appropriately, not deemed worthy of serious consideration.  (Bettencourt Facts ¶ 130)  That is not evidence of age discrimination.

29

See, Pages-Cahue v. Iberia Lineas Aereeas De España, 82 F.3d 533, 538 (1st Cir. 1996).

### IV.  Even If Summary Judgment is Denied, Partial Summary Judgment Limiting Damages Should be Granted

Assuming *arguendo* that the court denies the motion for summary judgment, partial summary judgment would still be appropriate regarding Plaintiff's claim for damages.  Thus, there is no question that Defendant has transferred its marketing, sales, financial, accounting and numerous other corporate support services previously done by salaried exempt employees in Chicopee to California.  Plaintiff's claim, at this point, boils down to an assertion that he should have been retained over someone else who has subsequently lost their job as part of the changes that have occurred.

In light of the radical metamorphosis of Chicopee to a mere manufacturing facility overseen by Carlsbad based personnel, it is clear that Bettencourt's employment with TFGC would not have continued even if he was not laid off precisely when he was. There can be no basis, in such circumstances, to deny partial summary judgment relating to any claim for damages, in the fashion of either backpay or frontpay, beyond the point their alleged "replacement's" own employment ended, without the so-called replacement being replaced.  *See, e.g.,* Ramirez v. The Chase Manhattan Bank, 109 F. Supp. 2d 62, 65 (D.P.R. 2000) ("Ordinarily relief in discrimination suits will cease in the event that the plaintiff would have been the victim of a similar fate, *i.e.*, termination, due to subsequent business developments, *citing*, Blackburn v. Martin, 982 F.2d 125, 128-9 (4th Cir. 1992) ([T]he person discriminated against should only recover damages for the period of time he would have worked but for wrongful termination; he should not recover

30

damages for the time after which his employment would have ended for a nondiscriminatory reason.).  Also citing, <u>Bartek</u>, 882 F.2d at 740 (backpay award ceased when position at issue eliminated); <u>EEOC v. The Monarch Mach. Tool Co.</u>, 737 F.2d 1444, 1452 (backpay ends upon sale of business); <u>Hill v. Spiegel, Inc.</u>, 708 F.2d 233, 238 (6th Cir. 1983) (period for calculating backpay for unlawful termination ended when facility closed), <u>Richardson v. Restaurant Mktg. Assocs., Inc.</u>, 527 F. Supp. 690, 31 FEP 1562 (N.D. Cal. 1981) (Cutoff date for back pay period is date defendant ceased operations at facility at which plaintiffs worked, since neither plaintiff would ever have transferred to another of defendant's facilities.).  See, <u>Helbling v. Unclaimed Salvage & Freight Co.</u>, 489 F. Supp. 956, 963 (E.D.Pa. 1980) (by implication) (closing of local branch at which plaintiff was employed terminated backpay period).  Thus, assuming *arguendo* that Plaintiff convinces the court that there is a material issue of fact as to whether his termination was premature, there is no question that his employment would have ended long ago, and that partial summary judgment is appropriate terminating potential economic damages at the time the "replacement" holding the position Plaintiff claims he would have been in absent age discrimination, permanently left the company without replacement.  Similarly, since the Defendant as a matter of law is entitled to reorganize and establish salaries and positions commensurate with its actual needs, backpay must be limited to the earnings of the alleged replacement, minus appropriate offsets.  Thus, even assuming arguendo that Lally "replaced" Bettencourt, her employment with Defendant ceased on June 24, 2005, and she was not replaced.  There can be no backpay for Bettencourt beyond that date.

Respectfully Submitted,

_/s/ Jay M. Presser_____
Jay M. Presser, Esq.
BBO No. 405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:   November 30, 2006      Tel. (413) 737-4753/Fax: (413) 787-1941

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that a true and accurate copy of the foregoing *Defendant The Top-Flite Golf Company's Memorandum in Support of Its Motion for Summary Judgment* was served upon the attorney of record for each other party via electronic filing on November 30, 2006.

_/s/ Jay M. Presser_____
Jay M. Presser, Esq.

32