UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN BETTENCOURT,                          )
        Plaintiff                          )
                          )
vs.                                        )     CIVIL ACTION NO.: 05-30179-MAP
                          )
THE TOP-FLITE GOLF COMPANY,                )
        Defendant                          )

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF FACTS

In September of 2003, Callaway Golf Company purchased certain assets of the former Spalding Sports Worldwide. (Exh. 1) In doing so, Callaway formed the Top Flite Golf Company, meant to be a stand alone entity that would manufacture and sell golf balls and golf equipment under the Top Flite and Ben Hogan names, as had Spalding. (Exh. 1) Prior to this, Spalding had been in bankruptcy, (Exh. 1) largely related to the failure of its management after it had been purchased in 1996 by KKR. (Exh. 1) In additional to a different sales and marketing approach, KKR had saddled Spalding/Top Flite with a debt of over $850,000,000. (Exh. 1). This meant that even when the company was operationally profitable, it continued to lose money (Exh. 1) Prior to this, Spalding/Top Flite had been averaging $55-$60 million dollars a year in profit. (Exh. 1)

Callaway took over a new company which had already separated itself from Spalding products and which had already had layoffs and numerous transfers of employees who had worked on Spalding goods. (Exh. 1)

When Callaway took over, Robert Penicka, who is in his early forties, had become the

President and CEO of the Top Flite Golf Company. (Exh. 2, pp. 7-10) The intention was to

operate Top Flite Golf Company as a stand alone entity. (Exh. 1) Penicka hired and put in place

a new management team which included Andrew Kelleher, Jamie Bosworth and Thomas Fry, all

in their thirties. (Exh. 2)

Defendant's essentially assume that there is only one statement or piece of evidence

reflecting age bias on the part of the new Callaway management team, that being Mr. Penicka's

statement at the Chicopee Chamber of Commerce. This is not true. The evidence will show that

Callaway brought with it a deep and abiding age prejudice that was reflected in numerous

comments and actions of the new management team. This attitude of age bias came from the top

(Mr. Penicka), and affected every decision maker in this case: Mr. Bosworth, Mr. Kelliher, Mr.

Fry and Mr. Levandowski.

The nature of Mr. Penicka's statements at the Chicopee Chamber of Commerce are not

substantially disputed.[1]

What Mr. Penicka stated in his speech was:

"...if you all look up at the head table, you'll notice a lot of young faces up here and
that's not by accident, that's by design, and in some cases, the people that are in the
jobs they're in may not even be qualified to be in them yet". (Exh. 3, p. 192)

---

[1] Defendant attempts to mitigate the effect of what even Mr. Penicka admits to, as
somehow a reaction to questions or comments initiated by outsiders who were at the Chamber
meeting. This assertion is of course irrelevant in the summary judgment context, but it's highly
improbable nature is notable. It is unlikely that other members of the Chamber would suddenly
decide to initiate questions to the new president suggesting he was engaging in age discrimina-
tion when he came to a public function to introduce himself to the community. It is notable too
that Mr. Duval's version of the statement, is generally supported by other former employees who
are not litigants or interested parties, whereas Mr. Penicka's version is only supported (if at all) by
decision makers in this case who are implicated in the discriminatory practices.

-2-

Mr. Penickas' attitude permeated the Company. In the spring of 2004, he hired Jamie Bosworth to be the National Sales Director. Mr. Bosworth quickly held a meeting with his regional sales force. He began the meeting by asking the regional managers how many sales people they would get rid of. Bosworth stated that the people who had been there over 20 years were "bleeding the company dry". (Exh. 5) He referred to the "old regime" in speaking of existing employees and called them "deadwood". (Exh. 5)

In response to Mr. Bosworths' request, one of the regional managers complained that he had a number of older sales people and that if he had to let them go, there would be issues of age discrimination. (Exh. 5) Mr. Bosworth cynically suggested that he could escape this problem by also laying off some young people to make it look good ("just fire a couple of young guys with the old guys and no one will notice"). (Exh. 5)

At that meeting, one regional manager, a new hire (by Mr. Bosworth), Mr. Conley (age 34), said he could let go 9-11 of his sales force of 15. (Exh. 5, Exh. 4, p. 51)[2] Mr. Conley had not yet even met these men (Exh. 5). David Richardson said that he could only let go one individual (who happened to be in his late twenties). (Exh. 5) Four weeks later, Mr. Richarsdon was terminated (Exh. 5). Mr. Bosworth testified that it was Dave Richardson who had asked the question at the regional meeting about age discrimination (Exh. 4, p. 33) Bosworth said he terminated Mr. Richardson because he had a "bad attitude". (Exh. 4, p. 48). During that time, period, Mr. Richardson and Richard Gielow were the top performing regional managers that the Company had. (Exh. 5, 6) Mr. Bosworth terminated both of them. In Mr. Richardson's case, he

