UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN BETTENCOURT,

                                   Plaintiff,

vs.

THE TOP-FLITE GOLF COMPANY,

                                   Defendant.

CIVIL ACTION NO. 05-30179-KPN

**DEFENDANT'S RESPONSE, AND
PARTIAL MOTION TO STRIKE,
PLAINTIFF'S "STATEMENT OF
DISPUTED FACTS"**

        Defendant The Top-Flite Golf Company filed a Motion for Summary Judgment
and a Statement of Undisputed Facts, with supporting documentation, and a
Memorandum of Law.  Plaintiff has filed a document nominally captioned "Statement of
Disputed Facts".  A review of the document reveals many of the "disputed facts" are, in
reality, not disputed facts at all.  Rather, Plaintiff's Statement appears to be an
amalgam of "facts" over which, in many cases, there is no dispute, statements of
opinion and/or argument that should be stricken as such, a few proposed additional
facts (most of which Defendant does not dispute), and in some cases, Defendant would
submit, purported facts are either not supported by the referenced material (and are
sometimes contrary to the cited materials) or supported by affidavit statements that do
not satisfy the requirements of Fed. Rule Civ. P. Rule 56(e), and hence are the subject
of separate motions to strike.[1]  To assist the court in ferreting through the Plaintiff's
response, each purported Statement of Disputed Fact is set forth in italics below,

followed by Defendant's specific position as to whether the fact asserted is properly

before the court and if so, whether it is disputed or undisputed.

1.    *In September of 2003, Callaway Golf Company purchased certain assets of the former Spalding Sports Worldwide. (Exh. 1)*

**Defendant's response**:  This appears to be a rudimentary description of the September 2003 acquisition set forth in the Defendant's Statement of Undisputed Facts at ¶¶ 29, 30, and 38 and thus is not a disputed fact.

To the extent the statement is intended to dispute the facts set forth in Defendant's Statement of Undisputed Facts, it does not properly do so.  Thus, this statement is based solely on Paul Duval's Affidavit (Exhibit 1 of the Statement) which, in relevant part, is subject to a Partial Motion to Strike.  Duval has no first-hand knowledge of the business transactions described, as was made clear by his own deposition testimony.  His affidavit statements as to these business transactions and finances can be admitted, if at all, as an assertion as to what he may have been told, but cannot create a disputed fact as to the substance of the matter.

2.    *In doing so, Callaway formed the Top Flite Golf Company, meant to be a stand alone entity that would manufacture and sell golf balls and golf equipment under the Top Flite and Ben Hogan names, as had Spalding.  (Exh. 1)*

**Defendant's response.**  The fact that the initial plan was to operate TFGC as a stand alone company is set forth in Defendant's Statement of Facts at ¶ 39 and thus is not a disputed fact.

To the extent the paragraph is intended, in any way, to create a factual dispute regarding the subsequent changes to the original plan, as outlined in Defendant's

---

[1]Defendant has filed Separate Motions to strike portions of supporting affidavits that serve as the basis for some of the factual statements that Defendant seeks to strike from Plaintiff's Statement of Disputed Facts.

Statement of Undisputed Facts ¶¶ 47, 48, 49, 51, it cannot do so.  The statement is

based solely on Paul Duval's Affidavit (Exhibit 1 of the Statement) which is subject to a

Partial Motion to Strike based on the fact that Duval has no first-hand knowledge

regarding this issue.

> 3.     *Prior to this, Spalding had been in bankruptcy, (Exh. 1) largely related to the failure of its management after it had been purchased in 1996 by KKR (Ex. 1)*

**Defendant's response.**  The fact that there was a bankruptcy filing by the prior

company is not disputed, and expressly set forth in the Defendant's Statement of

Undisputed Facts at ¶ 29.

The assertion that the cause of the bankruptcy was *"largely related to the failure*

*of its management after it had been purchased in 1996 by KKR"* is not properly

supported and should be stricken.  Indeed, the sole source cited in support of this

assertion as to why the prior company went bankrupt is Paul Duval's affidavit, which

makes no such assertion.  Thus, this purported fact is nothing more than speculation

and/or opinion and not fact, disputed or otherwise, not supported, and should be

stricken.

Further, to the extent that the Duval affidavit can be interpreted as making such

an assertion, the portion of Duval's Affidavit that deals with the finances of the prior

company is subject to a Partial Motion to Strike.  Duval had no first-hand knowledge

and could not testify as to the reasons for the failure of the prior company.

> 4.     *In additional to a different sales and marketing approach, KKR had saddled Spalding/Top Flite with a debt of over $850,000,000. (Exh. I).*

**Defendant's response.**  To the extent that the material asserts that the KKR

management team had brought in a "different sales and marketing approach" this is not

a disputed fact.  (*See* Defendant's Statement of Undisputed Facts ¶ 59)  As to this fact, the affidavit of Paul Duval is admissible, since Paul Duval worked in the sales department and could presumably testify to the fact that there was a different approach.

However, the reference to KKR "saddling" Spalding/Top Flite should be stricken as argument, not fact.  Moreover, the Statement is premised solely on the Affidavit of Paul Duval, which is subject to a Partial Motion to Strike since Duval is not competent to testify as to the reasons for or details of the debt service of the prior company.  Duval was not a senior manager, was not employed in the finance department, and had no first-hand knowledge of the actual debt service.

There is no dispute that the combined senior and subordinated debt of the prior company was nearly $850,000.  (*See* Defendant's Statement of Position ¶ 20)  Thus, to the extent that the Plaintiff's material can be interpreted as confirmation of that fact it is not disputed.  To the extent the asserted fact attempts to establish a dispute (such as by claiming that the debt service was "over" $850,000 rather than almost that amount), not only is the difference not material, but the claim is unsupported by properly admissible evidence, since Duval would have had no first-hand knowledge as to these assertions.  (*See* Motion to Strike Duval Affidavit)

5.    *This meant that even when the company was operationally profitable, it continued to lose money (Exh. I)*

**Defendant's response.**  Nothing in Exhibit 1 supports this purported fact. Rather, the affidavit itself merely asserts that the "Company had to deal with a debt load of over $850,000 as a result of [the KKR] buyout."  The existence of the debt service is not in dispute.  As to any claim that Spalding was operationally profitable following the KKR transaction, there is no competent testimony to support such an assertion.  As

noted in the Motion to Strike Duval's Affidavit, Paul Duval would not be competent to testify as to whether the company was "operationally profitable" or, respectfully, even what factors go into profitability.  Whether or not any company is profitable will always depend on a variety of factors, including whether its income, whether that income is from operations or elsewhere, exceeds its expenses, and whatever debt service exists. Nothing in Duval's Affidavit indicates the basis for any first-hand knowledge that the prior company was, in fact, operationally profitable.  Instead, his testimony, as noted in the Motion to Strike Portions of Duval's affidavit, reflects that his awareness came exclusively from the hearsay statements of others.

