UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN BETTENCOURT,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>THE TOP-FLITE GOLF COMPANY,<br><br>　　　　　　　　Defendant. | CIVIL ACTION NO. 05-30179-KPN<br><br>**DEFENDANT'S MOTION TO STRIKE ¶ 3 AND PORTIONS OF ¶ 5 OF PAUL DUVAL'S AFFIDAVIT** |

　　　　Plaintiff has filed an Opposition to Defendant's Motion for Summary Judgment. Included with the materials is a Statement of Disputed Fact which sets forth certain facts in reliance upon Paul Duval's affidavit, attached thereto as Exhibit 1. Defendant submits that those portions of the Duval Affidavit (specifically ¶ 3 and ¶ 5 in part) do not satisfy the requirements of Rule 56(e) and should be stricken. Thus, under Fed. R. Civ. P. 56(e), affidavits in opposition to a Motion for Summary Judgment must be based on "personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein." Affidavits, or portions thereof, that fail to comply with the Rules cannot be considered in a determination whether or not to grant summary judgment. Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988); FDIC v. Roldan Fonseca, 795 F.2d 1102, 1110 (1st Cir. 1986) (holding that where receipts submitted to support opposition to summary judgment constituted inadmissible hearsay, party failed to comply with Rule 56(e))  This includes hearsay testimony within an affidavit that would not otherwise be admissible at trial. Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st

Cir. 1998). To the extent the affidavit at ¶ 3 and (in part) does not comply with the rule, that portion should be stricken, the portions of the Plaintiff's Statement of Disputed Facts should be stricken, and the assertions contained therein disregarded in ruling on its Motion for Summary Judgment.

### Paragraph 3, Of Duval's Affidavit, in Substantial Part, Is Hearsay, Not Based On First-Hand Information And Should Be Stricken

The Third Paragraph of Duval's affidavit contains information that simply is not based on first-hand knowledge and would not be admissible at trial. Indeed, Duval's affidavit does not even claim to be based on first-hand knowledge, and at paragraph two he merely indicates he is "familiar with its recent history." Yet the paragraph contains specific financial information, assertions that the company was "operationally profitable", and explanations for the failure of the prior company. To the extent that the affidavit is intended to reflect the truth of the matter asserted, as opposed to what Plaintiff may have been told by senior management of Spalding[1], the affidavit is simply hearsay that must be stricken.[2]

Thus, it is clear that Plaintiff has no first-hand knowledge as to the matters alleged in Paragraph 3 of his Affidavit. Plaintiff was not a member of the senior management. His job duties did not require him to review the company's financial records and there is no indication that he ever did so. Indeed, Duval's deposition

---

[1] To the extent that the affidavit is merely indicating what Duval was told, to the extent relevant and admissible as not hearsay, Defendant notes that there is no dispute that prior management blamed the economic woes of the company on the debt service. (*See* Defendant's Statement of Undisputed Fact ¶¶ 20, 81)

[2] Paragraph 4 is subject to the same deficiencies, but its accuracy, to the extent that it relates to what was happening in September 2003, is not questioned. (*See* Defendant's Statement of Fact at ¶ 39 and need not be stricken.)

testimony indicates that his knowledge of the company's financial difficulties, and the assertion that it was due to the debt service, came from what he was told at general meetings or routine conversation with a manager. (Duval Depo. p. 109, attached hereto) He testified at deposition that he was unaware that the Company was selling off parts of the business to stave off bankruptcy and that he was unaware that there was a key employee retention program until he read about it in the newspapers following the bankruptcy. Indeed, at deposition he was candid about the scope of his actual lack of knowledge regarding the extent of the company's problems indicating it was being dealt with by a tight circle of people, likely a small group amongst the senior management team, which did not include him. (Duval Depo. pp. 110-111, reprinted below and attached hereto)[3]

---

[3]The attached transcript pages includes the following:
Q. So you were aware in the spring of 2003 that the situation -- the financial situation at Spalding was fairly serious to the extent that they had to sell off these other companies just to continue their existence?
A. I don't know the extent of it. I just know that we were in a serious situation. They had been in a serious situation --we had been in a serious situation for at least two years since the sale of the company and we had never met any of the bank requirements that I was aware of and we had refinanced at least once, so we didn't know if there would be another refinance or what it might be because that was really something that was occurring in a very -- I think in a very tight circle of people for obvious reasons in terms of the -- that it involved the health and well-being of the company and confidentiality is important.
Q. That would be dealt with by senior managers?
A. That's correct.
Q. And even at that, probably a small group of the senior managers?
A. Probably.
Q. You were never a senior manager as that term is used?
A. No.
Q. When you became aware that the company also sold off it's own name of Spalding to Russell?
A. That's correct.
Q. At that point, did Mr. Craigie explain to you how dire the situation was?
A. No; he positioned it as why it was a good thing.
Q. Did you at any point become aware that certain individuals within the company were being identified as key employees?
A. After the bankruptcy I was aware of such a thing.

