UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN BETTENCOURT,<br>      Plaintiff | )<br>)<br>) |
| vs. | )   CIVIL ACTION NO.: 05-30179-MAP<br>) |
| THE TOP-FLITE GOLF COMPANY,<br>      Defendant | )<br>) |

## OPPOSITION TO DEFENDANT'S MOTION
## TO STRIKE THE AFFIDAVIT OF RICHARD GIELOW

Now comes the plaintiff, John Bettencourt, and opposes the Motion to Strike the Affidavit of Richard Gielow.

The defendant moves to strike portions of the Affidavit of Richard Gielow on grounds that it is "conclusionary". It is difficult to understand exactly what this objection is. The fact that Mr. Gorman, Mr. Duval and Mr. Bosworth were sales management employees who dealt with the Regional Sales Managers, is obvious in many places in the record. Even from the defendant's motion, it is clear defendant does not dispute the fact that all of these individuals would have worked with the Regional Sales Managers and the Regional Sales force. Mr. Gielow's point is simply that to his observation as a Regional Sales Manager, Mr. Gorman was performing Mr. Duval's work. Since Mr. Geilow had a different job than Mr. Gorman, defendant is free to attack the degree and detail of Mr. Gielow's knowledge if it wishes, but that is not a reason to strike the affidavit since Mr. Gielow is competent to testify as to what occurred in the department he worked in. Indeed, Mr. Gielow's testimony is supported in the record by other Company officials including Andrew Kelleher. (Exh. A, pp. 62-67, the "national sales function" was Mr. Gorman)

It is certainly material that Mr. Gielow, Mr. Duval and Mr. Kelleher, all understood Mr. Gorman was taking Mr. Duval's job.

The defendant further objects to Mr. Gielow's assertion that he was replaced by an individual named Chris Reh who was in his thirties.  Mr. Gielow explains that he knew Mr. Reh's circumstances because Mr. Reh consulted with him *after* Reh had been hired by Callaway, even though Mr. Gielow had been terminated.  Because he later had occasion to hire Mr. Reh, Gielow was familiar with his qualifications and his prior work.  Mr. Reh's consultation with Mr. Gielow after he had been hired by Callaway is an admission by Mr. Reh that is binding upon the Company.  The entire objection is disingenuous since the Company obviously does not dispute that Mr. Reh was hired to replace Mr. Gielow.  The further objection to the remaining information in Paragraph 4 (that Mr. Gielow had in fact later hired Mr. Reh), is frivolous since Mr. Gielow obviously has personal knowledge of his own subsequent work experience and the fact that he hired Mr. Reh.  For these reasons, the motion should be denied.

THE DEFENDANT, JOHN BETTENCOURT
BY HIS ATTORNEY

Dated: March 9, 2007

   / S /  Maurice M. Cahillane
Maurice M. Cahillane, Esq.
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121
BBO# 069660

**CERTIFICATE OF SERVICE**

  I hereby certify that a copy of the Opposition to Defendant's Motion to Strike the Affidavit of Richard Gielow was served this 9th day of March, 2007 on all parties, by electronic filing to Jay M. Presser, Esq., Skoler, Abbott & Presser, 1 Monarch Place, Springfield, MA 01144


          / S / Maurice M. Cahillane




12085-050157\131244.wpd

# EXHIBIT A

## PP. 61-67 - DEPO. OF

## R. LEVANDOWSKI

Page 61

1  A. Mr. Rist left the company.
2  Q. You mean voluntarily left the company?
3      MR. PRESSER: Objection; if you
4  know.
5      THE WITNESS: I'm not quite sure.
6  Q. (BY MR. CAHILLANE) You don't know?
7  A. He may have left -- he left the company
8  with his full contract being paid out.
9      I believe Mr. Rist went to Mr. Penicka
10 and told him that in the smaller organization that
11 we will have that his function and the level of
12 person that he is or was, was not needed.
13 Q. That occurred when?
14 A. I believe in that time frame that I gave
15 you.
16 Q. Was this something Mr. Penicka told you?
17 A. Yes.
18 Q. Did you have any role, yourself, in this
19 decision or did Mr. Penicka just tell you it was
20 going to be you?
21 A. Mr. Penicka offered me the position.
22 Q. Did you have any experience with Human
23 Resources?
24 A. Yes.

Page 62

1  Q. When was that?
2  A. Babcock Borsig Machinery.
3  Q. Where?
4  A. My last company -- my last two
5  companies.
6  Q. Were you then involved in subsequent
7  layoffs that the company had?
8  A. Yes.
9  Q. When were they?
10 A. I don't recall the specific dates.
11 Q. Were there any layoffs in the summer
12 of '04?
13 A. Yes.
14 Q. What do you recall about that? Who was
15 laid off?
16 A. I believe there was a number of
17 salespeople that were laid off.
18 Q. Did that include Mr. Duval?
19 A. Yes.
20 Q. How did that come about -- the decision
21 to do that?
22 A. Mr. Bosworth evaluated the position and
23 felt that Mr. Duval's function could be
24 consolidated into another function.

