UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN BETTENCOURT,<br>      Plaintiff<br><br>vs.<br><br>THE TOP-FLITE GOLF COMPANY,<br>      Defendant | )<br>)<br>)<br>)   CIVIL ACTION NO.: 05-30179-MAP<br>)<br>)<br>) |

**OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO
STRIKE PLAINTIFF'S STATEMENT OF DISPUTED FACTS**

Now comes the Plaintiff and opposes the Defendant's Motion to Strike.

**I.   General Objections**

Defendant has filed a Motion to Strike Portions of the Plaintiff's Statement under Local Rule 56.1. Generally, the defendant objects to inclusion of facts which they claim are not "disputed" and further objects to the inclusion of "additional facts" as opposed to "disputed facts", as well as various particular objections. None of the objections are well founded.

*Local Rule 56.1* states in part:

> Opposition to motions for summary judgment shall include a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried...

*Local Rule 56.1*

Under this rule (and under *Fed.R.Civ.P. 56*), it is the obligation of the opposing party not merely to note which of the moving parties facts he disputes, but to bring forward all of the material facts that present a genuine issue to be tried. This is relevant to the defendant's motion in several respects. Defendant in numerous places objects to the plaintiff stating "additional facts", i.e., putting

in his statement of facts, matters, however relevant, which do not directly contradict facts contained in the March 9, 2007 defendant's statement. This would mean that the plaintiff would be limited to dealing with the facts presented by the defendant, which is simply an absurd position under *Fed.R.Civ.P. 56* and *Local Rule 56.1* .

The Rules call upon the plaintiff to present all the material facts he is aware of - not limited to whatever the defendant claims is material. To object that these are "additional" facts, but not "disputed" facts is only meaningful if the defendant is conceding that these additional facts are undisputed and it is clear from the particulars that defendant is not.

Secondly, the defendant objects to the plaintiff's inclusion of some facts, contained within a paragraph or even within a sentence, which are in agreement with the defendant's statement. To some extent, it is true that the plaintiff included such facts, but even seemingly undisputed facts take on a whole new meaning in relation to their context. For instance, the plaintiff understands the defendant's description of the recent history of Spalding and Top Flite to be an assertion that the predecessor, Spalding, was an unsuccessful company with, by implication, unsuccessful employees. They in turn suggest that Callaway had good cause to replace those employees with other employees from successful companies. Plaintiff disputes this scenario. In describing what happened, the context and sequence of events have meaning even if some of the events (i.e.., bankruptcy) are not themselves disputed. In order to present the story in a meaningful manner, the plaintiff had to include some events which are material, even if not disputed, but whose sequence and context present a different picture in a material way.

Another objection frequently raised by the defendant is that the plaintiff has mixed in "argument" with facts. Plaintiff does not believe that the rule obligates him to relate the facts in a

purely neutral fashion and some material factual statements are inherently "argumentative". (e.g., the existence of a discriminatory attitude among multiple Callaway people as evidenced by their own statements).

Some of these objections would be understandable if the plaintiff's repetition of a few undisputed facts had created a document of excessive length, but the plaintiff's statement under *Local Rule 56.1* is *six* pages long. The Defendant's Statement was *fifty two* pages, and their objection is *thirty* pages. Plaintiff has been true to *Local Rule 56.1*'s requirement of a "concise" statement. Defendant has not.

## II. **Particular Objections**

Plaintiff will respond in the order in which the defendant has raised his objections with reference to the same numbered facts that the defendant references.

1.  *In September of 2003, Callaway Golf Company purchased certain assets of the former Spalding Sports Worldwide. (Exh. 1)*

As the plaintiff notes above, this is included as a material fact, even though not disputed, since it is necessary to the sequence and context of the narrative. Mr. Duval's affidavit is perfectly valid as discussed in the objection to the motion to strike that affidavit.

2.  *In doing so, Callaway formed the Top Flite Golf Company, meant to be a stand alone entity that would manufacture and sell golf balls and golf equipment under the Top Flite and Ben Hogan names, as had Spalding. (Exh. 1)*

As the plaintiff notes above, this is included as a matter of fact, even though not disputed, since it is necessary to the sequence and context of the narrative. This applies to several objections below, but plaintiff will not continue to repeat the same point on the issue of undisputed facts. Mr. Duval's affidavit is perfectly valid as discussed in the objection to the Motion to Strike.