---

[2] Mr. Bosworth also hired: Mr. Gorman, age 31, Mr. Reh, age 35, Mr. Arnold, age 33, Mr. Blake, age 30 and Mr. Martin, age 40. (Exh. 4, pp. 51, 123-124, 173)

was told that his job was being eliminated to make way for the hiring of Reid Gorman, age 34, a friend of Mr. Bosworth's (Exh. 5).

In Mr. Gielow's case, Mr. Bosworth said Mr. Gielow was let go because he was "incompetent" (Exh. 4, p. 48) But Mr. Gielow was told that his position was being "consolidated" (Exh. 6). In fact, he was immediately replaced by an individual named Chris Reh (age 35), who had no management experience, and who now *works for* Mr. Gielow (Exh. 6)

The evidence of Mr. Bosworth's attitude towards age is not limited to these events that occurred while he was at Top Flite. When he appeared at his deposition in this case, even though he obviously knew that he was appearing as a management representative and decision maker in an age discrimination law suit, he could not restrain himself from discriminatory comments. He referred to the "inside crew" at Top Flite as the "old regime". (Exh. 4, p. 119). He explained at length that Paul Duval was part of the "old regime", that he "concentrated on how things were done in the past", he criticized Mr. Duval "because Paul was telling us what we should do from ten years ago and it had no point of relevance", and he was "just so stuck in the old ways" (Exh. 4, pp. 28-33). In fact, Mr. Duval never expressed these attitudes, it was *Mr. Bosworth's* perception that he was stuck in "old ways" (Exh. 1).

At his deposition, Mr. Bosworth also offered his opinion about "experience":

> I made the statement a lot is that a lot of people there who said they had twelve, thirteen, fifteen years experience and, in my opinion, they had one year of experience, they just did it thirteen times or fifteen times in a row (Exh. 4, pp. 26-27)

Mr. Bosworth made it clear that the above remarks were directed at "most of the sales management team" and in particular, Paul Duval (Exh. 4, p. 27). He reiterated that Mr. Duval

-4-

didn't really have more experience in the golf business than the 34 year old Reid Gorman because he just "had more years on the job', but not more "experience" because he was not "exposed to the types of business that the modern golf equipment manufacturers needed". (Exh. 4, p. 111) Mr. Bosworth also identified Lou Turisi (age 47), his predecessor, as a member of the old regime (Exh. 4, p. 28) and on a visit to Top Flite before his hiring, told Bob Penicka he had no interest in working with "that gentleman", who Mr. Bosworth laughed at to his face, telling him "on a social visit" that he was "still in the past". (Exh. 4, pp. 140-141)

Andrew Kelleher, who made the decision to terminate John Bettencourt and Michael Behaylo demonstrated the same attitude as Mr. Bosworth and Mr. Penicka. Mr. Kelleher who was in his thirties and who held the position of Vice President of Finance, told John Bettencourt that long term employees who "are still here all this time" were "deadwood". (Exh. 7, #12) and that the top management of the Company looked at people with a lot of seniority and could not understand why they were still there. (Exh. 8, pp. 107-108)

Just like Mr. Bosworth, Andrew Kelleher could not restrain his discriminatory attitudes at his deposition. He too, knowing he was appearing as a management representative in an age discrimination suit, still maintained his prejudiced beliefs. When shown a department organization chart (Exh. 9), he referred to it as the organization he had "inherited" and stated "it is a lot of legacy folks that had been around with Spalding" (Exh.10, pp. 10-11). Mr. Kelleher considered both Mr. Bettencourt and Mr. Behaylo "overqualified" for accounting positions and a few months after their layoffs, he hired recent college students in their 20's as accountants. (Exh. 10, pp. 53-54)  Mr. Kelleher told Paul Duval that anything that had happened before 2003 was "meaningless". (Exh. 3, p. 212)

-5-

The Callaway vision of the desirability of a "young by design" team was also shared by

Richard Levandowski, who played a role in the termination of Michael Behaylo and by Thomas