To the extent that the putative statement of fact is intended to reflect what Duval may have been told, this would not appear to create a material issue of fact.  Thus, Defendant's Statement of Facts indicates that as late as September 2003, some of the OCM members were still claiming that the debt service was a primary source of Spalding's financial woes.  (Defendant Statement of Undisputed Facts ¶¶ 20, 81)

Further, in contrast to what may have been expressed by the management of the failed company, the Defendant's Statement of Undisputed Facts proceeds to assert, based on admissible testimony, that when Andrew Kelleher was hired as the CFO by Defendant, he reviewed the company's books and determined that the fiscal problems went far beyond debt service, and were more operational in nature.  (Defendant's Statement of Undisputed Facts ¶ 82)  To the extent that the Plaintiff's Statement of Disputed Facts is intended to dispute that statement (which is unclear) it is without proper support.  Moreover, Defendant would further note the obvious, it did not assume the KKR debt service when it purchased the assets following the *bankruptcy*.  Its own

5

losses, which totaled nearly nine million dollars in the first few months following the asset purchase, were thus wholly unrelated to any debt service incurred by KKR.

     6.    *Prior to this, Spalding/Top Flite had been averaging $55-$60 million dollars a year in profit.  (Exh. I)*

     **Defendant's response.**    <u>This alleged fact</u> is solely premised on the affidavit of Paul Duval, which is subject to a Motion to Strike as <u>not based on first-hand information</u>.  This statement of fact should therefore likewise be struck.

     Further, it is unclear as to what timeframe this statement relates and whether the statement is intended to assert that the economic problems were *solely* the result of the KKR purchase and debt service.  Stating that prior to the KKR purchase in 1996 the company was profitable does not create a dispute regarding the asserted myriad reasons for Spalding's woes that are outlined in Defendant's Statement of Undisputed Facts ¶¶ 18-21, including the new competition from TaylorMade, Adidas, and Callaway.

     7.    *Callaway took over a new company which had already separated itself from Spalding products and which had already had layoffs and numerous transfers of employees who had worked on Spalding goods.  (Exh. 1)*

     **Defendant's response.**  This statement is vague and unclear, and not supported by the cited references.  Thus, nowhere does Duval's Affidavit (Exhibit 1) assert that there were "layoffs *and numerous* transfers of employees who had worked on Spalding goods." (emphasis added)  The affidavit merely states "Prior to Callaway Golf purchasing the Company in 2003, Spalding sold off its other products and

employees were laid off or transferred." [2]  <u>The affidavit does not purport to quantify as "numerous" the numbers of people involved.  The affidavit also does not assert that there were layoffs <em>and</em> transfers</u>.  Accordingly, this assertion should be stricken.

Indeed, Duval is competent to testify only to the extent that he observed former Spalding employees working for the new Spalding, Division of Russell, since he worked at both companies.  However, Duval, who was not working in Human Resources, was not a senior manager, would not have access to information as to the circumstances (*i.e.*, specifically whether such employees were laid off or if they quit to take a position with the new company) or the number of employee departures (whether the departures were voluntary or involuntary).  That, perhaps, is why the sworn affidavit itself is phrased as to employees being laid off *or* transferred.

Duval, who commenced work for Spalding, A Division of Russell, competently testified at deposition that about forty employees of this new company were former Spalding Sports Worldwide employees.  (*See* Deposition pages attached to motion to strike)  <u>To the extent the affidavit is appropriately referring to the fact that up to forty individuals who had worked for Spalding began to work for the new Spalding, A Division of Russell before the asset purchase by Callaway, that assertion is properly supported but not in dispute</u>.  Indeed, this very fact was set forth in Defendant's Statement of Undisputed Fact.  (*See* Defendant's Statement of Undisputed Fact ¶ 27)[3]

---

[2]Defendant assumes that laid off or "transferred", as used in Duval's affidavit, refers to those who went to work for Spalding after the sale of that business to Russell, although it is unclear.  These individuals voluntarily left Spalding Sports Worldwide for a position with the new company, Spalding, A Division of Russell.  There was no "transfer" as that term is sometimes used, of employees between these two distinct, unrelated companies.  Duval would have no first-hand knowledge of the details of the transaction, or the reasons for the departure of the individuals who commenced work for Spalding, A Division of Russell.

To the extent it is intended to go beyond that claim, it should be stricken for the reasons stated in the Motion to Strike Portions of Duval's Affidavit.

Similarly, it is unclear what is meant by "already separated itself from Spalding". To the extent that the affidavit and statement of disputed fact" is confirming that Spalding (and other businesses owned by the prior company at the beginning of 2003, such as Dudley and Etonic), were sold to independent parties before the bankruptcy purchase by Callaway, the fact is undisputed. The details of such transactions are set forth in Defendant's Statement of Undisputed Fact ¶¶ 23-25.

8.    *When Callaway took over, Robert Penicka, who is in his early forties, had become the President and CEO of the Top Flite Golf Company. (Exh. 2, pp. 7-10)*

**Defendant's response.** This fact is not disputed. (*See* Defendant's Statement of Undisputed Facts at ¶¶ 37, 53)

9.    T*he intention was to operate Top Flite Golf Company as a stand alone entity. (Exh. I)*

**Defendant's response.** This fact is not disputed. (*See* Defendant's Statement of Undisputed Facts at ¶ 39)

10.    *Penicka hired and put in place a new management team which included Andrew Kelleher, Jamie Bosworth and Thomas Fry, all in their thirties. (Exh. 2)*

**Defendant's response.** This fact is not disputed, except to the extent that it implies that the entire management team consisted of the three individuals named. (*See* Defendant's Statement of Undisputed Facts at ¶¶ 54, 55, 56, 57, 58, 59, 60, 63)

11.    *Defendants essentially assume that there is only one statement or piece of evidence reflecting age bias on the part of the new Callaway management team, that being Mr. Penicka's statement at the Chicopee Chamber of Commerce. This is not true. The evidence will show that Callaway brought with it a deep and abiding age prejudice that was reflected in numerous comments and actions of the new management team. This attitude of age bias came from the top (Mr. Penicka), and*

*affected every decision maker in this case:  Mr. Bosworth, Mr. Kelleher, Mr. Fry and Mr. Levandowski.*

**Defendant's response.**  This portion of the alleged fact is not fact at all but merely argument, and as such should be stricken.