Similarly, there is a single conclusory statement that "Prior to Callaway Golf purchasing the Company in 2003, Spalding sold off its other products and employees were laid off or transferred."[4]  Both the meaning and basis of this assertion in the affidavit[5] is unclear and should be stricken.  To the extent, and only to the extent, that the sentence refers to the fact that Plaintiff observed former Spalding employees working for the new Spalding, Division of Russell, would such assertion be based on first-hand information and thus admissible.  Thus, Duval commenced work for Spalding, A Division of Russell, and at his deposition indicated that about forty employees of this new company were former Spalding Worldwide employees.[6]  (Dep. 19-20)  There is no indication that Plaintiff has first-hand information as to other layoffs and to the extent

---

Q.  You were not aware -- let me rephrase that.  Did you become aware of it after the bankruptcy or did you become aware that after the bankruptcy certain people had been labeled as key employees?  Do you understand the question?
A.  No.
Q.  Did you at any point become aware that even before the bankruptcy certain people had been labeled as key employees?
A.  No.
Q.  Did you at some point become aware that at some point in time individuals had been identified as key employees?
A.  Yes.
Q.  When did you become aware that certain people had been identified as key employees?
A.  When I read it in the paper in July when it announced -- it didn't announce but it talked about the bankruptcy and it talked about the process.

[4]Defendant assumes that laid off or transferred, as used in the affidavit, refers to those who went to work for Spalding after the sale of that business to Russell, although it is unclear.

[5]As asserted in the Defendant's response to the Plaintiff's Statement of Disputed Facts, from this single sentence Plaintiff attempts to weave a tapestry of factual assertions.

[6]Q. You say there are forty people formerly  from Spalding Sports Worldwide working at Russell.   Forty out of approximately how many?
A.  Forty out of approximately fifty.
Q.  Spalding Russell has approximately fifty employees?
A.  Yes.
Q.  And approximately forty of them were from Spalding Sports Worldwide?
A.  Yes.

4

that the sentence is intended to assert that there were "layoffs or reductions" beyond these approximately forty individuals, it is inadmissible hearsay that must be stricken.[7]

**Paragraph 5 of the Affidavit, To the Extent that It Comments on the Accuracy of Another Witness' Testimony, Should Be Stricken**

Mr. Duval is competent and would be allowed to testify as to his recollection of what he was told by Mr. Bosworth, and, arguably, to his own perceptions that "he did not resist" Bosworth's wishes. He would not be allowed to comment on his understandings on what another witness stated, or his views on the accuracy of another witnesses' testimony. To the extent his affidavit purports to do so, it should be stricken.

Respectfully Submitted,

　/s/ Jay M. Presser, Esq.　
Jay M. Presser, Esq.
BBO #405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts 01144
Dated: February 2, 2007        Tel. (413) 737-4753/Fax (413) 787-1941

CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy6 of the foregoing *Defendant's Motion to Strike ¶ 3 and Portions of ¶ 5 of Paul Duval's Affidavit* was served upon the attorney of record for each other party via electronic filing and first-class, U.S. mail, postage prepaid, on February 2, 2007.

　/s/ Jay M. Presser, Esq.　
Jay M. Presser, Esq.

---

[7] There is no dispute that about that number of employees left the former Spalding/Top-Flite to go with Spalding/Russell prior to the bankruptcy asset purchase in September 2003. (Defendant's Statement of Fact ¶ 27)

# EXHIBIT A

1  part of Spalding and had been sold off at that
2  time or around that time.  I don't remember,
3  Etonic might have been sold first or second but
4  all of that occurred within a sixty-day window of
5  that time.
6      Q.   Spring of '03, right?
7      A.   Yes.
8      Q.   Were you aware of the financial
9  difficulties Spalding was having?
10     A.   Yes.
11     Q.   How did you become aware of those?
12     A.   Well, we had general meetings, for one.
13 It was explained that we were not meeting our --
14 servicing our debt.  That would be the formal way.
15          It was not unusual to have a routine
16 conversation in manager meetings that they were
17 having trouble.  We didn't anticipate -- at least
18 I didn't anticipate the bankruptcy but obviously
19 if we were selling off parts of the company, it
20 wasn't going well.
21     Q.   Were you aware that Spalding was selling
22 off parts of the company to try to stave off
23 bankruptcy?
24     A.   No.

1  Q. Were you aware that they were selling
2  off parts of the company because they needed to
3  raise cash to continue to operate?
4  A. I would say yes to that.
5  Q. So you were aware in the spring of 2003
6  that the situation -- the financial situation at
7  Spalding was fairly serious to the extent that
8  they had to sell off these other companies just to
9  continue their existence?
10  A. I don't know the extent of it. I just
11  know that we were in a serious situation.
12     They had been in a serious situation --
13  we had been in a serious situation for at least
14  two years since the sale of the company and we had
15  never met any of the bank requirements that I was
16  aware of and we had refinanced at least once, so
17  we didn't know if there would be another refinance
18  or what it might be because that was really
19  something that was occurring in a very -- I think
20  in a very tight circle of people for obvious
21  reasons in terms of the -- that it involved the
22  health and well-being of the company and
23  confidentiality is important.
24  Q. That would be dealt with by senior

```
 1  managers?
 2       A.    That's correct.
 3       Q.    And even at that, probably a small group
 4  of the senior managers?
 5       A.    Probably.
 6       Q.    You were never a senior manager as that
 7  term is used?
 8       A.    No.
 9       Q.    When you became aware that the company
10  also sold off it's own name of Spalding to
11  Russell?
12       A.    That's correct.
13       Q.    At that point, did Mr. Craigie explain
14  to you how dire the situation was?
15       A.    No; he positioned it as why it was a
16  good thing.
17       Q.    Did you at any point become aware that
18  certain individuals within the company were being
19  identified as key employees?
20       A.    After the bankruptcy I was aware of such
21  a thing.
22       Q.    You were not aware -- let me rephrase
23  that.
24             Did you become aware of it after the
```