Page 63

1  Q. Actually I didn't mean -- I'll get to
2  that but I didn't mean Mr. Duval in particular but
3  the whole decision to have layoffs in the Sales
4  Department, how did that come about?
5  A. Mr. Bosworth.
6  Q. Did Mr. Bosworth come to you with a
7  recommendation?
8  A. Mr. Bosworth acted on a number of these
9  initiatives on his own.
10 Q. Do you mean whatever layoffs occurred in
11 the Sales Department in the summer of '04 were
12 initiated by Mr. Bosworth?
13 A. Correct.
14 Q. Was this separate from an independent
15 process that had led up to the April '04 layoffs?
16 A. Yes.
17 Q. In April of '04 were there as far as you
18 know any layoffs in the Sales Department?
19 A. Prior to Mr. Bosworth coming on board?
20 Q. Well, in April of '04?
21 A. Yes.
22 Q. Do you know whether or not Mr. Bosworth
23 had made the decisions as to those layoffs?
24 A. Mr. Bosworth was not a member of the

Page 64

1  company at that time.
2  Q. So Mr. Tursi made those decisions?
3  A. Mr. Tursi made some of the decisions and
4  Mr. Penicka made the remaining decisions.
5  Q. You understand that Mr. Bosworth came to
6  the company after April of '04?
7  A. I believe so; yes.
8  Q. I take it at some point after April
9  of '04 Mr. Bosworth -- did Mr. Bosworth come to
10 you with recommendations?
11 A. Mr. Bosworth evaluated his organization
12 and set about terminating those people that he
13 felt were either redundant or could add additional
14 value by consolidating their functions with
15 another person.
16     Mr. Bosworth did not come to me with a
17 specific list.
18 Q. What did he tell you he wanted to do?
19 A. He had some functions that he was in the
20 process of eliminating.
21 Q. Did he tell you why?
22 A. In some cases, yes.
23 Q. In what cases did he tell you why?
24 A. Mr. Duval's.

Case 3:05-cv-30179-KPN   Document 48-3   Filed 03/09/2007   Page 3 of 3

MICHAEL BEHAYLO vs. THE TOP-FLITE GOLF COMPANY
ANDREW KELLEHER                    JULY 28, 2006

**65**

1  Q. What did he tell you?
2  A. That he felt that he could take
3  Mr. Duval's function and combine that with the
4  national sales function.
5  Q. What was your understanding of
6  Mr. Duval's function?
7  A. Mr. Duval was performing sales --
8  developing sales and monitoring sales programs.
9  Q. Did he talk to you about anybody else in
10 particular?
11 A. Not in particular; no.
12 Q. Do you know how long Mr. Duval had been
13 in that position?
14 A. I do not know specifically but it was
15 not very long.
16 Q. Do you know who decided to put him in
17 that position?
18 A. Who? Mr. Duval?
19 Q. Yes; in the position that he was in at
20 the time he was let go?
21 A. I believe it was Mr. Rist but I'm not
22 sure.
23 Q. Why do you believe that?
24 A. That's what I had heard from

**66**

1  Mr. Bosworth.
2  Q. Do you mean that Mr. Bosworth indicated
3  to you that Mr. Rist had hired Mr. Duval for that
4  position?
5  A. No; he had recommended Mr. Duval for
6  that position.
7  Q. To Mr. Bosworth?
8  A. Correct.
9  Q. That would not have been Mr. Bosworth's
10 decision to hire him, correct?
11 A. I don't know. That ultimately would be
12 Mr. Bosworth's decision to hire someone in his
13 department.
14 Q. Since Mr. Bosworth as you recall arrived
15 there after April of '04 or after April 15th and
16 Mr. Duval was let go in the summer, that would
17 mean that Mr. Bosworth hired him in the spring and
18 by the summer had decided that his position was
19 redundant?
20         MR. PRESSER: Objection.
21         THE WITNESS: I don't know why
22 Mr. Bosworth would come up with that decision
23 since -- well, I believe the decision to terminate
24 Mr. Duval was associated with combining his

**67**

1  function with a national account management
2  function.
3  Q. (BY MR. CAHILLANE) Well, did you find
4  that odd at all that Mr. Duval who so recently had
5  come into that department was now being let go?
6  A. I do not have the -- I did not have the
7  expertise to make any judgment.
8  Q. Even as the director of Human Resources?
9  A. Even as the director of Human Resources.
10 Q. You didn't find anything odd as the
11 director of Human Resources that someone who had
12 just hired someone a matter of a few weeks ago was
13 now saying that the position was redundant?
14 A. No.
15 Q. The process that had been involved in
16 the prior set of layoffs, was Keith Keindel
17 involved in that at all?
18 A. I don't recall. Actually, yes,
19 Mr. Keindel was involved.
20 Q. What was his position?
21 A. I believe Mr. Keindel was -- had
22 something to do with International -- the
23 International business.
24 Q. Was he at any of those meetings that you

**68**

1  described?
2  A. He may have; I do not recall.
3  Q. Were there any layoffs after the summer
4  of '04?
5  A. I'm sure there were but I do not recall
6  specifically who they were.
7  Q. Did anyone ever tell you that
8  Mr. Bosworth had made statements to regional sales
9  directors about the ages of the employees in the
10 Sales Department?
11 A. No.
12 Q. Were you present at a meeting at the
13 Chicopee Chamber of Commerce in the spring of
14 2004?
15 A. Yes.
16 Q. Was this a meeting where Top-Flite was
17 featured?
18 A. Yes.
19 Q. Were you present at the head table so to
20 speak at that meeting?
21 A. Yes.
22 Q. Did Mr. Penicka speak?
23 A. Yes.
24 Q. Did anyone else speak on behalf of