3. *Prior to this, Spalding had been in bankruptcy, (Exh. 1) largely related to the failure of its management after it had been purchased in 1996 by KKR. (Exh. 1)*

The obvious implication of Mr. Duval's affidavit is that KKR's approach turned the Company downward, an assertion that the defendant does not really dispute anyway. The only point plaintiff wishes to make is that the Company was, up to that time, successful with the plaintiffs as employees. The failure of KKR management was noted by several defense witnesses. (See e.g., Exh. 4 pp. 140-144)

4. *In addition to a different sales and marketing approach, KKR had saddled Spalding/Top Flite with a debt of over $850,000,000. (Exh. 1)*

As to the issue in #4, Mr. Duval did have first hand financial knowledge as noted in the above referenced opposition to the motion to strike his affidavit. The plaintiff is not attempting to quibble about being over, or at the debt number, although it should be noted that the figure is in millions, not thousands. The objection to the use of the word "saddling" is silly. Debt is normally conceived of as a burden and, as such, this is a fair characterization.

5. *This meant that even when the company was operationally profitable, it continued to lose money. (Exh. 1)*

As noted above, Mr. Duval had a good basis for his assertion and has provided an additional affidavit. Plaintiff did not assert that losses suffered by Callaway were the fault of KKR.

6. *Prior to this, Spalding/Top Flite had been averaging $55-$60 million dollars a year in profit. (Exh. 1)*

Mr. Duval has provided an additional affidavit. That there could be more than one reason for the Company's problems is not disputed, nor it is very meaningful.

7. *Callaway took over a new company which had already separated itself from Spalding products and which had already had layoffs and numerous transfers of employees who had worked on Spalding goods. (Exh. 1)*

Defendant is correct that Mr. Duval's affidavit does not provide numbers. His deposition testimony, that the defendant cites, does. Given that there is no substantive dispute about numerous employees leaving Spalding prior to the Callaway purchase it is difficult to understand the point of the objection. Plaintiff raised the subject because defendant witnesses have taken the position that they inherited a larger than necessary organization designed to service the full line of Spalding products which no longer existed in the new Top Flite. Plaintiff is merely pointing out that Spalding employees who serviced those products had already left the organization. This helps explain why the plaintiffs, supposedly being laid off because the organization was too large, were nonetheless replaced.

7. *Callaway took over a new company which had already separated itself from Spalding products and which had already had layoffs and numerous transfers of employees who had worked on Spalding goods. (Exh. 1)*

8. *When Callaway took over, Robert Penicka, who is in his early forties, had become the President and CEO of the Top Flite Golf Company. (Exh. 2, pp. 7-10)*

9. *The intention was to operate Top Flite Golf Company as a stand alone entity. (Exh. 1)*

10. *Penicka hired and put in place a new management team which included Andrew Kelleher, Jamie Bosworth and Thomas Fry, all in their thirties. (Exh. 2)*

Plaintiff reiterates his argument above as to the propriety of including some undisputed facts.

11. *Defendant's essentially assume that there is only one statement or piece of evidence reflecting age bias on the part of the new Callaway management team, that being Mr. Penicka's statement at the Chicopee Chamber of Commerce. This is not true. The evidence will show that Callaway brought with it a deep and abiding age prejudice that was reflected in numerous comments and actions of the new management team. This attitude of age bias came from the top (Mr. Penicka), and affected every decision maker in this case: Mr. Bosworth, Mr. Kelliher, Mr. Fry and Mr. Levandowski.*

*The nature of Mr. Penicka's statements at the Chicopee Chamber of Commerce are not substantially disputed.*

*What Mr. Penicka stated in his speech was:*

*"...if you all look up at the head table, you'll notice a lot of young faces up here and that's not by accident, that's by design, and in some cases, the people that are in the jobs they're in may not even be qualified to be in them yet".*
That there are supported allegations of *multiple* age related comments by multiple Callaway officials, is a fact, and not an argument. As to Mr. Penicka's speech, the defendant presented multiple versions, thereby confusing the issue of what is disputed.

12(a)   *Mr. Penickas' attitude permeated the Company.*

When the President of the Company openly and publicly expresses the desirability of young management *and* there are multiple other statements from other subordinates demonstrating the same attitude, it is a fair inference that his attitude permeated the Company, at least at the decision making level.