Fry who made the decision to terminate Gary Lonczak.  Mr. Levandowski was Mr. Bettencourt's

successor in the finance department.  (Exh. 11, p. 10).  When asked about discussions he'd had

with Mr. Kelleher, Mr. Levandowski had the following thoughts to offer:

> Q.    Did you ever hear him comment on the age of the
>        employees who were there when he arrived or throughout
>        your tenure?
> A.    We always talked about the age of the manufacturing group
>        because that seemed to be always one of our problems.
>        Is's an elderly workforce and therefore generates additional
>        costs in higher medical insurance, higher costs of those
>        things.
> Q.    Higher cost of what?
> A.    Medical costs and that type of cost.
> Q.    Again, when you say the manufacturing group, that would
>        include who?
> A.    Basically the hourly people.
> Q.    These are people involved directly in the manufacture of the balls?
> A.    Right.
> Q.    When you say "we" would discuss it, you mean who?
> A.    Well I would discuss it with Andrew.  We would look at
>        the costs.  We'd have a lot of absenteeism.  If it gets really hot, some of the
>        elder people do not show up as often; it's just the way it is.
>        It wasn't a statement of degrading anybody, it's just, okay, we have an
>        elderly workforce, we're going to have higher medical benefits, we're
>        going to have higher absenteeism.  It just happens.
> Q.    Had someone examined the absenteeism in relationship to the age of the
>        workers?
> A.    I believe we had that study done just to get -- over a brief period of time,
>        eight, ten weeks.
> Q.    When was that done?
> A.    I couldn't be honest and tell you.  I mean, we would look at it at least once
>        a year just to see what was going on.  Absenteeism was always a big
>        problem.
> Q.    When you say "we," now you're talking about who?
> A.    If it was absenteeism, we would ask Lynn because at the time she also had
>        payroll so we'd let her do the research and give us with statistics.

Q.   What was the research you were asking her to do?
A.   We'd look and say –
Q.   When you say "we" you mean who?
A.   Management  - - Andrew, myself, Jim Laughlan, we would look at the manufacturing costs, we'd get Tom Fry involved.
     We'd say this is a problem, get into the summer months or the high peak periods of production and if you have high absenteeism then you have to work overtime to recover the same amount of hours. It's just additional expense.
Q.   You're saying that in particular you had asked Lynn Lafond to do a study on that?
A.   We would ask to take a look at the absenteeism, is it running higher than normal, is it the same.
Q.   Did she produce such reports?
A.   Yes.
Q.   Did you ask that it be analyzed in terms of the age of the employees?
A.   Well, we kind of knew which departments were more elder than not. We knew where the younger people had been just hired or the younger ones were. We didn't do it by age specific.
Q.   How did you conclude that the older workers were more prone to absenteeism?
A.   I didn't say the more elder. I said we have an elder workforce so that tends to lead to higher than normal absenteeism. If you take a look at a younger workforce - - and it doesn't matter it's in this business or not - - you go to a younger workforce they have a tendency to not have as much absenteeism.

(Exh. 11, pp. 43-44 )

These comments are revealing in many ways. While defendants may attempt to dismiss

them as comments about hourly workers, they clearly reflect, and are consistent with the

Company's attitude towards all older workers as demonstrated in other statements by Messers.

Penicka, Bosworth and Kelleher. It is notable as well that Mr. Levandowski states that Tom Fry

was part of this group which monitored and worried about employee's ages. Mr. Fry was the

decision maker in Mr. Lonczak's case.

Lastly, the depth to which the Callaway's attitude towards age and experience permeated

the Company was also evident when a member of Callaway's personnel department in California

visited Chicopee to help employees with the new benefit package. She commented that she had

never seen a company with so many employees with over 20 years seniority and that, at Callaway,

she was accustomed to people who had been there less than 10 years. (Exh.1)

## John Bettencourt

John Bettencourt began employment with Spalding and Top Flite in 1973, working five

years in the factory while he attended college. (Exh. 12, pp. 11-13). He is presently 52 years of

age. After obtaining his degree, he served as accounts payable supervisor, financial accountant,

senior cost accountant, cost accounting supervisor, finance manager for the golf division, plant

accounting manager, a new system integration team member, as manager cost industrial

engineering and manager manufactory cost accounting. (Exh. 12) There is no dispute that he

performed these jobs well. His experience included general accounting and financial analysis

(Exh. 8, p. 62) He had an M.B.A. (Exh. 12).