*The nature of Mr. Penicka's statements at the Chicopee Chamber of Commerce are not substantially disputed.*

*What Mr. Penicka stated in his speech was:*

*"...if you all look up at the head table, you'll notice a lot of young faces up here and that's not by accident, that's by design, and in some cases, the people that are in the jobs they're in may not even be qualified to be in them yet". (Exh. 3, p. 192)*

This quotation is a verbatim citation of what is set forth in Defendant's Statement of Undisputed Facts ¶ 69, and its citation here does not create a disputed issue of fact.

12.    *In the spring of 2004, he hired Jamie Bosworth to be the National Sales Director.*

This assertion is not contained in Exhibit 5 and is thus unsupported.  It continues to be undisputed however, that Jamie Bosworth was hired (as the Vice-President of Sales) in mid-April 2004.  (*See* Defendant's Statement of Undisputed Facts ¶ 62)

12   *Mr. Penickas' attitude permeated the Company.*

**Defendant's response.**  This is not a statement of fact as defined by the rules, but hyperbolic argument, and should be stricken.  The remainder of the paragraph is addressed below.

12-16.    *Plaintiff's Statement of Disputed Facts contains six paragraphs (12-16) devoted to comments allegedly made by Jamie Bosworth at a National Sales Meeting in the spring of 2004.  The alleged statements pertain to the possibility of changes being made to the field sales force (which, of course, did not include Plaintiff).  The respective statements as asserted by Plaintiff are:*

➢ *Mr. Bosworth quickly held a meeting with his regional sales force.  He began the meeting by asking the regional managers how many sales people they would get*

> *rid of, Bosworth stated that the people who had been there over 20 years were "bleeding the company dry".  (¶ 12, Exh. 5)*
> ➢ *He referred to the "old regime" in speaking of existing employees and called them "deadwood".  (¶ 13, Exh. 5)*
> ➢ *In response to Mr. Bosworth's request, one of the regional managers complained that he had a number of older sales people and that if he had to let them go, there would be issues of age discrimination.  (¶ 14, Exh. 5)*
> ➢ *Mr. Bosworth cynically suggested that he could escape this problem by also laying off some young people to make it look good ("just fire a couple of young guys with the old guys and no one will notice").  (¶ 15, Exh. 5)*
> ➢ *At that meeting, one regional manager, a new hire (by Mr. Bosworth), Mr. Conley (age 34, said he could let go 9-11 of his sales force of 15.  (¶ 16, Exh. 5, Exh. 4, p. 51)  Mr. Conley had not yet even met these men.  (Exh. 5)*
> ➢ *David Richardson said that he could only let go one individual (who happened to be in his late twenties).  (¶ 17, Exh. 5)*

**Defendant's response.**  The lack of relevance of these alleged statements, relating to the field sales personnel (a position never occupied by Plaintiff), which were made *after* the April layoffs by an individual who was not employed by Defendant when the three of the Plaintiffs were notified of their layoff, is addressed in the Reply Brief. For purposes of responding to this Statement of Disputed Facts, it is noted that Mr. Bosworth's statements about the field sales people, made at the Sales Meeting in May or June, 2004, was not addressed by Defendant.  Therefore, these are not, as described by the document, "disputed facts" but rather, proposed *additional* facts Plaintiff desires to place before the court.

Defendant, for the reasons stated below, submits that taken most favorably to Plaintiff, the materials submitted by Plaintiff would support additional factual assertions only as noted below.  Stripped to the claims actually supported by the materials, there is a genuine dispute only as to one (non-material) fact.

Plaintiff's submitted materials contain three sources of information about this Spring 2004 meeting:  Bosworth's Deposition (contained at Ex. 4); David Richardson's

Affidavit (Exhibit 5 at ¶¶ 3, 4); and Richard Gielow's Affidavit (Exhibit 6 at ¶ 2).  Both affidavits refer to the "sum and substance" of Bosworth's comments and hence, although likely admissible, presumably, are shaded by the hindsight interpretations of affiant as to what was actually said.  However, the court, of course, must, to the extent there are differences, accept the version most favorable to Plaintiff and Defendant does so here.

At deposition, questioned by Plaintiff's counsel, Bosworth admitted that he talked to the Regional Managers about changing the sales force.  He indicated that he said that they should be upgrading their sales team.  (Ex. 4, p. 32)  Specifically asked by counsel if he was against "the old way of doing things," Bosworth acknowledged that he was "against the old way of doing things at Top-Flite the way they were done."  (Ex. 4, p. 34)  Asked directly, Bosworth denied suggesting to those present getting rid of a lot of the older sales force.  (Ex. 4, pp. 32, 34)  He further testified that someone, perhaps Dave Richardson, indicated that if the company got rid of certain people there might be an age discrimination suit.  Bosworth stated that he was aware of great older salespeople as well as great younger sales people.  Bosworth testified that when the matter was raised, he responded, "We need to get people who can get the job done.  I am not interested in talking about potential or fictitious lawsuits.  I said this place is losing twenty million dollars a year.  I said we don't have the luxury of -- I think I said playing patty cake with everybody.  We need people who can get the job done."  He further denied suggesting that "if he thought age discrimination was an issue, that they should fire young people too."  (Id. pp. 34-35)

11

As noted, to the extent the affidavits of Plaintiff's witnesses dispute Bosworth's account, at least at this summary judgment stage, their versions of what was said at the meeting must be credited. However, the affidavits, when carefully reviewed, show much agreement and very little disagreement with Bosworth's deposition testimony regarding what he said at the meeting.

Plaintiff's statement begins with a seemingly innocuous misstatement that is unsupported by the cited materials. The misstatement results in an improper absence of context regarding what follows. Thus, Plaintiff's Statement of Disputed Facts indicates that Bosworth _began_ the meeting by asking the regional managers how many sales people they could get rid of. However, neither affiant asserts that the meeting began that way, and like Bosworth's deposition, both indicate that the meeting began with Bosworth's discussion of the future and his negative assessment of the incumbent field sales force. As to the criticism, Richardson's affidavit asserts that Bosworth indicated that the sales force had a lot of dead weight and that people with the company for over twenty years were bleeding the company dry. (*See*, Plaintiff Ex. 5 ¶ 3) Gielow's affidavit indicates that Bosworth began the discussion with his plans for the department. He indicated that the sum and substance of the meeting was "out with the old and in with the new, and he made reference to the "old regime." There was, according to the affiants, discussion about replacing many members of the sales force.