12(b)   *In the spring of 2004, he hired Jamie Bosworth to be the National Sales Director. Mr. Bosworth quickly held a meeting with his regional sales force.*

Other than this being undisputed, plaintiff fails to see the point of the objection.

12.   *Mr. Penickas' attitude permeated the Company. In the spring of 2004, he hired Jamie Bosworth to be the National Sales Director. Mr. Bosworth quickly held a meeting with his regional sales force. He began the meeting by asking the regional managers how many sales people they would get rid of. Bosworth stated that the people who had been there over 20 years were "bleeding the company dry".*

13.   *He referred to the "old regime" in speaking of existing employees and called them "deadwood".*

14.   *In response to Mr. Bosworths' request, one of the regional managers complained that he had a number of older sales people and that if he had to let them go, there would be issues of age discrimination.*

15. *Mr. Bosworth cynically suggested that he could escape this problem by also laying off some young people to make it look good ("just fire a couple of young guys with the old guys and no one will notice").*

16. *At that meeting, one regional manager, a new hire (by Mr. Bosworth), Mr. Conley (age 34), said he could let go 9-11 of his sales force of 15. (Exh. 5, Exh. 4, p. 51) Mr. Conley had not yet even met these men.*

The defendant's seven page argument as to the relevance and significance of Mr. Richardson's and Mr. Gielow's description of the meeting presents no cause for a motion to strike. The idea that the plaintiff cannot present "additional" facts in a summary judgment proceeding is absurd on its face. Complaining that a witnesses' testimony is "hindsight" is equally absurd. Witnesses are presumably remembering the past, not predicting the future. The lengthy repetition of Mr. Bosworth's deposition spin on this meeting, is meaningless in the summary judgment context. Nitpicking over the use of the word "began" is silly and meaningless.

Defendant goes on at length on the subject of whether Mr. Richardson's affidavit supports the issue of whether age discrimination itself was discussed at the meeting. It is true that the *literal* reference to "age discrimination" is in Mr. Gielow's affidavit and not in Mr. Richardson's, although they are obviously talking about the same thing. Defendant is simply wasting the Court's time quibbling over the reference.

Apparently, the defense wishes to take the position that unless Mr. Bosworth directly stated that age should be a reason for termination, the plaintiff should not be permitted to raise anything else he said. The idea that the plaintiff is limited to only the purest form of direct evidence is completely unwarranted and the entire structure of proof by inference in discrimination cases would not even exist if this were the case.

Understandably the defense would like to wish away the biased statements of Mr. Bosworth

as described by two witnesses who are not parties to this case. There is, however, no basis for doing so, and raising it in a motion to strike is frivolous.

Lastly, Mr. Conley' statements are not irrelevant because he was a new hire by Callaway, who, when faced with an older group of salespeople was willing to terminate them arbitrarily.

18. *Four weeks later, Mr. Richarsdon was terminated (Exh. 5). Mr. Bosworth testified that it was Dave Richardson who had asked the question at the regional meeting about age discrimination.*

19. *Bosworth said he terminated Mr. Richardson because he had a "bad attitude".*

Presumably the Defendant objects to the reference to Mr. Richardson's termination as an "additional" fact (see above) since it is not something they raised. Defendant then attempts a fine distinction: that when Mr. Bosworth testified that it may have been Mr. Richardson who raised the issue of age discrimination, he only raises a possibility and therefore, does not present evidence that it really was Mr. Richardson. The point is not who really in fact raised the issue, rather it is that Mr. Bosworth believes it was Mr. Richardson, who he then fired for a "bad attitude." It is a perfectly fair inference to claim from this, that the memory of Mr. Richardson's challenge affected Mr. Bosworth's decision. Mr. Richardson's supposed "defeatist mentality" may well be based on a memory of the age discrimination discussion. In any event, the defendant is simply arguing different possible interpretations of what Mr. Bosworth meant. It is completely improper to make this an issue for a motion to strike, when it is an undisputed piece of evidence that one can arguably draw different inferences from.