As of 2004, Mr. Bettencourt reported to Andrew Kelleher, head of the Finance

Department. At one point, he had a conversation with Kelleher where Kelleher explained that the

top management of the Company looked at employees with a lot of seniority and didn't

understand how they could still be there, referring to them as deadwood. (Exh. 8, pp. 107-108)

On April 15, 2004, Mr. Bettencourt was laid off. (Exh. 8, p. 122) At that time, he asked

Andrew Kelleher if there were any other option, specifically including *lower* positions in his

request, and was told no. (Exh. 8, p. 122)

After laying off Mr. Bettencourt, the Company then hired two accountants in their

-8-

twenties - essentially straight out of college. (Exh. 10, pp. 46-47) Andrew Kelleher said these hires were made in 2005 when "a need arose". (Exh. 10). The actual records show this is false. Katarzyna Zlobicka, (age 22) ("financial analyst") and Sharon Lally (age 21) ("staff accountant") were both hired July 19, 2004. (Exhs. 13 and 14) This was just three months after Mr. Bettencourt's and John Behaylo's layoffs. The Company apparently contends that these individuals were hired for a different job than Mr. Bettencourt's. Levandowski admits that Lally did do both general accounting and cost accounting and that within a short time she was reporting directly to him. (Exh. 11, p. 31) Mr. Kelleher described her job as "rudimentary accounting". (Exh. 10, p 49). Ms. Zlobicka was hired to do "very rudimentary financial analyses" (Exh. 10, pp. 46-47). Mr. Kelleher said Mr. Bettencourt was "overqualified" for these jobs. (Exh. 10, p. 54)

Mr. Levandowski told Mr. Bettencourt that he had two new *cost* accountants, who reported to him. (Exh. 8, p. 128). Mr. Bettencourt also had many more years employment at Top Flite and in the golf industry than Mr. Levandowski who was retained. Even though Mr. Levandowski was older, he certainly made known to Messrs. Kelleher, Fry and Penicka that he shared their opinions about the negatives of an older work force. (Exh. 11, pp. 43-47) Andrew Kelleher said he chose Mr. Levandowski over Mr. Bettencourt because Levandowski had been in the position first (Exh. 11, p. 39). This assertion that Levandowski had some kind of seniority vis a vis management of cost accounting is specious. Mr. Bettencourt may have entered the Finance Department later but he had many, many more years of cost accounting experience, especially at Top Flite, than Levandowski. (Exh. 12) Mr. Kelleher also said Levandowski had more computer system knowledge (Exh. 11, p. 39). This too is wrong since Mr. Bettencourt had been a system integration team member in 1999 and 2000, when Mr. Levandowski was not even with the

-9-

company. (Exh. 12 ) The whole suggestion that Mr. Kelleher even attempted to compare
Bettencourt and Levandowski is false anyway. Kelleher admitted that he never looked at Mr.
Bettencourt's record or evaluation and only knew of his cost accounting work. (Exh. 10, pp. 39-
42)

## ARGUMENT

## I.    There are Genuine Issues of Material Fact That Demonstrate Age Discrimination

## A.    The Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of any material fact and
the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*. An issue is
genuine where the evidence about the fact is such that a reasonable jury could resolve the point in
favor of the non moving party. *Zades v. Lowe's Home Centers, Inc., 446 F.Supp. 2nd 29, 36 ,
(2006), Velez-Rivera v. Augusto-Alicea, 437 F. 3rd, 145, 150 (1st Cir. 2006)*. A fact is material
where it has the potential to alter the outcome of the suit under the governing law if the dispute
over it is resolved favorably to the non movant. *Zades at 36.* While the Court must view the
facts in the light most favorable to the non moving party, drawing all reasonable inferences in that
party's favor, if the moving party satisfies the initial burden of showing that no genuine issues of
material fact exist, the burden then shifts to the non moving party with respect to each issue on
which he has the burden of proof to demonstrate that a trier of fact reasonably could find in his
favor. *Zades, at 36, Sands v. Ridefilm Corp., 212 F. 3rd 657, 661, (1st Cir. 2001).*

The Plaintiff brings statutory discrimination claims under both *M.G.L.c. 151B,* and the
ADEA. Although there are both federal and state claims, under present law, the summary
judgment standard under both state law and federal law are essentially the same. See *Reeves v.*

*Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), Abramian v. President and Fellows of Harvard College, 432 Mass. 107 (2000), McDonnell Douglas Corp., v. Green 411 U.S. 792 (1973), Wheelock College v. Massachusetts Commission Against Discrimination, 371 Mass. 130 (1976).* In each situation, the Plaintiff can present a prima facie case by showing that he was a member of a protected class, that an adverse action such as discharge was taken against him, that he was replaced or that work remained that he was qualified for, and the employer sought someone with similar qualifications. *Id.* (see other cases below) Once having shown that, the burden shifts to the employer to articulate a legitimate non discriminatory reason for the action taken. Assuming the employer does so, the burden then shifts to the employee to show that the reasons provided were in fact a pretext for discrimination. *Id.*

## B.   The Plaintiff Presents a Prima Facie Case of Age Discrimination

In order to make out a prima facie case of age discrimination, Mr. Bettencourt must show 1) that he is within the protected class; 2) that he performed his job within the legitimate expectations of the employer; 3) that he was terminated and 4) there was a continuing need for the services provided by the position for which he was discharged or that age was not treated neutrally in layoffs. *Zades at 37, Currier v. United Technologies Corp.,* 393 F3d 246, 254 (1st Cir. 2004). Some Courts state this last element as "otherwise discharged because of his age. *Palasote v. Haggar Clothing, Co.,* 342 F.3d, 569 (5th Cir. 2003). Defendants must then articulate a legitimate non-discriminatory reason for the discharge and the plaintiff must then show this is a pretext for age discrimination. *See supra, Reeves, Abramian, McDonnell Douglas, Wheelock College.* There is no apparent dispute between the parties as to elements 1, 2 and 3,

-11-

*Players, Inc.*, 17 F.3d 755 (1st Cir 1994). See also *Seapier v. Johnson & Higgins*, 45 F.3d 724 (3rd Cir. 1995). (duties transferred to younger employees), *Christian v. Scor Reinsurance Co.*, 63 FEP 1219 (N.D. Tex. 1993). (duties distributed to three younger workers).

The fourth element is also satisfied by evidence of biased comments by the employer, of which there are numerous ones here. *Machenchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005). *Machenchick* is almost identical to this case. There, a vice president sent an email stating he had a plan "to strategically hire some young engineers and designers" and the company's business plan set a goal of the hiring of employees "whose mindsets reside in the 21st century". *Id* at 353-354. Further, echoing Mr. Bosworth's statements about Mr. Duval and numerous other older workers, the employer in that case complained the plaintiff had a "low motivation to adapt" *Id* at 354. These are exactly the kind of sentiments expressed by Messrs. Penicka, Bosworth and Kelleher.

There is no dispute that Mr. Bettencourt satisfies the first three criteria for a prima facie case of age discrimination. As with the other cases, the dispute arises under the fourth criteria as to whether or not age was treated neutrally in the decision to lay off Mr. Bettencourt and/or whether or not he was either replaced or there continued to be a need for the work that he was qualified to do. Mr. Bettencourt satisfies both criteria. Mr. Bettencourt was laid off on April 15, 2004. In July, 2004, the finance department hired two inexperienced accounts in their 20's Sharon Lally and Jatarzyna Zoblicka. The testimony of Andrew Kelleher and Richard Levandowski indicates that they were hired to preform general accounting and financial analysis. It is also true that Mr. Levandowski admitted that at least one of them did do cost accounting work and reported to him. Mr. Levandowski told Mr. Bettencourt at a later date, that both of them reported

-13-

approximately $125,000. The two new hires, Ms. Lally and Ms. Zoblicka were paid $33, 000 and 37, 000 respectively and therefore represented an annual cost of over $70,000. In additional to their salaries, by virtue of the layoffs, the Company had to pay the severance to Mr. Bettencourt and Mr. Behaylo which amounts to still another $60,000, making the total paid, for at least the severance period, more than what would have been paid to both Mr. Bettencourt and Mr. Behaylo had they remained. This calculation does not account for the cost of unemployment and the willingness of Mr. Bettencourt and/or Mr. Behaylo to take a lower salary. Mr. Kelleher stated that he did not consider Mr. Bettencourt for either of the two new positions that became open because he was "overqualified". Overqualified has been recognized as a code word for age discrimination. *Taggart v. Time Inc.,* 924 F.2d 43-47 (2nd Cir. 1991). The defendant also cites cases stating that a company is not under any obligation to transfer an employee or bump one downward in order to prevent their layoff. None of the cases cited by the defendant involves the situation that exists here: two new employees were hired and brought into the department, instead of allowing Mr. Bettencourt (or Mr. Behaylo) to continue. *See Simpson v. Midland-Ross Corp.,* 823 F.2d 937 (6th Cir. 1987); *Rose v. Wells Fargo and Co.,* 902 F.2d ad 1417 (9th Cir. 1990); *Early v. Champion International Corp.,* 907 F.2d 1077, (11th Cir. 1990); *Ridenour v. The Lawson Co.,* 791 F. ad 52 (6th Cir. 1986); *Parcinski v. The Outlet Co.* 673 F.2d 34 (2nd Cir. 1982); *Pages-Cahue v. Iberia Lineas Aereas De Espana,* 82 F.3d 533 (1st Cir. 1996); *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510 (6th Cir. 1990); *Barnes v. Gencorp, Inc.,* 896 F.2d 1457 (6th Cir. 1990). There is another aspect to Bettencourt's termination. Mr. Keller had a choice to make not only of whether to give Mr. Bettencourt the work that ended up being performed by the two new accountants hired in July, but he also had to choose between Mr.