These assertions would support a factual assertion that the meeting began with Bosworth deriding the field sales force and that in doing so he said that it had a lot of "dead weight". That claim, which must be believed, is different from a claim that he began by asking how many people the managers were going to get rid of and that he

implied all the incumbents were dead weight (*i.e.*, Defendant's Statement asserts that *"in speaking of existing employees and called them "deadwood".)*  (The affidavit of Richardson would also support a claim that he indicated people there more than 20 years were bleeding the company dry.)

The affidavits would not support the statement that "*In response to Mr. Bosworths' request, one of the regional managers complained that he had a number of older sales people and that if he had to let them go, there would be issues of age discrimination.*"  Rather, it is undisputed that Bosworth was in favor of changes to the sales force, and while it is clear that he viewed the sales force as either needing upgrading (in his terms) or having much dead weight (as Richardson claims in his sum and substance affidavit), it was in that context a manager commented that a number of older workers might be let go as a result.

**Significantly, consistent with Bosworth's assertion that he never indicated that age should play a role in deciding which salesmen should be terminated, neither affidavit supports the assertion that the backdrop to Bosworth's comments was a directive that the managers select people for termination because of their age rather than, as stated, discussions about possible legal problems in the event older employees were included amongst those terminated.** There is no dispute that Bosworth was vehement about his unwillingness to not let the possibility of age discrimination claims deter removing individuals he perceived as "dead weight" or "needing upgrading".  Thus, he admitted telling the managers that, "this place is losing twenty million dollars a year," and that he didn't have the "luxury of 'playing patty cake with everybody.  We need people who can get the job done.'"  Any

13

discussion of potential legal problems that may flow from the termination of "dead weight," which included individuals over fifty and of long service, is a far different thing than a discussion of the "issue of age discrimination".  While the suggested response is improper, it is not an indication that the manager had a bias based on age or that employment decisions, both before and after, were due to age. [4]

Indeed, a review of the submitted materials leaves no doubt that the discussion related to the possibility of a lawsuit alleging age discrimination if (taking the evidence in the light most favorable to Plaintiff ) "dead weight" in the sales force was terminated and those terminations included older employees with considerable seniority.  Thus, Gielow's affidavit, at ¶ 2, expressly confirms Bosworth's testimony that the "…issue was *raised as to possible legal problems* related to age discrimination…."

This is not contradicted by Richardson's affidavit, which, at ¶ 4, indicates that when Bosworth was discussing possible terminations in the field sales force, Bosworth was asked by a manager what he was to do since he had a number of people over fifty, some of whom had been with the company a long time.  Such a statement clearly reflects concern over a potential lawsuit, and is an inquiry as to how the company would defend or avoid an age discrimination suit by an older employee who might be terminated.  Indeed, just as there is no dispute that Bosworth wanted changes, and poor performers or dead weight out, there is no dispute that there was this discussion about the possibility of age discrimination lawsuits if wholesale changes in the sales force resulted in the termination of some older and senior employees.

---

[4]Thus, without being facetious, even if he had said that if any of the dead weight brings a lawsuit claiming age discrimination we will pay to have them killed, the statement would be heinous and criminal, it would not demonstrate age bias in the decision making process.

Indeed, the only actual dispute relates to Bosworth's alleged response to this question. Bosworth states that he indicated he wasn't concerned about discussing non-existent lawsuits, and he denies saying that they should fire young people as part of a defense strategy. Gielow's affidavit at ¶ 2 (Exhibit 6 of Plaintiff's materials) also does not assert that Bosworth told managers to layoff young people, too, but rather asserts that "Mr. Bosworth's response was that we should do what we needed to do to cover ourselves." Notwithstanding that, and because Defendant recognizes, for purposes of this motion at least, the court must accept the version of Bosworth's response most beneficial to Plaintiff, the court should, for this purpose, accept the claim by Richardson that Mr. Bosworth responded to the inquiry as what a manager was to do since he had a number of people over fifty, some of whom had been with the company a long time by stating "that he should just fire a couple of young guys along with the old ones and no one would notice."

Accepting Richardson's account would support the conclusion that Bosworth suggested that a few younger people be unjustly terminated to assist in the defense of a lawsuit brought by older workers eliminated when, according to Richardson's phrasing, the "dead weight" was culled. It does not support a directive that someone would be fired because they were old. Thus, at best, it is a cynical suggestion as to how the dead weight in the sales force could be eliminated without it leading to a successful lawsuit. At most, it shows that Bosworth was willing to sacrifice some unfortunate younger employees to rid the company of dead weight.

Lastly*, the statement that Mr. Conley (age 34) said he could let go 9-11 of his sales force of 15" and that Mr. Conley had not yet even met these men,* would not be

admissible because it is irrelevant and, in any event, not supported by the cited reference.  The cited reference, Richardson's affidavit (Exhibit 5), says (without indicating if it is based on personal knowledge or an assumption), that Conley was new and would not have had the opportunity to meet *most* of these sales people.  (Ex 5)  Whether Mr. Conley had or had not met all, or most, of his sales force (which is not established), and/or whether Mr. Conley believed he could judge their worth as employees based on their sales numbers without meeting them, is wholly irrelevant to an age discrimination case brought by an individual who was not a salesman, and did not work for Conley.

> 18.    *Four weeks later, Mr. Richardson was terminated (Exh. 5).  Mr. Bosworth testified that it was Dave Richardson who had asked the question at the regional meeting about age discrimination (Exh. 4, p. 33).*

**Defendant's response.**  <u>The fact that Mr. Richardson was terminated is not disputed</u>.  As to the second sentence, the citation does <u>not</u> indicate that Bosworth testified that Dave Richardson asked the question.  Rather, Plaintiff's counsel asked Bosworth if he knew Mr. Richardson, and if he was at the meeting in question.  (Ex. 4, p. 32)  Counsel, then virtually immediately asked Mr. Bosworth if "anyone at the meeting, in response to anything that you did say, suggested that there would be a problem with getting rid of certain members of the sales force."  To that question Mr. Bosworth answered yes.  Asked if he remembered who Bosworth responded to, "I don't remember but—it may have been Dave Richardson saying hey, if we get rid of some people there might be a lawsuit, an age discrimination lawsuit."  (Ex. 4, p. 133)  Thus, the alleged fact does not indicate that Mr. Bosworth recalled Dave Richardson as the

individual, only that he acknowledged the possibility[5] that it may have been Mr. Richardson. More substantively, Mr. Bosworth did not admit that anyone asked a question about age discrimination, but rather, he admitted that someone asked a question about a potential age discrimination *lawsuit*. There is, as noted above, a major difference.