20(a) *During that time, period, Mr. Richardson and Richard Gielow were the top performing regional managers that the Company had.*

Mr. Richardson and Mr. Gielow certainly have personal knowledge of their and their region's sales performance during their tenures. That Mr. Rist has made contradictory statements about Mr. Richardson's performance is irrelevant in summary judgment - only the statement favorable to the plaintiff should be credited. If Mr. Richardson's performance was not good - by whatever standard the company utilized - it is they who possess the evidence and the ability to dispute this. Notably, they do not. The defendant's objection might be the subject of a motion in limine before a trial as to the degree it is desirable to contest the circumstances of Richardson's dismissal, but it is completely inappropriate to prohibit the plaintiff from even raising the subject in summary judgment. It should also be noted that Mr. Richardson's circumstances are not "anecdotes", but a specific instance of an older, successful member of sales management being terminated when the decision maker believed he was raising issues of age discrimination.

20(b)   *Mr. Bosworth terminated both of them. In Mr. Richardson's case, he was told that his job was being eliminated to make way for the hiring of Reid Gorman, age 34, a friend of Mr. Bosworth's.*

Defendant asserts that Mr. Richardson's affidavit does not reference Mr. Gorman. This is true. Counsel believes he concluded this from reading notes from a conversation with Mr. Richardson and forgot to put it in the affidavit. Counsel will research this with Mr. Richardson and if necessary re-do the affidavit.

21.   *In Mr. Gielow's case, Mr. Bosworth said Mr. Gielow was let go because he was "incompetent".*

Here, the defendant points out that the cited reference is wrong and that it is on page 50 of the deposition instead of page 48. It is nonetheless Mr. Bosworth's testimony. A small mistake on the page number does not justify striking this from the record.

22. *But Mr. Gielow was told that his position was being "consolidated" (Exh. 6). In fact, he was immediately replaced by an individual named Chris Reh (age 35), who had no management experience, and who now works for Mr. Gielow*

Defendant asserts that Mr. Gielow has no first-hand knowledge regarding Mr. Reh. This is not true. Mr. Gielow stated in his affidavit that Mr. Reh sought his advice after Mr. Gielow had been fired and Mr. Reh had replaced him (Exh. 6, para. 4). There is no basis for the objection.

23. *The evidence of Mr. Bosworth's attitude towards age is not limited to these events that occurred while he was at Top Flite. When he appeared at his deposition in this case, even though he obviously knew that he was appearing as a management representative and decision maker in an age discrimination law suit, he could not restrain himself from discriminatory comments. He referred to the "inside crew" at Top Flite as the "old regime". (Exh. 4, p. 119).*

What Defendant objects to as "argument" is necessary to properly present the context of Mr. Bosworth's remarks. That they were made at the deposition in this case is most certainly a fact and that he would do so under such circumstances demonstrates the depth of his prejudice and bias. References to the "old regime" are manifestly relevant to the issue of age discrimination.

24. *He explained at length that Paul Duval was part of the "old regime", that he "concentrated on how things were done in the past", he criticized Mr. Duval "because Paul was telling us what we should do from ten years ago and it had no point of relevance", and he was "just so stuck in the old ways" (Exh. 4, pp. 28-33).*

Plaintiff fails to see how direct quotes from Mr. Bosworth can be stricken as "argument." One could interpret the reference to the old regime on page 28 as excluding Mr. Duval, but in context (including pg. 27 above) it is fair to infer that Mr. Duval was also seen as part of the "old regime" from these statements. The constant use of the word "old" in describing Mr. Duval's work is irrelevant.

25. *In fact, Mr. Duval never expressed these attitudes, it was Mr. Bosworth's perception that he was stuck in "old ways" (Exh. 1).*

Plaintiff agrees that Mr. Bosworth undisputedly perceives Mr. Duval as "stuck in the old ways." The point is that he had no basis for this perception - except for Mr. Duval's age and years of experience, which Bosworth disparaged.

26. *At his deposition, Mr. Bosworth also offered his opinion about "experience":*

> *I made the statement a lot is that a lot of people there who said they had twelve, thirteen, fifteen years experience and, in my opinion, they had one year of experience, they just did it thirteen times or fifteen times in a row (Exh. 4, pp. 26-27)*

Defendant does not dispute that this was Mr. Bosworth's testimony. It is a fair characterization to say it is an opinion of Mr. Bosworth on the subject of work "experience". Defendant is free to ague the opposite, but it is hardly a proper subject for a motion to strike.