-15-

Bettencourt and Mr. Levandowski. Defendant of course contends that since Mr. Levandowski was also in the protected age group and older than Mr. Bettencourt that the selection of Mr. Levandowski to be retained is not evidence of age discrimination. However, Levandowski had an advantage that Mr Bettencourt did not have, and it was an advantage that related directly to the Company's discriminatory attitude. As Mr. Levandowski made clear, at length, in his deposition, he shared along with Mr. Kelleher and other company leaders, a concern about the Company's aging workforce and a negative view of the productivity of older workers. Mr. Levandowski was in this sense, a kindred spirit to the Company leadership in his attitude towards the age of employees. Mr. Kelleher decided that Mr. Bettencourt should be let go without ever having examined his record or his qualifications, even though, he claims he compared Mr. Bettencourt to Mr. Levandowski. In this case, Mr. Bettencourt's situation echoes the consistent theme in all four terminations: the decision maker made a quick assumption as to what the older worker could or couldn't do and never inquired as to his actual background and qualifications and instead assumed his own biased assumptions were correct.

-16-

## II.       Partial Summary Judgment Would be Inappropriate

Defendant contends that the Court should, even if it finds in favor of the Plaintiff on this motion, enter an order of some form of partial summary judgment on the grounds that the Plaintiffs would have lost their jobs eventually because many functions were later consolidated with the Callaway corporation in California. This is inappropriate. Defendant attempts to turn an issue of damages into one of liability. This argument calls for pure speculation as to what would have happened if the Company had never engaged in the discriminatory practices that it engaged in. When Callaway took over the corporation in September, 2003, the intention was to run it as a stand alone company. While there was consolidation of some functions early on, there was no effort to move any of the departments in which the Plaintiffs in this case were involved. After Mr. Penicka had installed, by his own definition, his "young by design team", by hiring Messrs. Bosworth, Kelliher and Fry, the Company did not in fact do well. Mr. Bosworth admitted that sales in fact went down over the next year under his supervision. Defendants imply that there was a decision in August of 2004 to consolidate all functions in California and to stop running Top Flite as a stand alone corporation, but the actual consolidation of the departments did not occur until the end of 2005. This was *after* Mr. Bosworth, after more than a year of running the department, created lower sales. Mr. Bosworth was fired. No one knows what would have happened in 2005 if the Company's sales had not been in decline. Mr. Bosworth and Mr. Gorman were given control over a sales department which operated out of Chicopee and which was to be part of a stand alone company. They terminated numerous older employees, including their two most successful regional sales managers, and the result was that sales declined. It was then in *2005,* that Callaway decided not to continue to run a stand alone corporation. No one knows

-17-

what would have happened if the decision had not been made first to hire Bosworth, Kelleher, Fry, and Gorman and to terminate so many successful, experienced employees.

It was not only the sales department that failed. Mr. Kelleher left the corporation in early 2006 after it had been determined that there was a 3.3 million dollar inventory error. (Exh. 19, p. 148) Inventory control, as Mr. Kelleher indicated himself, is a basic function of cost accounting. Mr. Kelleher made decisions to terminate his most experienced cost accountants. It is pure speculation as to whether or not, absent these errors in sales and in accounting, there would or would not have been a decision to consolidate those functions in California. Likewise, no one knows how the Chicopee operation would have faired if the individual Plaintiffs in this case had been retained instead of dismissed. In the meantime, Callaway moved its production of golf balls to Chicopee.