   19. *Bosworth said he terminated Mr. Richardson because he had a "bad attitude". (Exh. 4, p. 48).*

   To the extent this fact, via its juxtaposition, is intended to imply that the "bad attitude" was evidenced by Mr. Richardson's questions at the sales meeting, this fact is not supported by the cited reference. The reference indicates more fully that by "bad attitude" Bosworth meant that "he had a defeatist mentality and he didn't think we could turn the business around and he was extremely sarcastic." Id.

   20. *During that time, period, Mr. Richardson and Richard Gielow were the top performing regional managers that the Company had. (Exh. 5,6)*

   **Defendant's response.** This is a conclusory statement, not properly supported, which fails to even indicate what is meant by "top performing sales managers."[6] Thus, the affidavit of Mr. Richardson indicates that his performance was

---

[5]This difference between the deposition stating it *was* Richardson who asked the question, and stating that he <u>may</u> have asked the question, is all the more significant in light of the implication that Richardson's termination was related to Bosworth's (apparently erroneous) belief that Richardson had asked the question at the meeting.

 Based on Richardson's affidavit, it apparently was *not* him. (Ex. 5, ¶ 4) Therefore, he could not have been terminated for raising the question unless Bosworth, at the time, believed it was Richardson's inquiry. While in July 2006 Bosworth could not remember whether it was or was not Richardson who asked the question or not, presumably he would have four weeks after the meeting. Testimony two years later that it may have been Richardson would not support the assertion that at the time Bosworth believed, although erroneously, that the question came from Richardson.

[6]In conclusory terms, Richardson and Gielow assert that they were the "top performing sales managers". Neither indicates the factual basis for the assertion or even how it is being measured. Thus, at the time, sales managers primarily oversaw salesmen working in a

complimented by Vaughn Rist.  To the extent that Rist's making of the statement, as

opposed to its purported truth, is relevant, it would be admissible only to indicate what

Rist said to Richardson.  Thus, as to Richardson's actual performance as a sales

manager, or more accurately, Mr. Rist's actual perception of his performance, the

deposition of Mr. Rist (pp. 83-84 attached hereto) contains the following line of

questioning (after Rist testified that Richardson was released as part of a consolidation

of the sales force):

> Q: Mr. Richardson had been with the company a long time, had he?
> A. Yes.
> Q. Had he been successful in his sales position?
> A. No.
> Q. For how long had he not been successful?
> A. From the time that he was promoted from salesman to regional manager.
> Q. How long had he been regional manager?
> A. A year, approximately.  I don't recall. [7]

---

sales territory.  Is the top performing sales manager the individual whose territory (mostly through the efforts of the field staff) has the highest sales volume (without consideration regarding the relative size of the different territories and/or the repeat business flowing from the already existing customer base)?  Or is the top performing sales manager, the individual managing the territory, which performs best as compared to expectations (quota) for the year?  Or is top performing sales manager the manager whose total sales volume grew the most during the year?  Or is the manager whose employees were able to sell the more profitable items, increasing profitability while the sales numbers declined?  Thus, Bosworth indicated that one of his goals was to reduce the "top line" sales but grow profitability.  (Bosworth Dep. p. 82)  Thus, Bosworth testified that the challenge wasn't the top-line number of balls being sold, sometimes at a loss, but actually making money selling balls. (Plaintiff Ex. 4, pp. 82-91)  Given this, a "top performer" in terms of top-line sales may be acting contrary to Bosworth's legitimate goals.

[7]This dialogue amply demonstrates why anecdotal evidence from others who believe that they may have been the victims of discrimination is often properly deemed inadmissible in individual discrimination actions by others.  While actual evidence of a corporate mindset of age bias evidenced by the termination of others may be relevant, the mere discharge of an older employee, or even several older workers, whose performance is contested, would not be relevant to establish such a discriminatory corporate mindset, absent a preliminary finding that there was age discrimination in the termination of Mr. Richardson.  Thus, the mere termination of Mr. Richardson, when there in fact was a consolidation of sales territories (especially given the literally hundreds of people terminated during this period and the absence of any statistical evidence showing a disproportionate number of older workers being fired), by itself, does not establish age bias by Bosworth, much less bias on a corporate wide basis.  If Richardson's

20 (again).    Mr. Bosworth terminated both of them.  In Mr. Richardson's case, he was told that his job was being eliminated to make way for the hiring of Reid Gorman, age 34, a friend of Mr. Bosworth's (Exh. 5).

**Defendant's response.**  This factual assertion is simply contrary to the material cited.  The cited material indicates he was told that his region was going to be consolidated into other regions and that the elimination of his region was necessary in order to allow the company to make other changes.  There is absolutely no mention of "making way for the hiring of Reid Gorman" as the reason articulated for the termination.  This statement should therefore be stricken.

21.    In Mr. Gielow's case, Mr. Bosworth said Mr. Gielow was let go because he was "incompetent" (Exh. 4, p. 48)

**Defendant's response.**  The cited transcript page makes no reference whatsoever to Mr. Gielow and it should therefore be stricken.

---

testimony was to the effect that he was told he was being fired due to his age, at least a bona fide argument could be made that he should be allowed to testify about his own termination because, that evidence, if credited, would show a bias at least by Bosworth. However, there is no such evidence offered, merely circumstantial evidence from which Richardson, had he pursued a legal claim, could attempt to convince a jury that an inference of age discrimination could be drawn.  Thus, even if the evidence is that Richardson was doing a good job and was fired nonetheless, it does not compel a finding of age bias.  The Company would, of course, be required to rebut any such attempted inference, and present its evidence of Richardson's performance, the changes in the Sales Territories, etc., in an effort to demonstrate that Richardson's departure was not indicative of age bias.  This would, of course, have to be allowed, since if, but only if, the circumstantial evidence relating to Richardson's departure led the jury to first conclude that Richardson's termination evidenced age discrimination, could there even be a plausible assertion that the biases evidenced by Richardson's termination also tainted the decision relating to Paul Duval.  The jury would therefore be subjected to a trial within a trial relating to the consolidation of the outside Sales Force (which included none of the Plaintiffs) in general, and the specific reasons why Richardson was selected as part of the consolidation, all before it could even begin to assess if unlawful motivation caused Richardson's termination.  Only after engaging in that exercise could they determine if the same motivation also tainted the decision to terminate Duval. "Allowing such evidence would be prejudicial," forcing [Defendant] to respond to each witness's claims, and creating, in effect, several "trials within a trial."  Wyvill v. United Companies Life Ins. Co., 212 F.3d 296, 303 (5th Cir. 2000) cf. Goldman v. First Nat'l Bank, 985 F.2d 1113, 1119 (1st Cir. 1993) (anecdotal evidence did not give rise to reasonable inferences supporting plaintiff's claim of age discrimination.).