27. *Mr. Bosworth made it clear that the above remarks were directed at "most of the sales management team" and in particular, Paul Duval (Exh. 4, p. 27).*

The cited reference certainly does support the statement. Right after Mr. Bosworth's comments, counsel asked "who in particular are you talking about"? The reply was "most of the sales management team that was there". When asked "who is that"? Mr. Bosworth replied "Paul Duval who was the one....(Exh. 4, pp. 26-27). There is no basis for an objection.

28. *He reiterated that Mr. Duval didn't really have more experience in the golf business than the 34 year old Reid Gorman because he just "had more years on the job', but not more "experience" because he was not "exposed to the types of business that the modern golf equipment manufacturers needed". (Exh. 4, p. 111)*

Defendants themselves seem to state there is no basis for an objection. The statement was made, there is no reason to strike it from the record.

29. *Mr. Bosworth also identified Lou Tursi (age 47), his predecessor, as a member of the old regime (Exh. 4, p. 28) and on a visit to Top Flite before his hiring, told Bob Penicka he had no interest in working with "that gentleman", who Mr. Bosworth laughed at to his face, telling him "on a social visit" that he was "still in the past". (Exh. 4, pp. 140-141)*

11

Defendant does not state a basis for an objection or a reason to strike the material. Defendant just wants to put a different interpretation on the same facts.

30. *Andrew Kelleher, who made the decision to terminate John Bettencourt and Michael Behaylo demonstrated the same attitude as Mr. Bosworth and Mr. Penicka. Mr. Kelleher who was in his thirties and who held the position of Vice President of Finance, told John Bettencourt that long term employees who "are still here all this time" were "deadwood". (Exh. 7, #12) and that the top management of the Company looked at people with a lot of seniority and could not understand why they were still there. (Exh. 8, pp. 107-108)*

There is no lack of support in the materials cited, these are direct quotes. That the defendant chooses to interpret the statements in a slightly more innocuous fashion *is* irrelevant, and certainly not a proper reason for a motion to strike. That Mr. Kelleher would not tell Mr. Bettencourt to his face that he in particular was "deadwood" hardly proves that he didn't believe it. He may simply have caught himself and attempted to be polite while obviously making clear to Mr. Bettencourt his overall attitude. Defendants desire for an interpretation or spin favorable to them is not a proper reason to strike the matter from consideration in summary judgment.

31. *Just like Mr. Bosworth, Andrew Kelleher could not restrain his discriminatory attitudes at his deposition. He too, knowing he was appearing as a management representative in an age discrimination suit, still maintained his prejudiced beliefs. When shown a department organization chart (Exh. 9), he referred to it as the organization he had "inherited" and stated "it is a lot of legacy folks that had been around with Spalding" (Exh.10, pp. 10-11).*

The statements construed as argument merely place Mr. Kelliher's quotes in context and do so accurately.

32. *Mr. Kelleher considered both Mr. Bettencourt and Mr. Behaylo "overqualified" for accounting positions and a few months after their layoffs, he hired recent college students in their 20's as accountants. (Exh. 10, pp. 53-54)*

The objection is incomprehensible. The "overqualified" statements are direct quotes from Mr. Kelleher concerning the accounting positions for which he had hired two individuals in their twenties.

Defendant simply takes the opportunity to argue these facts in relation to the case. That is no a basis for a motion to strike.

33.  Mr. Kelleher told Paul Duval that anything that had happened before 2003 was "meaningless". (Exh. 3, p. 212)

Plaintiff cannot understand what the objection is, or why it is made the subject of a motion to strike. As noted above, the plaintiff has both a right and an obligation to raise relevant evidence not cited by the moving party.

34.  The Callaway vision of the desirability of a "young by design" team was also shared by Richard Levandowski, who played a role in the termination of Michael Behaylo and by Thomas Fry who made the decision to terminate Gary Lonczak. Mr. Levandowski was Mr. Bettencourt's successor in the finance department. (Exh. 11, p. 10).

This is a fair characterization of Mr. Levandowski's testimony where he went on at some length on the subject of the negatives of an older work force. Page 10 is attached.