Lastly, the idea of deciding on an end date for damages for each of the Plaintiffs ignores the possibility that in an age neutral environment, where qualifications and performance were judged fairly, it might well have been appropriate to continue to offer positions to the Plaintiffs whether in California or elsewhere. There is no reason why any of the Plaintiffs could not have been offered jobs in California. It is pure speculation to try to decide now what would have happened had the company not discriminated in the first place. To this day, the Company continues to have at least one cost accountant on the premises. Several of the Plaintiffs had a wide ranging background. Even the Defendant admits that there is more production of golf balls presently going on in Chicopee than there had ever been before. This issue is a factual question as to the extent of damages and is not appropriate for summary judgment.

-18-

## III.     The Plaintiff Is Not Barred From His State Law Action by the Execution of the Release

The Defendants argue that summary judgment should issue on the Plaintiffs' state law

counts under Chapter 151B on grounds that the Plaintiffs signed a release and received severance

in exchange. In making this argument, the Defendants rely almost exclusively on federal cases

interpreting federal law. See *Rivera Flores v. Bristol-Meyers Squibb Carribean*, 12 F.3rd 9 (1st

Cir. 1998). Relying on federal law in this case is misplaced. Interpretation of law under the

federal statutes is considerably complicated by the mere existence of the Older Worker Benefit

Protection Act which Defendants presumably admit they violated. In deciding whether or not

releases under other statutes bar a claim, federal courts have a different issue to decide because

they have to determine the impact of the fact that congress has created one set of rules for age

discrimination without creating any other rules for other forms of discrimination. The question of

whether the release as executed by the Plaintiff would bar a claim under Chapter 151B is purely a

state law issue. There is no appellate court body of law in Massachusetts on this issue, however,

there is a complete set of standards that has been adopted by the Massachusetts Commission

Against Discrimination. Defendants ignore these standards. The criteria utilized by the

Commission to determine the validity of a release are as follows:

(1)    the clarity of the language set forth in the release (and the degree to which the release uses language which is understandable to a lay person);

(2)    whether the release specifically mentions the statutory provisions allegedly waived;

(3)    whether the complainant was aware of the existence of a claim of discrimination at the time that the release was executed;

(4)    the nature of the discussion between the complainant and the respondent at the time of execution;

(5)    whether opportunity for negotiation was afforded to the complainant;

(6)    whether complainant conferred with counsel prior to executing the release or was encouraged to do so by the respondent;

(7)    whether the respondent afforded the complainant a reasonable period of time to consider/reflect upon the release;

(8)    the degree of education of the complainant or the degree of knowledge possessed by the complainant regarding business practices; and

(9)    whether the release purports only to waive claims arising from acts that antedate the release or whether, conversely, the language of the release purports to waive prospective claims as well.

*Leo McCabe v. Tetley Inc.*, 22 MDLR 31 (Exhibit 15);

*See also Berman v. Northeast Saving Bank* 10 MDLR 1582, 1585 (1988).


What is particularly important about the decision in this case is it makes clear that the Commission is attempting to follow the standards of the Older Worker Benefit Protection Act. It notes that the purpose of the act is to determine whether or not the release is knowing and voluntary. The release is this case is deficient on the Commission criteria just as it is under the OWBPA. This includes, in particular, the fact that the release does not specifically mention the statutory provisions that are being waived. The release is also deficient in that at the time of its execution, the Plaintiffs could not be expected to be aware of the existence of a claim of discrimination. This is particularly true of Mr. Bettencourt, Behaylo and Lonczak, whose layoffs occurred before Mr. Penicka made his statements in public to the Chicopee Chamber of Commerce. But with respect to all of the Plaintiffs, they could not have been aware of all of the evidence cited above which became apparent in the wake of their terminations some of which even came out in discovery itself. These include the above cited statements of Messrs, Kelliher,

Bosworth, Fry and Levandowski. While some of the Plaintiffs knew some of these things at the time they executed their release, they could only be aware of one little piece or the other. Further, they obviously could not have known about the subsequent hire of two accountants in their 20's, the subsequent transition of Roseanne Turner into Gary Lonczak's position and the subsequent hire of Scott Serois for the position previously held by Mr. Duval. As for the nature of the discussion between the Plaintiff and the Defendant at the time of the execution, the Plaintiffs were essentially left with a take it or leave it proposition and had no realistic opportunity for negotiation. With respect to the retention of benefits, since Massachusetts is following the Older Workers Benefit Protection Act, one should assume that as under the Act, retention of benefits is not a bar to alter claim. *See, Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998).