Further, at page 50 of Exhibit 4 Mr. Bosworth indicates that the reason Mr. Gielow was let go was incompetence, but he does not say that is what was actually said to Mr. Gielow.  Asked what he told Mr. Gielow and others let go, Mr. Bosworth indicated, "I'm just not really sure what exactly—we told them they were being let go and I don't think we really wanted to get into the reasons why."  (*See* Ex. 4, p. 52)

22. *But Mr. Gielow was told that his position was being "consolidated"  (Exh. 6).  In fact, he was immediately replaced by an individual named Chris Reh (age 39), who had no management experience, and who now works for Mr. Gielow (Exh. 6).*

**Defendant's response.**  Mr. Gielow's affidavit supports an assertion that he was told that his position was being "consolidated".  (*See* Defendant's response to ¶ 21 above.)

Gielow has no first-hand information regarding Mr. Reh's hiring date by Defendant or whether he was "replaced" by him.  His affidavit on that point is subject to a Motion to Strike.  The record does show that Mr. Reh was previously employed by TaylorMade, a company that had had explosive growth.  (Dep. 4, p. 52)  Further, the sworn deposition of Bosworth indicates that at this time there was a change in the job duties of sales managers, making them more responsible for accounts rather than just people.  (Dep. 4, p. 52)

23. *The evidence of Mr. Bosworth's attitude towards age is not limited to these events that occurred while he was at Top Flite.  When he appeared at his deposition in this case, even though he obviously knew that he was appearing as a management representative and decision maker in an age discrimination law suit, he could not restrain himself from discriminatory comments.  He referred to the "inside crew" at Top Flite as the "old regime".  (Exh. 4, p. 119)*

**Defendant's response.**  <u>This paragraph should be stricken since it is argument not fact</u>.  To the extent there is any fact alleged, it would be a reference to the "old regime", however, the cited transcript page does not contain any such reference.

20

Further, any reference to the "old regime" would have no legal relevance, and the court should not have to search the submitted materials to ascertain if such a reference was made and, if so, its context.

24.    *He explained at length that Paul Duval was part of the "old regime", that he "concentrated on how things were done in the past", he criticized Mr. Duval "because Paul was telling us what we should do from ten years ago and it had no point of relevance", and he was "just so stuck in the old ways." (Exh. 4, pp. 28-33).*

**Defendant's response.**  This paragraph should be stricken as argument rather than a concise statement of fact.

The cited pages would support as a fact, which for what its worth, is undisputed, *i.e.,* that Bosworth referred to the prior Sales Management team, including Lou Tursi, as part of the "old regime" which had moved Duval from position to position during prior reductions to protect his employment.  The record does not, however, refer to Duval as part of the "old regime".  (Ex. 4, p 28)[8]

The materials cited to also reflect Bosworth's perception that Duval was "stuck in the old ways that to me didn't make money for the company."  (Ex. 4, p. 30)  However, this, too, is not a disputed issue of fact.  To the contrary, these facts were fully set forth in the Defendant's Statement of Undisputed Fact in the case of Paul Duval at ¶¶ 138, 139.[9]

---

[8]Specifically, Bosworth had testified that because Duval was a very, very popular, a very nice guy, great guy, very popular guy in the company "they" moved him around to prevent him from being laid off.  Asked to define "they" he said "The old regime—Lou Tursi, that whole group."

[9]Since these Paragraphs are relevant to the case brought by this Plaintiff, it was not set forth in the Defendant's Statement of Undisputed Facts for this Plaintiff.  For the convenience of the court, set forth in this margin are Defendant's Statement of Undisputed Facts on this point, demonstrating the absence of a material issue of fact.

138. Coupled with the fact that Duval was in a position that Bosworth had come to see as unnecessary, Bosworth actually began to see Duval as a drag on his efforts to effectuate

25.    *In fact, Mr. Duval never expressed these attitudes, it was Mr. Bosworth's perception that he was stuck in "old ways" (Exh. 1).*

**Defendant's response.**  The fact that it was Mr. Bosworth's *perception* that Mr. Duval was stuck in the old ways is not disputed.  Indeed, ¶ 138 of the Defendant's Statement of Undisputed Facts (set forth in the prior footnote) makes it clear that it is referencing Mr. Bosworth's *perception*, using terms such as "Bosworth actually began to see Duval as a drag on his efforts to effectuate change in the department", [h]e saw Duval as tied to what Bosworth viewed as antiquated business practices that had no likelihood of success in the current marketplace…." and "from Bosworth's vantage point…"

26.    *At his deposition, Mr. Bosworth also offered his opinion about "experience":  I made the statement a lot is that a lot of people there who said they had twelve, thirteen, fifteen years experience and, in my opinion, they had one year of experience, they just did it thirteen times or fifteen times in a row (Exh. 4, pp. 26-27).*

**Defendant's response.**  The statement itself is not disputed, although it does not necessarily summarize Mr. Bosworth's opinion about "experience" in full, or even in general as it is characterized by the putative statement of fact.

27.    *Mr. Bosworth made it clear that the above remarks were directed at "most of the sales management team" and in particular, Paul Duval (Exh. 4, p. 27).*

---

change in the department.  He saw Duval as tied to what Bosworth viewed as antiquated business practices that had no likelihood of success in the current marketplace, and resistant to change.  (Bosworth 30, 73, 111, 113-114)

139. From Bosworth's vantage point, Duval was one of the old regime that was still tied to the old ways of doing things, including believing that his area should establish the sales programs and determine pricing issues, which conflicted with Bosworth's own viewpoint on how things should be done.  Bosworth viewed the company as antiquated in many respects, "like a 1980 IBM".  Bosworth believed that programming and pricing should be controlled by those in the sales function with closer contact with customers and more knowledge about the competition.  Bosworth and Duval would "butt heads" over these differences on more than one occasion.  (Bosworth 28-29)

**Defendant's response.**  The cited reference does not support a claim that Mr. Duval, "in particular", was viewed as one that had one year of experience and did the same thing thirteen or fifteen times.  The cited reference would only support the following (or similar) statement:  "Mr. Bosworth perceived Paul Duval as one that really concentrated on how things were always done in the past and trying to get back to the way things were done ten years when, in Bosworth's view, the market had completely changed."