35.  When asked about discussions he'd had with Mr. Kelleher, Mr. Levandowski had the following thoughts to offer:

> Q. Did you ever hear him comment on the age of the employees who were there when he arrived or throughout your tenure?
> A. We always talked about the age of the manufacturing group because that seemed to be always one of our problems.
> Is's an elderly workforce and therefore generates additional costs in higher medical insurance, higher costs of those things.
> Q. Higher cost of what?
> A. Medical costs and that type of cost.
> Q. Again, when you say the manufacturing group, that would include who?
> A. Basically the hourly people.
> Q. These are people involved directly in the manufacture of the balls?
> A. Right.
> Q. When you say "we" would discuss it, you mean who?
> A. Well I would discuss it with Andrew. We would look at the costs. We'd have a lot of absenteeism. If it gets really hot, some of the elder people do not show up as often; it's just the way it is.

> *It wasn't a statement of degrading anybody, it's just, okay, we have an elderly workforce, we're going to have higher medical benefits, we're going to have higher absenteeism. It just happens.*
> Q. *Had someone examined the absenteeism in relationship to the age of the workers?*
> A. *I believe we had that study done just to get -- over a brief period of time, eight, ten weeks.*
> Q. *When was that done?*
> A. *I couldn't be honest and tell you. I mean, we would look at it at least once a year just to see what was going on. Absenteeism was always a big problem.*
> Q. *When you say "we," now you're talking about who?*
> A. *If it was absenteeism, we would ask Lynn because at the time she also had payroll so we'd let her do the research and give us with statistics.*
> Q. *What was the research you were asking her to do?*
> A. *We'd look and say –*
> Q. *When you say "we" you mean who?*
> A. *Management - - Andrew, myself, Jim Laughlan, we would look at the manufacturing costs, we'd get Tom Fry involved.*
> *We'd say this is a problem, get into the summer months or the high peak periods of production and if you have high absenteeism then you have to work overtime to recover the same amount of hours. It's just additional expense.*
> Q. *You're saying that in particular you had asked Lynn Lafond to do a study on that?*
> A. *We would ask to take a look at the absenteeism, is it running higher than normal, is it the same.*
> Q. *Did she produce such reports?*
> A. *Yes.*
> Q. *Did you ask that it be analyzed in terms of the age of the employees?*
> A. *Well, we kind of knew which departments were more elder than not.*
> *We knew where the younger people had been just hired or the younger ones were. We didn't do it by age specific.*
>
> Q. *How did you conclude that the older workers were more prone to absenteeism?*
> A. *I didn't say the more elder. I said we have an elder workforce so that tends to lead to higher than normal absenteeism. If you take a look at a younger workforce - - and it doesn't matter it it's in this business or not - - you go to a younger workforce they have a tendency to not have as much absenteeism.*
> *(Exh. 11, pp. 43-44 )*

Mr. Levandowski's direct testimony as to his opinion, and the opinions of other decision

makers as to the age of the work force are certainly "facts" and manifestly relevant.

36. *These comments are revealing in many ways. While defendants may attempt to dismiss them as comments about hourly workers, they clearly reflect, and are consistent with the Company's attitude towards all older workers as demonstrated in other statements by Messers. Penicka, Bosworth and Kelleher. It is notable as well that Mr. Levandowski states that Tom Fry was part of this group which monitored and worried about employee's ages. Mr. Fry was the decision maker in Mr. Lonczak's case.*

   The comments fairly put Mr. Levandowski's statements in context and the reference to Mr. Fry is a material and relevant fact.

37. *Lastly, the depth to which the Callaway's attitude towards age and experience permeated the Company was also evident when a member of Callaway's personnel department in California visited Chicopee to help employees with the new benefit package. She commented that she had never seen a company with so many employees with over 20 years seniority and that, at Callaway, she was accustomed to people who had been there less than 10 years. (Exh.1)*

   There is no basis for objection, it is a statement made by a Company representative concerning seniority in the work force.

   For these reasons, the motion should be denied.

                                             THE PLAINTIFF,
                                             JOHN BETTENCOURT
                                             BY HIS ATTORNEY


Dated: March 9, 2007                         / S / Maurice M. Cahillane
                                             Maurice M. Cahillane, Esq.;
                                             EGAN, FLANAGAN AND COHEN, P.C.
                                             67 Market Street - Post Office Box 9035
                                             Springfield, MA 01102
                                             (413) 737-0260; Fax: (413) 737-0121
                                             BBO# 069660


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the Opposition to Defendant's Partial Motion to Strike Plaintiff's Statement of Disputed Facts was served this 9th day of March, 2007, on all parties, by electronic filing to Jay M. Presser, Esq., Skoler, Abbott & Presser, 1 Monarch Place, Springfield, MA 01144.