In sum, the only definitive law in Massachusetts on this subject is McCabe which uses the standards of the Older Worker Benefit Protection Act, and therefore, the releases are invalid and the state law claims should stand.

## CONCLUSION

For the reasons stated above, the Defendant's motion should be denied.

.

THE PLAINTIFF, JOHN BETTENCOURT
BY HIS ATTORNEY


Dated: January 16, 2007                    / S / Maurice M. Cahillane
                                           Maurice M. Cahillane, Esquire
                                           EGAN, FLANAGAN AND COHEN, P.C.
                                           67 Market Street - Post Office Box 9035
                                           Springfield, MA 01102
                                           (413) 737-0260; Fax: (413) 737-0121
                                           BBO# 069660


### CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing document was served this 16th day of January, 2007 on all parties, by hand delivery or First Class Mail, postage prepaid, to Jay M. Presser, Esq., Skoler, Abbott & Presser, 1 Monarch Place, Springfield, MA 01144


                                           / S / Maurice M. Cahillane


12085-050157\126925.wpd

-22-

or as to the articulation of a legitimate reason for dismissal. The controversy rests with the fourth element. In a situation such as Mr. Bettencourt's, where there is a claim of the need for a layoff for economic reasons, evidence on the fourth element is closely tied to evidence of pretext for discrimination. Indeed it seems that the defendant has treated them as the same. In this case, the evidence cited above of the many discriminatory statements about age by Callaway leadership is both evidence of not treating age as a neutral factor and evidence that the reasons given for discharge were pretexts for age discrimination.

In addressing the fourth factor in the layoff or reduction in force context, courts have held that the employer must show that older employees were not treated differently than younger employees and that if younger employees were retained over older employees, it was for non discriminatory reasons. *Massarky v. General Motors Corp.*, 706 F.2d 111 (3rd Cir. 1983). That some within the protected class are retained, or are even among the replacements, does not foreclose the issue, if there are other factors demonstrating age discrimination. See *Beirne v. Fieldcrest Canon, Inc.*, 74 FEP Cases 30 (S.D.N.Y. 1997).

With respect to replacement and available jobs, as long as the jobs being compared have similar functions and titles, the jobs of employees retained need not be the same as the jobs eliminated for a laid off worker to show discrimination. *Burger v. N.Y. Institute of Technology*, 94 F.3d 930 (2nd Cir 1996). It is sufficient if those absorbing the employee's duties are outside the protected class. *Miller v. Border Inc.*, 168 F.3rd, 308 (7th Cir. 1999), *Hamilton v. National Propane*, 276 F.Supp. 934 (W.D. Wisc. 2002). The First Circuit has held that the standard is satisfied if the plaintiff's job responsibilities are assumed by another employee, thereby showing the employer's continued need for the same services and skills. *Keirsling v. SER-Jobs for*

-12-

to him and were performing cost accounting work. Mr. Bettencourt was therefore either partially or fully replaced. Mr. Bettencourt was more than qualified to perform all these services. Indeed Mr. Kelleher stated that Mr. Bettencourt was *overqualified* for these positions. Mr. Bettencourt had in fact performed general accounting and cost analysis in the past. At the time of his layoff, Mr. Bettencourt asked Kelleher if he could have even a lower level position, Mr. Kelleher told him there was nothing available and then proceeded just a few months later to hire two individuals in their 20's to perform work that Mr. Bettencourt was "overqualified" to perform. As discussed below, Mr. Bettencourt was also rejected in favor of Mr. Levandowski. There can be no reasonable dispute but that work remained in the Company that Mr. Bettencourt was qualified for and willing to perform which was instead given to individuals who were more than 20 years his junior.

## C. Age Was Not Treated Neutrally in Mr. Bettencourt's Layoff and the Company's Stated Reasons for Dismissal Were a Pretext for Discrimination.

The Company contends Mr. Bettencourt was laid off due to the economic needs of the Company which was trying to reduce the size of its workforce. There is obvious evidence that this is a pretext for age discrimination because very quickly after having laid off Mr. Bettencourt and Mr. Behaylo, the Company turned around and hired two completely inexperienced accountants in their 20's. The defendant's argument that it was attempting to save costs by hiring less qualified individuals does not work. First, it completely discounts the fact that Mr. Bettencourt indicated directly to Mr. Kelleher that he would be willing to take a lower level position. Even if Mr. Bettencourt did not take a lower salary, the Company would have to wait a very long time to save money by this transaction. Mr. Bettencourt and Mr. Behaylo had combined salaries of

-14-