   28.    *He reiterated that Mr. Duval didn't really have more experience in the golf business than the 34 year old Reid Gorman because he just "had more years on the job', but not more "experience" because he was not "exposed to the types of business that the modern golf equipment manufacturers needed". (Exh. 4, p.111)*

**Defendant's response.**  The statement, as written, is denied as unsupported.  A review of the record reveals that the question was whether he viewed Duval as having "many more years experience in the golf business" than Mr. Gorman.  To that inquiry, it is undisputed that Bosworth "believed that Duval had more years on the job" but didn't believe "he had many more years of experience because he didn't believe that Duval had been exposed to things that were needed in the modern golf equipment business. (Ex. 4, pp. 110-111)  As clarified there is no dispute.

   29.    *Mr. Bosworth also identified Lou Turisi [sic] (age 47), his predecessor, as a member of the old regime (Exh. 4, p. 28) and on a visit to Top Flite before his hiring, told Bob Penicka he had no interest in working with "that gentleman", who Mr. Bosworth laughed at to his face, telling him "on a social visit" that he was "still in the past".  (Exh. 4, pp. 140-141)*

**Defendant's response.**  The fact that Mr. Tursi was identified by Bosworth as part of the "old regime" is not disputed.  (*See* response to ¶ 25 above)  Nor is there a dispute that Bosworth laughed (although there is no evidence to support a claim that it was in Tursi's face) and told Tursi he was "still in the past" when, during the meeting,

Tursi, asked by Bosworth what the competition was doing in the field now, pulled out books to show what the company had sold two and three years earlier. (*See* Ex. 4, pp. 140-141cited by Plaintiff.) The fact that Bosworth viewed Tursi "as very smart", but that he had a low opinion of his sales approach, at least for the golf industry, is not disputed, and was fully set forth in the Defendant's Statement of Undisputed Facts at ¶ 59.

> 30.    *Andrew Kelleher, who made the decision to terminate John Bettencourt and Michael Behaylo demonstrated the same attitude as Mr. Bosworth and Mr. Penicka. Mr. Kelleher who was in his thirties and who held the position of Vice President of Finance, told John Bettencourt that long term employees who "are still here all this time" were "deadwood". (Exh. 7, # 12) and that the top management of the Company looked at people with a lot of seniority and could not understand why they were still there. (Exh. 8, pp. 107-108)*

<u>The paragraph, as written, is not a statement of fact but hyperbolic argument as to the alleged attitude that should be stricken. Further, it is not supported by the materials cited.</u>

The fact that Andrew Kelleher made the decision to terminate John Bettencourt and Michael Behaylo is undisputed. As to the references to "deadwood", the affidavit simply does not assert that Keller said that employees there a long time were deadwood, which would imply that all long service employees were deadwood. Rather, it clearly says Mr. Kelleher "complained about long-term employees who "are still here all this time" <u>and</u> are "deadwood". This is far different.

Indeed, the fact that Kelleher did <u>not</u> perceive <u>all</u> long service employees as deadwood is clearly set forth in the materials cited by Plaintiff. Thus, in the cited deposition page, it is made clear that Kelleher did not view John Bettencourt, who had been with the Company for thirty years (*see* Ex. 7), as "deadwood". At transcript page

108 Bettencourt specifically testifies that Kelleher told him that he *wasn't* referring to

him as deadwood.  At page 109 of the same transcript (not included with Plaintiff's

materials but attached hereto, this was confirmed.  Asked whether Kelleher told him

that he was not perceived that way (as deadwood), Bettencourt responded,

"Absolutely."

      Thus, beyond the hyperbolic argument, to the extent that Plaintiff 's statement

asserts that Kelleher perceived, much less stated, that all long service employees were

deadwood, the assertion is entirely contradicted by the cited materials.  To the extent

that Bosworth is alleged to have complained about deadwood who remained at the

Company, the statement is supported by the materials.

      *31.    Just like Mr. Bosworth, Andrew Kelleher could not restrain his
discriminatory attitudes at his deposition.  He too, knowing he was appearing as a
management representative in an age discrimination suit, still maintained his prejudiced
beliefs.  When shown a department organization chart (Exh. 9), he referred to it as the
organization he had "inherited" and stated "it is a lot of legacy folks that had been
around with Spalding" (Exh. 10, pp. 10-11).*

      **Defendant's response.**  The first two sentences of the so-called statement of

disputed fact must be stricken as nothing more than hyperbolic argument, and not a

concise statement of fact.  The remaining statements are not disputed.

      *32.    Mr. Kelleher considered both Mr. Bettencourt and Mr. Behaylo
"overqualified" for accounting positions and a few months after their layoffs, he hired
recent college students in their 20's as accountants. (Exh. 10, pp. 53-54)*

      **Defendant's response.**  The Statement, as written, is not supported by the cited

material.  Thus, there is no testimony that they were considered "overqualified' for

accounting positions in general.  (The fact that two recent college graduates in their twenties were hired several months after the April layoffs is not disputed, and is in fact covered at length at ¶¶ 128-131 of the Defendant's Statement of Undisputed Facts in the Bettencourt matter, and at ¶¶ 131-135 of the Defendant's Statement of Undisputed Facts in the Behaylo matter.)

As to the references to being "overqualified," the cited testimony is in response to a line of questioning that commences at page 52 of Exhibit 10, in reference to the hiring of a new college graduate to work part-time in the cost accounting department. The cited testimony followed Kelleher's statement that in the summer of 2004 it was determined that they "may need what we characterized as a utility player that had a *rudimentary financial background,* accounting background, that could help out on an ad hoc basis for the department.  (Plaintiff Ex. 10, at 52 emphasis added)  Shortly thereafter, asked why there was no consideration to recalling any of the three laid off cost accountants, Mr. Kelleher responded that in the case of Mr. Bettencourt, it would have entailed a fifty-thousand dollar reduction in salary.  Immediately thereafter, asked if Bettencourt and Behaylo would have been qualified for a position that he had already described as requiring a "rudimentary financial background," Kelleher indicated that they would have been overqualified.  Asked later whether he thought that either Behaylo or Bettencourt could do "general accounting work," Kelleher indicated that he was sure that Bettencourt could but that he didn't think Behaylo could.  (Plaintiff's Ex. 10, p. 119)

33.    *Mr. Kelleher told Paul Duval that anything that had happened before 2003 was "meaningless".  (Exh. 3, p. 212)*

**Defendant's response.** <u>This is a new statement that is not disputed</u>.

Defendant notes that the cited material makes clear that the comment was made during an awards ceremony where Kelleher indicated that he didn't think the awards were meaningful.