          / S / Maurice M. Cahillane

12085-050157\131248.wpd

# ATTACHMENT

# P. 10 - DEPO. OF

# R. LEVANDOWSKI

Case 3:05-cv-30179-KPN    Document 49-2    Filed 03/09/2007    Page 2 of 2

MICHAEL BEHAYLO vs. THE TOP-FLITE GOLF COMPANY
RICHARD LEVANDOWSKI        JULY 24, 2006

**Page 9**

1  Q. Securing inventory assets, did you say?
2  A. Yes.
3  Q. An analysis of?
4  A. Manufacturing variances.
5  Q. And establishing costs?
6  A. Yes.
7  Q. At some point -- well, do you know Gary
8  Lonczak?
9  A. Yes; I do.
10 Q. In what capacity did you know him?
11 A. Co-worker. He held various positions in
12 the golf club area as far as -- and I'm not sure
13 exactly what his title was but I know he did some
14 purchasing and planning and that's part of the
15 cost accounting needs for me -- we need to know if
16 they're buying stuff and get the costs and so
17 forth.
18      We worked together but nothing beyond
19 that.
20 Q. Paul Duval, did you know him?
21 A. I knew him as a friend but we had very
22 little job contact.
23 Q. Mike Behaylo?
24 A. He was a direct report to me.

**Page 10**

1  Q. Did you hire Mr. Behaylo?
2  A. No.
3  Q. Was he there when you got there?
4  A. Yes; he was.
5  Q. What was his job position?
6  A. It said cost accountant -- I'm not sure
7  if it said senior or not.
8  Q. And John Bettencourt, did you know him?
9  A. Yes.
10 Q. What was your relationship to him at
11 Top-Flite?
12 A. We were co-workers. He had been my
13 predecessor and he moved on to work in
14 manufacturing.
15      After the bankruptcy, he was -- his
16 reporting responsibility changed to report to
17 Andrew Kelleher, the same person I reported to.
18 Q. Changed from who?
19 A. It was reporting to the vice president
20 of manufacturing.
21 Q. Who had been who?
22 A. Michael Esch.
23      MR. CAHILLANE: I'm going to show
24 you a document. If I could have that marked?

**Page 11**

1      (Plaintiff's Deposition Exhibit
       No. 1 offered and marked.)
2
3  Q. (BY MR. CAHILLANE) Before I ask you
4  about this, when -- you understand that at some
5  point in 2003 Callaway took over the Top-Flite
6  operation?
7  A. Yes.
8  Q. Did that change your position at all?
9  A. No.
10 Q. I'm going to show you this chart. First
11 I'll ask you, have you ever seen this before?
12 (Indicating.)
13 A. No.
14 Q. Can you tell me whether or not this
15 would be an accurate depiction of the structure of
16 the Finance Department at Top-Flite at some point
17 in time?
18 A. I'm not sure what this means here, under
19 John Bettencourt.
20 Q. You're not sure what what means?
21 A. I'm not sure what those lines mean
22 because these two gentlemen reported to me.
23 Q. Mr. Normand and Mr. Behaylo?
24 A. Yes.

**Page 12**

1  Q. You're saying they did not report to
2  Mr. Bettencourt?
3  A. No.
4  Q. Anything else?
5  A. I don't believe so.
6  Q. Do you know about what period of time
7  this would represent?
8  A. Well, with Jim on here it would have to
9  be November-ish 2003.
10 Q. When you say Jim, do you mean Jim
11 Laughlan?
12 A. Jim Laughlan.
13 Q. Why do you use him as a frame of
14 reference?
15 A. Because he was a new hire after Andrew
16 Kelleher after the sale.
17 Q. Did he take somebody's place?
18 A. We had an opening for a few years and
19 Mr. Kelleher came in and wanted a controller.
20 Q. Do you know whether anyone else in the
21 department had applied for that?
22 A. That, I don't know.
23 Q. I take it you didn't?
24 A. No; I did not.