34. *The Callaway vision of the desirability of a "young by design" team was also shared by Richard Levandowski, who played a role in the termination of Michael Behaylo and by Thomas Fry who made the decision to terminate Gary Lonczak. Mr. Levandowski was Mr. Bettencourt's successor in the finance department. (Exh. 11, p. 10).*

**Defendant's response.** <u>This purported statement of fact, except to as to the assertion that Mr. Levandowski was Mr. Bettencourt's successor in the finance department, must be stricken since it is not fact, but hyperbolic argument, wholly unsupported by the cited material</u>. As to the final sentence, which asserts that Mr. Levandowski was Mr. Bettencourt's successor in the finance department, Defendant notes that page 10 of the transcript was not included with the materials submitted to the court. Nevertheless, the assertion is not disputed and, in fact, appears in ¶ 110 of Defendant's Statement of Undisputed Facts in the Behaylo case, and ¶ 110 of Defendant's Statement of Undisputed Facts in the Bettencourt case.

35. *When asked about discussions he'd had with Mr. Kelleher, Mr. Levandowski had the following thoughts to offer:*

> Q. *Did you ever hear him comment on the age of the employees who were there when he arrived or throughout your tenure?*
> A. *We always talked about the age of the manufacturing group because that seemed to be always one of our problems. It's an elderly workforce and therefore generates additional costs in higher medical insurance, higher costs of those things.*
> Q. *Higher cost of what?*
> A. *Medical costs and that type of cost.*

27

Q.    Again, when you say the manufacturing group, that would include who?

A.    Basically the hourly people.

Q.    These are people involved directly in the manufacture of the balls?

A.    Right.

Q.    When you say "we" would discuss it, you mean who?

A.    Well I would discuss it with Andrew. We would look at the costs. We'd have a lot of absenteeism. If it gets really hot, some of the elder people do not show up as often; it's just the way it is. It wasn't a statement of degrading anybody, it's just, okay, we have an elderly workforce, we're going to have higher medical benefits, we're going to have higher absenteeism.  It just happens.

Q.    Had someone examined the absenteeism in relationship to the age of the workers?

A.    I believe we had that study done just to get --over a brief period of time, eight, ten weeks.

Q.    When was that done?

A.    I couldn't be honest and tell you.  I mean, we would look at it at least once a year just to see what was going on. Absenteeism was always a big problem.

Q.    When you say "we," now you're talking about who?

A.    If it was absenteeism, we would ask Lynn because at the time she also had payroll so we'd let her do the research and give us with statistics.

Q.    What was the research you were asking her to do?

A.    We'd look and say -

Q.    When you say "we" you mean who?

A.    Management - - Andrew, myself, Jim Laughlan, we would look at the manufacturing costs, we'd get Tom Fry involved.  We'd say this is a problem, get into the summer months or the high peak periods of production and if you have high absenteeism then you have to work overtime to recover the same amount of hours.  It's just additional expense.

Q.    You're saying that in particular you had asked Lynn Lafond to do a study on that?

A.    We would ask to take a look at the absenteeism, is it running higher than normal, is it the same.

Q.    Did she produce such reports?

A.    Yes.

Q.    Did you ask that it be analyzed in terms of the age of the employees?

A.    Well, we kind of knew which departments were more elder than not. We knew where the younger people had been just hired or the younger ones were. We didn't do it by age specific.

Q.    How did you conclude that the older workers were more prone to absenteeism?

28

> A.    I didn't say the more elder. I said we have an elder workforce so that
> leads to lead to higher than normal absenteeism. If you take a look
> at a younger workforce --and it doesn't matter it it's in this business
> or not --you go to a younger workforce they have a tendency to not
> have as much absenteeism.

*(Exh. 11, pp. 43-44 )*

**Defendant's response.**  <u>This paragraph should be stricken because it fails to</u>

<u>set forth a concise statement of fact</u>.

To the extent that the transcript supports a factual assertion it would be to

indicate that the Company would periodically study absenteeism in the factory, and

determined that their higher than average absentee rate was due to having an older

workforce, and although that might have influenced attendance and health care costs,

that was simply the way it was.

36.    *These comments are revealing in many ways. While defendants may
attempt to dismiss them as comments about hourly workers, they clearly reflect, and
are consistent with the Company's attitude towards all older workers as demonstrated
in other statements by Messers. Penicka, Bosworth and Kelleher. It is notable as well
that Mr. Levandowski states that Tom Fry was part of this group which monitored and
worried about employee's ages.  Mr. Fry was the decision maker in Mr. Lonczak's case.*

<u>This paragraph, which fails to state any facts but is exclusively argument, and is</u>

<u>without citation to any supporting material, should be stricken.</u>

37.  *Lastly, the depth to which the Callaway's attitude towards age and
experience permeated the Company was also evident when a member of Callaway's
personnel department in California visited Chicopee to help employees with the new
benefit package.  She commented that she had never seen a company with so many
employees with over 20 years seniority and that, at Callaway, she was accustomed to
people who had been there less than 20 years.  (Exh. 1)*

**Defendant's response.**  <u>This paragraph should be stricken as containing</u>

<u>argument well beyond any supporting factual support.</u>  To the extent the supporting

materials support a "fact," it would be that an unidentified individual from Callaway's

personnel department indicated that she had never seen a company with so many employees with over 20 years seniority and that, at Callaway, she was accustomed to people who had been there less than 20 years.[10]  This is a new fact that is undisputed for purposes of this motion.

Respectfully Submitted,


   /s/ Jay M. Presser, Esq.
Jay M. Presser, Esq.
BBO #405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Tel. (413) 737-4753/Fax (413) 787-1941

Dated:  February 2, 2007

### CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing *Defendant's Response, and Partial Motion to Strike, Plaintiff's "Statement of Disputed Facts"* was served upon the attorney of record for each other party via electronic filing and by first-class, U.S. mail, postage prepaid, on February 2, 2007.

   /s/ Jay M. Presser
Jay M. Presser, Esq.

---

[10]This is hardly surprising since Callaway was founded in 1982. (Affidavit of Robert Bourdeau)