*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

| | |
|---|---|
| MICHAEL BEHAYLO<br><br>               Plaintiff,<br><br>vs.<br><br>CALLAWAY GOLF BALL<br>OPERATIONS, INC.,<br><br>               Defendant.<br><br>*Consolidated For Trial With*<br><br>JOHN BETTENCOURT<br><br>vs.<br><br>CALLAWAY GOLF BALL<br>OPERATIONS, INC.,<br><br>               Defendant. | CIVIL ACTION NO. 05-30178-KPN<br><br><br><br>CIVIL ACTION NO. 05-30179-KPN<br><br><br><br>**DEFENDANTS' MOTION TO PRECLUDE<br>THE TESTIMONY OF PLAINTIFFS'<br>EXPERT, DR. CRAIG MOORE, AND TO<br>EXCLUDE PLAINTIFFS' EXPERT<br>REPORT** |

I.     **<u>Introduction</u>**

On October 12, 2007, this Court set a deadline of December 31, 2007 for Plaintiff

to Designate any Expert and to submit the materials required by Fed. R. Civ. P. Rule

26(a)(2).  On December 31, 2007, Defendant was served with a Designation of Dr.

Craig Moore ("Moore") as Expert and was provided, for each of the four Plaintiffs, an

Economic Report prepared by Moore ("Expert Report").[1]  On January 8, 2008,

Defendant filed a Motion to Strike the Report, with supporting Memo of Law, based

---

[1]None of the cases were, at that time, consolidated for trial.  Separate documents were therefore filed for each of the four Plaintiffs whose cases are scheduled for trial commencing March 3, 2008.  A copy of each report is attached hereto as Exs. 1-4.  The transcript of the Deposition of the expert is attached as Exhibit 5.

upon the failure to comply with the express requirements of Rule 26, including the failure to specify the expert's compensation.[2]  That motion remains pending.

After the expiration of the deadline and after the Motion to Strike was filed, without leave of court, Defendant was served an "amended report" that, while curing most of the defects noted in the Motion to Strike, still failed to comply with the obligations of Fed. R. Civ. P. 26(a)(2)(B) to specify the expert's compensation.

Defendant proceeded to timely depose Moore, but the expert was unable to provide the requisite information relating to his compensation, although it was purportedly on his computer.  Further, while at deposition the expert "offered to further supplement the report" and provide the information regarding his compensation, he has not done so.  (Moore Dep. pp.11-12)[3]  The Motion to Strike based on procedural defects is still pending and is hereby supplemented by the instant Motion which is based on

---

[2]The original reports were not signed, did not include a list of the cases in which the expert had testified, and did not include a listing of publications.  Further, it failed to meet the obligation to specify the expert's compensation.  As to compensation, the Memorandum noted: "The Expert Report states that the expert is being paid $200 per hour for time spent on preparing the report and will be paid $300 for time spent testifying at trial, which is the expert's billing rate.  However, a more detailed statement is required under Rule 26(a)(2)(B).  *See* Amster v. River Capital Intern. Group, LLC, 2002 WL 2031614, *1 (S.D.N.Y.  2002) ("Although it may be common for attorneys to consider this requirement satisfied by the disclosure of the expert's hourly rate, [Fed. R. Civ. P. 26] on its face refers to the expert's 'compensation,' not to the expert's billing rate.")

[3]Similarly, as noted below, at deposition the expert failed to produce some of the documents purportedly relied upon that were subpoenaed for the deposition.  They still have not been produced, and could not be subjected to careful review if they were produced at this late stage.  In many instances, the expert wholly failed to obtain relevant documents that would clearly have enhanced the reliability of his report and which should have been available.  Thus, for example, in the case of Mr. Duval, the last tax return obtained by the expert for review was for 2004, and yet calculations continued well beyond that time.  (Moore Depo. pp. 45-46)  While a single instance of such sloppiness might go solely to credibility, as discussed, the totality of the errors are such that even if the methodology was correct (which it was not), the reports are clearly unreliable and could not assist the trier of fact.  *When a Defendant merely asserts that the report is deficient in some respect it is a matter of credibility.  When the expert himself concedes material errors the report is unreliable and cannot be the basis of expert testimony.*

Rule 702 of the Federal Rules of Evidence ("Rule 702").

Moore's report purports to reflect his assessment of the back and frontpay that may be recovered under the Age Discrimination and Employment Act ("ADEA").[4]  Of course, the issue of frontpay is not properly before the jury but, rather, is an equitable issue for the court to decide.[5]  Thus, neither the report itself nor testimony regarding frontpay should be placed before the jury.  While that alone would not be the basis for barring the expert's testimony regarding backpay, the fact is that calculation of simple backpay is not so complex that expert testimony would be needed.  In the exercise of his gatekeeper function, the fact that backpay (perhaps liquidated) is the only damage calculation for the jury to decide negates the need for an expert, and clearly compels excluding the testimony of an expert whose report, as here, wholly fails to satisfy the requirements for admissibility of expert testimony in federal court under Rule 702.  *See* Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999); Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).

## II.  **Admissibility of Expert Testimony under Federal Rule of Evidence 702**

The admissibility of expert testimony in federal court is governed by Rule 702, which provides:

---

[4]The report also gratuitously notes that the Plaintiff has indicated that his termination has caused "considerable stress and anxiety", the value of which is "typically left to the common judgment of the jury."  Of course, emotional distress damages are not recoverable under the A.D.E.A.  His reference to such damages and the jury's typical role in assessing such damages is yet one more reason to preclude the admission of the report.

[5]Kelley v. Airborne Freight Corp., 140 F.3d 335, 354 (1st Cir. 1998) ("Within federal employment discrimination law, front pay is generally an equitable remedy awarded by the court, while, under ch. 151B, the jury awards front pay.") (*internal citations omitted*); Lussier v. Runyon, 50 F.3d 1103, 1108 (1st Cir. 1995); Wildman v. Lerner Stores Corp., 771 F.2d 605, 616 (1st Cir. 1985); Dominic v. Consolidated Edison Co. of New York, Inc., 822 F.2d 1249, 1257 (2d 1987); Currier v. United Technologies Corp., 326 F. Supp. 2d 145, 158 (D. Me. 2004), *aff'd* 393 F.3d 246 (1st Cir. 2004).  This is addressed by separate motion.

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Ev. 702.  The district court is vested with a "gate-keeping" function regarding the admissibility of expert testimony under Rule 702, and this duty extends to *all* experts. *See* Kumho Tire Co., 526 U.S. at 149.  In exercising this function, the court must initially determine whether the witness is "qualified" as an expert and whether the purported testimony concerns "scientific, technical, or other specialized knowledge."[6]

The court must then analyze the expert's testimony in light of the three prongs of Rule 702.  The first prong requires the expert to rely on "sufficient facts or data," which goes to the underlying accuracy of the expert's findings.  The court must then analyze the *reliability* and *relevance* of the witness's proposed testimony under Daubert and its progeny.  According to the Supreme Court, "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592-593; *see also* Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc., 124 F.3d 252, 259 (1st Cir. 1997) ("[T]he trial court must decide whether the proposed testimony, including the *methodology* employed by the witness in arriving at the proffered opinion, rests on a *reliable foundation* and is *relevant* to the facts of the case.") (*internal citations omitted, emphasis in original*); L.B. Corp. v. Schweitzer-Mauduit Intern., Inc., 121 F. Supp. 2d 147, 155 (D. Mass. 2000).

---

[6]While Moore has been a frequent witness, and has written numerous articles, it appears that he wrote only a single article relevant to the issue of calculating economic damages. (Moore Dep. pp. 99-100)

This inquiry is "a flexible one" that "must be tied to the facts" of each case. Kumho Tire Co., 526 U.S. at 150 (*internal citations omitted*).  As experts vary considerably in kind, the court must tailor its reliability inquiry pursuant to the type of expert that is seeking to give testimony in each case.  *See, e.g.,* Kumho Tire Co., 526 U.S. 137 (Courts should look beyond the enumerated factors of Daubert when determining reliability of non-scientific experts).

While the trial court should focus on an expert's methodology, rather than [his] conclusions, they "are not entirely distinct from one another."  General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).  "[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable."  Ruiz-Troche v. Pepsi Cola of Puerto Rico, 161 F.3d 77, 81 (1st Cir. 1998); *see also,* American General Life and Acc. Ins. Co. v. Ward, --- F. Supp. 2d ----, 2008 WL 68837 (N.D. Ga.) (barring the testimony of an expert) ("The proponent of expert testimony bears the burden of demonstrating that the expert "is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving a disputed issue of material fact." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004).  *See also, McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1238 (11th Cir. 2005) (recognizing that "[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion").  Plaintiff, of course, need not prove that the expert is correct to establish the admissibility of the evidence.  However, when, as here, the expert admits that much of his report is wrong and other portions lack a reliable factual basis, or if he applies erroneous standards, the expert's testimony should be excluded.

Ultimately, "[u]nder Rule 702 of the Federal Rules of Evidence, it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis. Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006). Where, as here, the factual basis of an expert's testimony is called into question, the district court must determine whether the testimony has "a reliable basis". Crowe v. Marchand, 506 F.3d 13, 17 (1st Cir. 2007). Ultimately, the court must look further at the methodology, facts and data that the expert relied on to determine whether the expert's testimony is relevant or helpful to the trier of fact in determining damages. *See* Ruiz-Troche v. Pepsi Cola, 161 F.3d 77, 81 (1st Cir. 1998) (relevancy under Rule 702 goes beyond Rule 402 relevance; it must also "assist the trier of fact.").

II.    **Problems In Methodology And Other "Errors" Common Throughout The Reports**

Dr. Moore uses the same methodology he uses to assess tort damages relating to wrongful discharge. However, damages under the A.D.E.A. are not tort damages but set by statute, and are more limited. *Cf.* CIR v. Schleier, 515 U.S. 323, 336, 115 S. Ct. 2159, 2167 (1995) (monetary damages under the A.D.E.A. are limited to backwages and liquidated damages); Powers v. Grinnell Corp., 915 F.2d 34, 42 (1st Cir. 1990); Erie County Retirees Association v. County of Erie, 166 F. Supp. 2d 310, 311 (W.D. Penn. 2001) ("Fundamentally, the A.D.E.A. is of a make-whole nature."). Under the A.D.E.A., the district court should fashion a remedy that makes an injured Plaintiff *whole*, and not one that provides a Plaintiff with a windfall at the expense of the employer. *See* id. In other words, awards under the A.D.E.A. should "put the Plaintiff in the economic position he would have occupied but for the discrimination." Kolb v. Goldring, Inc., 694

F.2d 869, 872 (1st Cir. 1982) (*citations omitted*); <u>Erie</u>, 166 F. Supp. 2d at 311 (same).

Only actual monetary losses may be recovered.  <u>Maleszewski v. U.S.</u>, 827 F. Supp.

1553, 1556 (N.D. FL. 1993).

      The expert's testimony seeks to value backpay (including fringe benefits) and

frontpay as if it were a tort.  Moore's methodology conflicts with legal precedent, which

does not permit a valuation for economic losses based on "cost to the employer".

Moreover, his "expert" calculations include the cost of benefits never even offered by

this employer!  It also improperly factors in the employer's theoretical costs for health

insurance costs that one plaintiff never had and another replaced without additional

cost.  Even as to the question of backpay, which should be a relatively easy calculation,

the expert uses data inconsistent with the Plaintiff's own testimony and otherwise

demonstrates that his calculations are clearly wrong.[7]

      Moore used a so-called "opportunity cost" formula in calculating each Plaintiff's

"lost earnings".  Under this formula, Moore included as lost earnings any benefit that the

Defendant made available to its employees and each benefit was given a "value" equal

to the Defendant's alleged cost for supplying such benefit.[8]  While arguably such an

approach is acceptable to assess tort type damages, Moore's use of "opportunity cost"

---

[7]Thus, deposition exhibits show the salary of each Plaintiff when hired by Defendant in September 2003.  As noted below, he failed to use this figure, using instead tax data that included moneys, such as accrued vacation, that were paid in 2003 not as salary, but resulting from the termination itself.

[8]As Moore explained, "[t]he basis of damages is opportunity cost.  If it's a particular benefit, whether they took advantage of it or not, but they had the opportunity to take advantage of it if they wanted to exercise it, that's a loss."  (Moore Depo. pp. 26-27)  Moore went on, "I view salaries and earnings of all types as part of a compensation package an employee gets from an employer.  I also view all of the benefits or *potential* benefits or programs that that employee receives or *could* receive as part of the compensation package."  (Moore Depo. pp. 36-37) (*emphasis mine*).

methodology is inconsistent with the statutory scheme "make whole" purpose of the A.D.E.A.

Even if he had accurately determined what benefits were offered by this employer (which as discussed below he did not), and even if he had accurately only included the cost of actual fringe benefits costs to this defendant (which as discussed later he did not), such an approach is unacceptable and results in an inappropriate windfall.  Although the First Circuit has yet to rule on the issue, numerous courts have rejected the "opportunity cost" approach as contrary to the A.D.E.A.'s remedial scheme with regard to calculating fringe benefit awards under the A.D.E.A., and instead have found that the proper calculation is the proven replacement cost, if any, incurred by the Plaintiff in securing alternate coverage.  See Pearce v. Carrier Corp., 966 F.2d 958, 959 (5th Cir. 1992) ("A.D.E.A. claimant is limited to recovery of those expenses actually incurred by either replacement of the lost insurance or occurrence of the insured risk."); Kossman v. Calumet County, 800 F.2d 697, 703-04 (7th Cir. 1986) ("Including the cost of insurance coverage in a backpay award when the victim of discrimination fails to secure alternative coverage allows the victim to recover an unwarranted windfall unless he or she can demonstrate that they were unable to secure coverage and had a medical expense."), overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834, 835-36 (7th Cir. 1988); Erie, 166 F. Supp. 2d at 311 (awarding damages without factoring in post-termination insurance benefits would create a "windfall"); McKelvy v. Metal Container Corp., 674 F. Supp. 827, 832 (M.D. Fla. 1987), aff'd in part on other grounds and vacated in part on other grounds, 854 F.2d 448 (11th Cir. 1998); Merkel v. Scovill, Inc., 570 F. Supp. 141, 146 (S.D. Ohio 1983) ("to include the amount of the

insurance premiums in the back-pay award would make plaintiffs more than whole."); *see also,* Galindo v. Stoody Co., 793 F.2d 1502, 1517 (9th Cir. 1986) ("lost insurance coverage, unless replaced or unless actual expenses are incurred, is simply not a monetary benefit owing to the plaintiff.").[9]

Several critical problems with Moore's flawed methodology are revealed by his method of calculating the economic damages purportedly resulting from the loss of health insurance by virtue of a Plaintiff's termination. In three of the four instances,

_____

[9]The impact of this expert's inappropriate use of employer cost as the measure of damages is demonstrated clearly here in various ways. Thus, for example, Moore calculated the amount of Behaylo's "lost benefits" as equaling 19.5% of his "prior earnings". This 19.5% figure included, among other things, health insurance, life insurance, short-term and long-term disability insurance, 401(k) contributions, paid vacation, paid time off, and sick leave. Moore used this 19.5% figure in each of the twenty years represented by the "lost benefit" column of Table 2 in Behaylo's Report. Over this twenty year period, Behaylo's lost benefit calculation is estimated at $208,093, and pursuant to Moore's "opportunity cost" methodology, Behaylo would be entitled to recover this entire amount. However, since his termination, Behaylo has been receiving health insurance benefits from his spouse's employer. (Moore Depo. p. 42) Under Moore's methodology, based on employer costs, rather than providing the money actually spent by the employee to replace the benefits (which were none) he inappropriately provides the Plaintiff with a significant windfall, which is improper under the ADEA. *See* Powers, 915 F.2d at 42. Moore himself admits that health insurance would be a "major component" of the $208,093 benefit package. (Moore Depo. p. 156) Since Behaylo has already been covered by health insurance through his spouse, giving him money to pay for that which he did not pay for would put Behaylo in a significantly better economic position than he would have been in but for the discrimination. *See* Kolb, 694 F.2d at 872.

The inappropriateness of the method was even more clearly illustrated in the case of Gary Lonczak. Moore calculated Lonczak's "lost benefits" by taking 14.8% of his salary at the time of his termination. (Moore Depo. p. 155) (although this figure was based on the employer cost of Duval's estimated benefit package, not Lonczak's, and the figure related to a different position than Lonczak held at the time of his termination.) Using this percentage, Moore calculated Lonczak's "lost benefit" package at $223,230, and again, a "major component" of this figure would have encompassed health insurance. (Moore Depo. p. 156) However, in making this calculation, Moore's methodology failed to account for the fact that Lonczak had declined health insurance while he was employed with Defendant. Moore also did not account for the fact that he had insurance through his spouse, who worked for MassMutual. (Moore Depo. p. 151) Therefore, under Moore's methodology, Lonczak would be entitled to the purported cost of health insurance benefits at the time of his discharge, even though he had rejected such benefits during his employment with Defendant and had not paid to replace the benefit. (Moore Depo. p. 154) Therefore, as is the case with Behaylo, Moore's methodology produces an estimated benefit package for Lonczak that makes him more than whole and puts him in a much better economic position than if the discrimination had not occurred. *See* Kolb, 694 F.2d at 872.

Moore calculates damages based on the purported *cost* of fringe benefits, including health insurance to the employer, rather than replacement costs, while in Bettencourt's case, he used a replacement cost methodology. Thus, in the consolidated trial of Bettencourt and Behaylo, the same expert would seek to present evidence of damages using two different methodologies. The expert used the replacement cost approach when calculating the value of the benefits for John Bettencourt, he testified, because in Bettencourt's case he had that information. (Moore Dep. p. 112)[10] Of course, as the Plaintiff's expert witness, there is no reason why he could not have obtained appropriate documentation of replacement costs from each of the Plaintiffs.

The inexplicable failure to seek out data to utilize replacement costs (if any) cannot justify the use of an inappropriate measuring stick. Put simply, replacement costs, not the cost to the employer, is the appropriate measure of damages for the loss of such benefits. *See, e.g.,* Erie County Retirees Ass'n v. County of Erie, Pennsylvania, 66 F. Supp. 2d 313, 315 (W.D. Pa. 2001) ("Simply, the cost to the Defendants of providing a benefit is not the proper measure of make-whole damages under the A.D.E.A.").

The problem is compounded by the fact that the expert includes the cost of the health insurance benefit as damages even if the employee replaced the benefit at no cost, an approach that creates a windfall that is completely at odds with the "make whole" purpose of the A.D.E.A., and one that has been rejected by numerous courts in A.D.E.A. cases. Further compounding the methodology error, the expert's damage assessment includes the cost of health insurance regardless of whether the employee

---

[10]As discussed below, he had no such information. He merely had a typed sheet where Bettencourt wrote down his own assessment of replacement costs.

was actually even covered by the employer's health insurance plan at the time of his termination.

In addition to these fundamental methodology flaws, the expert's calculations as to the cost of the various benefits were not even based on evidence reflecting the cost of any such benefit to Defendant.  Indeed, it places a value for lost benefits that Plaintiffs had received from Spalding, even though those benefits had never even been offered by this company, and hence clearly were not "lost" by virtue of the termination.  Thus, he based his "cost" analysis on information provided to employees by Spalding in 2002 or 2003.  As a result, his calculations include, for example, the value of a pension plan previously provided by Spalding that ended with the bankruptcy of that Company.

In several cases, items that Moore himself admits are not properly considered "fringe benefits", such as unemployment insurance, were included as fringe benefits in the calculations.  In several cases the employees became self-employed, or the owner of a business.  The expert, who used gross income to calculate the losses, used net income to the business for calculating interim earnings, allowing the Plaintiff to eliminate from interim earnings things that cannot be "written off" by a wage owner, an approach also rejected by the courts.  *See* Teichgraeber v. Memorial Union Corp. of Emporia State University, 932 F. Supp. 1263, 1266 (D. Kan. 1996).

In addition to a patently flawed methodology, Moore's calculations and substantive findings are incomplete, inaccurate, replete with errors and thus unreliable.[11]  Indeed, as noted below, at deposition *the expert himself acknowledged*

---

[11]The errors in the report come in all shapes and forms.  Thus, the Behaylo report states that "Mr. Behaylo's annual salary prior to his termination was $81,535 according to company records."  (Moore Report p. 3, Moore Dep. pp. 80-81)  His actual salary was over $32,000 less. Id.  Presenting such a statement to a jury risks confusion on a matter that is actually undisputed.

_that in various aspects his own calculations are flawed or simply incorrect_.  Given these

admissions, the expert should not be allowed to either introduce a flawed report or

testify about damages.  He clearly should not be allowed to testify about calculations

that, beyond being based on an improper methodology, are admittedly and/or patently

wrong.  Nor should he be allowed to testify differently as to different calculations at trial,

leaving Defendant to analyze and respond to what would, in substance, be a

supplemental expert report presented, for the first time, at trial.  Thus, the court noted in

Foraker v. Schauer, 2005 WL 6000493 *4 (D. Colo. 2005):

> The purpose of Rule 26(a)(2)(C) is to prevent unfair surprise at trial and to permit
> the opposing party to prepare rebuttal expert reports, to depose the expert in
> advance of trial, and to prepare for depositions and cross-examination at trial.
> _See_ Coles v. Perry, 217 F.R.D. 1, 4 (D.D.C. 2003) (noting that "the very purpose
> of the rule is nullified" when an expert "supplements" his report by addressing a
> new matter after discovery has ended).  The Rule also prevents experts from
> "lying in wait" to express new opinions at the last minute, thereby denying the
> opposing party the opportunity to depose the expert on the new information or
> closely examine the expert's new testimony.  _See_ Keener v. United States, 181
> F.R.D. 639, 641 (D. Mont. 1998).

Further, although compelled by a deposition subpoena to present **all** the materials

purportedly relied upon to prepare his report[12] at deposition, he failed to produce all

---

Similarly, each report states that the asset purchases occurred in 2004 and that Plaintiff was
terminated in April (or July in Duval's case) of 2004 by Top-Flite "prior to the company being
sold to Callaway Golf Company."  Of course, it is not disputed that the bankruptcy occurred in
June of 2003, the asset purchase (not a company sale) by Callaway Golf Company occurred in
September 2003, and the discharge of Plaintiff occurred _after_ the asset purchase by Callaway.

[12]The documents relied upon were woefully insufficient.  Thus, Moore failed to even
review all tax returns for the Plantiffs for the years since the terminations.  He failed to look at
any business returns for the self-employed Plaintiffs.  Moreover, Defendant had made a
document request for "All documents that relate to wages, salaries, tips, commissions or any
other income or earnings of Plaintiff from January 2001 to the present, including, but not limited
to, pay stubs, federal and state tax returns, W-2 forms and all schedules and attachments to
such documents."  The Plaintiffs have not supplemented their responses since the matters were
produced in 2006, when deposed.  The Plaintiffs have never supplemented their initial response
to the Defendant's Request for Production of Documents by producing the documents.

listed documents, and at deposition was unable to answer questions on critical issues. The cumulative effect of these mistakes and omissions renders his testimony and Reports wholly irrelevant and of no assistance to this court or the jury in ascertaining an accurate prediction of damages.  Therefore, the court should exercise its gate-keeping function and preclude the Plaintiffs from offering Moore's testimony or any related evidence, including his Reports, at each trial.

### The Behaylo Report[13]

Moore's report calculates Behaylo's back and frontpay damages as $349,475.08. Not only is any reference to frontpay to the jury improper here, every entry in the "lost benefit" column in Table 2 of Behaylo's Report is grossly over-inflated due to Moore's use of clearly inaccurate data.  Thus, for each year, Moore counted as a "lost benefit" the Defendant's FICA match ($3,745/year), its federal unemployment premiums ($56/year), its state unemployment premiums ($615.60/year), and its workers' compensation premiums ($91/year).  (Moore Depo. pp. 61-62)  However, **Moore himself admits that these are not "benefits" offered by the Defendant, <u>and that they should not have been included in his "lost benefit" calculation.</u>**  (Moore Depo p. 61)[14]

---

[13]Beyond the global problems already discussed, Defendant addresses Moore's proposed testimony and Report with regard to each individual Plaintiff's specific facts and circumstances, as is required under the court's <u>Daubert</u> analysis.  <u>Kumho Tire Co.</u>, 526 U.S. at 150.

[14]All totaled, this amounted to an overestimate of $4,507.81 per year.  Because Moore made this mistake in all twenty years listed on Table 2 of Behaylo's Report, Moore's calculations were *at least* $90,156.20 too high.  Further, the first figure in that column, representing Behaylo's "lost benefit" amount for the year 2004, was not reduced to take into account the fact that Behaylo only worked a portion of the year.  (Moore Depo. pp. 67-68)  Therefore, the $9,547 should have been proportionally reduced to account for Behaylo's partial year on account of his termination.

Indeed, Moore, when examined, admitted that "[he] did not know how [the lost benefit column] was calculated."  (Moore Depo. p. 63)  Further, he admitted that while he wrongly included certain amounts (Moore Depo. p. 62), even *he* could not ascertain from his Report, or the documents that he used compiling the Report, whether there were other items mistakenly included.  (Moore Depo. pp. 62-64)

Thus, for example, Moore could not tell from his own materials whether the "lost benefit" calculations included a 5% bonus or not.[15]  With regard to the bonus, Moore admitted at the deposition, "I don't know whether I included it or I didn't or what I did with it."  (Moore Depo. p. 66)

Moore's calculations are further skewed because he fails to properly account for Behaylo's mitigated earnings.  Illustrative of this is the fact that, at deposition Behaylo had testified that he had earned approximately $40,000 in real estate commissions for 2005 (Behaylo Dep. pp. 75-76), Moore did not factor those earnings into Behaylo's Report as "mitigated earnings" simply because on his 2005 tax return, Behaylo was able to "write off" substantial expenses related to his "business".[16]

While self-employment may, in some cases, be appropriate mitigation, not every deduction permitted to the self-employed can reduce the offset to earnings from self-employment.  Rather, to avoid windfalls, courts do not allow deductions for the self-

---

[15]Moore agreed that without information on the 5% bonus, it should not be carried forward as a continuing benefit.  (Moore Depo. p. 67)  Therefore, if that bonus was included, and Moore did not have knowledge of whether it was a continuing benefit, then Behaylo's lost benefit total should be reduced by an *additional* 5% of his "prior earnings" in each of the twenty years, totaling $53,358.25.  However, it cannot be ascertained from the report or the deposition whether or not Moore included that bonus.

[16]Behaylo's Schedule C shows a net profit of $0 after $37,923 worth of deductions regarding his sole proprietorship.

employed that are not available to a wage-earner to be used to reduce interim earnings. *See* Teichgraeber v. Memorial Union Corp. of Emporia State University, 932 F. Supp. 1263, 1266 (D. Kan. 1996) (Listing several factors that must be analyzed in determining self-employed Plaintiff's interim earnings). *See also*, Denton v. Boilermakers Local 29, 673 F. Supp. 37, 48 (D. Mass. 1987) (car expense deductions unrelated to business were not to be used to offset mitigated earnings under the ADEA).[17]  Moore's methodology made no effort to analyze what write-offs should not be utilized to reduce income.  Rather, he admitted, he simply used "net" taxable income as it is reported on his income tax returns, since "[t]hat is what he gets taxed on.  That is his income as far at the U.S. government is concerned…I'm not measuring his cash flow.  I'm measuring his net earnings."  (Moore Depo. p. 84)  Of course, he uses "gross income" when calculating prior earnings for the period he worked for the Defendant.  Such an approach is contrary to the law regarding offsets from self-employment.

---

[17]Based on Behaylo's 2004 Schedule C, Behaylo took a $9,351 deduction for his vehicle expense, although he indicates on line 45 of his Schedule C that he did not have another car available for personal use.  Therefore, part, if not all, of this deduction should be included as mitigated earnings, as it included at least some personal use of the car.  *See* Denton v. Boilermakers Local 29, 673 F. Supp. 37, 48 (D. Mass. 1987) (car expense deductions unrelated to business were not to be used to offset mitigated earnings under the A.D.E.A.).  Similarly, Behaylo took a $1,575 deduction for a cell phone, $18,320 in depreciation for a computer and various properties, and $1,417 in dividends.  These "write-offs" needed to be analyzed in greater detail by Moore to determine the extent that they were really "personal" and not "business" related.  Because they were not, Behaylo's entire "mitigated earnings" figure is called into question.  The same can be said about Behaylo's 2006 tax return.  Moore lists Behaylo's earnings in Table 1 of Behaylo's Report as equaling $28,977.  This amount, again, is his "net" or "taxable" earnings from his business as shown on his tax return.  His "gross" business income was $55,139, but Moore again offset $26,162 for Behaylo's "business" expenses.  These expenses included $14,041 for his business/personal vehicle, $425 in insurance, $1,179 in meals and entertainment, $1,265 for a cell phone, and $1,582 in dividends.  Using a methodology that doesn't exclude that portion that could not be written off by a wage-earner renders his methodology of calculations inappropriate.  *See* Teichgraeber, 932 F. Supp. at 1266.

**The Bettencourt Report**

Moore calculated Bettencourt's lost benefits in Table 3 of Bettencourt's Report as equaling $15,151 in 2004 and then $36,922 for each of the following nineteen years.  Of that, $4,576 is for health insurance.  Other "fringe benefits" included in this grossly exaggerated amount are vacations ($7,500 per year) and thirteen days holiday ($2,778 per year) although neither is paid in addition to salary, and there is no sound basis for including them as economic damages in addition to salary.  *See, e.g.*, <u>Foraker v. Schauer</u>, 2005 WL 6000493, *18 (D. Colo. 2005) ("[Expert] has failed to provide a methodology that would demonstrate the validity of his conclusion that the value of the fringe benefits to plaintiffs was an 'economic benefit' that can be *added* to their salaries.")  Other alleged fringe benefits added without justification were payroll taxes $9,360 (not a fringe benefit) and a 10% ($7,800) annual bonus that he had once received from the prior company (without evidence that anyone received a bonus from Defendant).  Moore was unable to explain what the bonus was for, or whether it would have been repeated.  (Moore Dep. pp.108-109)  All totaled, Moore calculated Bettencourt's lost benefits as $716,669.

As noted, unlike the other instances, in this instance, the damage methodology was supposedly based on actual "replacement costs".  However, it is clear that **the expert reviewed no actual documents that would establish a "reliable foundation" to support his conclusion**.  Rather, the expert relied solely on a one page typed sheet prepared by Bettencourt listing his purported replacement costs for certain benefits. (Moore Depo. p. 111, 117; *see also* Moore Depo. Exhibit 7 attached as Ex. 6)  The expert admits that he merely "assumed" Bettencourt could back up the figures with

16

actual data.  (Moore Dep. p. 112)  This is not only a patently insufficient basis for expert testimony.  Indeed, such testimony in reality is merely the witness testifying through the mouth of the expert, seeking to add prestige and credibility to an assertion that he spent such sums, in lieu of presenting actual proof that would support a claim that the Plaintiff actually spent such sums to purchase, for example, replacement health insurance.[18]

In addition to the issues already addressed, such as improperly using the employee's cost, and determining those benefits and costs based on what the prior company offered,  Moore also, once again, did not use accurate data in his calculations, which renders his testimony and Report unreliable and irrelevant under Rule 702.  *See* Ruiz-Troche, 161 F.3d at 81-81.

As with Behaylo, Moore erroneously overestimated Bettencourt's "lost benefits" throughout his Report.  First, Moore includes a 10% bonus ($7,800) for Bettencourt as a "lost benefit" in *each* of the twenty years.  However, this bonus was given to Bettencourt in 2002 by a company that went bankrupt, not by Defendant.  There is no basis to include it as a fringe benefit that he would have received, yearly or otherwise, from *this* Defendant.[19]

---

[18]While the expert report claims he reviewed the deposition of Mr. Bettencourt, Bettencourt's deposition indicates that his wife was an assistant manager at Bank of America and that he had not opted into his wife's health insurance plan.  (Bettencourt Depo. p. 32)

[19]Moore actually mentions two bonuses in the "Employee Benefits" narrative in Bettencourt's report:  he states that he awarded Bettencourt a bonus based on company performance, and he also states that he chose not to award an additional 10% bonus that was offered to Bettencourt.  When probed on this matter, **Moore could not remember which bonus he actually included in his calculations**.  He did, however, indicate that whichever bonus he included, it was based on the bonus given in 2002.  (Moore Depo. pp. 108-09)  The bonus used would affect how much the calculation is off, not whether it is appropriate to include in the calculations a bonus never given by the Defendant to any employee.  Thus, if the expert included the company performance bonus, his lost benefit calculation was overestimated by $156,000.

Moore then improperly included the same non-benefits in Bettencourt's "lost benefit" calculations that he did for Behaylo, including, in Table 2 of Bettencourt's Report, a yearly lost benefit amount including $9,360 in payroll taxes.[20]  Further, with regard to lost benefits, Moore included $7,500 in lost vacations and $2,778 for lost holidays in each of the twenty years of his calculations.  Moore included these substantial amounts in the lost benefit calculation even though Bettencourt was a salaried employee whose yearly salary subsumed vacation and holidays.  (Moore Depo. pp. 113-114)[21]  These are double benefits not recoverable under the ADEA.

Moore's calculations are further exaggerated because, as another self-employed person, the expert again fails to properly deduct Bettencourt's "mitigated earnings", using "net" or "taxable" income as it appears on his tax return (while using gross earnings as an employee).  Moreover, Moore failed to provide the Defendant with copies of Bettencourt's 2005 and 2006 tax returns at his deposition or anytime thereafter, although his report indicated that he had relied on said documents, and all documents relied upon were subpoenaed for deposition.[22]  Without such documentation, the Defendant, during expert discovery, was unable to scrutinize

---

[20]As noted, Moore had admitted this figure "shouldn't be" included in Bettencourt's lost benefit calculation.  (Moore Depo. p. 110)

[21]Moore indicated that *some* employer's buy back unused vacation time, but when asked if the Defendant did so, Moore stated, "I'm not particularly interested in whether they did it or not, to be honest with you.  That time off has a value."  (Moore Depo. p. 114)  As noted above, an expert's attempt to include the value of vacation in addition to salary has been rejected by courts absent specific justification.  *See, e.g.,* Foraker v. Schauer, 2005 WL 6000493 (D. Colo. 2005) (allowing a motion in limine precluding identical testimony placing a value on vacation in addition to salary).

[22]Moore did provide Defendant with the first page of Bettencourt's Schedule C for 2005.  However, the remainder of Bettencourt's 2005 tax return was not provided at his deposition and has not been submitted to Defendant subsequently.

Moore's 2005 and 2006 backpay calculations for Bettencourt. Defendant (and the court for that matter) are unable, for example, to ascertain whether Bettencourt took deductions in 2005, 2006 (or 2007) for a personal vehicle, insurance, a cell phone, or other items to which he also received a "personal" benefit, items which should not have been allowed to reduce interim earnings. *See* <u>Denton</u>, 673 F. Supp. at 48; <u>Teichgraeber</u>, 932 F. Supp. at 1266.[23] It is, of course, far too late to provide the documentation and allow meaningful, pre-trial, expert discovery.

### The Duval Report

Moore's Report for Paul Duval is also plagued by crucial mistakes that go to the heart of his calculations, all of which severely alter his findings and make them completely unhelpful to the trier of fact. *See* <u>Ruiz-Troche</u>, 161 F.3d at 81. First, Moore uses an incorrect figure for Duval's 2004 salary at the time of his termination. Thus, Plaintiff's deposition exhibits, purportedly relied upon by Moore, reveal that as of May 2004, shortly before his lay-off, Duval had a salary of $119,773.[24] (Moore Depo. p. 136) Although this figure would accurately show Duval's salary at the time of discharge, in Table 2 of Duval's Report, Moore cites Duval's "prior earnings" from Defendant as $126,358 annually.

---

[23]The Defendant is also left unable to ascertain whether the Plaintiff drew a salary, dividends or other profits from his "business". Although Plaintiff's 2005 Schedule C indicates a $6,314 vehicle deduction, a $562 meal and entertainment deduction, $3,048 in depreciation and $1,619 in other expenses, without more information the Defendant simply cannot determine if Moore's calculations accurately portray Bettencourt's mitigated earnings for that year. Therefore, being the eve of trial, Plaintiff should not have the benefit of introducing Moore's testimony or Report for Bettencourt, while the Defendant and the court have no effective means to evaluate Moore's findings. Allowing the Plaintiff to introduce this information this late in the game will unfairly prejudice the Defendant and hamstring its ability to challenge the accuracy of Moore's findings.

[24]There is no indication that he received a raise during the final two months of his employment.

19

Moore agreed that one time payouts based on termination, such as unused vacation pay, should not be carried forward in subsequent years in calculating Duval's baseline salary.  (Moore Depo. pp. 137-138)  However, Moore did just that.  Thus, rather than using the data showing Duval's real salary, Moore used the gross income from Duval's tax return, a gross income that included a substantial one time payout of $4,323.71 for such things as unused vacation pay, moneys paid only because of the termination.[25]  Moore then uses this improper amount as a "baseline" for each subsequent year's "prior earnings" amount, compounding the error.[26]

Moore then calculates Duval's "lost benefits" for 2004, based on "cost" to the employer, which is improper.  Moreover, he bases his calculations not on any benefit package that Duval himself was receiving from the Defendant at the time of his termination, but rather on a benefit package that was offered in 2002 by Duval's prior employer, the defunct Spalding.  (Moore Depo. p. 140)  The impact of such sloppiness is blatant.  Thus, Spalding had offered a pension plan that, according to Moore, accounted for $6,103.80 (or 28.7%) of the total benefit package used by Moore. However, as shown by Duval's Deposition Ex.12 (attached hereto as Exhibit 7), when Defendant commenced operations, that pension had ceased.  Yet, the "value" of that defunct pension plan is carried forward as damages by Moore.

---

[25]Thus, under state law, at the time of termination an employee must be paid for unused accrued vacation.  If employed, the employee uses the time, and receives a salary.  He doesn't receive salary for 52 weeks and then five weeks additional pay for vacation.

[26]As a result, Moore overestimates Duval's "prior earnings" by at least $56,208.23 for the period of 2005-2017.  **Moore states that his overestimate is around seven or eight thousand dollars per year**.  (Moore Dep. p.138)

Additionally, as with Behaylo, Moore improperly included items in the benefit package, such as Employer FICA match, federal unemployment premiums, state unemployment premiums and workers' compensation that Moore himself has admitted are not fringe benefits. This amounts to $7,323.09 or 34.4% of the total benefit package..

## The Lonczak Report

Moore calculated Lonczak's lost earnings (backpay and frontpay until retirement) as $1,490,831.00. Moore incorrectly overestimates Lonczak's lost benefit amount. As explained above, Moore calculated Lonczak's "lost benefits" without regard to the fact that at the time of his termination, Lonczak was not receiving health insurance from Defendant; he had affirmatively declined health insurance coverage because he had it through his wife's employer. The report does not take into account whether Lonczak has obtained alternate coverage since his termination without additional cost to what he was paying when employed. (Moore Depo. p. 151) These factors alone make the entire lost benefit calculation unreliable.

Furthermore, Moore used a figure of 14.8% to calculate Lonczak's lost fringe benefits. (Moore Depo. p. 155) However, this figure was not even based on the amount that the Defendant offered to Lonczak during his employment, or even what Spalding had once offered to him. Rather, this 14.8% figure was "borrowed" from Duval, who was not similarly situated at the company with Lonczak. (Moore Depo. p. 155) Thus, Moore has calculated damages for Lonczak's lost fringe benefits based on benefits not being received by Lonczak, based on the cost to the employer rather than replacement costs, based on what a different employer had, several years before, given

21

to a different employee.  (Moore Depo. pp. 154-155)  This cannot be admitted as expert testimony reflecting damages.

Moreover, since the "benefit" calculations used for Lonczak were based on the data applicable to Duval (from Spalding in 2002), it carried forth the same deficiencies. Thus, the 2002 benefit package contained substantial amounts of "non-benefit" employer expenditures, such as Employer FICA match ($6,738.89/year), federal unemployment premiums ($56.00/year), state unemployment premiums ($367.20/year), and workers' compensation premiums ($161.00/year).  (Moore Depo. pp. 61-62)  This 2002 benefit package offered by Spalding to Duval also contained the pension plan that the Defendant never assumed when it purchased the assets of the bankrupt company.

Moore also improperly calculates Lonczak's mitigated earnings during the relevant backpay period.  For the years of 2005, 2006 and 2007, Moore calculates Lonczak's mitigated earnings as $0.  However, during that period, Lonczak removed himself from the job market and started his own business.  Moore looked solely at Lonczak's personal tax returns, which show $0 in "net" income for those years.  Moore did not look at any documentation regarding Lonczak's business.  (Moore Depo. p. 149) Moore merely relied on Lonczak's "word" regarding that business' finances.  (Moore Depo. pp. 148-149)  The absence of a meaningful review of those financial records, which clearly were available to Plaintiff, render wholly unreliable a claim that he obtained no benefit from the business that should reduce the wage losses.[27]  *See* <u>Raya and Haig Hair Salon v. Pennsylvania Human Relations Cm'n</u>, 915 A.2d 728, 737 (Pa. Cmwlth 2007) (when determining a self-employed Plaintiff's backpay award, court must

---

[27]Apparently, Lonczak started a Mini-Golf business in Texas sometime in 2004.  At a minimum, one could assume that the land on which the business resides has some value.

look beyond their tax returns and W-2 to determine the value obtained from business ownership).

Since Moore does not pay any attention to the particulars of Lonczak's business[28], his calculations obviously do not take into account any benefits that Lonczak would have received through business ownership.  *See* Denton, 673 F. Supp. at 48; Teichgraeber, 932 F. Supp. at 1266.  For example, there is no indication whether Lonczak reinvested the business's profits into the business, which would be particularly relevant in determining the benefit that Lonczak reaped from his business.[29]  Moore asserts he was told that the business was being liquidated.  (Moore Depo. pp. 148-149) Moore asserts that Lonczak stated he did not expect to "get anything" from the liquidation, but there is absolutely no documentation to back this up; this is based solely on Lonczak's statements to Moore.  (Moore Depo. pp. 148-149)  Therefore, it will be impossible to tell from Moore's Report or testimony what Lonczak received through the liquidation or other financial aspects of the business, which are critical factors in determining back pay.

Moore's calculations are also inherently suspect as they do not account for *any* mitigated earnings on the part of Lonczak from the present date up until 2020.  Thus, according to Moore's findings and Report, even though Lonczak was well-educated, had an extensive earnings history and a vast amount of work experience, he will *never*

---

[28]Moore candidly stated, "I wasn't that focused on that business."  (Moore Depo. p. 149)

[29]Lonczak did tell Moore that he agreed to reinvest money into the business and would limit the amount that he drew from it for the first couple of years.  (Moore Depo. p. 147)  Moore referred to this reinvestment as an "implicit loan", which would inherently increase the value of the business or its capital assets.  (Moore Depo. p. 148)  However, Moore does not indicate how much reinvestment actually occurred, nor does he factor that into Lonczak's mitigated earnings figures.  (Moore Depo. p. 147)

work again.  **When asked if he thought Lonczak's mitigated earnings calculations were accurate, Moore stated, "No, I don't."**  (Moore Depo. p. 151)  Continuing, Moore stated, "I fully assume that at some point [Lonczak] is going to get some other income and it will be mitigated but at this point there is nothing to base that on so there just isn't sufficient information."  (Moore Depo. pp. 150-51)  This reasonable assumption however, conflicts with the assumption he himself used when making his calculations, demonstrating the absurdity of the calculations.

## CONCLUSION

Moore's findings are completely unreliable and irrelevant to the issue of both back and frontpay damages for each of the four Plaintiffs.  His Reports are rampant with substantive mistakes and omissions that greatly overestimate each Plaintiff's damages and render his conclusions entirely inaccurate.  His underlying methodology is incorrect and has been rejected by a number of courts as being inconsistent with the A.D.E.A. Therefore, the court should preclude the Plaintiff from offering Moore's testimony as it fails to even remotely comply with the Daubert standard and Rule 702.

<div style="margin-left:40%">

Respectfully submitted,


  /s/ Jay M. Presser, Esq.
Jay M. Presser, Esq.
BBO No. 405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Tel.:  (413) 737-4753/Fax: (413) 787-1941

</div>

Dated:    February 19, 2008

**Craig L. Moore**
*Economic consulting*

65B Hatfield Street
*Northampton MA 01060*
*Tel: 413-587-9405*
*Fax: 413-587-9581*
*craiglmoore@hotmail.com*

# *Economic Report*

*To:* Maurice M. Cahillane, Esq.

*From:* Craig L. Moore, Ph.D.

*Date:* December 26, 2007

*Re: Michael Behaylo v. The Top-Flite Golf Company*

DEFENDANT'S EXHIBIT
PENGAD 800-631-6989
1 Moore
12410 8

At your request, I have reviewed the following documents in the case of *Michael J. Behaylo v. The Top-Flite Golf Company*:

1. Copy of the Complaint filed in United States District Court;
2. A copy of Plaintiff, Michael Behaylo's Response to Request for Production of Documents by the Defendant, The Top-Flite Golf Company;
3. A copy of Plaintiff, Michael Behaylo's Answers to Interrogatories by the Defendant, The Top-Flite Golf Company;
4. A copy of the deposition transcript and exhibits of Michael Behaylo;
5. Personnel action forms from Spalding Sports Worldwide for Michael Behaylo;
6. Copies of letters to Mr. Behaylo from Spalding concerning merit increases;
7. Copies of forms filed with the Massachusetts Division of Unemployment Assistance by Top Flite Golf Company concerning Mr. Behaylo;
8. Income tax records for 2002 through 2006;
9. Employee Benefits Statement from Top-Flite to Michael Behaylo dated 5/20/03;
10. A copy of the resume of Michael Behaylo;
11. I interviewed Mr. Behaylo on August 30, 2007 and information received in writing from him in response to specific questions I forwarded to him in writing.

## Background

It is my understanding that Michael Behaylo lives in Holyoke, Massachusetts with his husband John McCann. He was born on April 20, 1956 and is 51 years old.

Mr. Behaylo was hired by the Spalding Corporation in June of 1999 as a Senior Cost Accountant.[1] His responsibilities included working on the implementation of the SAP system. Mr. Behaylo was terminated on April 15, 2004 by Top-Flite prior to the company being sold to Callaway Golf Company.

---

[1] Spalding was a holding company that was purchased in 2003 by the Russell Corporation for $65 million. The sale did not include the Top-Flite, Ben Hogan and Strata brands that were retained by the Top-Flite Golf Company. In September of 2004, the Callaway Golf Corporation purchased Top-Flite out of Chapter 11 bankruptcy. The bankruptcy was described in the press at the time as part of a sale strategy to avoid the claims of creditors against Top-Flite to boost the price of the company. The sale price was $174.4 million.

It is claimed by Mr. Behaylo that Top-Flite engaged in discriminatory actions against him and that his termination was based on his age. After his termination, he tried to secure employment in the area. He obtained a real estate license and began working for Caldwell Banker Real Estate in July of 2004.

The focus of this report is to estimate the economic damages arising from the termination of Michael Behaylo by the Top-Flite Golf Company. All assumptions and facts relied upon in this analysis will be stated and all computations are shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, Michael Behaylo was deprived of the opportunity to earn a living and to pursue his occupation in the most advantageous manner. He also says that his termination caused considerable stress and anxiety. Some things, such as emotional stress are impossible to assess in an accounting sense and are typically left to the common judgment of a jury. Economic damages, however, can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts.

Economic damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the loss. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that would have accrued to the injured party less any mitigating income anticipated or earned unless it is from a collateral source. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged act.

## Earnings History

Michael Behaylo received an Associates degree in business from Holyoke Community College in 1977. He took a job with Eastern Specialties doing accounting and customer service. In 1979 he worked for J.P. Stevens. From 1980 through 1984 he worked at Bexton Corporation doing cost accounting and was involved in time studies and manufacturing efficiency. While he was working, Mr. Behaylo was also able to complete a Bachelor of Science degree in Accounting at Western New England College that he completed in 1984. From 1984 through 1988 he worked for Kidder Stacy as an Accounting Supervisor. After working as an Accounting Manager at United Air Fleet, he took a job as a Senior Cost Accountant with U.S. Tsubaki in Holyoke. In 1999 he was hired by Spaulding as a Senior Cost Accountant where he worked until he was terminated by Top-Flite in April of 2004.

Mr. Behaylo's earnings, based on federal income tax returns, are shown in Table 1 below. It is clear from this information that the termination by Top-Flite had a very

2

significant negative impact on his income that continues to the present. Mr. Behaylo's annual salary prior to his termination was $81,535 according to company records.

**Annual Earnings**
Table 1.

| Year | Earnings | Total |
|------|----------|-------|
| 2002 | 47,095 | 47,095 |
| 2003 | 48,770 | 48,770 |
| 2004 | 20,796 | 20,796 |
| 2005 | 976 | 976 |
| 2006 | 28,977 | 28,977 |



## Employee Benefits

In addition to wages, earnings capacity also includes the value of employee benefits. Mr. Behaylo lost all of his benefits upon termination by Top-Flite. This included health insurance, life insurance, short-term and long-term disability insurance, 401(k) contributions, paid vacation, paid time off, sick leave, employee stock purchase plan, and, employee discounts for company products. He was also eligible for bonus payments based on company performance. Top-Flite provided statements to their employees that showed the employer's cost of the benefits programs they provided. I have used this as the basis to estimate the value of lost employee benefits. The value given in 2003 by Top-Flite for employee benefits was 19.5% of earnings in that year.

## Work-life Estimates

An important element in the analysis is the determination of the normal work-life expectancy of Mr. Behaylo. One could argue that any of several ages might be most appropriate for the work-life of any particular individual based on their personal characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 to maximize Social Security retirement benefits. Mr. Behaylo indicates that he had no plans to retire early. On the contrary, he opines that he intends to work well beyond the age of 67. Based on these factors I have assumed that a work-life to age 67 would be reasonable in this case.

## Estimating the Present Value of Lost Future Earnings Capacity

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during Michael Behaylo's work-life. This involves projecting his prior earnings to that age netting out any earnings he is expected to make. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. The economic background concerning each of these elements of the analysis is described in the following sections in detail.

## Rate of Economic Growth, Prices, and Real Wages

In this case, Mr. Behaylo's real earnings at Top-Flite are assumed to only grow at the cost of living. That is, no increase in real earnings is used in the computation of future economic damages. His net income from being a realtor increases at a real rate of 4%. This assumption is the most conservative that is reasonable in my opinion.

## Present Value

Once the rate of growth in future earnings and the value of lost future income is established, it must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[2]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets.

## Determination of Lost Future Earnings

The computations to estimate the economic damages arising from Mr. Behaylo's termination are shown in Table 2. The first column in the table shows each year in which Michael Behaylo will work. The second column indicates his age in that year. The third column contains his prior earnings in each year. The fourth column shows the value of mitigation. This figure includes earnings (cash-flow) from working as a realtor and assumes a 4% real rate of growth in net earnings into the future. Lost Benefits are estimated based on Top-Flite's benefit statements. The next column shows the value of net lost earnings. This figure is then reduced to present value assuming 12 equal payments each year with the interest accruing to the end of each period. This is the most conservative method available and results in an effective annual rate of return that is in excess of 2%.

## Summary of Findings

Based on the documents that I reviewed and the analysis that I have done, I believe that there is a reasonable economic certainty that the present value of lost earnings resulting from the termination of Michael Behaylo by Top-Flite is approximately $350,000 at the present time. This figure could change significantly if Mr. Behaylo finds some alternative employment and benefits. At such time as that happens, I would revise this opinion and supplement it in a timely fashion if any additional information becomes available.

---

[2] For a discussion of *Pfeifer* and related cases, see George, Serien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

4

### Present Value of Lost Earnings
Table 2.

| Year | Age | Prior Earnings | Mitigating Earnings | Lost Benefits | Net Loss | Present Value |
|------|-----|----------------|---------------------|---------------|----------|---------------|
| 2004 | 48 | 48,957 | 20,796 | 9,547 | 37,708 | 37,708 |
| 2005 | 49 | 50,676 | 19,956 | 9,882 | 40,601 | 40,601 |
| 2006 | 50 | 52,473 | 32,091 | 10,232 | 30,614 | 30,614 |
| 2007 | 51 | 53,827 | 35,000 | 10,496 | 29,323 | 29,311 |
| 2008 | 52 | 53,827 | 36,400 | 10,496 | 27,923 | 27,531 |
| 2009 | 53 | 53,827 | 37,856 | 10,496 | 26,467 | 25,579 |
| 2010 | 54 | 53,827 | 39,370 | 10,496 | 24,953 | 23,639 |
| 2011 | 55 | 53,827 | 40,945 | 10,496 | 23,378 | 21,709 |
| 2012 | 56 | 53,827 | 42,583 | 10,496 | 21,740 | 19,789 |
| 2013 | 57 | 53,827 | 44,286 | 10,496 | 20,037 | 17,877 |
| 2014 | 58 | 53,827 | 46,058 | 10,496 | 18,266 | 15,974 |
| 2015 | 59 | 53,827 | 47,900 | 10,496 | 16,423 | 14,079 |
| 2016 | 60 | 53,827 | 49,816 | 10,496 | 14,507 | 12,190 |
| 2017 | 61 | 53,827 | 51,809 | 10,496 | 12,515 | 10,308 |
| 2018 | 62 | 53,827 | 53,881 | 10,496 | 10,442 | 8,431 |
| 2019 | 63 | 53,827 | 56,036 | 10,496 | 8,287 | 6,558 |
| 2020 | 64 | 53,827 | 58,278 | 10,496 | 6,046 | 4,690 |
| 2021 | 65 | 53,827 | 60,609 | 10,496 | 3,715 | 2,825 |
| 2022 | 66 | 53,827 | 63,033 | 10,496 | 1,290 | 962 |
| 2023 | 67 | 53,827 | 65,554 | 10,496 | (1,231) | (899) |

**Total**                                                              $   349,475.08

The opinions expressed here are based the documents and information listed at the beginning of the report and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required.

A list of recent testimony is attached to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."

_____
Craig L. Moore, Ph.D.

Date   2/8/88

# Prior Testimony of Craig Moore

| Trial Date | Plaintiff | Defendant | Court |
|---|---|---|---|
| 1/13/2004 | Durwood Currier | United Technologies | Maine Federal District (D) |
| 3/26/2004 | Laura Clark | United Parcel Service | Hampden Superior |
| 4/14/2004 | Thomas J. Cosmos | Commonwealth of Massachusetts | Worcester Superior |
| 4/29/2004 | Mary and Michael Conchieri | | Hampden Superior (A) |
| 8/10/2004 | Mark Fortier | Giddings & Lewis, Inc. et al | U.S. Court Springfield (D) |
| 9/24/2004 | Louis Chighisola | P. A. Landers, Inc. | Plymouth Superior |
| 11/8/2004 | Keith Lemon | Lynn Creamery | Suffolk Superior |
| 1/13/2005 | George Giard | Harvey Darby and C.R. England, Inc. | U.S. District Mass. |
| 2/17/2005 | Keneth Parsons | Mass Mutual Insurance | Hampden Superior (D) |
| 3/9/2005 | Sharon Sklarski et al | Ferdauz Canteenwalla, M.D. | Hampden Superior |
| 4/1/2005 | Joan Heroux (widow) | Kim Robert Krach, M.D. | Hampden Superior |
| 5/12/2005 | Ronald Larsen | Simonds Industries, Inc. | Mass. Federal (D) |
| 5/23/2005 | Estate of Sheldon Rothstein | | Middlesex Superior |
| 5/31/2005 | Estate of Linda Marie Davis | | Suffolk Superior (D) |
| 6/7/2005 | Joseph Zabielski | Agawam School Committee, et al | Hampden Superior (D) |
| 6/17/2005 | Michael Joseph | Susan Tyler et al | Superior Court - Hartford |
| 8/16/2005 | Jorge Diaz | Massachusetts Mutual Insurance | Hampden Superior (D) |
| 8/22/2005 | Ahmed Sarrage | Jarrah Omar Mohammad | Hampden Superior |

*Tuesday, January 08, 2008*

*Page 1 of 2*

| Trial Date | Plaintiff | Defendant | Court |
|---|---|---|---|
| 10/20/2005 | Estate of Cheryl Sweeney | Allard Nazarian Group | Hillsboro Superior NH |
| 10/21/2005 | Joan Moynihan | | Arbitration |
| 11/30/2005 | James Broderick and John Stamatov, EIU Group | Gulf Insurance Co. et al | U.S. District Boston (D) |
| 1/6/2006 | Thomas Manning | Arthur D. Little, Inc. | American Arbitration Assoc. |
| 1/17/2006 | James Doherty | Thompson Financial, Inc. | Suffolk Superior |
| 1/19/2006 | Russell Gilbert | Kevin Gilbert | Franklin Superior |
| 5/12/2006 | Patrick O'Connell | DaimlerChrysler | Hampshire Superior |
| 10/16/2006 | United States | Monty Schwartz | Federal Court Boston |
| 10/25/2006 | Richard A. Cormier | Estate of Justin Farrell | Berkshire Superior |
| 2/27/2007 | Melissa Mendonsa, et al | Lowell Housing Authority | Suffolk Superior |
| 3/27/2007 | Jessica Rodriguez | CVT Limited Partnership, LLP | Hampden Superior |
| 4/12/2007 | Joyce Waters, et al. | Interskate 91 North | Hampshire Superior |
| 5/25/2007 | Alex J. Orban | Friendly Ice Cream Corp. et al | Springfield Federal Court (D) |
| 6/13/2007 | Cynthia Haddad | Wal-Mart Stores, et al | Berkshire Superior (D) |
| 6/19/2007 | Michelle Beebe | Williams College | Federal Court Springfield (D) |
| 8/1/2007 | Carolyn Brooks, MD | Robert Piela, MD | Hampshire Probate |
| 8/13/2007 | Sally Wilson | | Not filed to date (A) |
| 10/10/2007 | Ene Inyang - Administrator of Estate of Rose Ok | Arbor Hospital, and Donna Orvin, M.D. | Suffolk Superior |

# Curriculum Vita

## Craig L. Moore

65B Hatfield Street
Northampton MA 01060

**Phone: 413-587-9405**          **Fax 413-587-9581**          email: *Craiglmoore@hotmail.com*

| | |
|---|---|
| **Education** | B. S. Economics, West Virginia University, 1967;<br>M. A. Economics, Maxwell School, Syracuse University, 1972;<br>Ph.D. Maxwell School, Syracuse University, 1972;<br>Areas of study: Economics, Statistics, and Public Finance. |
| **Present Positions** | Private Management and Legal Consultant;<br>Member of the New England Business Advisory Council of the Federal Reserve Bank of Boston, 2004 – 2008;<br>Board of Directors of Holyoke Medical Center and Hospital;<br>Board of Directors of the Regional Employment Board of Hampden County. |
| **Previous Positions** | Chief Operating Officer of Marox Corporation, 2004 - 2006<br>University Professor of Political Economy, University of Massachusetts;<br>Full Professor at the Isenberg School of Management, University of Massachusetts, Amherst, 1972 through 2003;<br>Adjunct Professor of Regional Planning; Amherst;<br>Director of the Masters Program, School of Management, 1978-1979;<br>Special Assistant to the President of the University, 1979-1981;<br>Special Assistant to the President of the University, 1997-2000;<br>Policy Advisor to the President of the University, 2000-2003;<br>Chairman of the Department of Finance & Operations Management from September 1982 to August 1994;<br>Founder and Editor of *Massachusetts Benchmarks* from 1997 to 2002. |
| **Professional History** | Joined the faculty of the University of Massachusetts Isenberg School of Management as an Assistant Professor in 1972;<br>Promoted to Associate Professor in 1976;<br>Awarded Tenure in 1978;<br>Promoted to Full Professor in 1980;<br>Named University Professor of Political Economy in 1997;<br>Retired from the University of Massachusetts December 31, 2003;<br>Joined MAROX Corporation as Chief Operating Officer on January 1, 2004;<br>Served as a Legal Consultant and Expert Witness for the past 33 years. |
| **Teaching Experience** | Financial Models – required for all finance majors;<br>Statistical Tools for Management - required undergraduate course;<br>Business Data Analysis – MBA Statistics requirement;<br>Quantitative Methods II – Ph.D. Statistics requirement;<br>Macro Economic Theory – Ph.D. requirement; |

# PUBLICATIONS

## BOOKS AND MONOGRAPHS

Publications in this category include government publications reviewed by professional and academic economists before their publication.

*Regional Economic Analysis for Community Development Planning*, Massachusetts Department of Community Affairs, 119 pages, Oct. 1978.

*Massachusetts Reconsidered: an Economic Anatomy of the Commonwealth*, School of Management, University of Massachusetts, 148 pages, September, 1978.

"The Regional Industrial System" in *Spatial Analysis and the Industrial Environment* by F.I. Hamilton and G.J.R. Linge, London: John Wiley Ltd. (with Karaska and Susman), 1980.

*The New Economic Reality, Massachusetts Prospects for Long-Term Growth;* School of Management, University of Massachusetts, sponsored by the Massachusetts Taxpayers Foundation, 75 pages printed, May 1994 with Edward Moscovitch.

*A Taxpayer's Look at a Sacred Cow: Public Sector Design in Massachusetts Two Decades After the Ward Commission,* 38 pages printed, November 1995 with Edward Moscovitch

*Connection to the Future; An Analysis of the Telecommunications Industry in Massachusetts,* published by the Massachusetts Telecommunications Council and the University of Massachusetts Economic Project, 45 pages printed, June 1, 1997.

*The Effect of State Tax Policy on the Insurance Industry in Massachusetts*, published by the Massachusetts Business Roundtable, 35 pages printed, October 1, 1997

*The New Foundation; Information Technology*, The Donahue Institute, University of Massachusetts, 18 pages printed, May 1999.

*Science, Technology and Investment; The Cycle of Growth in Massachusetts,* Massachusetts Department of Economic Development, 60 pages printed, August 2001.

*Mathematical Models of a Regional Economy (in Russian), with 4 Russian co-authors, published by the St. Petersburg State Technical University, summer of 2002, 85 pages printed.*

*Critical Transitions in Telecommunications: Shaping the New Economy, Massachusetts Telecommunications Council, November 2002, 60 pages, printed.*

## JOURNAL ARTICLES

[ 1]  "The Impact of Non-Profit Institutions on Regional Income, Syracuse University a Case in Point," *Growth and Change*, January 1974, Vol. 5, No. 2, pp. 36-40.

[ 2]  "A New Look at the Regional Trade Multiplier," *Northeast Regional Science Review*, Vol. III, 1973, pp. 164-170.

[ 3]  "The Impact of Non-Profit Institutions on Regional Income, Upstate Medical Center a Case in Point," *Economic Geography*, Vol. 50, No. 2, April 1974, pp. 124-129.

[ 4]  "Social Equity and Retained Earnings," *Rivista Internazionale di Scionzele Economiche e Commerciali*, Ann. XXI, No. 2, 1974, pp. 137-135, with Sidney Sufrin.

[ 5]  "A New SYMAP for Viewing Spatial Location Patterns," *Selected Projects*, Graduate School of Design, Harvard University, Vol. VII, pp. 77-80, 1974.

[ 6]  "A National Planning Model for Petroleum Allocations," *Rivista Internazionale di Scionzele Economiche e Commerciali,* Ann. XII, 1974, pp. 547-656.

[ 7]  "The Impact of a Non-Profit Institution on Regional Income:  A Discussion," *Growth and Change*, Vol. 6, No. 3,  July 1975, pp. 45-49.

[ 8]  "Computer Graphics and Decision Analysis," *Northeast Regional Science Review*, Vol. V, pp. 93-100, 1975, with Roger Calantone.

[ 9]  "A New Look at the Minimum Requirements Approach to Regional Economic Analysis," *Economic Geography*, Vol. 51, No. 4, October 1975, pp. 350-356.

[10]  "A Linear Programming Model for Determining an Optimal Regional Distribution of Petroleum Products," *Lecture Notes in Economics and Mathematical Systems*, No. 126, Energy, Regional Science and Public Policy, May 1975, pp. 119-135.

[11]  "Optimal Regional Distribution of Petroleum Products," *Omega*, Vol. 4, No. 3, 1976, pp. 301-311.

[12]  "A Bayesian Approach to Spatial Decision Models," *Northeast American Institute of Decision Sciences Proceedings*, May 1976, pp. 41-44.

[13]  "A Cross-Sectional Analysis of the Municipal Property Tax," *Northeast Regional Science Review*, Vol. 6, pp. 200-210.

[14]  "Modeling Interstate Shifts in Employment," *Northeast Regional Science Review*, Vol. 7, 1977, pp. 143-152.

[15]  "A Critical Review of Shift-Share Analysis as a Forecasting Technique," *Journal of Regional Science*, Vol. 20, No. 4, pp. 419-437.

[16]  "Banking and the Regional Income Multiplier," *Northeast Regional Science Review*, Vol. 9, 1979, pp. 1-7.

[17]  "Interregional Arbitrage and the Supply of Loanable Funds," *Journal of Regional Science*, Vol. 22, No. 4, 1982, pp. 499-512.

[18]  "Minimum Requirements and Required Economics, 1980," *Economic Geography*, Vol. 60, No. 3, July, 1984.

[19]  "The Impact of the Banking System on Regional Analysis," *Regional Studies*, Vol. 19.1, pp. 29-35, 1984.

[20]  "A General Equilibrium Model of Interregional Monetary Flows," *Environment and Planning A*, Vol. 21, pp. 397-404, 1989.

[21]  "Utilizing an Economist to Establish Damages Through Expert Testimony, "*Journal of the Massachusetts Academy of Trial Attorneys*, Vol. 4, No. 2, pp. 7-10, May 1996.

[22]  "Benchmarking – An American Perspective," *Economia & Perspectiva*, No. 15/16, Jan./June, 2001, pp.201 – 211, 2001.

## PUBLISHED CASE STUDIES

The following case studies were gathered and written during the summer of 1973 under a grant from the Center for Business and Economic Research and were subsequently published by the Harvard Case Clearing House, and in the book cited below:

| Case Title | Publication Number |
|---|---|
| Jacobsen Rug Company | 9-375-813 |
| Jacobsen Teaching Note | 8-375-814 |
| Magnavox CATV | 9-375-815 |
| Magnavox Teaching Note | 8-375-815 |
| Cherry House Furniture | 9-375-825 |
| Cherry House Furniture [A] | 9-375-826 |
| Cherry House Teaching Note | 8-375-827 |

Baird, Bruce F., *Introduction to Decision Analysis*, 1978 pp. 506-508, Duxbury; Jacobsen Rug Company, Cherry House Furniture [A], Cherry House Furniture Teaching Note.

## BOOK REVIEWS

"The Changing Role of Public Administration," A review of three books and a discussion of how they illustrate the new demand on public administrators. *Management Research*, Vol. 8, No. 3, 1975, page 51.

*Waste Paper Recovery: Economic Aspects and Environmental Impacts*, reviewed in the *Annals of Regional Science*, 1982.

*Economic Geography* by James Wheeler and Peter Muller, reviewed in the *Annals of Regional Science*, 1983.

## OTHER PUBLICATIONS

*Designing an Administrative Control System for MEPA: Massachusetts Environmental Policy Act*, Institute for Man and the Environment and The Executive Office of Environmental Affairs, 130 pages, August 1975, with Richard Smardon.

"A New Technique for Estimating Municipal Property Tax Base," Proceedings of the New England Business and Economic Development Conference, University of New Hampshire, 1974 with Richard Evans.

*A Long Range Systems Development Guide for Transportation Planning in the Commonwealth of Massachusetts*, July 1975, DPW-UMASS. Joint Transportation Program, Contract 17618, 55 pages.

*Computer Assisted Analysis of Geographical Information for Transportation Planning*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 31 pages.
*An Economic Base Analysis of the Fitchburg-Leominister Region*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 40 pages.

"Welfare Serendipity," editorial page, *New York Times*, July 17, 1975, p. 28, with Joel Morse.

*A Planned Program Budget System*, The Legislative Research Council, Commonwealth of Massachusetts, 65 pages, June 1976, with George Odiorne.

*Economic Development Program - Town of Wareham*, September 1976, Office of Economic Development, Town of Wareham, 152 pages.

*Economic Analysis of the Proposed Park Plaza Urban Renewal Project*, Center for Community Renewal Studies and the Department of Community Affairs, June 1976, 78 pages.

*A Management System for Financial Administration*, The City of Northampton, September 1976, 84 pages, bound.

*The Economic Development Potential of 121B*, Massachusetts Department of Community Affairs, 64 pages, July 1977, with Tom Nutt-Powell at M.I.T.

*New Bedford - Fairhaven Route 6 Corridor Planning Study*, Southeastern Regional Planning and Economic Development District, February 1977, three volumes, 272 pages bound.

Tapping Local Business Talent for Community Development Planning, *Management Research*, Vol. 10, #4, July/August 1977.

*Market Analysis of Retail and Commercial Trade in Downtown Holyoke*. City of Holyoke, Holyoke Redevelopment Authority, April 1977, 45 pages, with Jack Wolf.

*Marketing Industrial Space*, Department of Community Affairs Commonwealth of Massachusetts, August 1978, 114 pages, bound.

*Attitudes Toward Flood Management in Northampton, Massachusetts*; New England Division, U.S. Army Corps of Engineers, Waltham, MA, November 1978, 173 pages, bound, with Alice Carlozzi, James Palmer, Carl Carlozzi, & Arthur Elkins.

*Economic Analysis of the Pioneer Valley*, Pioneer Valley Association, January 1979, 66 pages, printed and bound.

*New Bedford State Pier; Economics and Marketing Study*, Department of Environmental Quality Engineering, Division of Waterways, Commonwealth of Massachusetts, March 1979

## PAPERS PRESENTED    (a partial list)

"A Linear Programming Model for Determining an Optimal Distribution of Petroleum Products," presented at the ORSA-TIMS Meetings in San Juan, Puerto Rico, 1974.

"A Linear Programming Model for Optimal Regional Distribution of Petroleum Products in the U.S.", International Conference on Energy and the Environment, Leuven, Belgium, May 1975.

"A Bayesian Approach to Spatial Decision Models," presented at the Northeast AIDS Meetings, Philadelphia, PA., 1975.

"Modeling Interstate Shifts in Employment," presented at the Northeast Regional Science Meetings, Halifax, Nova Scotia, 1977.

"Banking and the Regional Income Multiplier," Presidential Address, Northeast Regional Science Meetings, Amherst, May 1979.

"Commercial Banking and Regional Growth," presented at the Eastern Economics Association Meetings, Boston, Mass, May 1979.

"Banking and the Regional Income Multiplier," invited paper presented at the National Regional Science Meetings, Los Angeles, California, November 1979.

"The Impact of Energy Price Increases on Consumer Expenditures," invited paper presented to the National Energy Policy Conference, West Virginia University, Morgantown, W. VA., May 1980.

"The Regional Industrial System," presented to the International Geographical Union Commission on Industrial Systems, Tokyo, Japan, August 1980.

"Interregional Arbitrage and the Supply of Loanable Funds" presented to the Northeast Regional Science Meetings, Rutgers University, May 1981.

"Interregional Arbitrage and the Supply of Loanable Funds" invited paper presented to the North American Regional Science Association, Montreal, Canada, November 1981.

"Toward a Systems Approach to Regional Analysis," invited paper presented at the International Congress of Arts and Sciences, Rotterdam Holland, June 1984.

"A General Equilibrium Model of Interregional Monetary Flows," invited paper presented at the National Conference of Modeling and Simulation, Pittsburgh, April 1986.

"The Post Industrial Challenge to Location Theory," presented at the Northeast Regional Science Association meetings in Buffalo, N. Y., May 1990.

"The Application of Real Time Statistical Software to Developing Econometric Models," Umea University, Uppsala University and Lund University, Sweden, October 1990.

"An Empirical Comparison of Diversification Indices," The International Regional Science Meetings, New Orleans, LA, November 1991.

"Establishing an Entrepreneurial Base for Economic Transition," Jagellonia University, Cracow, Poland, January 1992.

"The Benefits of Economic and Academic Interaction in Supporting Peace Efforts in Northern Ireland", Ulster University, Londonderry, Northern Ireland, June 1995.

"Prospects for the Economic Monetary Union; an American Perspective", Keynote address, 20th anniversary symposium, Haarlem International School of Business, Haarlem, Netherlands, November 2, 1998.

"A Russian Economic Strategy in the Global Economy", presented at the Saint Petersburg State Technical University in Pskov, Russia 23rd, 2001.

"New Approaches to Economic Analysis in a Knowledge Based Economy", National Association of State Development Agencies, National Research Meetings, Saratoga Springs, July 23, 2001.

"The New Economy and the Law", Proceedings of The Massachusetts Bar Association Annual Conference, Boston, Massachusetts, January 26, 2002, pp 1-4.

"Using Statistics in Employment Cases", Proceeding of the Employment Law Conference, Mass. Continuing Legal Education, December 6, 2002, Boston, pp. 157-168.

## PROFESSIONAL ACTIVITIES AND HONORS

President of the Northeast Regional Science Association: 1975-1976, 1978-1979, 1990-1991.

Associate Editor of the Regional Science Review, 1975, 1991.

*Who's Who in Computer Graphics*, 1985.

Named as a Fellow of the Institute for Man and the Environment, 1976-1977.

Selected as a visiting scholar to Sweden. I gave lectures and worked with faculty at three major universities in Sweden: Umea, Uppsalla and Lund during the fall of 1990.

Helped direct the first postgraduate business program in Poland at the Jagellonia University in Cracow supported by the Mellon Foundation and the U. S. Information Agency, 1992.

School of Management Faculty Service Award, 1994

Recipient of the Chancellor's University Advancement Award, 1995

Invited by Governor William Weld to accompany him on a trade mission to the Republic of Ireland and Northern Ireland, March 1997.

Named as a University Professor of Political Economy by the Board of Trustees of the University of Massachusetts, June 1997.

Named "Professor of the Year" by the Massachusetts Telecommunications Council in recognition of "outstanding achievement in expanding our understanding of issues and opportunities in the Telecommunications Industry", March 1999.

Helped organize the International Conference on Economies Emerging from Conflict, jointly sponsored with Magee College at the University of Ulster, hosted by John Hume, held in Londonderry, Northern Ireland, June 23 - 25, 1999.

Appointed to the New England Business Advisory Council that advises the Federal Reserve Bank of Boston on business and economic policy each quarter, 2004 - 2008.

## Legal Expertise and Consulting

I began working as an expert witness in 1972 and have testified in well over 100 cases. I have testified in Federal District Court in Massachusetts, New York, Pennsylvania, Rhode Island, Maine, and North Carolina. I have testified in superior court and district courts in Massachusetts, Connecticut, Vermont, New Hampshire, New York, and Queensland, Australia. I have been retained by law firms in California, Arizona, New Jersey, South Carolina, Illinois, and Indiana.

I have testified for both plaintiffs and defendants as an economist in a wide variety of cases including wrongful death, personal injury, medical malpractice, divorce, and breach of contract.

I have also testified as both an economist and a statistician in race, gender and age discrimination cases related to termination, promotion and hiring under Title VII and the Age Discrimination in Employment Act of 1967. I testified in Hazen Paper Co. et al. v. Biggins, an important United States Supreme Court case, and in Halligan et al v. Ground Round, Inc. that received national attention.

I was heavily involved in preparing economic damage estimates arising from the deaths in the World Trade Center on September 11, 2001. I prepared reports submitted to the Victim's Compensation Fund for the surviving families of dozens of executives and others killed in that act of terrorism.

I have been regularly invited to lecture in programs conducted by Massachusetts Continuing Legal Education concerning statistical evidence and economic damages:

Age Discrimination, Boston, June 11, 1992.
Personal Injury Damages, Boston, March 11, 1993.
Personal Injury Damages, Boston, July 20, 1994.
Advanced Trial Advocacy Workshop, Boston, August 4, 1994.
Personal Injury Damages, Boston, February 1996.
Advanced Trial Advocacy Workshop, Boston, August 14, 1997.
Trying Employment Cases in the Superior Court, Springfield, April 7, 1999.
Trying Employment Law Cases in the Superior Court, Boston, April 13, 1999.
Annual Employment Law Conference, Boston, December 5, 2002

I have also been invited to lecture by other organizations that include:

The Massachusetts Chapter of the National Employment Lawyers Association; "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Boston, April 27, 1995.
National Employment Lawyers Association, "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Proceedings of the National Employment Lawyers Association, Vol. I., pp.444-454, San Diego, June 27, 1996.
Massachusetts Bar Association, Committee on Employee Rights, Boston, February 7, 2000.
Western New England Law School on several occasions over the past few years.
"The New Economy and the Law", The Massachusetts Bar Association 2002 Annual Conference on January 26th, 2002, published in the proceedings, pp 1-4.
Annual District Court Judges Conference, Southbridge, Massachusetts, May 29, 2003.

I was an elected member of the Board of Overseers of the Historical Society of the Supreme Judicial Court of Massachusetts for two 3 year terms that ended in 2006.

In addition to legal work, I also regularly consult with government leaders, public agencies, non-profit organizations, and business firms on a wide range of management, financial, and public policy issues.

8

**Service to the Commonwealth of Massachusetts**
- Department of Community Affairs: economic feasibility study of the Park Plaza Redevelopment Project, reviewed 21 urban renewal projects, and the prepared handbooks concerning the economic development of communities, 1975-1978.
- Chairman of the Task Force on Policy Issues, Northeast Council for Economic Action, sponsored by the Bank of Boston and the Economic Development Admin.; 1977 - 1978.
- Addressed the leadership of the Massachusetts House of Representatives regarding state economic policy, State House, Boston, July 29, 1994.
- Advised the Massachusetts House Committee on Taxation on tax policy and its impact on business development, July 11, 1995
- Invited to testify before the joint session of the Massachusetts House and Senate Taxation Committee on Governor Weld's proposed tax legislation, October 5, 1995.
- Worked with the Mass. Business Roundtable to support pending tax legislation for the mutual funds industry in the Massachusetts Senate, July 1996.
- Invited to testify before a joint session of the Massachusetts House and Senate Technology Committees on the Telecommunications Industry in Massachusetts, February 5, 1997.
- Worked with the Mass. Business Roundtable to present information and analysis concerning pending tax reform legislation in the insurance industry during 1997 and 1998.
- Invited to testify before a joint session of the Massachusetts House and Senate Ways and Means Committees concerning the economy and tax revenues, March 1998, 1999, 2000, and 2001.
- Member of the Massachusetts Labor Market Information Advisory Subcommittee established by the Department of Employment and Training and the Massachusetts Jobs Council, 1999-2003.

**Service to the University of Massachusetts**
- Member of the Faculty Senate, 1973-1974, 2000 – present.
- University Computer Services Committee, 1972-1976, 1978-1979, Chair 1974-1976.
- University Management Systems Advisory Committee, 1974-1976.
- Faculty Research Selection Committee, 1975.
- Member of the Advisory Board of Orchard Hill Residential College, 1974-1977.
- Member of the Campus Center Director Search Committee, 1977.
- Member of the Title IX Salary Review Committee, 1977-78.
- Member of the Graduate Council, 1978.
- Member of the Committee on Academic Priorities, 1978-1980 (Chair, 1978-1979), 2000 to present.
- Special Assistant to the President of the University of Massachusetts, 1979-1981.
- Member of the University Personnel Policies Committee, Chairman, 1988-89.
- Member of the Committee to Advise the Provost on Budget Priorities, 1991.
- Chairman of the Committee on Statistical Pedagogy, 1994-1996
- Member of the Public Policy Planning Council 1996-1997
- Special Assistant to the President of the University of Massachusetts, 1997-2001
- Member of the Program and Budget Council 2000 – 2003, Chair 2000-2002

**Service to the Isenberg School of Management**
- Curriculum Committees' Task Force on Quantitative Studies, 1972-1973.
- Economics Ph.D. Qualifying Examination Committee, 1973-1977, Chair 1974-1977.
- Member of the Graduate Studies Committee, 1972-1975.
- Director of the Graduate Public Management Program, 1973-1977.
- Chairman of the Department Personnel Committee 1978-1979, 1981-1982, 1996-1997.
- Member of the Task Force on Research Policy, 1977.
- Director of Masters Program, 1978-1979.
- Member of Academic Policy Committee, 1981-1982.
- Member of Administrative Committee, 1978-1979, 1982 -1994.
- Quantitative Methods Ph.D. Qualifying Examination Committee, Chair 1990-1992.
- Member of the committee to design the school's computer facilities, 1991.
- Chair of the MBA Task Force to Establish a Professional MBA Program, 1991-1992.
- Chairman of the Department of Finance and Operations Management 1982-1994.
- Chairman of the search committee for the Isenberg Chair in Integrative Studies 2000-2001

**Craig L. Moore**
*Economic consulting*

*65B Hatfield Street*
*Northampton MA 01060*
*Tel: 413-587-9405*
*Fax: 413-587-9581*
*craiglmoore@hotmail.com*

# *Economic Report*

**To:** Maurice M. Cahillane, Esq.

**From:** Craig L. Moore, Ph.D.

**Date:** December 26, 2007

**Re:** *John Bettencourt v. The Top-Flite Golf Company*

At your request, I have reviewed the following documents in the case of *John J. Bettencourt v. The Top-Flite Golf Company*:

1. Copy of the Complaint filed in United States District Court;
2. A copy of Plaintiff, John Bettencourt's Response to Request for Production of Documents by the Defendant, The Top-Flite Golf Company;
3. A copy of Plaintiff, John Bettencourt's Answers to Interrogatories by the Defendant, The Top-Flite Golf Company;
4. A copy of the deposition transcript and exhibits of John Bettencourt;
5. Personnel records from Spalding and Top-Flite for John Bettencourt;
6. Income tax records for 2002 through 2006;
7. Estimated earnings for 2007 for John Bettencourt;
8. Employee Benefits Statements from Top-Flite to John Bettencourt for 2002 and 2003;
9. A copy of the resume of John Bettencourt;
10. I interviewed Mr. Bettencourt on August 30, 2007 and information received in writing from him in response to specific questions I forwarded to him in writing.

## Background

It is my understanding that John Bettencourt lives in Ludlow, Massachusetts with his wife, Ana with whom he has two children, Monica and Mathew Bettencourt. He was born on January 26, 1955 in Portugal and came to the United States with his family when he was 16.

Mr. Bettencourt was hired by the Spalding Corporation as a factory worker shortly after completing high school. His mother also worked for Spalding as a factory worker. He went to college at night and after finishing his Bachelors degree, began working as an accountant at Spalding in 1980.[1] Between 1980 and 2004 he was promoted

---

[1] Spalding was a holding company that was purchased in 2003 by the Russell Corporation for $65 million. The sale did not include the Top-Flite, Ben Hogan and Strata brands that were retained by the Top-Flite Golf Company. In September of 2004, the Callaway Golf Corporation purchased Top-Flite out of Chapter

repeatedly and held positions as Financial Accountant, Senior Cost Accountant, Cost Accounting Supervisor, Finance Manager for the Golf Division, Plant Accounting Manager for the Domestic Division, New System Integration Team Member, and Manager, Cost/Industrial Engineering. His responsibilities included working on the implementation of the SAP system. Mr. Bettencourt was terminated on April 15, 2004 by Top-Flite prior to the company being sold to Callaway Golf Company.

It is claimed by Mr. Bettencourt that Top-Flite engaged in discriminatory actions against him and that his termination was based on his age. After his termination, he tried to secure employment in the area. He obtained a real estate license and began working for Ideal Real Estate in Ludlow where he is currently employed.

The focus of this report is to estimate the economic damages arising from the termination of John Bettencourt by the Top-Flite Golf Company. All assumptions and facts relied upon in this analysis will be stated and all computations are shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, John Bettencourt was deprived of the opportunity to earn a living and to pursue his occupation in the most advantageous manner. He also says that his termination caused considerable stress and anxiety. Some things, such as emotional stress are impossible to assess in an accounting sense and are typically left to the common judgment of a jury. Economic damages, however, can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts.

Economic damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the loss. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that would have accrued to the injured party less any mitigating income anticipated or earned unless it is from a collateral source. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged act.

## Earnings History

John Bettencourt received a Bachelors degree in Accounting from American International College in 1981 and completed his MBA at American International College in 1984. He worked for Spalding Worldwide Sports and Top-Flite almost his entire career until he was terminated in 2004.

---

11 bankruptcy. The bankruptcy was described in the press at the time as part of a sale strategy to avoid the claims of creditors against Top-Flite to boost the price of the company. The sale price was $174.4 million.

At the time of his termination, Mr. Bettencourt was the Cost/Industrial Engineering Manager for Top-Flite. His gross earnings for 2004 is $77,699.45 with $3,983.22 being Deferred Compensation and $1,793.04 going into a Section 125 Plan. Hee also received $16,740 from Top-Flite in that year.

Mr. Bettencourt's earnings, based on federal income tax returns, are shown in Table 1 below. It is clear from this information that the termination by Top-Flite had a very significant negative impact on his income that continues to the present. During 2005, his gross revenue from real estate was $75,697 and net income $64,029. He also received $6,146 in unemployment compensation payments included in the $77,699 for that year. In 2006, his gross revenue from real estate sales is $118,956 and his net income is $95,993. His estimated net income from real estate sales for 2007 is $70,000, but could be lower given the weak market.

**Annual Earnings**

Table 1.

| Year | Earnings |
|------|----------|
| 2001 | 70,887 |
| 2002 | 88,733 |
| 2003 | 54,870 |
| 2004 | 77,699 |
| 2005 | 70,175 |
| 2006 | 95,993 |
| 2007 | 70,000 |



## Employee Benefits

In addition to wages, earnings capacity also includes the value of employee benefits. Mr. Bettencourt lost all of his benefits upon termination by Top-Flite. This included medical and dental insurance, life insurance, short-term and long-term disability insurance, 401(k) contributions, 5 weeks of paid vacation, paid time off, sick leave, employee stock purchase plan, and, employee discounts for company products. He was also eligible for bonus payments based on company performance. Top-Flite provided statements to their employees that showed the employer's cost of the benefits programs they provided. Based on his 2002 company statement, benefits he received in his total compensation package were equal to approximately 24% of his salary. He also earned another 10% bonus that was included in that year that I have not included as a benefit. He also had 5 weeks paid vacation that had a value in 2002 of at least $7,161.83 that is not included.

The cost to Mr. Bettencourt to replace these benefits in his present job is approximately $36,822 per year. An itemized breakdown is shown in Table 2 below. It is not surprising that the replacement cost is much higher given that he no longer has group insurance rates available to him.

3

**Replacement Cost of Benefits**

Table 2.

| Benefit | Annual Cost |
|---|---|
| Health Insurance | $    4,576 |
| Dental Insurance | 936 |
| Vision | 312 |
| 401(k) Matching - 3% | 2,340 |
| Vacation - 5 Weeks | 7,500 |
| Holidays - 13 Days | 2,778 |
| Payroll Taxes - 12% | 9,360 |
| Bonus - 10% | 7,800 |
| Life Insurance | 720 |
| Employee Purchase Plan | 500 |
| Long-Term Disability | |
| Accidental Death Insurance | |
| **Total** | **$    36,822** |

## Work-life Estimates

An important element in the analysis is the determination of the normal work-life expectancy of Mr. Bettencourt. One could argue that any of several ages might be most appropriate for the work-life of any particular individual based on their personal characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 to maximize Social Security retirement benefits. Mr. Bettencourt indicates that he had no plans to retire early. On the contrary, he opines that he intends to work well beyond the age of 67. Based on these factors I have assumed that a work-life to age 67 would be reasonable in this case.

## Estimating the Present Value of Lost Future Earnings Capacity

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during John Bettencourt's work-life. This involves projecting his prior earnings to that age netting out any earnings he is expected to make. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. The economic background concerning each of these elements of the analysis is described in the following sections in detail.

## Rate of Economic Growth, Prices, and Real Wages

In this case, Mr. Bettencourt's real earnings at Top-Flite are assumed to only grow at the cost of living. That is, no increase in real earnings is used in the computation of future economic damages. His net income from being a realtor increases at a real rate of 4%. This assumption is the most conservative, especially in view of the present problems in the national housing market. Mr. Bettencourt's earnings for this year are expected to be less than last year and not 4% more.

4

## Present Value

Once the rate of growth in future earnings and the value of lost future income is established, it must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[2]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets.

## Determination of Lost Future Earnings

The computations to estimate the economic damages arising from Mr. Bettencourt's termination are shown in Table 3. The first column in the table shows each year in which John Bettencourt will work. The second column indicates his age in that year. The third column contains his prior earnings in each year. The fourth column shows the value of mitigation. This figure includes earnings (cash-flow) from working as a realtor and assumes a 4% real rate of growth in net earnings into the future. Lost Benefits are estimated based on the replacement cost as described above. The next column shows the value of net lost earnings. This figure is then reduced to present value assuming 12 equal payments each year with the interest accruing to the end of each period. This is the most conservative method available and results in an effective annual rate of return that is in excess of 2%.

## Summary of Findings

Based on the documents that I reviewed and the analysis that I have done, I believe that there is a reasonable economic certainty that the present value of lost earnings resulting from the termination of John Bettencourt by Top-Flite is approximately $475,475 at the present time. At such time as that happens, I would revise this opinion and supplement it in a timely fashion if any additional information becomes available.

---

[2] For a discussion of *Pfeifer* and related cases, see George, Serien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

### Present Value of Lost Earnings
Table 3.

| Year | Age | Prior Earnings | Mitigating Earnings | Lost Benefits | Net Loss | Present Value |
|------|-----|----------------|---------------------|---------------|----------|---------------|
| 2004 | 48 | 77,699 | 77,699 | 15,151 | 15,151 | 15,151 |
| 2005 | 49 | 80,427 | 70,175 | 36,922 | 47,174 | 47,174 |
| 2006 | 50 | 83,278 | 95,993 | 36,922 | 24,207 | 24,207 |
| 2007 | 51 | 85,428 | 70,000 | 36,922 | 52,350 | 52,328 |
| 2008 | 52 | 85,428 | 72,800 | 36,922 | 49,550 | 48,854 |
| 2009 | 53 | 85,428 | 75,712 | 36,922 | 46,638 | 45,073 |
| 2010 | 54 | 85,428 | 78,740 | 36,922 | 43,610 | 41,313 |
| 2011 | 55 | 85,428 | 81,890 | 36,922 | 40,460 | 37,571 |
| 2012 | 56 | 85,428 | 85,166 | 36,922 | 37,184 | 33,846 |
| 2013 | 57 | 85,428 | 88,572 | 36,922 | 33,778 | 30,137 |
| 2014 | 58 | 85,428 | 92,115 | 36,922 | 30,235 | 26,442 |
| 2015 | 59 | 85,428 | 95,800 | 36,922 | 26,550 | 22,760 |
| 2016 | 60 | 85,428 | 99,632 | 36,922 | 22,718 | 19,090 |
| 2017 | 61 | 85,428 | 103,617 | 36,922 | 18,733 | 15,430 |
| 2018 | 62 | 85,428 | 107,762 | 36,922 | 14,588 | 11,778 |
| 2019 | 63 | 85,428 | 112,072 | 36,922 | 10,278 | 8,134 |
| 2020 | 64 | 85,428 | 116,555 | 36,922 | 5,795 | 4,495 |
| 2021 | 65 | 85,428 | 121,217 | 36,922 | 1,133 | 861 |
| 2022 | 66 | 85,428 | 126,066 | 36,922 | (3,716) | (2,770) |
| 2023 | 67 | 85,428 | 131,109 | 36,922 | (8,759) | (6,399) |

**Total**                                                        $ 475,475.45

The opinions expressed here are based the documents and information listed at the beginning of the report and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required.

A list of recent testimony is attached in the appendix to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."

Craig L. Moore, Ph.D.

Date   1/8/08

6

# Prior Testimony of Craig Moore

| Trial Date | Plaintiff | Defendant | Court |
| --- | --- | --- | --- |
| 1/13/2004 | Durwood Currier | United Technologies | Maine Federal District (D) |
| 3/26/2004 | Laura Clark | United Parcel Service | Hampden Superior |
| 4/14/2004 | Thomas J. Cosmos | Commonwealth of Massachusetts | Worcester Superior |
| 4/29/2004 | Mary and Michael Conchieri | | Hampden Superior (A) |
| 8/10/2004 | Mark Fortier | Giddings & Lewis, Inc. et al | U.S. Court Springfield (D) |
| 9/24/2004 | Louis Chighisola | P. A. Landers, Inc. | Plymouth Superior |
| 11/8/2004 | Keith Lemon | Lynn Creamery | Suffolk Superior |
| 1/13/2005 | George Giard | Harvey Darby and C.R. England, Inc. | U.S. District Mass. |
| 2/17/2005 | Keneth Parsons | Mass Mutual Insurance | Hampden Superior (D) |
| 3/9/2005 | Sharon Sklarski et al | Ferdauz Canteenwalla, M.D. | Hampden Superior |
| 4/1/2005 | Joan Heroux (widow) | Kim Robert Krach, M.D. | Hampden Superior |
| 5/12/2005 | Ronald Larsen | Simonds Industries, Inc. | Mass. Federal (D) |
| 5/23/2005 | Estate of Sheldon Rothstein | | Middlesex Superior |
| 5/31/2005 | Estate of Linda Marie Davis | | Suffolk Superior (D) |
| 6/7/2005 | Joseph Zabielski | Agawam School Committee, et al | Hampden Superior (D) |
| 6/17/2005 | Michael Joseph | Susan Tyler et al | Superior Court - Hartford |
| 8/16/2005 | Jorge Diaz | Massachusetts Mutual Insurance | Hampden Superior (D) |
| 8/22/2005 | Ahmed Sarrage | Jarrah Omar Mohammad | Hampden Superior |

*Tuesday, January 08, 2008*

*Page 1 of 2*

| Trial Date | Plaintiff | Defendant | Court |
|---|---|---|---|
| 10/20/2005 | Estate of Cheryl Sweeney | Allard Nazarian Group | Hillsboro Superior NH |
| 10/21/2005 | Joan Moynihan | | Arbitration |
| 11/30/2005 | James Broderick and John Stamatov, EIU Group | | U.S. District Boston (D) |
| 1/6/2006 | Thomas Manning | Gulf Insurance Co. et al | American Arbitration Assoc. |
| 1/17/2006 | James Doherty | Arthur D. Little, Inc. | Suffolk Superior |
| 1/19/2006 | Russell Gilbert | Thompson Financial, Inc. | Franklin Superior |
| 5/12/2006 | Patrick O'Connell | Kevin Gilbert | Hampshire Superior |
| 10/16/2006 | United States | DaimlerChrysler | Federal Court Boston |
| 10/25/2006 | Richard A. Cormier | Monty Schwartz | Berkshire Superior |
| 2/27/2007 | Melissa Mendonsa, et al | Estate of Justin Farrell | Suffolk Superior |
| 3/27/2007 | Jessica Rodriguez | Lowell Housing Authority | Hampden Superior |
| 4/12/2007 | Joyce Waters, et al. | CVT Limited Partnership, LLP | Hampshire Superior |
| 5/25/2007 | Alex J. Orban | Interskate 91 North | Springfield Federal Court (D) |
| 6/13/2007 | Cynthia Haddad | Friendly Ice Cream Corp. et al | Berkshire Superior (D) |
| 6/19/2007 | Michelle Beebe | Wal-Mart Stores, et al | Federal Court Springfield (D) |
| 8/1/2007 | Carolyn Brooks, MD | Williams College | Hampshire Probate |
| 8/13/2007 | Sally Wilson | Robert Piela, MD | Not filed to date (A) |
| 10/10/2007 | Ene Inyang - Administrator of Estate of Rose Ok | Arbor Hospital, and Donna Orvin, M.D. | Suffolk Superior |

# Curriculum Vita

## Craig L. Moore

65B Hatfield Street
Northampton MA 01060

**Phone: 413-587-9405**          **Fax 413-587-9581**          email: *Craiglmoore@hotmail.com*

| | |
|---|---|
| **Education** | B. S. Economics, West Virginia University, 1967;<br>M. A. Economics, Maxwell School, Syracuse University, 1972;<br>Ph.D. Maxwell School, Syracuse University, 1972;<br>Areas of study: Economics, Statistics, and Public Finance. |
| **Present Positions** | Private Management and Legal Consultant;<br>Member of the New England Business Advisory Council of the Federal Reserve Bank of Boston, 2004 – 2008;<br>Board of Directors of Holyoke Medical Center and Hospital;<br>Board of Directors of the Regional Employment Board of Hampden County. |
| **Previous Positions** | Chief Operating Officer of Marox Corporation, 2004 - 2006<br>University Professor of Political Economy, University of Massachusetts;<br>Full Professor at the Isenberg School of Management, University of Massachusetts, Amherst, 1972 through 2003;<br>Adjunct Professor of Regional Planning; Amherst;<br>Director of the Masters Program, School of Management, 1978-1979;<br>Special Assistant to the President of the University, 1979-1981;<br>Special Assistant to the President of the University, 1997-2000;<br>Policy Advisor to the President of the University, 2000-2003;<br>Chairman of the Department of Finance & Operations Management from September 1982 to August 1994;<br>Founder and Editor of *Massachusetts Benchmarks* from 1997 to 2002. |
| **Professional History** | Joined the faculty of the University of Massachusetts Isenberg School of Management as an Assistant Professor in 1972;<br>Promoted to Associate Professor in 1976;<br>Awarded Tenure in 1978;<br>Promoted to Full Professor in 1980;<br>Named University Professor of Political Economy in 1997;<br>Retired from the University of Massachusetts December 31, 2003;<br>Joined MAROX Corporation as Chief Operating Officer on January 1, 2004;<br>Served as a Legal Consultant and Expert Witness for the past 33 years. |
| **Teaching Experience** | Financial Models – required for all finance majors;<br>Statistical Tools for Management - required undergraduate course;<br>Business Data Analysis – MBA Statistics requirement;<br>Quantitative Methods II – Ph.D. Statistics requirement;<br>Macro Economic Theory – Ph.D. requirement; |

# PUBLICATIONS

## BOOKS AND MONOGRAPHS

Publications in this category include government publications reviewed by professional and academic economists before their publication.

*Regional Economic Analysis for Community Development Planning*, Massachusetts Department of Community Affairs, 119 pages, Oct. 1978.

*Massachusetts Reconsidered: an Economic Anatomy of the Commonwealth*, School of Management, University of Massachusetts, 148 pages, September, 1978.

"The Regional Industrial System" in *Spatial Analysis and the Industrial Environment* by F.I. Hamilton and G.J.R. Linge, London: John Wiley Ltd. (with Karaska and Susman), 1980.

*The New Economic Reality, Massachusetts Prospects for Long-Term Growth;* School of Management, University of Massachusetts, sponsored by the Massachusetts Taxpayers Foundation, 75 pages printed, May 1994 with Edward Moscovitch.

*A Taxpayer's Look at a Sacred Cow: Public Sector Design in Massachusetts Two Decades After the Ward Commission,* 38 pages printed, November 1995 with Edward Moscovitch

*Connection to the Future; An Analysis of the Telecommunications Industry in Massachusetts,* published by the Massachusetts Telecommunications Council and the University of Massachusetts Economic Project, 45 pages printed, June 1, 1997.

*The Effect of State Tax Policy on the Insurance Industry in Massachusetts*, published by the Massachusetts Business Roundtable, 35 pages printed, October 1, 1997

*The New Foundation; Information Technology*, The Donahue Institute, University of Massachusetts, 18 pages printed, May 1999.

*Science, Technology and Investment; The Cycle of Growth in Massachusetts,* Massachusetts Department of Economic Development, 60 pages printed, August 2001.

*Mathematical Models of a Regional Economy (in Russian), with 4 Russian co-authors, published by the St. Petersburg State Technical University, summer of 2002, 85 pages printed.*

*Critical Transitions in Telecommunications: Shaping the New Economy, Massachusetts Telecommunications Council, November 2002, 60 pages, printed.*

2

## JOURNAL ARTICLES

[ 1]    "The Impact of Non-Profit Institutions on Regional Income, Syracuse University a Case in Point," *Growth and Change*, January 1974, Vol. 5, No. 2, pp. 36-40.

[ 2]    "A New Look at the Regional Trade Multiplier," *Northeast Regional Science Review*, Vol. III, 1973, pp. 164-170.

[ 3]    "The Impact of Non-Profit Institutions on Regional Income, Upstate Medical Center a Case in Point," *Economic Geography*, Vol. 50, No. 2, April 1974, pp. 124-129.

[ 4]    "Social Equity and Retained Earnings," *Rivista Internazionale di Scionzele Economiche e Commerciali*, Ann. XXI, No. 2, 1974, pp. 137-135, with Sidney Sufrin.

[ 5]    "A New SYMAP for Viewing Spatial Location Patterns," *Selected Projects*, Graduate School of Design, Harvard University, Vol. VII, pp. 77-80, 1974.

[ 6]    "A National Planning Model for Petroleum Allocations," *Rivista Internazionale di Scionzele Economiche e Commerciali,* Ann. XII, 1974, pp. 547-656.

[ 7]    "The Impact of a Non-Profit Institution on Regional Income:  A Discussion," *Growth and Change*, Vol. 6, No. 3,  July 1975, pp. 45-49.

[ 8]    "Computer Graphics and Decision Analysis," *Northeast Regional Science Review*, Vol. V, pp. 93-100, 1975, with Roger Calantone.

[ 9]    "A New Look at the Minimum Requirements Approach to Regional Economic Analysis," *Economic Geography*, Vol. 51, No. 4, October 1975, pp. 350-356.

[10]    "A Linear Programming Model for Determining an Optimal Regional Distribution of Petroleum Products," *Lecture Notes in Economics and Mathematical Systems*, No. 126, Energy, Regional Science and Public Policy, May 1975, pp. 119-135.

[11]    "Optimal Regional Distribution of Petroleum Products," *Omega*, Vol. 4, No. 3, 1976, pp. 301-311.

[12]    "A Bayesian Approach to Spatial Decision Models," *Northeast American Institute of Decision Sciences Proceedings*, May 1976, pp. 41-44.

[13]    "A Cross-Sectional Analysis of the Municipal Property Tax," *Northeast Regional Science Review*, Vol. 6, pp. 200-210.

[14]    "Modeling Interstate Shifts in Employment," *Northeast Regional Science Review*, Vol. 7, 1977, pp. 143-152.

[15]    "A Critical Review of Shift-Share Analysis as a Forecasting Technique," *Journal of Regional Science*, Vol. 20, No. 4, pp. 419-437.

[16]    "Banking and the Regional Income Multiplier," *Northeast Regional Science Review*, Vol. 9, 1979, pp. 1-7.

[17]    "Interregional Arbitrage and the Supply of Loanable Funds," *Journal of Regional Science*, Vol. 22, No. 4, 1982, pp. 499-512.

[18]  "Minimum Requirements and Required Economics, 1980," *Economic Geography*, Vol. 60, No. 3, July, 1984.

[19]  "The Impact of the Banking System on Regional Analysis," *Regional Studies*, Vol. 19.1, pp. 29-35, 1984.

[20]  "A General Equilibrium Model of Interregional Monetary Flows," *Environment and Planning A*, Vol. 21, pp. 397-404, 1989.

[21]  "Utilizing an Economist to Establish Damages Through Expert Testimony, "*Journal of the Massachusetts Academy of Trial Attorneys*, Vol. 4, No. 2, pp. 7-10, May 1996.

[22]  "Benchmarking – An American Perspective," *Economia & Perspectiva*, No. 15/16, Jan./June, 2001, pp.201 – 211, 2001.

## PUBLISHED CASE STUDIES

The following case studies were gathered and written during the summer of 1973 under a grant from the Center for Business and Economic Research and were subsequently published by the Harvard Case Clearing House, and in the book cited below:

| Case Title | Publication Number |
|---|---|
| Jacobsen Rug Company | 9-375-813 |
| Jacobsen Teaching Note | 8-375-814 |
| Magnavox CATV | 9-375-815 |
| Magnavox Teaching Note | 8-375-815 |
| Cherry House Furniture | 9-375-825 |
| Cherry House Furniture [A] | 9-375-826 |
| Cherry House Teaching Note | 8-375-827 |

Baird, Bruce F., *Introduction to Decision Analysis*, 1978 pp. 506-508, Duxbury; Jacobsen Rug Company, Cherry House Furniture [A], Cherry House Furniture Teaching Note.

## BOOK REVIEWS

"The Changing Role of Public Administration," A review of three books and a discussion of how they illustrate the new demand on public administrators. *Management Research*, Vol. 8, No. 3, 1975, page 51.

*Waste Paper Recovery: Economic Aspects and Environmental Impacts*, reviewed in the *Annals of Regional Science*, 1982.

*Economic Geography* by James Wheeler and Peter Muller, reviewed in the *Annals of Regional Science*, 1983.

## OTHER PUBLICATIONS

*Designing an Administrative Control System for MEPA: Massachusetts Environmental Policy Act*, Institute for Man and the Environment and The Executive Office of Environmental Affairs, 130 pages, August 1975, with Richard Smardon.

"A New Technique for Estimating Municipal Property Tax Base," Proceedings of the New England Business and Economic Development Conference, University of New Hampshire, 1974 with Richard Evans.

*A Long Range Systems Development Guide for Transportation Planning in the Commonwealth of Massachusetts*, July 1975, DPW-UMASS. Joint Transportation Program, Contract 17618, 55 pages.

*Computer Assisted Analysis of Geographical Information for Transportation Planning*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 31 pages.
*An Economic Base Analysis of the Fitchburg-Leominister Region*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 40 pages.

"Welfare Serendipity," editorial page, *New York Times*, July 17, 1975, p. 28, with Joel Morse.

*A Planned Program Budget System*, The Legislative Research Council, Commonwealth of Massachusetts, 65 pages, June 1976, with George Odiorne.

*Economic Development Program - Town of Wareham*, September 1976, Office of Economic Development, Town of Wareham, 152 pages.

*Economic Analysis of the Proposed Park Plaza Urban Renewal Project*, Center for Community Renewal Studies and the Department of Community Affairs, June 1976, 78 pages.

*A Management System for Financial Administration*, The City of Northampton, September 1976, 84 pages, bound.

*The Economic Development Potential of 121B*, Massachusetts Department of Community Affairs, 64 pages, July 1977, with Tom Nutt-Powell at M.I.T.

*New Bedford - Fairhaven Route 6 Corridor Planning Study*, Southeastern Regional Planning and Economic Development District, February 1977, three volumes, 272 pages bound.

Tapping Local Business Talent for Community Development Planning, *Management Research*, Vol. 10, #4, July/August 1977.

*Market Analysis of Retail and Commercial Trade in Downtown Holyoke.* City of Holyoke, Holyoke Redevelopment Authority, April 1977, 45 pages, with Jack Wolf.

*Marketing Industrial Space*, Department of Community Affairs Commonwealth of Massachusetts, August 1978, 114 pages, bound.

*Attitudes Toward Flood Management in Northampton, Massachusetts*; New England Division, U.S. Army Corps of Engineers, Waltham, MA, November 1978, 173 pages, bound, with Alice Carlozzi, James Palmer, Carl Carlozzi, & Arthur Elkins.

*Economic Analysis of the Pioneer Valley*, Pioneer Valley Association, January 1979, 66 pages, printed and bound.

*New Bedford State Pier; Economics and Marketing Study*, Department of Environmental Quality Engineering, Division of Waterways, Commonwealth of Massachusetts, March 1979

## PAPERS PRESENTED     (a partial list)

"A Linear Programming Model for Determining an Optimal Distribution of Petroleum Products," presented at the ORSA-TIMS Meetings in San Juan, Puerto Rico, 1974.

"A Linear Programming Model for Optimal Regional Distribution of Petroleum Products in the U.S.", International Conference on Energy and the Environment, Leuven, Belgium, May 1975.

"A Bayesian Approach to Spatial Decision Models," presented at the Northeast AIDS Meetings, Philadelphia, PA., 1975.

"Modeling Interstate Shifts in Employment," presented at the Northeast Regional Science Meetings, Halifax, Nova Scotia, 1977.

"Banking and the Regional Income Multiplier," Presidential Address, Northeast Regional Science Meetings, Amherst, May 1979.

"Commercial Banking and Regional Growth," presented at the Eastern Economics Association Meetings, Boston, Mass, May 1979.

"Banking and the Regional Income Multiplier," invited paper presented at the National Regional Science Meetings, Los Angeles, California, November 1979.

"The Impact of Energy Price Increases on Consumer Expenditures," invited paper presented to the National Energy Policy Conference, West Virginia University, Morgantown, W. VA., May 1980.

"The Regional Industrial System," presented to the International Geographical Union Commission on Industrial Systems, Tokyo, Japan, August 1980.

"Interregional Arbitrage and the Supply of Loanable Funds" presented to the Northeast Regional Science Meetings, Rutgers University, May 1981.

"Interregional Arbitrage and the Supply of Loanable Funds" invited paper presented to the North American Regional Science Association, Montreal, Canada, November 1981.

"Toward a Systems Approach to Regional Analysis," invited paper presented at the International Congress of Arts and Sciences, Rotterdam Holland, June 1984.

"A General Equilibrium Model of Interregional Monetary Flows," invited paper presented at the National Conference of Modeling and Simulation, Pittsburgh, April 1986.

"The Post Industrial Challenge to Location Theory," presented at the Northeast Regional Science Association meetings in Buffalo, N. Y., May 1990.

"The Application of Real Time Statistical Software to Developing Econometric Models," Umea University, Uppsala University and Lund University, Sweden, October 1990.

"An Empirical Comparison of Diversification Indices," The International Regional Science Meetings, New Orleans, LA, November 1991.

"Establishing an Entrepreneurial Base for Economic Transition," Jagellonia University, Cracow, Poland, January 1992.

"The Benefits of Economic and Academic Interaction in Supporting Peace Efforts in Northern Ireland", Ulster University, Londonderry, Northern Ireland, June 1995.

6

"Prospects for the Economic Monetary Union; an American Perspective", Keynote address, 20th anniversary symposium, Haarlem International School of Business, Haarlem, Netherlands, November 2, 1998.

"A Russian Economic Strategy in the Global Economy", presented at the Saint Petersburg State Technical University in Pskov, Russia 23rd, 2001.

"New Approaches to Economic Analysis in a Knowledge Based Economy", National Association of State Development Agencies, National Research Meetings, Saratoga Springs, July 23, 2001.

"The New Economy and the Law", Proceedings of The Massachusetts Bar Association Annual Conference, Boston, Massachusetts, January 26, 2002, pp 1-4.

"Using Statistics in Employment Cases", Proceeding of the Employment Law Conference, Mass. Continuing Legal Education, December 6, 2002, Boston, pp. 157-168.

## PROFESSIONAL ACTIVITIES AND HONORS

President of the Northeast Regional Science Association: 1975-1976, 1978-1979, 1990-1991.

Associate Editor of the Regional Science Review, 1975, 1991.

*Who's Who in Computer Graphics*, 1985.

Named as a Fellow of the Institute for Man and the Environment, 1976-1977.

Selected as a visiting scholar to Sweden. I gave lectures and worked with faculty at three major universities in Sweden: Umea, Uppsalla and Lund during the fall of 1990.

Helped direct the first postgraduate business program in Poland at the Jagellonia University in Cracow supported by the Mellon Foundation and the U. S. Information Agency, 1992.

School of Management Faculty Service Award, 1994

Recipient of the Chancellor's University Advancement Award, 1995

Invited by Governor William Weld to accompany him on a trade mission to the Republic of Ireland and Northern Ireland, March 1997.

Named as a University Professor of Political Economy by the Board of Trustees of the University of Massachusetts, June 1997.

Named "Professor of the Year" by the Massachusetts Telecommunications Council in recognition of "outstanding achievement in expanding our understanding of issues and opportunities in the Telecommunications Industry", March 1999.

Helped organize the International Conference on Economies Emerging from Conflict, jointly sponsored with Magee College at the University of Ulster, hosted by John Hume, held in Londonderry, Northern Ireland, June 23 - 25, 1999.

Appointed to the New England Business Advisory Council that advises the Federal Reserve Bank of Boston on business and economic policy each quarter, 2004 - 2008.

## Legal Expertise and Consulting

I began working as an expert witness in 1972 and have testified in well over 100 cases. I have testified in Federal District Court in Massachusetts, New York, Pennsylvania, Rhode Island, Maine, and North Carolina. I have testified in superior court and district courts in Massachusetts, Connecticut, Vermont, New Hampshire, New York, and Queensland, Australia. I have been retained by law firms in California, Arizona, New Jersey, South Carolina, Illinois, and Indiana.

I have testified for both plaintiffs and defendants as an economist in a wide variety of cases including wrongful death, personal injury, medical malpractice, divorce, and breach of contract.

I have also testified as both an economist and a statistician in race, gender and age discrimination cases related to termination, promotion and hiring under Title VII and the Age Discrimination in Employment Act of 1967. I testified in Hazen Paper Co. et al. v. Biggins, an important United States Supreme Court case, and in Halligan et al v. Ground Round, Inc. that received national attention.

I was heavily involved in preparing economic damage estimates arising from the deaths in the World Trade Center on September 11, 2001. I prepared reports submitted to the Victim's Compensation Fund for the surviving families of dozens of executives and others killed in that act of terrorism.

I have been regularly invited to lecture in programs conducted by Massachusetts Continuing Legal Education concerning statistical evidence and economic damages:

Age Discrimination, Boston, June 11, 1992.
Personal Injury Damages, Boston, March 11, 1993.
Personal Injury Damages, Boston, July 20, 1994.
Advanced Trial Advocacy Workshop, Boston, August 4, 1994.
Personal Injury Damages, Boston, February 1996.
Advanced Trial Advocacy Workshop, Boston, August 14, 1997.
Trying Employment Cases in the Superior Court, Springfield, April 7, 1999.
Trying Employment Law Cases in the Superior Court, Boston, April 13, 1999.
Annual Employment Law Conference, Boston, December 5, 2002

I have also been invited to lecture by other organizations that include:

The Massachusetts Chapter of the National Employment Lawyers Association; "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Boston, April 27, 1995.
National Employment Lawyers Association, "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Proceedings of the National Employment Lawyers Association, Vol. I., pp.444-454, San Diego, June 27, 1996.
Massachusetts Bar Association, Committee on Employee Rights, Boston, February 7, 2000.
Western New England Law School on several occasions over the past few years.
"The New Economy and the Law", The Massachusetts Bar Association 2002 Annual Conference on January 26th, 2002, published in the proceedings, pp 1-4.
Annual District Court Judges Conference, Southbridge, Massachusetts, May 29, 2003.

I was an elected member of the Board of Overseers of the Historical Society of the Supreme Judicial Court of Massachusetts for two 3 year terms that ended in 2006.

In addition to legal work, I also regularly consult with government leaders, public agencies, non-profit organizations, and business firms on a wide range of management, financial, and public policy issues.

**Service to the Commonwealth of Massachusetts**
- Department of Community Affairs: economic feasibility study of the Park Plaza Redevelopment Project, reviewed 21 urban renewal projects, and the prepared handbooks concerning the economic development of communities, 1975-1978.
- Chairman of the Task Force on Policy Issues, Northeast Council for Economic Action, sponsored by the Bank of Boston and the Economic Development Admin.; 1977 - 1978.
- Addressed the leadership of the Massachusetts House of Representatives regarding state economic policy, State House, Boston, July 29, 1994.
- Advised the Massachusetts House Committee on Taxation on tax policy and its impact on business development, July 11, 1995
- Invited to testify before the joint session of the Massachusetts House and Senate Taxation Committee on Governor Weld's proposed tax legislation, October 5, 1995.
- Worked with the Mass. Business Roundtable to support pending tax legislation for the mutual funds industry in the Massachusetts Senate, July 1996.
- Invited to testify before a joint session of the Massachusetts House and Senate Technology Committees on the Telecommunications Industry in Massachusetts, February 5, 1997.
- Worked with the Mass. Business Roundtable to present information and analysis concerning pending tax reform legislation in the insurance industry during 1997 and 1998.
- Invited to testify before a joint session of the Massachusetts House and Senate Ways and Means Committees concerning the economy and tax revenues, March 1998, 1999, 2000, and 2001.
- Member of the Massachusetts Labor Market Information Advisory Subcommittee established by the Department of Employment and Training and the Massachusetts Jobs Council, 1999-2003.

**Service to the University of Massachusetts**
- Member of the Faculty Senate, 1973-1974, 2000 – present.
- University Computer Services Committee, 1972-1976, 1978-1979, Chair 1974-1976.
- University Management Systems Advisory Committee, 1974-1976.
- Faculty Research Selection Committee, 1975.
- Member of the Advisory Board of Orchard Hill Residential College, 1974-1977.
- Member of the Campus Center Director Search Committee, 1977.
- Member of the Title IX Salary Review Committee, 1977-78.
- Member of the Graduate Council, 1978.
- Member of the Committee on Academic Priorities, 1978-1980 (Chair, 1978-1979), 2000 to present.
- Special Assistant to the President of the University of Massachusetts, 1979-1981.
- Member of the University Personnel Policies Committee, Chairman, 1988-89.
- Member of the Committee to Advise the Provost on Budget Priorities, 1991.
- Chairman of the Committee on Statistical Pedagogy, 1994-1996
- Member of the Public Policy Planning Council 1996-1997
- Special Assistant to the President of the University of Massachusetts, 1997-2001
- Member of the Program and Budget Council 2000 – 2003, Chair 2000-2002

**Service to the Isenberg School of Management**
- Curriculum Committees' Task Force on Quantitative Studies, 1972-1973.
- Economics Ph.D. Qualifying Examination Committee, 1973-1977, Chair 1974-1977.
- Member of the Graduate Studies Committee, 1972-1975.
- Director of the Graduate Public Management Program, 1973-1977.
- Chairman of the Department Personnel Committee 1978-1979, 1981-1982, 1996-1997.
- Member of the Task Force on Research Policy, 1977.
- Director of Masters Program, 1978-1979.
- Member of Academic Policy Committee, 1981-1982.
- Member of Administrative Committee, 1978-1979, 1982 -1994.
- Quantitative Methods Ph.D. Qualifying Examination Committee, Chair 1990-1992.
- Member of the committee to design the school's computer facilities, 1991.
- Chair of the MBA Task Force to Establish a Professional MBA Program, 1991-1992.
- Chairman of the Department of Finance and Operations Management 1982-1994.
- Chairman of the search committee for the Isenberg Chair in Integrative Studies 2000-2001

**Craig L. Moore**
*Economic consulting*

65B Hatfield Street
Northampton MA 01060
Tel: 413-587-9405
Fax: 413-587-9581
craiglmoore@hotmail.com

# *Economic Report*



*To:* Maurice M. Cahillane, Esq.

*From:* Craig L. Moore, Ph.D.

*Date:* December 26, 2007

*Re: Paul Duval v. The Top-Flite Golf Company*

At your request, I have reviewed the following documents in the case of *Paul J. Duval v. The Top-Flite Golf Company*:

1. Copy of the Complaint filed in United States District Court;
2. A copy of Plaintiff, Paul Duval's Response to Request for Production of Documents by the Defendant, The Top-Flite Golf Company;
3. A copy of Plaintiff, Paul Duval's Answers to Interrogatories by the Defendant, The Top-Flite Golf Company;
4. A copy of the deposition transcript and exhibits of Paul Duval;
5. A copy of a summary of benefits and employer costs for Paul Duval for 2002;
6. Personnel action forms from Spalding Sports Worldwide for Paul Duval;
7. Copies of letters to Mr. Duval from Spalding concerning merit increases;
8. Copies of forms filed with the Massachusetts Division of Unemployment Assistance by Top Flite Golf Company concerning Mr. Duval;
9. Income tax records for the years 2001 through 2004;
10. Social Security earnings history for Paul Duval through 2004;
11. A copy of the resume and work history of Paul Duval;
12. Written responses to specific questions I asked Paul Duval concerning his employment, earnings history, chronology of events in the case, and personal background;
13. I interviewed Mr. Duval on August 30, 2007.

## Background

It is my understanding that Paul Duval lives in Chicopee, Massachusetts with his wife Christine. During their 30 year marriage they have had two children, Mathew, who is 23 and lives in Hanover, New Hampshire and, Meredith, who is a 19 year old sophomore at Colby College. Mr. Duval was born on January 27, 1951 and is 56 years old.

It is claimed by Mr. Duval that his former employer, Top-Flite Corporation, engaged in discriminatory actions against him and that his termination by Top-Flite in July of 2004 was based on his age.

The focus of this report is to estimate the economic damages arising from the termination of Paul Duval by the Top-Flite Golf Company. All assumptions and facts relied upon in this analysis will be stated and all computations are shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, Paul Duval was deprived of the opportunity to earn a living and to pursue his occupation in the most advantageous manner. He also says that his termination caused considerable stress and anxiety. Some things, such as emotional stress are impossible to assess in an accounting sense and are typically left to the common judgment of a jury. Economic damages, however, can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts.

Economic damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the loss. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that would have accrued to the injured party less any mitigating income anticipated or earned unless it is from a collateral source. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged act.

## Earnings History

Paul Duval received an Associates degree from Holyoke Community College in 1971. He continued his education and earned a Bachelor of Arts in education from Westfield State College in 1973. He then went on to study at Western New England College where he received his Masters in Business Administration in 1978. Since that time Mr. Duval has taken a continuing education course in marketing at Elms College.

Mr. Duval was first hired by the Spalding Corporation in February of 1969 to work on the factory floor. He was a college student at the time and worked at Spaulding during the summer during the next two years. On March 25, 1974 he became a full-time permanent employee and was put on salary as a Shop Floor Expediter for golf club manufacturing.[1] During his tenure at the company Paul Duval was promoted repeatedly and worked his way up the corporate ladder. By 1980 he was a manager and held a number of management and supervisory positions during the 1980's. By 1992 he was

---

[1] Spalding was a holding company that was purchased in 2003 by the Russell Corporation for $65 million. The sale did not include the Top-Flite, Ben Hogan and Strata brands that were retained by the Top-Flite Golf Company. In September of 2004, the Callaway Golf Corporation purchased Top-Flite out of Chapter 11 bankruptcy. The bankruptcy was described in the press at the time as part of a sale strategy to avoid the claims of creditors against Top-Flite to boost the price of the company. The sale price was $174.4 million.

Director, Custom Golf Balls, and his responsibilities included management of all aspects of marketing and production with 140 employees working for him. In 1999 he was assigned to the SAP project and was part of the team charged with implementation of the new management system. In 2003 he was promoted to Sales Planning Manager, On-Course Golf Products and later that year became Director of International Sales. In April of 2004 his position was eliminated and he was transferred to U.S. Sales. In July of 2004 he was terminated by Top-Flite. His position at that time was Director of Sales and Promotion. After his termination, he tried to secure employment in the area and received unemployment compensation. In September of 2004 he received an offer from the Spalding Division of Russell Corporation and began working there on September 13, 2004 as Director of International Sales.

Mr. Duval's earnings are shown in Table 1 below. During 2005 he received severance payments from Top-Flite through April that accounts for the $36,318 that year. His starting salary at Spalding in 2004 was $90,000 with a potential to earn up to a 15% bonus. My understanding is that his current salary is $104,000 with a possible bonus of up to 15%. His salary at the time he was terminated was approximately $127,000.

**Annual Earnings**

Table 1.

| Year | Top-Flite | Russell | Unempl. | Total |
|------|-----------|---------|---------|-------|
| 2000 | 123,811 | | | 123,811 |
| 2001 | 99,043 | | | 99,043 |
| 2002 | 100,535 | | | 100,535 |
| 2003 | 119,953 | | | 119,953 |
| 2004 | 126,358 | 26,166 | 3,198 | 155,722 |
| 2005 | 36,318 | 85,211 | | 121,529 |

## Employee Benefits

In addition to wages, earnings capacity also includes the value of employee benefits. Mr. Duval lost all of his benefits upon termination by Top-Flite. This included health insurance, life insurance, short-term and long-term disability insurance, 401(k) contributions, paid vacation, paid time off, sick leave, employee stock purchase plan, and, employee discounts for company products. He was also eligible for bonus payments based on company performance. Top-Flite provided an annual benefits statement that shows the employer's contribution to Mr. Duval's benefit package. I have used the ratio of this figure to his base salary to estimate the value of those benefits in my analysis. Mr. Duval was able to replace most of these benefits at his new job in September of 2004. Based on current information, I have only included a value for lost benefits during the 3 months he was unemployed.

## Work-life Estimates

An important element in the analysis is the determination of the normal work-life expectancy of Mr. Duval. One could argue that any of several ages might be most appropriate for the work-life of any particular individual based on their personal

characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 to maximize Social Security retirement benefits. Mr. Duval indicates that he had no plans to retire early. Based on these factors I have assumed that a work-life to age 67 would be reasonable in this case.

## Estimating the Present Value of Lost Future Earnings Capacity

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during Paul Duval's work-life. This involves projecting his prior earnings to that age netting out any earnings he is expected to make. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. The economic background concerning each of these elements of the analysis is described in the following sections in detail.

## Rate of Economic Growth, Prices, and Real Wages

In this case, Mr. Duval's real earnings are assumed to only grow at the cost of living. That is, no increase in real earnings is used in the computation of future economic damages. This is the most conservative assumption that is reasonable in my opinion.

## Present Value

Once the rate of growth in future earnings and the value of lost future income has been established, it must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[2]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets.

## Determination of Lost Future Earnings

The computations to estimate the economic damages arising from Mr. Duval's termination are shown in Table 2. The first column in the table shows each year in the analysis. The second column indicates his age in that year. The third column contains his prior earnings in each year based on the salary he was receiving at the time of his termination by Top-Flite. The fourth column shows the value of mitigation. Lost Benefits are estimated for 3 months during 2004. The next column shows net lost earnings. This

---

[2] For a discussion of *Pfeifer* and related cases, see George, Serien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

figure is then reduced to present value assuming 12 equal payments each year with the interest accruing to the end of each period. This is the most conservative method available and results in an effective annual rate of return that is in excess of 2%.

### Present Value of Lost Earnings
#### Table 2.

| Year | Age | Prior Earnings | Mitigating Earnings | Lost Benefits | Net Loss | Present Value |
|------|-----|----------------|---------------------|---------------|----------|---------------|
| 2004 | 53 | 126,358 | 155,722 | 4,675 | (24,689) | (24,689) |
| 2005 | 54 | 130,794 | 121,529 | | 9,265 | 9,265 |
| 2006 | 55 | 135,432 | 97,000 | | 38,432 | 38,432 |
| 2007 | 56 | 138,927 | 104,000 | | 34,927 | 34,912 |
| 2008 | 57 | 138,927 | 104,000 | | 34,927 | 34,437 |
| 2009 | 58 | 138,927 | 104,000 | | 34,927 | 33,755 |
| 2010 | 59 | 138,927 | 104,000 | | 34,927 | 33,087 |
| 2011 | 60 | 138,927 | 104,000 | | 34,927 | 32,433 |
| 2012 | 61 | 138,927 | 104,000 | | 34,927 | 31,791 |
| 2013 | 62 | 138,927 | 104,000 | | 34,927 | 31,162 |
| 2014 | 63 | 138,927 | 104,000 | | 34,927 | 30,546 |
| 2015 | 64 | 138,927 | 104,000 | | 34,927 | 29,941 |
| 2016 | 65 | 138,927 | 104,000 | | 34,927 | 29,349 |
| 2017 | 66 | 138,927 | 104,000 | | 34,927 | 28,768 |
| 2018 | 67 | 11,577 | 8,667 | | 2,911 | 2,350 |

**Total**             **$ 375,540**

## Summary of Findings

Based on the documents that I reviewed and the analysis that I have done, I believe that there is a reasonable economic certainty that the present value of lost earnings resulting from the termination of Paul Duval by Top-Flite is at least $375,540 based on an assumption that he will continue to work at his present job for the rest of his work-life.

I reserve the opportunity to revise and supplement it in a timely fashion if any additional information becomes available.

The opinions expressed here are based the documents and information listed at the beginning of the report and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required.

A list of recent testimony is attached in the appendix to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."

5

_____          _____
Craig L. Moore, Ph.D.                     Date   1/8/08

# Prior Testimony of Craig Moore

| Trial Date | Plaintiff | Defendant | Court |
|---|---|---|---|
| 1/13/2004 | Durwood Currier | United Technologies | Maine Federal District (D) |
| 3/26/2004 | Laura Clark | United Parcel Service | Hampden Superior |
| 4/14/2004 | Thomas J. Cosmos | Commonwealth of Massachusetts | Worcester Superior |
| 4/29/2004 | Mary and Michael Conchieri | | Hampden Superior (A) |
| 8/10/2004 | Mark Fortier | Giddings & Lewis, Inc. et al | U.S. Court Springfield (D) |
| 9/24/2004 | Louis Chighisola | P. A. Landers, Inc. | Plymouth Superior |
| 11/8/2004 | Keith Lemon | Lynn Creamery | Suffolk Superior |
| 1/13/2005 | George Giard | Harvey Darby and C.R. England, Inc. | U.S. District Mass. |
| 2/17/2005 | Keneth Parsons | Mass Mutual Insurance | Hampden Superior (D) |
| 3/9/2005 | Sharon Sklarski et al | Ferdauz Canteenwalla, M.D. | Hampden Superior |
| 4/1/2005 | Joan Heroux (widow) | Kim Robert Krach, M.D. | Hampden Superior |
| 5/12/2005 | Ronald Larsen | Simonds Industries, Inc. | Mass. Federal (D) |
| 5/23/2005 | Estate of Sheldon Rothstein | | Middlesex Superior |
| 5/31/2005 | Estate of Linda Marie Davis | | Suffolk Superior (D) |
| 6/7/2005 | Joseph Zabielski | Agawam School Committee, et al | Hampden Superior (D) |
| 6/17/2005 | Michael Joseph | Susan Tyler et al | Superior Court - Hartford |
| 8/16/2005 | Jorge Diaz | Massachusetts Mutual Insurance | Hampden Superior (D) |
| 8/22/2005 | Ahmed Sarrage | Jarrah Omar Mohammad | Hampden Superior |

| Trial Date | Plaintiff | Defendant | Court |
|---|---|---|---|
| 10/20/2005 | Estate of Cheryl Sweeney | Allard Nazarian Group | Hillsboro Superior NH |
| 10/21/2005 | Joan Moynihan | | Arbitration |
| 11/30/2005 | James Broderick and John Stamatov, EIU Group | Gulf Insurance Co. et al | U.S. District Boston (D) |
| 1/6/2006 | Thomas Manning | Arthur D. Little, Inc. | American Arbitration Assoc. |
| 1/17/2006 | James Doherty | Thompson Financial, Inc. | Suffolk Superior |
| 1/19/2006 | Russell Gilbert | Kevin Gilbert | Franklin Superior |
| 5/12/2006 | Patrick O'Connell | DaimlerChrysler | Hampshire Superior |
| 10/16/2006 | United States | Monty Schwartz | Federal Court Boston |
| 10/25/2006 | Richard A. Cormier | Estate of Justin Farrell | Berkshire Superior |
| 2/27/2007 | Melissa Mendonsa, et al | Lowell Housing Authority | Suffolk Superior |
| 3/27/2007 | Jessica Rodriguez | CVT Limited Partnership, LLP | Hampden Superior |
| 4/12/2007 | Joyce Waters, et al. | Interskate 91 North | Hampshire Superior |
| 5/25/2007 | Alex J. Orban | Friendly Ice Cream Corp. et al | Springfield Federal Court (D) |
| 6/13/2007 | Cynthia Haddad | Wal-Mart Stores, et al | Berkshire Superior (D) |
| 6/19/2007 | Michelle Beebe | Williams College | Federal Court Springfield (D) |
| 8/1/2007 | Carolyn Brooks, MD | Robert Piela, MD | Hampshire Probate |
| 8/13/2007 | Sally Wilson | | Not filed to date (A) |
| 10/10/2007 | Ene Inyang - Administrator of Estate of Rose Ok | Arbor Hospital, and Donna Orvin, M.D. | Suffolk Superior |

*Tuesday, January 08, 2008*

*Page 2 of 2*

# Curriculum Vita

## Craig L. Moore

65B Hatfield Street
Northampton MA 01060

**Phone: 413-587-9405**          **Fax 413-587-9581**          email: *Craiglmoore@hotmail.com*

| | |
|---|---|
| **Education** | B. S. Economics, West Virginia University, 1967; <br> M. A. Economics, Maxwell School, Syracuse University, 1972; <br> Ph.D. Maxwell School, Syracuse University, 1972; <br> Areas of study: Economics, Statistics, and Public Finance. |
| **Present Positions** | Private Management and Legal Consultant; <br> Member of the New England Business Advisory Council of the Federal Reserve Bank of Boston, 2004 – 2008; <br> Board of Directors of Holyoke Medical Center and Hospital; <br> Board of Directors of the Regional Employment Board of Hampden County. |
| **Previous Positions** | Chief Operating Officer of Marox Corporation, 2004 - 2006 <br> University Professor of Political Economy, University of Massachusetts; <br> Full Professor at the Isenberg School of Management, University of Massachusetts, Amherst, 1972 through 2003; <br> Adjunct Professor of Regional Planning; Amherst; <br> Director of the Masters Program, School of Management, 1978-1979; <br> Special Assistant to the President of the University, 1979-1981; <br> Special Assistant to the President of the University, 1997-2000; <br> Policy Advisor to the President of the University, 2000-2003; <br> Chairman of the Department of Finance & Operations Management from September 1982 to August 1994; <br> Founder and Editor of *Massachusetts Benchmarks* from 1997 to 2002. |
| **Professional History** | Joined the faculty of the University of Massachusetts Isenberg School of Management as an Assistant Professor in 1972; <br> Promoted to Associate Professor in 1976; <br> Awarded Tenure in 1978; <br> Promoted to Full Professor in 1980; <br> Named University Professor of Political Economy in 1997; <br> Retired from the University of Massachusetts December 31, 2003; <br> Joined MAROX Corporation as Chief Operating Officer on January 1, 2004; <br> Served as a Legal Consultant and Expert Witness for the past 33 years. |
| **Teaching Experience** | Financial Models – required for all finance majors; <br> Statistical Tools for Management - required undergraduate course; <br> Business Data Analysis – MBA Statistics requirement; <br> Quantitative Methods II – Ph.D. Statistics requirement; <br> Macro Economic Theory – Ph.D. requirement; |

# PUBLICATIONS

## BOOKS AND MONOGRAPHS

Publications in this category include government publications reviewed by professional and academic economists before their publication.

*Regional Economic Analysis for Community Development Planning*, Massachusetts Department of Community Affairs, 119 pages, Oct. 1978.

*Massachusetts Reconsidered: an Economic Anatomy of the Commonwealth*, School of Management, University of Massachusetts, 148 pages, September, 1978.

"The Regional Industrial System" in *Spatial Analysis and the Industrial Environment* by F.I. Hamilton and G.J.R. Linge, London: John Wiley Ltd. (with Karaska and Susman), 1980.

*The New Economic Reality, Massachusetts Prospects for Long-Term Growth;* School of Management, University of Massachusetts, sponsored by the Massachusetts Taxpayers Foundation, 75 pages printed, May 1994 with Edward Moscovitch.

*A Taxpayer's Look at a Sacred Cow: Public Sector Design in Massachusetts Two Decades After the Ward Commission,* 38 pages printed, November 1995 with Edward Moscovitch

*Connection to the Future; An Analysis of the Telecommunications Industry in Massachusetts,* published by the Massachusetts Telecommunications Council and the University of Massachusetts Economic Project, 45 pages printed, June 1, 1997.

*The Effect of State Tax Policy on the Insurance Industry in Massachusetts*, published by the Massachusetts Business Roundtable, 35 pages printed, October 1, 1997

*The New Foundation; Information Technology,* The Donahue Institute, University of Massachusetts, 18 pages printed, May 1999.

*Science, Technology and Investment; The Cycle of Growth in Massachusetts,* Massachusetts Department of Economic Development, 60 pages printed, August 2001.

*Mathematical Models of a Regional Economy (in Russian), with 4 Russian co-authors, published by the St. Petersburg State Technical University, summer of 2002, 85 pages printed.*

*Critical Transitions in Telecommunications: Shaping the New Economy, Massachusetts Telecommunications Council, November 2002, 60 pages, printed.*

2

## JOURNAL ARTICLES

[ 1]   "The Impact of Non-Profit Institutions on Regional Income, Syracuse University a Case in Point," *Growth and Change*, January 1974, Vol. 5, No. 2, pp. 36-40.

[ 2]   "A New Look at the Regional Trade Multiplier," *Northeast Regional Science Review*, Vol. III, 1973, pp. 164-170.

[ 3]   "The Impact of Non-Profit Institutions on Regional Income, Upstate Medical Center a Case in Point," *Economic Geography*, Vol. 50, No. 2, April 1974, pp. 124-129.

[ 4]   "Social Equity and Retained Earnings," *Rivista Internazionale di Scionzele Economiche e Commerciali*, Ann. XXI, No. 2, 1974, pp. 137-135, with Sidney Sufrin.

[ 5]   "A New SYMAP for Viewing Spatial Location Patterns," *Selected Projects*, Graduate School of Design, Harvard University, Vol. VII, pp. 77-80, 1974.

[ 6]   "A National Planning Model for Petroleum Allocations," *Rivista Internazionale di Scionzele Economiche e Commerciali,* Ann. XII, 1974, pp. 547-656.

[ 7]   "The Impact of a Non-Profit Institution on Regional Income:  A Discussion," *Growth and Change*, Vol. 6, No. 3,  July 1975, pp. 45-49.

[ 8]   "Computer Graphics and Decision Analysis," *Northeast Regional Science Review*, Vol. V, pp. 93-100, 1975, with Roger Calantone.

[ 9]   "A New Look at the Minimum Requirements Approach to Regional Economic Analysis," *Economic Geography*, Vol. 51, No. 4, October 1975, pp. 350-356.

[10]   "A Linear Programming Model for Determining an Optimal Regional Distribution of Petroleum Products," *Lecture Notes in Economics and Mathematical Systems*, No. 126, Energy, Regional Science and Public Policy, May 1975, pp. 119-135.

[11]   "Optimal Regional Distribution of Petroleum Products," *Omega*, Vol. 4, No. 3, 1976, pp. 301-311.

[12]   "A Bayesian Approach to Spatial Decision Models," *Northeast American Institute of Decision Sciences Proceedings*, May 1976, pp. 41-44.

[13]   "A Cross-Sectional Analysis of the Municipal Property Tax," *Northeast Regional Science Review*, Vol. 6, pp. 200-210.

[14]   "Modeling Interstate Shifts in Employment," *Northeast Regional Science Review*, Vol. 7, 1977, pp. 143-152.

[15]   "A Critical Review of Shift-Share Analysis as a Forecasting Technique," *Journal of Regional Science*, Vol. 20, No. 4, pp. 419-437.

[16]   "Banking and the Regional Income Multiplier," *Northeast Regional Science Review*, Vol. 9, 1979, pp. 1-7.

[17]   "Interregional Arbitrage and the Supply of Loanable Funds," *Journal of Regional Science*, Vol. 22, No. 4, 1982, pp. 499-512.

[18]   "Minimum Requirements and Required Economics, 1980," *Economic Geography*, Vol. 60, No. 3, July, 1984.

[19]   "The Impact of the Banking System on Regional Analysis," *Regional Studies*, Vol. 19.1, pp. 29-35, 1984.

[20]   "A General Equilibrium Model of Interregional Monetary Flows," *Environment and Planning A*, Vol. 21, pp. 397-404, 1989.

[21]   "Utilizing an Economist to Establish Damages Through Expert Testimony, "*Journal of the Massachusetts Academy of Trial Attorneys*, Vol. 4, No. 2, pp. 7-10, May 1996.

[22]   "Benchmarking – An American Perspective," *Economia & Perspectiva*, No. 15/16, Jan./June, 2001, pp.201 – 211, 2001.

## PUBLISHED CASE STUDIES

The following case studies were gathered and written during the summer of 1973 under a grant from the Center for Business and Economic Research and were subsequently published by the Harvard Case Clearing House, and in the book cited below:

| Case Title | Publication Number |
|---|---|
| Jacobsen Rug Company | 9-375-813 |
| Jacobsen Teaching Note | 8-375-814 |
| Magnavox CATV | 9-375-815 |
| Magnavox Teaching Note | 8-375-815 |
| Cherry House Furniture | 9-375-825 |
| Cherry House Furniture [A] | 9-375-826 |
| Cherry House Teaching Note | 8-375-827 |

Baird, Bruce F., *Introduction to Decision Analysis*, 1978 pp. 506-508, Duxbury; Jacobsen Rug Company, Cherry House Furniture [A], Cherry House Furniture Teaching Note.

## BOOK REVIEWS

"The Changing Role of Public Administration," A review of three books and a discussion of how they illustrate the new demand on public administrators. *Management Research*, Vol. 8, No. 3, 1975, page 51.

*Waste Paper Recovery: Economic Aspects and Environmental Impacts*, reviewed in the *Annals of Regional Science*, 1982.

*Economic Geography* by James Wheeler and Peter Muller, reviewed in the *Annals of Regional Science*, 1983.

## OTHER PUBLICATIONS

*Designing an Administrative Control System for MEPA: Massachusetts Environmental Policy Act*, Institute for Man and the Environment and The Executive Office of Environmental Affairs, 130 pages, August 1975, with Richard Smardon.

"A New Technique for Estimating Municipal Property Tax Base," Proceedings of the New England Business and Economic Development Conference, University of New Hampshire, 1974 with Richard Evans.

*A Long Range Systems Development Guide for Transportation Planning in the Commonwealth of Massachusetts*, July 1975, DPW-UMASS. Joint Transportation Program, Contract 17618, 55 pages.

*Computer Assisted Analysis of Geographical Information for Transportation Planning*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 31 pages.
*An Economic Base Analysis of the Fitchburg-Leominister Region*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 40 pages.

"Welfare Serendipity," editorial page, *New York Times*, July 17, 1975, p. 28, with Joel Morse.

*A Planned Program Budget System*, The Legislative Research Council, Commonwealth of Massachusetts, 65 pages, June 1976, with George Odiorne.

*Economic Development Program - Town of Wareham*, September 1976, Office of Economic Development, Town of Wareham, 152 pages.

*Economic Analysis of the Proposed Park Plaza Urban Renewal Project*, Center for Community Renewal Studies and the Department of Community Affairs, June 1976, 78 pages.

*A Management System for Financial Administration*, The City of Northampton, September 1976, 84 pages, bound.

*The Economic Development Potential of 121B*, Massachusetts Department of Community Affairs, 64 pages, July 1977, with Tom Nutt-Powell at M.I.T.

*New Bedford - Fairhaven Route 6 Corridor Planning Study*, Southeastern Regional Planning and Economic Development District, February 1977, three volumes, 272 pages bound.

Tapping Local Business Talent for Community Development Planning, *Management Research*, Vol. 10, #4, July/August 1977.

*Market Analysis of Retail and Commercial Trade in Downtown Holyoke*. City of Holyoke, Holyoke Redevelopment Authority, April 1977, 45 pages, with Jack Wolf.

*Marketing Industrial Space*, Department of Community Affairs Commonwealth of Massachusetts, August 1978, 114 pages, bound.

*Attitudes Toward Flood Management in Northampton, Massachusetts*; New England Division, U.S. Army Corps of Engineers, Waltham, MA, November 1978, 173 pages, bound, with Alice Carlozzi, James Palmer, Carl Carlozzi, & Arthur Elkins.

*Economic Analysis of the Pioneer Valley*, Pioneer Valley Association, January 1979, 66 pages, printed and bound.

*New Bedford State Pier; Economics and Marketing Study*, Department of Environmental Quality Engineering, Division of Waterways, Commonwealth of Massachusetts, March 1979

## PAPERS PRESENTED    (a partial list)

"A Linear Programming Model for Determining an Optimal Distribution of Petroleum Products," presented at the ORSA-TIMS Meetings in San Juan, Puerto Rico, 1974.

"A Linear Programming Model for Optimal Regional Distribution of Petroleum Products in the U.S.", International Conference on Energy and the Environment, Leuven, Belgium, May 1975.

"A Bayesian Approach to Spatial Decision Models," presented at the Northeast AIDS Meetings, Philadelphia, PA., 1975.

"Modeling Interstate Shifts in Employment," presented at the Northeast Regional Science Meetings, Halifax, Nova Scotia, 1977.

"Banking and the Regional Income Multiplier," Presidential Address, Northeast Regional Science Meetings, Amherst, May 1979.

"Commercial Banking and Regional Growth," presented at the Eastern Economics Association Meetings, Boston, Mass, May 1979.

"Banking and the Regional Income Multiplier," invited paper presented at the National Regional Science Meetings, Los Angeles, California, November 1979.

"The Impact of Energy Price Increases on Consumer Expenditures," invited paper presented to the National Energy Policy Conference, West Virginia University, Morgantown, W. VA., May 1980.

"The Regional Industrial System," presented to the International Geographical Union Commission on Industrial Systems, Tokyo, Japan, August 1980.

"Interregional Arbitrage and the Supply of Loanable Funds" presented to the Northeast Regional Science Meetings, Rutgers University, May 1981.

"Interregional Arbitrage and the Supply of Loanable Funds" invited paper presented to the North American Regional Science Association, Montreal, Canada, November 1981.

"Toward a Systems Approach to Regional Analysis," invited paper presented at the International Congress of Arts and Sciences, Rotterdam Holland, June 1984.

"A General Equilibrium Model of Interregional Monetary Flows," invited paper presented at the National Conference of Modeling and Simulation, Pittsburgh, April 1986.

"The Post Industrial Challenge to Location Theory," presented at the Northeast Regional Science Association meetings in Buffalo, N. Y., May 1990.

"The Application of Real Time Statistical Software to Developing Econometric Models," Umea University, Uppsala University and Lund University, Sweden, October 1990.

"An Empirical Comparison of Diversification Indices," The International Regional Science Meetings, New Orleans, LA, November 1991.

"Establishing an Entrepreneurial Base for Economic Transition," Jagellonia University, Cracow, Poland, January 1992.

"The Benefits of Economic and Academic Interaction in Supporting Peace Efforts in Northern Ireland", Ulster University, Londonderry, Northern Ireland, June 1995.

"Prospects for the Economic Monetary Union; an American Perspective", Keynote address, 20th anniversary symposium, Haarlem International School of Business, Haarlem, Netherlands, November 2, 1998.

"A Russian Economic Strategy in the Global Economy", presented at the Saint Petersburg State Technical University in Pskov, Russia 23rd, 2001.

"New Approaches to Economic Analysis in a Knowledge Based Economy", National Association of State Development Agencies, National Research Meetings, Saratoga Springs, July 23, 2001.

"The New Economy and the Law", Proceedings of The Massachusetts Bar Association Annual Conference, Boston, Massachusetts, January 26, 2002, pp 1-4.

"Using Statistics in Employment Cases", Proceeding of the Employment Law Conference, Mass. Continuing Legal Education, December 6, 2002, Boston, pp. 157-168.

## PROFESSIONAL ACTIVITIES AND HONORS

President of the Northeast Regional Science Association: 1975-1976, 1978-1979, 1990-1991.

Associate Editor of the Regional Science Review, 1975, 1991.

*Who's Who in Computer Graphics*, 1985.

Named as a Fellow of the Institute for Man and the Environment, 1976-1977.

Selected as a visiting scholar to Sweden. I gave lectures and worked with faculty at three major universities in Sweden: Umea, Uppsalla and Lund during the fall of 1990.

Helped direct the first postgraduate business program in Poland at the Jagellonia University in Cracow supported by the Mellon Foundation and the U. S. Information Agency, 1992.

School of Management Faculty Service Award, 1994

Recipient of the Chancellor's University Advancement Award, 1995

Invited by Governor William Weld to accompany him on a trade mission to the Republic of Ireland and Northern Ireland, March 1997.

Named as a University Professor of Political Economy by the Board of Trustees of the University of Massachusetts, June 1997.

Named "Professor of the Year" by the Massachusetts Telecommunications Council in recognition of "outstanding achievement in expanding our understanding of issues and opportunities in the Telecommunications Industry", March 1999.

Helped organize the International Conference on Economies Emerging from Conflict, jointly sponsored with Magee College at the University of Ulster, hosted by John Hume, held in Londonderry, Northern Ireland, June 23 - 25, 1999.

Appointed to the New England Business Advisory Council that advises the Federal Reserve Bank of Boston on business and economic policy each quarter, 2004 - 2008.

## Legal Expertise and Consulting

I began working as an expert witness in 1972 and have testified in well over 100 cases. I have testified in Federal District Court in Massachusetts, New York, Pennsylvania, Rhode Island, Maine, and North Carolina. I have testified in superior court and district courts in Massachusetts, Connecticut, Vermont, New Hampshire, New York, and Queensland, Australia. I have been retained by law firms in California, Arizona, New Jersey, South Carolina, Illinois, and Indiana.

I have testified for both plaintiffs and defendants as an economist in a wide variety of cases including wrongful death, personal injury, medical malpractice, divorce, and breach of contract.

I have also testified as both an economist and a statistician in race, gender and age discrimination cases related to termination, promotion and hiring under Title VII and the Age Discrimination in Employment Act of 1967. I testified in Hazen Paper Co. et al. v. Biggins, an important United States Supreme Court case, and in Halligan et al v. Ground Round, Inc. that received national attention.

I was heavily involved in preparing economic damage estimates arising from the deaths in the World Trade Center on September 11, 2001. I prepared reports submitted to the Victim's Compensation Fund for the surviving families of dozens of executives and others killed in that act of terrorism.

I have been regularly invited to lecture in programs conducted by Massachusetts Continuing Legal Education concerning statistical evidence and economic damages:

Age Discrimination, Boston, June 11, 1992.
Personal Injury Damages, Boston, March 11, 1993.
Personal Injury Damages, Boston, July 20, 1994.
Advanced Trial Advocacy Workshop, Boston, August 4, 1994.
Personal Injury Damages, Boston, February 1996.
Advanced Trial Advocacy Workshop, Boston, August 14, 1997.
Trying Employment Cases in the Superior Court, Springfield, April 7, 1999.
Trying Employment Law Cases in the Superior Court, Boston, April 13, 1999.
Annual Employment Law Conference, Boston, December 5, 2002

I have also been invited to lecture by other organizations that include:

The Massachusetts Chapter of the National Employment Lawyers Association; "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Boston, April 27, 1995.
National Employment Lawyers Association, "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Proceedings of the National Employment Lawyers Association, Vol. I., pp.444-454, San Diego, June 27, 1996.
Massachusetts Bar Association, Committee on Employee Rights, Boston, February 7, 2000.
Western New England Law School on several occasions over the past few years.
"The New Economy and the Law", The Massachusetts Bar Association 2002 Annual Conference on January 26th, 2002, published in the proceedings, pp 1-4.
Annual District Court Judges Conference, Southbridge, Massachusetts, May 29, 2003.

I was an elected member of the Board of Overseers of the Historical Society of the Supreme Judicial Court of Massachusetts for two 3 year terms that ended in 2006.

In addition to legal work, I also regularly consult with government leaders, public agencies, non-profit organizations, and business firms on a wide range of management, financial, and public policy issues.

**Service to the Commonwealth of Massachusetts**

- Department of Community Affairs: economic feasibility study of the Park Plaza Redevelopment Project, reviewed 21 urban renewal projects, and the prepared handbooks concerning the economic development of communities, 1975-1978.
- Chairman of the Task Force on Policy Issues, Northeast Council for Economic Action, sponsored by the Bank of Boston and the Economic Development Admin.; 1977 - 1978.
- Addressed the leadership of the Massachusetts House of Representatives regarding state economic policy, State House, Boston, July 29, 1994.
- Advised the Massachusetts House Committee on Taxation on tax policy and its impact on business development, July 11, 1995
- Invited to testify before the joint session of the Massachusetts House and Senate Taxation Committee on Governor Weld's proposed tax legislation, October 5, 1995.
- Worked with the Mass. Business Roundtable to support pending tax legislation for the mutual funds industry in the Massachusetts Senate, July 1996.
- Invited to testify before a joint session of the Massachusetts House and Senate Technology Committees on the Telecommunications Industry in Massachusetts, February 5, 1997.
- Worked with the Mass. Business Roundtable to present information and analysis concerning pending tax reform legislation in the insurance industry during 1997 and 1998.
- Invited to testify before a joint session of the Massachusetts House and Senate Ways and Means Committees concerning the economy and tax revenues, March 1998, 1999, 2000, and 2001.
- Member of the Massachusetts Labor Market Information Advisory Subcommittee established by the Department of Employment and Training and the Massachusetts Jobs Council, 1999-2003.

**Service to the University of Massachusetts**

- Member of the Faculty Senate, 1973-1974, 2000 – present.
- University Computer Services Committee, 1972-1976, 1978-1979, Chair 1974-1976.
- University Management Systems Advisory Committee, 1974-1976.
- Faculty Research Selection Committee, 1975.
- Member of the Advisory Board of Orchard Hill Residential College, 1974-1977.
- Member of the Campus Center Director Search Committee, 1977.
- Member of the Title IX Salary Review Committee, 1977-78.
- Member of the Graduate Council, 1978.
- Member of the Committee on Academic Priorities, 1978-1980 (Chair, 1978-1979), 2000 to present.
- Special Assistant to the President of the University of Massachusetts, 1979-1981.
- Member of the University Personnel Policies Committee, Chairman, 1988-89.
- Member of the Committee to Advise the Provost on Budget Priorities, 1991.
- Chairman of the Committee on Statistical Pedagogy, 1994-1996
- Member of the Public Policy Planning Council 1996-1997
- Special Assistant to the President of the University of Massachusetts, 1997-2001
- Member of the Program and Budget Council 2000 – 2003, Chair 2000-2002

**Service to the Isenberg School of Management**

- Curriculum Committees' Task Force on Quantitative Studies, 1972-1973.
- Economics Ph.D. Qualifying Examination Committee, 1973-1977, Chair 1974-1977.
- Member of the Graduate Studies Committee, 1972-1975.
- Director of the Graduate Public Management Program, 1973-1977.
- Chairman of the Department Personnel Committee 1978-1979, 1981-1982, 1996-1997.
- Member of the Task Force on Research Policy, 1977.
- Director of Masters Program, 1978-1979.
- Member of Academic Policy Committee, 1981-1982.
- Member of Administrative Committee, 1978-1979, 1982 -1994.
- Quantitative Methods Ph.D. Qualifying Examination Committee, Chair 1990-1992.
- Member of the committee to design the school's computer facilities, 1991.
- Chair of the MBA Task Force to Establish a Professional MBA Program, 1991-1992.
- Chairman of the Department of Finance and Operations Management 1982-1994.
- Chairman of the search committee for the Isenberg Chair in Integrative Studies 2000-2001

**Craig L. Moore**
*Economic consulting*

*65B Hatfield Street*
*Northampton MA 01060*
*Tel: 413-587-9405*
*Fax: 413-587-9581*
*craiglmoore@hotmail.com*

# *Economic Report*

*To:* Maurice M. Cahillane, Esq.

*From:* Craig L. Moore, Ph.D.

*Date:* December 26, 2007

*Re: Gary Lonczak v. The Top-Flite Golf Company*

At your request, I have reviewed the following documents in the case of *Gary J. Lonczak v. The Top-Flite Golf Company*:

1. Copy of the Complaint filed in United States District Court;
2. A copy of Plaintiff, Gary Lonczak's Response to Request for Production of Documents by the Defendant, The Top-Flite Golf Company;
3. A copy of Plaintiff, Gary Lonczak's Answers to Interrogatories by the Defendant, The Top-Flite Golf Company;
4. A copy of the deposition transcript and exhibits of Gary Lonczak;
5. Personnel action forms from Spalding Sports Worldwide for Gary Lonczak;
6. Copies of letters to Mr. Lonczak from Spalding concerning merit increases;
7. Copies of forms filed with the Massachusetts Division of Unemployment Assistance by Top Flite Golf Company concerning Mr. Lonczak;
8. Income tax records for Gary Lonczak for the years 1999 through 2006;
9. A copy of the resume of Gary Lonczak;
10. I interviewed Mr. Lonczak on August 30, 2007.

## Background

It is my understanding that Gary Lonczak lives in Burleson, Texas with his wife Darlene. He was born on June 24, 1953 and is 54 years old.

Mr. Lonczak was hired by the Spalding Corporation in February of 1998 as a Materials Operations Manager.[1] His responsibilities included materials planning and procurement for golf club manufacturing. Prior to that, he worked for Digital Equipment Corporation for approximately 23 years. Mr. Lonczak was terminated on April 15, 2004 by Top-Flite prior to the company being sold to Callaway Golf Company.

---

[1] Spalding was a holding company that was purchased in 2003 by the Russell Corporation for $65 million. The sale did not include the Top-Flite, Ben Hogan and Strata brands that were retained by the Top-Flite Golf Company. In September of 2004, the Callaway Golf Corporation purchased Top-Flite out of Chapter 11 bankruptcy. The bankruptcy was described in the press at the time as part of a sale strategy to avoid the claims of creditors against Top-Flite to boost the price of the company. The sale price was $174.4 million.

It is claimed by Mr. Lonczak that Top-Flite engaged in discriminatory actions against him and that his termination was based on his age. After his termination, he tried to secure employment in the area but was only able to find part-time work with the Barnes Group in Bristol, Connecticut. In April of 2005, he moved to Texas where he helped establish a business partnership, Dreylon Sports Company, to develop a miniature golf and family entertainment center. That business, Old West Miniature Golf & Arcade, opened in March of 2006, but has since failed and is in the process of liquidating its assets.

The focus of this report is to estimate the economic damages arising from the termination of Gary Lonczak by the Top-Flite Golf Company. All assumptions and facts relied upon in this analysis will be stated and all computations are shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, Gary Lonczak was deprived of the opportunity to earn a living and to pursue his occupation in the most advantageous manner. He also says that his termination caused considerable stress and anxiety. Some things, such as emotional stress are impossible to assess in an accounting sense and are typically left to the common judgment of a jury. Economic damages, however, can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts.

Economic damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the loss. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that would have accrued to the injured party less any mitigating income anticipated or earned unless it is from a collateral source. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged act.

## Earnings History

Gary Lonczak received a Bachelor of Science in Business Administration from Western New England College in 1975. He spent the next approximately 23 years in plant operations and materials management for Digital Equipment Corporation prior to going to work for Spalding in Chicopee, Massachusetts in early 1998.

Mr. Lonczak's earnings, based on federal income tax returns, are shown in Table 1 below. It is clear from this information that the termination by Top-Flite had a very significant negative impact on his income that continues to the present. Mr. Lonczak's annual salary prior to his termination was $81,535 according to company records.

2

**Annual Earnings**
Table 1.

| Year | Earnings | Bonus | Barnes | Unempl. | Total |
|------|----------|-------|--------|---------|-------|
| 1999 | 73,807 | | | | 73,807 |
| 2000 | 76,314 | 11,071 | | | 87,385 |
| 2001 | 78,859 | | | | 78,859 |
| 2002 | 79,555 | | | | 79,555 |
| 2003 | 92,433 | | | | 92,433 |
| 2004 | 55,678 | | 5,709 | 14,775 | 76,162 |
| 2005 | - | | 6,522 | 1,228 | 7,750 |
| 2006 | – | | | | – |



## Employee Benefits

In addition to wages, earnings capacity also includes the value of employee benefits. Mr. Lonczak lost all of his benefits upon termination by Top-Flite. This included health insurance, life insurance, short-term and long-term disability insurance, 401(k) contributions, paid vacation, paid time off, sick leave, employee stock purchase plan, and, employee discounts for company products. He was also eligible for bonus payments based on company performance. Top-Flite provided statements to their employees that showed the employer's cost of the benefits programs they provided. I have used this as the basis to estimate the value of lost employee benefits.

## Work-life Estimates

An important element in the analysis is the determination of the normal work-life expectancy of Mr. Lonczak. One could argue that any of several ages might be most appropriate for the work-life of any particular individual based on their personal characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 to maximize Social Security retirement benefits. Mr. Lonczak indicates that he had no plans to retire early. On the contrary, he opines that he intends to work well beyond the age of 67. Based on these factors I have assumed that a work-life to age 67 would be reasonable in this case.

## Estimating the Present Value of Lost Future Earnings Capacity

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during Gary Lonczak's work-life. This involves projecting his prior earnings to that age netting out any earnings he is expected to make. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. The economic background concerning each of these elements of the analysis is described in the following sections in detail.

3

## Rate of Economic Growth, Prices, and Real Wages

In this case, Mr. Lonczak's real earnings are assumed to only grow at the cost of living. That is, no increase in real earnings is used in the computation of future economic damages. This is the most conservative assumption that is reasonable in my opinion.

## Present Value

Once the rate of growth in future earnings and the value of lost future income are established, it must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[2]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets.

## Determination of Lost Future Earnings

The computations to estimate the economic damages arising from Mr. Lonczak's termination are shown in Table 2. The first column in the table shows each year in which Gary Lonczak will work. The second column indicates his age in that year. The third column contains his prior earnings in each year. The fourth column shows the value of mitigation. Lost Benefits are estimated on Top-Flite benefit statements. The next column shows the value of net lost earnings. This figure is then reduced to present value assuming 12 equal payments each year with the interest accruing to the end of each period. This is the most conservative method available and results in an effective annual rate of return that is in excess of 2%.

## Summary of Findings

Based on the documents that I reviewed and the analysis that I have done, I believe that there is a reasonable economic certainty that the present value of lost earnings resulting from the termination of Gary Lonczak by Top-Flite is $1,490,831 present time. This figure could change significantly if Mr. Lonczak finds some alternative employment and benefits. At such time as that happens, I would revise this opinion and supplement it in a timely fashion if any additional information becomes available.

---

[2] For a discussion of *Pfeifer* and related cases, see George, Serien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

**Present Value of Lost Earnings**
Table 2.

| Year | Age | Prior Earnings | Mitigating Earnings | Lost Benefits | Net Loss | Present Value |
|------|-----|----------------|---------------------|---------------|----------|---------------|
| 2004 | 51 | 81,535 | 76,162 | 12,067 | 17,440 | 17,440 |
| 2005 | 52 | 84,397 | - | 12,491 | 96,888 | 96,888 |
| 2006 | 53 | 87,390 | - | 12,934 | 100,324 | 100,324 |
| 2007 | 54 | 89,645 | - | 13,267 | 102,913 | 102,870 |
| 2008 | 55 | 89,645 | | 13,267 | 102,912 | 101,468 |
| 2009 | 56 | 89,645 | | 13,267 | 102,912 | 99,460 |
| 2010 | 57 | 89,645 | | 13,267 | 102,912 | 97,492 |
| 2011 | 58 | 89,645 | | 13,267 | 102,912 | 95,563 |
| 2012 | 59 | 89,645 | | 13,267 | 102,912 | 93,673 |
| 2013 | 60 | 89,645 | | 13,267 | 102,912 | 91,819 |
| 2014 | 61 | 89,645 | | 13,267 | 102,912 | 90,003 |
| 2015 | 62 | 89,645 | | 13,267 | 102,912 | 88,222 |
| 2016 | 63 | 89,645 | | 13,267 | 102,912 | 86,477 |
| 2017 | 64 | 89,645 | | 13,267 | 102,912 | 84,766 |
| 2018 | 65 | 89,645 | | 13,267 | 102,912 | 83,089 |
| 2019 | 66 | 89,645 | | 13,267 | 102,912 | 81,445 |
| 2020 | 67 | 89,645 | | 13,267 | 102,912 | 79,833 |

**Total**                                                              **$ 1,490,831**

The opinions expressed here are based the documents and information listed at the beginning of the report and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required.

A list of recent testimony is attached in the appendix to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."

Craig L. Moore, Ph.D.

Date  1/8/08

5

# Prior Testimony of Craig Moore

| Trial Date | Plaintiff | Defendant | Court |
|---|---|---|---|
| 1/13/2004 | Durwood Currier | United Technologies | Maine Federal District (D) |
| 3/26/2004 | Laura Clark | United Parcel Service | Hampden Superior |
| 4/14/2004 | Thomas J. Cosmos | Commonwealth of Massachusetts | Worcester Superior |
| 4/29/2004 | Mary and Michael Conchieri | | Hampden Superior (A) |
| 8/10/2004 | Mark Fortier | Giddings & Lewis, Inc. et al | U.S. Court Springfield (D) |
| 9/24/2004 | Louis Chighisola | P. A. Landers, Inc. | Plymouth Superior |
| 11/8/2004 | Keith Lemon | Lynn Creamery | Suffolk Superior |
| 1/13/2005 | George Giard | Harvey Darby and C.R. England, Inc. | U.S. District Mass. |
| 2/17/2005 | Keneth Parsons | Mass Mutual Insurance | Hampden Superior (D) |
| 3/9/2005 | Sharon Sklarski et al | Ferdauz Canteenwalla, M.D. | Hampden Superior |
| 4/1/2005 | Joan Heroux (widow) | Kim Robert Krach, M.D. | Hampden Superior |
| 5/12/2005 | Ronald Larsen | Simonds Industries, Inc. | Mass. Federal (D) |
| 5/23/2005 | Estate of Sheldon Rothstein | | Middlesex Superior |
| 5/31/2005 | Estate of Linda Marie Davis | | Suffolk Superior (D) |
| 6/7/2005 | Joseph Zabielski | Agawam School Committee, et al | Hampden Superior (D) |
| 6/17/2005 | Michael Joseph | Susan Tyler et al | Superior Court - Hartford |
| 8/16/2005 | Jorge Diaz | Massachusetts Mutual Insurance | Hampden Superior (D) |
| 8/22/2005 | Ahmed Sarrage | Jarrah Omar Mohammad | Hampden Superior |

| Trial Date | Plaintiff | Defendant | Court |
|---|---|---|---|
| 10/20/2005 | Estate of Cheryl Sweeney | Allard Nazarian Group | Hillsboro Superior NH |
| 10/21/2005 | Joan Moynihan | | Arbitration |
| 11/30/2005 | James Broderick and John Stamatov, EIU Group | Gulf Insurance Co. et al | U.S. District Boston (D) |
| 1/6/2006 | Thomas Manning | Arthur D. Little, Inc. | American Arbitration Assoc. |
| 1/17/2006 | James Doherty | Thompson Financial, Inc. | Suffolk Superior |
| 1/19/2006 | Russell Gilbert | Kevin Gilbert | Franklin Superior |
| 5/12/2006 | Patrick O'Connell | DaimlerChrysler | Hampshire Superior |
| 10/16/2006 | United States | Monty Schwartz | Federal Court Boston |
| 10/25/2006 | Richard A. Cormier | Estate of Justin Farrell | Berkshire Superior |
| 2/27/2007 | Melissa Mendonsa, et al | Lowell Housing Authority | Suffolk Superior |
| 3/27/2007 | Jessica Rodriguez | CVT Limited Partnership, LLP | Hampden Superior |
| 4/12/2007 | Joyce Waters, et al. | Interskate 91 North | Hampshire Superior |
| 5/25/2007 | Alex J. Orban | Friendly Ice Cream Corp. et al | Springfield Federal Court (D) |
| 6/13/2007 | Cynthia Haddad | Wal-Mart Stores, et al | Berkshire Superior (D) |
| 6/19/2007 | Michelle Beebe | Williams College | Federal Court Springfield (D) |
| 8/1/2007 | Carolyn Brooks, MD | Robert Piela, MD | Hampshire Probate |
| 8/13/2007 | Sally Wilson | | Not filed to date (A) |
| 10/10/2007 | Ene Inyang - Administrator of Estate of Rose Ok | Arbor Hospital, and Donna Orvin, M.D. | Suffolk Superior |

*Tuesday, January 08, 2008*

# Curriculum Vita

## Craig L. Moore

65B Hatfield Street
Northampton MA 01060

| | | |
|---|---|---|
| **Phone: 413-587-9405** | **Fax 413-587-9581** | email: *Craiglmoore@hotmail.com* |

| | |
|---|---|
| **Education** | B. S. Economics, West Virginia University, 1967;<br>M. A. Economics, Maxwell School, Syracuse University, 1972;<br>Ph.D. Maxwell School, Syracuse University, 1972;<br>Areas of study: Economics, Statistics, and Public Finance. |
| **Present Positions** | Private Management and Legal Consultant;<br>Member of the New England Business Advisory Council of the Federal Reserve Bank of Boston, 2004 – 2008;<br>Board of Directors of Holyoke Medical Center and Hospital;<br>Board of Directors of the Regional Employment Board of Hampden County. |
| **Previous Positions** | Chief Operating Officer of Marox Corporation, 2004 - 2006<br>University Professor of Political Economy, University of Massachusetts;<br>Full Professor at the Isenberg School of Management, University of Massachusetts, Amherst, 1972 through 2003;<br>Adjunct Professor of Regional Planning; Amherst;<br>Director of the Masters Program, School of Management, 1978-1979;<br>Special Assistant to the President of the University, 1979-1981;<br>Special Assistant to the President of the University, 1997-2000;<br>Policy Advisor to the President of the University, 2000-2003;<br>Chairman of the Department of Finance & Operations Management from September 1982 to August 1994;<br>Founder and Editor of *Massachusetts Benchmarks* from 1997 to 2002. |
| **Professional History** | Joined the faculty of the University of Massachusetts Isenberg School of Management as an Assistant Professor in 1972;<br>Promoted to Associate Professor in 1976;<br>Awarded Tenure in 1978;<br>Promoted to Full Professor in 1980;<br>Named University Professor of Political Economy in 1997;<br>Retired from the University of Massachusetts December 31, 2003;<br>Joined MAROX Corporation as Chief Operating Officer on January 1, 2004;<br>Served as a Legal Consultant and Expert Witness for the past 33 years. |
| **Teaching Experience** | Financial Models – required for all finance majors;<br>Statistical Tools for Management - required undergraduate course;<br>Business Data Analysis – MBA Statistics requirement;<br>Quantitative Methods II – Ph.D. Statistics requirement;<br>Macro Economic Theory – Ph.D. requirement; |

# PUBLICATIONS

## BOOKS AND MONOGRAPHS

Publications in this category include government publications reviewed by professional and academic economists before their publication.

*Regional Economic Analysis for Community Development Planning,* Massachusetts Department of Community Affairs, 119 pages, Oct. 1978.

*Massachusetts Reconsidered: an Economic Anatomy of the Commonwealth,* School of Management, University of Massachusetts, 148 pages, September, 1978.

"The Regional Industrial System" in *Spatial Analysis and the Industrial Environment* by F.I. Hamilton and G.J.R. Linge, London: John Wiley Ltd. (with Karaska and Susman), 1980.

*The New Economic Reality, Massachusetts Prospects for Long-Term Growth;* School of Management, University of Massachusetts, sponsored by the Massachusetts Taxpayers Foundation, 75 pages printed, May 1994 with Edward Moscovitch.

*A Taxpayer's Look at a Sacred Cow: Public Sector Design in Massachusetts Two Decades After the Ward Commission,* 38 pages printed, November 1995 with Edward Moscovitch

*Connection to the Future; An Analysis of the Telecommunications Industry in Massachusetts,* published by the Massachusetts Telecommunications Council and the University of Massachusetts Economic Project, 45 pages printed, June 1, 1997.

*The Effect of State Tax Policy on the Insurance Industry in Massachusetts,* published by the Massachusetts Business Roundtable, 35 pages printed, October 1, 1997

*The New Foundation; Information Technology,* The Donahue Institute, University of Massachusetts, 18 pages printed, May 1999.

*Science, Technology and Investment; The Cycle of Growth in Massachusetts,* Massachusetts Department of Economic Development, 60 pages printed, August 2001.

*Mathematical Models of a Regional Economy (in Russian), with 4 Russian co-authors, published by the St. Petersburg State Technical University, summer of 2002, 85 pages printed.*

*Critical Transitions in Telecommunications: Shaping the New Economy, Massachusetts Telecommunications Council, November 2002, 60 pages, printed.*

## JOURNAL ARTICLES

[ 1]   "The Impact of Non-Profit Institutions on Regional Income, Syracuse University a Case in Point," *Growth and Change*, January 1974, Vol. 5, No. 2, pp. 36-40.

[ 2]   "A New Look at the Regional Trade Multiplier," *Northeast Regional Science Review*, Vol. III, 1973, pp. 164-170.

[ 3]   "The Impact of Non-Profit Institutions on Regional Income, Upstate Medical Center a Case in Point," *Economic Geography*, Vol. 50, No. 2, April 1974, pp. 124-129.

[ 4]   "Social Equity and Retained Earnings," *Rivista Internazionale di Scionzele Economiche e Commerciali*, Ann. XXI, No. 2, 1974, pp. 137-135, with Sidney Sufrin.

[ 5]   "A New SYMAP for Viewing Spatial Location Patterns," *Selected Projects*, Graduate School of Design, Harvard University, Vol. VII, pp. 77-80, 1974.

[ 6]   "A National Planning Model for Petroleum Allocations," *Rivista Internazionale di Scionzele Economiche e Commerciali*, Ann. XII, 1974, pp. 547-656.

[ 7]   "The Impact of a Non-Profit Institution on Regional Income:  A Discussion," *Growth and Change*, Vol. 6, No. 3,  July 1975, pp. 45-49.

[ 8]   "Computer Graphics and Decision Analysis," *Northeast Regional Science Review*, Vol. V, pp. 93-100, 1975, with Roger Calantone.

[ 9]   "A New Look at the Minimum Requirements Approach to Regional Economic Analysis," *Economic Geography*, Vol. 51, No. 4, October 1975, pp. 350-356.

[10]   "A Linear Programming Model for Determining an Optimal Regional Distribution of Petroleum Products," *Lecture Notes in Economics and Mathematical Systems*, No. 126, Energy, Regional Science and Public Policy, May 1975, pp. 119-135.

[11]   "Optimal Regional Distribution of Petroleum Products," *Omega*, Vol. 4, No. 3, 1976, pp. 301-311.

[12]   "A Bayesian Approach to Spatial Decision Models," *Northeast American Institute of Decision Sciences Proceedings*, May 1976, pp. 41-44.

[13]   "A Cross-Sectional Analysis of the Municipal Property Tax," *Northeast Regional Science Review*, Vol. 6, pp. 200-210.

[14]   "Modeling Interstate Shifts in Employment," *Northeast Regional Science Review*, Vol. 7, 1977, pp. 143-152.

[15]   "A Critical Review of Shift-Share Analysis as a Forecasting Technique," *Journal of Regional Science*, Vol. 20, No. 4, pp. 419-437.

[16]   "Banking and the Regional Income Multiplier," *Northeast Regional Science Review*, Vol. 9, 1979, pp. 1-7.

[17]   "Interregional Arbitrage and the Supply of Loanable Funds," *Journal of Regional Science*, Vol. 22, No. 4, 1982, pp. 499-512.

[18] "Minimum Requirements and Required Economics, 1980," *Economic Geography*, Vol. 60, No. 3, July, 1984.

[19] "The Impact of the Banking System on Regional Analysis," *Regional Studies*, Vol. 19.1, pp. 29-35, 1984.

[20] "A General Equilibrium Model of Interregional Monetary Flows," *Environment and Planning A*, Vol. 21, pp. 397-404, 1989.

[21] "Utilizing an Economist to Establish Damages Through Expert Testimony, "*Journal of the Massachusetts Academy of Trial Attorneys*, Vol. 4, No. 2, pp. 7-10, May 1996.

[22] "Benchmarking – An American Perspective," *Economia & Perspectiva*, No. 15/16, Jan./June, 2001, pp.201 – 211, 2001.

## PUBLISHED CASE STUDIES

The following case studies were gathered and written during the summer of 1973 under a grant from the Center for Business and Economic Research and were subsequently published by the Harvard Case Clearing House, and in the book cited below:

| Case Title | Publication Number |
|---|---|
| Jacobsen Rug Company | 9-375-813 |
| Jacobsen Teaching Note | 8-375-814 |
| Magnavox CATV | 9-375-815 |
| Magnavox Teaching Note | 8-375-815 |
| Cherry House Furniture | 9-375-825 |
| Cherry House Furniture [A] | 9-375-826 |
| Cherry House Teaching Note | 8-375-827 |

Baird, Bruce F., *Introduction to Decision Analysis*, 1978 pp. 506-508, Duxbury; Jacobsen Rug Company, Cherry House Furniture [A], Cherry House Furniture Teaching Note.

## BOOK REVIEWS

"The Changing Role of Public Administration," A review of three books and a discussion of how they illustrate the new demand on public administrators. *Management Research*, Vol. 8, No. 3, 1975, page 51.

*Waste Paper Recovery: Economic Aspects and Environmental Impacts*, reviewed in the *Annals of Regional Science*, 1982.

*Economic Geography* by James Wheeler and Peter Muller, reviewed in the *Annals of Regional Science*, 1983.

## OTHER PUBLICATIONS

*Designing an Administrative Control System for MEPA: Massachusetts Environmental Policy Act*, Institute for Man and the Environment and The Executive Office of Environmental Affairs, 130 pages, August 1975, with Richard Smardon.

"A New Technique for Estimating Municipal Property Tax Base," Proceedings of the New England Business and Economic Development Conference, University of New Hampshire, 1974 with Richard Evans.

*A Long Range Systems Development Guide for Transportation Planning in the Commonwealth of Massachusetts*, July 1975, DPW-UMASS. Joint Transportation Program, Contract 17618, 55 pages.

*Computer Assisted Analysis of Geographical Information for Transportation Planning*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 31 pages.
*An Economic Base Analysis of the Fitchburg-Leominister Region*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 40 pages.

"Welfare Serendipity," editorial page, *New York Times*, July 17, 1975, p. 28, with Joel Morse.

*A Planned Program Budget System*, The Legislative Research Council, Commonwealth of Massachusetts, 65 pages, June 1976, with George Odiorne.

*Economic Development Program - Town of Wareham*, September 1976, Office of Economic Development, Town of Wareham, 152 pages.

*Economic Analysis of the Proposed Park Plaza Urban Renewal Project*, Center for Community Renewal Studies and the Department of Community Affairs, June 1976, 78 pages.

*A Management System for Financial Administration*, The City of Northampton, September 1976, 84 pages, bound.

*The Economic Development Potential of 121B*, Massachusetts  Department of Community Affairs, 64 pages, July 1977, with Tom Nutt-Powell at M.I.T.

*New Bedford - Fairhaven Route 6 Corridor Planning Study*, Southeastern Regional Planning and Economic Development District, February 1977, three volumes, 272 pages bound.

Tapping Local Business Talent for Community Development Planning, *Management Research*, Vol. 10, #4, July/August 1977.

*Market Analysis of Retail and Commercial Trade in Downtown Holyoke*. City of Holyoke, Holyoke Redevelopment Authority, April 1977, 45 pages, with Jack Wolf.

*Marketing Industrial Space*, Department of Community Affairs Commonwealth of Massachusetts, August 1978, 114 pages, bound.

*Attitudes Toward Flood Management in Northampton, Massachusetts*; New England Division, U.S. Army Corps of Engineers, Waltham, MA, November 1978, 173 pages, bound, with Alice Carlozzi, James Palmer, Carl Carlozzi, & Arthur Elkins.

*Economic Analysis of the Pioneer Valley*, Pioneer Valley Association, January 1979, 66 pages, printed and bound.

*New Bedford State Pier; Economics and Marketing Study*, Department of Environmental Quality Engineering, Division of Waterways, Commonwealth of Massachusetts, March 1979

## PAPERS PRESENTED    (a partial list)

"A Linear Programming Model for Determining an Optimal Distribution of Petroleum Products," presented at the ORSA-TIMS Meetings in San Juan, Puerto Rico, 1974.

"A Linear Programming Model for Optimal Regional Distribution of Petroleum Products in the U.S.", International Conference on Energy and the Environment, Leuven, Belgium, May 1975.

"A Bayesian Approach to Spatial Decision Models," presented at the Northeast AIDS Meetings, Philadelphia, PA., 1975.

"Modeling Interstate Shifts in Employment," presented at the Northeast Regional Science Meetings, Halifax, Nova Scotia, 1977.

"Banking and the Regional Income Multiplier," Presidential Address, Northeast Regional Science Meetings, Amherst, May 1979.

"Commercial Banking and Regional Growth," presented at the Eastern Economics Association Meetings, Boston, Mass, May 1979.

"Banking and the Regional Income Multiplier," invited paper presented at the National Regional Science Meetings, Los Angeles, California, November 1979.

"The Impact of Energy Price Increases on Consumer Expenditures," invited paper presented to the National Energy Policy Conference, West Virginia University, Morgantown, W. VA., May 1980.

"The Regional Industrial System," presented to the International Geographical Union Commission on Industrial Systems, Tokyo, Japan, August 1980.

"Interregional Arbitrage and the Supply of Loanable Funds" presented to the Northeast Regional Science Meetings, Rutgers University, May 1981.

"Interregional Arbitrage and the Supply of Loanable Funds" invited paper presented to the North American Regional Science Association, Montreal, Canada, November 1981.

"Toward a Systems Approach to Regional Analysis," invited paper presented at the International Congress of Arts and Sciences, Rotterdam Holland, June 1984.

"A General Equilibrium Model of Interregional Monetary Flows," invited paper presented at the National Conference of Modeling and Simulation, Pittsburgh, April 1986.

"The Post Industrial Challenge to Location Theory," presented at the Northeast Regional Science Association meetings in Buffalo, N. Y., May 1990.

"The Application of Real Time Statistical Software to Developing Econometric Models," Umea University, Uppsala University and Lund University, Sweden, October 1990.

"An Empirical Comparison of Diversification Indices," The International Regional Science Meetings, New Orleans, LA, November 1991.

"Establishing an Entrepreneurial Base for Economic Transition," Jagellonia University, Cracow, Poland, January 1992.

"The Benefits of Economic and Academic Interaction in Supporting Peace Efforts in Northern Ireland", Ulster University, Londonderry, Northern Ireland, June 1995.

"Prospects for the Economic Monetary Union; an American Perspective", Keynote address, 20th anniversary symposium, Haarlem International School of Business, Haarlem, Netherlands, November 2, 1998.

"A Russian Economic Strategy in the Global Economy", presented at the Saint Petersburg State Technical University in Pskov, Russia 23rd, 2001.

"New Approaches to Economic Analysis in a Knowledge Based Economy", National Association of State Development Agencies, National Research Meetings, Saratoga Springs, July 23, 2001.

"The New Economy and the Law", Proceedings of The Massachusetts Bar Association Annual Conference, Boston, Massachusetts, January 26, 2002, pp 1-4.

"Using Statistics in Employment Cases", Proceeding of the Employment Law Conference, Mass. Continuing Legal Education, December 6, 2002, Boston, pp. 157-168.

## PROFESSIONAL ACTIVITIES AND HONORS

President of the Northeast Regional Science Association: 1975-1976, 1978-1979, 1990-1991.

Associate Editor of the Regional Science Review, 1975, 1991.

*Who's Who in Computer Graphics*, 1985.

Named as a Fellow of the Institute for Man and the Environment, 1976-1977.

Selected as a visiting scholar to Sweden. I gave lectures and worked with faculty at three major universities in Sweden: Umea, Uppsalla and Lund during the fall of 1990.

Helped direct the first postgraduate business program in Poland at the Jagellonia University in Cracow supported by the Mellon Foundation and the U. S. Information Agency, 1992.

School of Management Faculty Service Award, 1994

Recipient of the Chancellor's University Advancement Award, 1995

Invited by Governor William Weld to accompany him on a trade mission to the Republic of Ireland and Northern Ireland, March 1997.

Named as a University Professor of Political Economy by the Board of Trustees of the University of Massachusetts, June 1997.

Named "Professor of the Year" by the Massachusetts Telecommunications Council in recognition of "outstanding achievement in expanding our understanding of issues and opportunities in the Telecommunications Industry", March 1999.

Helped organize the International Conference on Economies Emerging from Conflict, jointly sponsored with Magee College at the University of Ulster, hosted by John Hume, held in Londonderry, Northern Ireland, June 23 - 25, 1999.

Appointed to the New England Business Advisory Council that advises the Federal Reserve Bank of Boston on business and economic policy each quarter, 2004 - 2008.

## Legal Expertise and Consulting

I began working as an expert witness in 1972 and have testified in well over 100 cases. I have testified in Federal District Court in Massachusetts, New York, Pennsylvania, Rhode Island, Maine, and North Carolina. I have testified in superior court and district courts in Massachusetts, Connecticut, Vermont, New Hampshire, New York, and Queensland, Australia. I have been retained by law firms in California, Arizona, New Jersey, South Carolina, Illinois, and Indiana.

I have testified for both plaintiffs and defendants as an economist in a wide variety of cases including wrongful death, personal injury, medical malpractice, divorce, and breach of contract.

I have also testified as both an economist and a statistician in race, gender and age discrimination cases related to termination, promotion and hiring under Title VII and the Age Discrimination in Employment Act of 1967. I testified in Hazen Paper Co. et al. v. Biggins, an important United States Supreme Court case, and in Halligan et al v. Ground Round, Inc. that received national attention.

I was heavily involved in preparing economic damage estimates arising from the deaths in the World Trade Center on September 11, 2001. I prepared reports submitted to the Victim's Compensation Fund for the surviving families of dozens of executives and others killed in that act of terrorism.

I have been regularly invited to lecture in programs conducted by Massachusetts Continuing Legal Education concerning statistical evidence and economic damages:

Age Discrimination, Boston, June 11, 1992.
Personal Injury Damages, Boston, March 11, 1993.
Personal Injury Damages, Boston, July 20, 1994.
Advanced Trial Advocacy Workshop, Boston, August 4, 1994.
Personal Injury Damages, Boston, February 1996.
Advanced Trial Advocacy Workshop, Boston, August 14, 1997.
Trying Employment Cases in the Superior Court, Springfield, April 7, 1999.
Trying Employment Law Cases in the Superior Court, Boston, April 13, 1999.
Annual Employment Law Conference, Boston, December 5, 2002

I have also been invited to lecture by other organizations that include:

The Massachusetts Chapter of the National Employment Lawyers Association; "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Boston, April 27, 1995.
National Employment Lawyers Association, "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Proceedings of the National Employment Lawyers Association, Vol. I., pp.444-454, San Diego, June 27, 1996.
Massachusetts Bar Association, Committee on Employee Rights, Boston, February 7, 2000.
Western New England Law School on several occasions over the past few years.
"The New Economy and the Law", The Massachusetts Bar Association 2002 Annual Conference on January 26th, 2002, published in the proceedings, pp 1-4.
Annual District Court Judges Conference, Southbridge, Massachusetts, May 29, 2003.

I was an elected member of the Board of Overseers of the Historical Society of the Supreme Judicial Court of Massachusetts for two 3 year terms that ended in 2006.

In addition to legal work, I also regularly consult with government leaders, public agencies, non-profit organizations, and business firms on a wide range of management, financial, and public policy issues.

**Service to the Commonwealth of Massachusetts**
- Department of Community Affairs: economic feasibility study of the Park Plaza Redevelopment Project, reviewed 21 urban renewal projects, and the prepared handbooks concerning the economic development of communities, 1975-1978.
- Chairman of the Task Force on Policy Issues, Northeast Council for Economic Action, sponsored by the Bank of Boston and the Economic Development Admin.; 1977 - 1978.
- Addressed the leadership of the Massachusetts House of Representatives regarding state economic policy, State House, Boston, July 29, 1994.
- Advised the Massachusetts House Committee on Taxation on tax policy and its impact on business development, July 11, 1995
- Invited to testify before the joint session of the Massachusetts House and Senate Taxation Committee on Governor Weld's proposed tax legislation, October 5, 1995.
- Worked with the Mass. Business Roundtable to support pending tax legislation for the mutual funds industry in the Massachusetts Senate, July 1996.
- Invited to testify before a joint session of the Massachusetts House and Senate Technology Committees on the Telecommunications Industry in Massachusetts, February 5, 1997.
- Worked with the Mass. Business Roundtable to present information and analysis concerning pending tax reform legislation in the insurance industry during 1997 and 1998.
- Invited to testify before a joint session of the Massachusetts House and Senate Ways and Means Committees concerning the economy and tax revenues, March 1998, 1999, 2000, and 2001.
- Member of the Massachusetts Labor Market Information Advisory Subcommittee established by the Department of Employment and Training and the Massachusetts Jobs Council, 1999-2003.

**Service to the University of Massachusetts**
- Member of the Faculty Senate, 1973-1974, 2000 – present.
- University Computer Services Committee, 1972-1976, 1978-1979, Chair 1974-1976.
- University Management Systems Advisory Committee, 1974-1976.
- Faculty Research Selection Committee, 1975.
- Member of the Advisory Board of Orchard Hill Residential College, 1974-1977.
- Member of the Campus Center Director Search Committee, 1977.
- Member of the Title IX Salary Review Committee, 1977-78.
- Member of the Graduate Council, 1978.
- Member of the Committee on Academic Priorities, 1978-1980 (Chair, 1978-1979), 2000 to present.
- Special Assistant to the President of the University of Massachusetts, 1979-1981.
- Member of the University Personnel Policies Committee, Chairman, 1988-89.
- Member of the Committee to Advise the Provost on Budget Priorities, 1991.
- Chairman of the Committee on Statistical Pedagogy, 1994-1996
- Member of the Public Policy Planning Council 1996-1997
- Special Assistant to the President of the University of Massachusetts, 1997-2001
- Member of the Program and Budget Council 2000 – 2003, Chair 2000-2002

**Service to the Isenberg School of Management**
- Curriculum Committees' Task Force on Quantitative Studies, 1972-1973.
- Economics Ph.D. Qualifying Examination Committee, 1973-1977, Chair 1974-1977.
- Member of the Graduate Studies Committee, 1972-1975.
- Director of the Graduate Public Management Program, 1973-1977.
- Chairman of the Department Personnel Committee 1978-1979, 1981-1982, 1996-1997.
- Member of the Task Force on Research Policy, 1977.
- Director of Masters Program, 1978-1979.
- Member of Academic Policy Committee, 1981-1982.
- Member of Administrative Committee, 1978-1979, 1982 -1994.
- Quantitative Methods Ph.D. Qualifying Examination Committee, Chair 1990-1992.
- Member of the committee to design the school's computer facilities, 1991.
- Chair of the MBA Task Force to Establish a Professional MBA Program, 1991-1992.
- Chairman of the Department of Finance and Operations Management 1982-1994.
- Chairman of the search committee for the Isenberg Chair in Integrative Studies 2000-2001

9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Pages 1-159
Volume I

MICHAEL BAHAYLO
vs.                           C.A. 05-30178-KPN
CALLAWAY GOLF BALL
OPERATIONS, INC.

JOHN BETTENCOURT
vs.                           C.A. 05-30179-KPN
CALLAWAY GOLF BALL
OPERATIONS, INC.

GARY J. LONCZAK
vs.                           C.A. 05-30180-KPN
CALLAWAY GOLF BALL
OPERATIONS, INC.

PAUL DUVAL
vs.                           C.A. 05-30181-KPN
CALLAWAY GOLF BALL
OPERATIONS, INC.

**ORIGINAL**

------------------------------------------------------
**DEPOSITION OF: CRAIG L. MOORE, PH.D.**
------------------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Skoler, Abbott & Presser,
P.C., One Monarch Place, Springfield,
Massachusetts on JANUARY 24, 2008, commencing
at 1:00 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

APPEARANCES:


FOR THE PLAINTIFFS:

        EGAN, FLANAGAN AND COHEN, P.C.
        67 Market Street
        Springfield, Massachusetts 01103
BY:  MAURICE M. CAHILLANE, ESQUIRE



FOR THE DEFENDANT:

        SKOLER, ABBOTT & PRESSER, P.C.
        One Monarch Place
        Springfield, Massachusetts 01144
BY:  JAY M. PRESSER, ESQUIRE


Also Present:  Peter A. Arturi, Esquire
                Callaway Golf Company

1                          I N D E X

2
   WITNESS                  DIRECT CROSS REDIRECT RECROSS
3
     CRAIG L. MOORE, PH.D.    6
4

5

6

7

8                        E X H I B I T S

9      NO.        DESCRIPTION                        PAGE

10        1   Moore Economic Report Re Michael
              Behaylo                                  7
11        2   Moore Economic Report Re John
              Bettencourt                              7
12        3   Moore Economic Report Re Paul Duval      7
          4   Moore Economic Report Re Gary Lonczak    7
13        5   Moore Notes Re First Meeting with
              Plaintiffs                              10
14        6   5/20/03 Behaylo Benefits Statement      63
          7   Bettencourt List of Amounts Spent on
15            Benefits                               117

16

17

18

19

20

21

22

23

24

1                S T I P U L A T I O N S

2

3          It is agreed by and between the parties

4     that all objections, except objections as to the

5     form of the question, are reserved to be raised at

6     the time of trial for the first time.

7

8          It is further agreed by and between the

9     parties that all motions to strike unresponsive

10    answers are also reserved to be raised at the time

11    of trial for the first time.

12

13         It is further agreed that the deponent will

14    read and sign the deposition and that the sealing

15    of said deposition will be waived.

16

17         It is further agreed by and between the

18    parties that notification to all parties of the

19    receipt of the original deposition transcript is

20    also hereby waived.

21

22                      * * * * *

23

24

1        CRAIG L. MOORE, PH.D., the Deponent, having

2    been satisfactorily identified by the production

3    of his driver's license and having been first duly

4    sworn by the Notary Public, deposes and says as

5    follows:

6            MR. PRESSER:  Let me, as a

7    preliminary matter, indicate that the witness,

8    Craig L. Moore, is here today pursuant to

9    subpoenas issued in four separate cases:  The case

10   of Gary Lonczak versus Callaway Golf Ball

11   Operations, 05-30180-KPN; the case the John

12   Bettencourt versus Callaway Golf Ball Operations

13   in case number 05-30179-KPN; the deposition -- the

14   case of Paul Duval versus Callaway Golf Ball

15   Operations, case number 05-30181-KPN; and the case

16   of Michael Behaylo, case number 05-30180-KPN.

17           Counsel have conferred prior to

18   commencing this deposition and agreed that there

19   are separate cases which may or may not be

20   consolidated for trial in whole or in part but

21   that in any event we will take a single deposition

22   of Doctor Moore today for all four of those

23   matters and that the information in that

24   deposition can be used in any and/or all of those

```
1    four cases without record to which case the
2    question specifically may be pertaining to.  Is
3    that correct?
4              MR. CAHILLANE:  Correct.
5                        * * * * *
6              DIRECT EXAMINATION BY MR. PRESSER
7         Q.   Can you state your name for the record,
8    sir?
9         A.   Craig Lawson Moore.
10        Q.   Do you go by Doctor Moore?
11        A.   Call me Doctor Moore, Craig, whatever
12   you prefer.
13        Q.   Let me call you Craig, then.  We can be
14   informal at this point.
15             Did you bring what each of the subpoenas
16   requested that you bring, sir, and the documents
17   with you relating to the report that you have
18   prepared in each one of these four cases?
19        A.   Yes.
20        Q.   Have you in fact brought those
21   documents?
22        A.   Yes.
23             MR. PRESSER:  If I can ask you to
24   produce -- and certainly you can consult with
```

```
 1   Attorney Cahillane if you need to -- if you

 2   produce all four I can have my assistant begin to

 3   copy them.  We'll keep one of them here to

 4   continue questioning and then copy that one

 5   subsequently.

 6             Let's go off the record for a moment.

 7                  (Discussion off the record.)

 8             MR. PRESSER:  I'd like to mark and

 9   put into evidence the four reports.  This is

10   Mr. Behaylo.  We'll make this 1, please?

11                  (Defendant's Deposition Exhibit
                      No. 1 offered and marked.)
12

13             MR. PRESSER:  Make this 2, which is

14   John Bettencourt.

15                  (Defendant's Deposition Exhibit
                      No. 2 offered and marked.)
16

17             MR. PRESSER:  Duval we'll make 3.

18                  (Defendant's Deposition Exhibit
                      No. 3 offered and marked.)
19

20             MR. PRESSER:  Why don't we mark this

21   as 4.

22                  (Defendant's Deposition Exhibit
                      No. 4 offered and marked.)
23

24        Q.   (BY MR. PRESSER)  Can you identify what
```

1   Exhibit Number 1 is?  (Indicating.)

2       A.   Exhibit Number 1 is a report that I

3   prepared dated December 26th, 2007, regarding the

4   economic damages of Michael Behaylo.

5       Q.   Can you identify Number 2, please?

6   (Indicating.)

7       A.   Number 2 is an economic report that I

8   prepared on the date of December 26th on 2007

9   regarding the economic damages of John

10  Bettencourt.

11      Q.   Can you identify Number 3, please?

12  (Indicating.)

13      A.   Number three is an economic report dated

14  December 26th, 2007 that I prepared regarding the

15  economic damages of Paul Duval.

16      Q.   And Exhibit Number 4, please?

17  (Indicating.)

18      A.   Exhibit Number 4 is a report that I

19  prepared dated December 26th, 2007 regarding

20  economic damages of Gary Lonczak.

21      Q.   Let the record reflect that the witness

22  has brought, pursuant to subpoena, copies of

23  various records for each of the four plaintiffs

24  that are being copied now except for Mr. Behaylo's

1    which we still have in front of us.

2          He has also brought with him a set of

3    notes, I take it, that you took that relate to all

4    four cases?

5          A.   Correct.

6          Q.   We'll identify -- we'll make that set of

7    notes Exhibit 5 as soon as we get copies.  Let me

8    ask you some background questions about Exhibit 5.

9          What was the process by which you

10   compiled Exhibit 5, the notes that you just turned

11   over?

12         A.   The first several pages of those notes

13   were taken spontaneously during my initial

14   interview with the four plaintiffs.

15         Q.   When you say the first portion, let me

16   show you, there are, all together, five pages of

17   handwritten notes?  (Indicating.)

18         A.   That's correct.

19         Q.   When you say the initial part, what is

20   that referring to?

21         A.   The first four pages.

22         Q.   The first four pages reflect your notes

23   you took while you met with individuals?

24         A.   At my first initial meeting with all

1    four plaintiffs.

2        Q.    How many meetings have you had with all

3    four plaintiffs together -- strike that.  Maybe I

4    wasn't clear on your answer.

5            The first four pages of Exhibit 5, was

6    that a result of a meeting you had with the four

7    of them in a group or separate meetings with all

8    four of them?

9        A.    No; with them as a group and with

10   counsel.

11       Q.    When you say counsel, who is that?

12       A.    Attorney Cahillane.

13       Q.    So you met with all four plaintiffs as a

14   group and Attorney Cahillane and prepared the

15   first four pages of what is Exhibit 5?

16       A.    That's correct, during that meeting,

17   spontaneously.

18           MR. PRESSER:  Why don't we mark this

19   as Exhibit 5.

20               (Defendant's Deposition Exhibit
                  No. 5 offered and marked.)
21

22       Q.    (BY MR. PRESSER) So during the course of

23   this deposition if I ask you questions that at any

24   time you need to refer to any of the documents you

CRAIG L. MOORE, RH.D
JANUARY 24, 2008

```
 1    brought or Exhibit 5, your notes, please just

 2    indicate as such and I'll be happy to let you

 3    review it --

 4         A.    (Interposing) Thank you.

 5         Q.    -- at any point.

 6         A.    Thank you.

 7         Q.    So either from memory or from your

 8    notes, when was this initial meeting that you had

 9    with the plaintiffs -- and let me give you

10    Exhibit 5. (Indicating.)

11         A.    They're not dated and I don't recall

12    from my memory when that first meeting was.  It

13    was sometime in the fall of 2007 I expect.

14              I would have to go back and look at my

15    computerized billing records to know when it was.

16         Q.    Let me ask you about that.  In your

17    report you didn't provide information about your

18    total hours that you spent on each of the reports

19    to prepare those.

20              Do you have that information with you

21    today?

22         A.    I don't.  It's on a computer file on my

23    desktop at home.

24              I'd be glad to supplement it to you if
```

1    you'd like.  I can tell you approximately.

2        Q.    If you could tell me that and supplement

3    it both, I'd appreciate it.  What is --

4        A.    (Interposing) The approximate amount of

5    time I've spent on these four cases combined is

6    just under twenty hours.

7        Q.    What was the process of preparing the

8    report in terms of how many meetings you had?

9    Were they group meetings, individual meetings,

10    both?  Explain that.

11        A.    The initial meeting that I had that

12    these notes were taken at, Exhibit 5, was the only

13    time that I recall meeting when all four

14    plaintiffs were present.

15            There may have been a subsequent meeting

16    when some of them were present but I'm not sure if

17    all of them were there.

18        Q.    Do you remember whether or not there was

19    such a meeting?

20        A.    Pardon?

21        Q.    Do you remember whether or not there was

22    in fact a subsequent meeting?

23        A.    I'm not a hundred percent sure.  I

24    recall that there was.

1           Most of the information that I garnered

2      from the plaintiffs was done following that

3      subsequent meeting as I worked on each of the

4      reports by either specifically asking them in

5      writing for particular information and they

6      responded to me in writing or over the telephone

7      or a combination of both.

8           Q.   Just because it's a little bit difficult

9      to read the handwriting, maybe we can go through

10     Exhibit 5.

11          These are notes, I take it -- at least

12     the first four pages -- that you took

13     contemporaneous with the meeting with all four

14     plaintiffs and Attorney Cahillane?

15          A.   That's right.  The fifth page had

16     nothing to do with the personal meeting.  It was

17     just an Internet research that I did involving the

18     background of the business involved, the

19     defendants in the case.

20          Q.   Do you remember the sources of that

21     information from the Internet?

22          A.   Not offhand.  I was basically looking at

23     business publications and articles during the

24     period of time that the acquisitions were taking

1  place, the sale was taking place by Callaway and I

2  wanted to find out what had been written about it

3  in the Wall Street Journal, business publications,

4  stories about the purchase.

5      Q.   Why did you deem that pertinent?

6      A.   Well, because that was part of the

7  situation that was involved with the case.

8          One of the first things I was told -- in

9  fact on these notes I think the second thing on

10  the notes says, it says Callaway bought Top-Flite

11  from bankruptcy, moved accounting to California

12  and so on, so one of the first things I was told

13  in this case when I had this meeting was there had

14  been this purchase.

15          So I wanted to make sure I had a

16  thorough understanding of what it involved and who

17  was involved and what brands were involved and so

18  on.  I just wanted it for background.

19      Q.   So you found that information from the

20  Internet somewhere but you don't remember the

21  specifics?

22      A.   I looked at several different sources.

23  I just Googled it and read probably the first

24  eight or ten sources that came up, articles that

1  had come out at the time in business publications.

2      Q.    Let me direct your attention to

3  Exhibit 1, for example, or 2, or 3.

4          If you look at the last item before

5  background, it indicates that you interviewed the

6  individual about whom the report is made on August

7  30th, 2007.

8      A.    Mmm-hmm.

9      Q.    Does that refresh your recollection as

10 to when the date was that you met with the four

11 plaintiffs and Attorney Cahillane?

12     A.    That's probably the date that I had the

13 meeting, yes.

14     Q.    There's no mention in any of the reports

15 of any other meetings with the plaintiffs or

16 conversations?

17     A.    I don't think that there was but it also

18 says "and information received in writing from him

19 in response to specific questions I forwarded to

20 him in writing."

21     Q.    But it doesn't refer to any other

22 conversations?

23     A.    I had phone conversations with some of

24 the plaintiffs at various times when I had

1    questions.

2         Q.    Let's get back to Exhibit 5.  Just so

3    I'm clear, can you read Exhibit 5 into the record?

4         A.    I'll start at the top of page one,

5    left-hand side.  It says "Federal Court."  To the

6    right of that it says, "Conference in early

7    September," something about "discovery" but I

8    can't read my own handwriting in regard to that.

9    "Four plaintiffs."

10              Then it has an arrow -- a right facing

11   arrow -- and then it says "Top-Flite" and then in

12   parenthesis, "Spalding."

13              Beneath that it has the number one,

14   circled.  It says, "Paul Duval laid off 7/04."

15        Q.    Is that word "career"?

16        A.    I think it is.  It looks like "career at

17   the company."

18              Obviously I haven't looked at these

19   notes in a long time and they were handwritten a

20   long time ago and obviously I'm not good at

21   reading my own handwriting.

22        Q.    It appears that word may be "signed"?

23        A.    I think it says, "Signed defective

24   release, dash, severance, now works at Russell

1    Athletics but making less.  Callaway bought

2    Top-Flite from bankruptcy, dash, moved accounting

3    to California and two plants" -- "and two

4    plaintiffs have been let go."

5        Q.    After "plaintiffs" there seems to be

6    some other word or letters?

7        A.    "May" -- "may have been let go."  It's

8    the word "may."

9        Q.    Let me interrupt for a minute.  Is there

10   a way to tell the source of that information that

11   you're writing down?

12           Does that mean because it is written

13   about Paul Duval's name, that's what Paul Duval

14   indicated to you?

15       A.    Not necessarily.  People were just sort

16   of telling me about kind of their story and it

17   wasn't in any particular order.

18           I wasn't asking questions because it was

19   the first initial meeting I ever had with these

20   people and so I was just listening to them and

21   writing down a few things.

22           I didn't write down everything because I

23   assumed I was going to be getting a lot of

24   documents and other things that would fill in a

1    lot of the blanks.  These were really just my

2    notes taken in getting acquainted with them and

3    listening to what they had to say.

4         I mean Paul Duval might have made that

5    remark; he might not have.  Someone else in the

6    room may have.  I don't know.

7         Q.   Proceeding, Gary Lonczak is next?

8         A.   It says, "Gary Lonczak worked in the

9    plant, came from Digital April '04, laid off,

10   replaced by younger woman, process control with

11   software, been with them approximately seven

12   years."

13        Below that it says, "Cost accounting,

14   dash, two plaintiffs, dash, 12/05, department

15   moved to California.  The line below that it says,

16   "Became real estate agents."

17        Then it has two names, "John

18   Bettencourt" and "Mike Mihaelas."

19        Q.   Next page please?

20        A.   Their names -- it says "Lonczak" and

21   "Behaylo"; then there's a horizontal line across

22   the page and below that it says "Gary Lonczak."

23        Q.   Do you know why you have a horizontal

24   line across the page?

CRAIG L. MOORE, PH.D.
JANUARY 24, 2008

1        A.    Yes; because at this point I wasn't

2    just -- I stopped just listening to people telling

3    me things and I started asking specific questions.

4            With regard to Gary Lonczak I

5    specifically asked him what his date of birth was

6    and he said 6/24/53.  I asked him what his date of

7    termination was and he said 4/15/04.

8            The next thing is scribbled over.  I

9    think it's "DOH."

10       Q.    What would that stand for, for you?

11       A.    Probably date of hire but I can't read

12   what I've got next to it.  I think the pen was

13   running out of ink a little bit.

14           Then underneath that it says, "Materials

15   operations manager, materials planning,

16   procurement for golf clubs, supervised three

17   people under him.  Twenty-three years at Digital."

18       Q.    Does that refer to Digital Equipment

19   Company?

20       A.    Yes; Digital Equipment Company.

21   "Partnered with plant manager from Fort Worth,

22   sold in Chicopee" -- meaning sold his house, I

23   believe, in Chicopee.  "Wife left job at

24   MassMutual and then was rehired, liquidated some

1   assets."

2        Q.   Does that mean his wife was working at

3   MassMutual at the time?

4        A.   I don't recall.  This is what I wrote

5   down when he was telling me about what happened to

6   him because I asked him, I believe, well, when you

7   left what happened next and he said that he had

8   gotten together with a plant manager in Fort Worth

9   and went on to tell me more about starting a

10  company down there and so on.

11       What I wrote down about that was -- it

12  says "sold in Chicopee" which meant they sold

13  their home in Chicopee, that he left with his wife

14  and she left a job at MassMutual but then was

15  rehired.

16       That's what I believe those notes meant.

17  He liquidated some assets.

18       Q.   Let me interrupt you before you go on.

19  Do you customarily ask a plaintiff in a case in

20  the course of doing a damage report whether

21  they're married, for example?

22       A.   Sure.

23       Q.   Would you ask them whether their spouse

24  is or is not employed?

1        A.    Sure.

2        Q.    Would you ask them whether their spouse

3    at their employment has health insurance benefits,

4    for example?

5        A.    Yes.

6        Q.    Would you ask whether those health

7    insurance benefits cover the Plaintiff in a

8    particular case?

9        A.    Yes.

10       Q.    Did you ask these four plaintiffs those

11    questions?

12       A.    I wasn't trying to get that detailed

13    information at this first initial meeting.

14            My practice is after I've met people and

15    they've sort of told me what they want to about

16    the case and I've gotten some specific things that

17    I know I'm going to need like date of birth and

18    date of termination, things like that, to then

19    just let them tell me what things that they feel

20    are important because I know that when I look at

21    the documents -- I look at Answers to

22    Interrogatories, the complaint, the depositions

23    that might be involved -- I know that I'm going to

24    get documents that are going to fill in a lot of

 1    the information and save me the time of asking all

 2    those questions.

 3         Q.    Let me ask:  Why do you normally -- you

 4    said before you typically at some point at least

 5    ask about a spouse?

 6         A.    Unless I already know; unless it's in a

 7    deposition.

 8         Q.    You find that information?

 9         A.    Oh, sure.

10         Q.    Why do you think that information is

11    relevant?

12         A.    Well, it depends on the particular case.

13    In some cases it's more relevant than others but

14    if, for example, there was a loss of an employee

15    benefit and that benefit had a value, I'd want to

16    know who was covered under that benefit, whether

17    there was another source for replacing that

18    benefit.

19              That's why I might ask something about

20    health coverage or whether or not a spouse was

21    employed, things like that.

22         Q.    Can you point at anywhere, for example

23    in Mr. Lonczak's case you said in these notes his

24    wife was reemployed by MassMutual?

1      A.    Yes.

2      Q.    Did you at any point ask for -- do you

3  have a recollection whether you ask if his wife

4  has health insurance?

5      A.    I don't recall asking that question.  I

6  may have ascertained that by looking at other

7  documents.  I may have asked him in writing at

8  some point; I don't know.

9      Q.    We'll get to his individual case.  I'm

10  just trying to get the normal.

11      A.    Right.

12      Q.    So that's normally something you would

13  at least take into account and find the

14  information about because of the potential effect

15  on the damages aspect?

16      A.    That's correct.

17      Q.    I put you off, we went off on a tangent.

18  You were on page two of Exhibit 5.  I think it

19  says Roseanne Turner?

20      A.    "Roseanne Turner, ten years younger, has

21  since left. "

22      Q.    Do you have a recollection of who

23  Roseanne Turner was or why it was discussed?

24      A.    I believe that was raised as someone who

1    took over Mr. Lonczak's duties.

2        Q.    What's written after that?

3        A.    "Had options."

4        Q.    Do you have a recollection of what that

5    means?

6        A.    No; no idea what that means.

7        Q.    All right.

8        A.    "Benefits, dash, sheet, dash, get

9    those."

10            I was told that there were benefit

11    sheets produced regularly for the employees that

12    laid out what their benefits were, what their

13    coverages were, what their contributions were so

14    this is at that point, it's another reason at this

15    meeting I wouldn't have specifically asked for

16    more details until I saw those sheets and saw what

17    was available -- and eventually I did get those

18    sheets.

19        Q.    Did you get them from each of the

20    plaintiffs?

21        A.    I don't remember if I got them from

22    each.  I got them definitely from someone.  They

23    are in the file.

24        Q.    We're talking about Mr. Lonczak so right

 1    now I'm looking at Number 4.  How would I know

 2    whether in Mr. Lonczak's case you received a sheet

 3    or not?

 4        A.    Well, in his case it would appear that I

 5    probably didn't because it is listed specifically

 6    on the other cases.

 7        Q.    So in Mr. Lonczak's case it's your

 8    testimony that you don't recall ever seeing a

 9    sheet from the company indicating the value or the

10    cost really of Mr. Lonczak's benefits?

11        A.    I don't believe that each and every one

12    of the plaintiffs had those sheets or kept them or

13    had them available.

14        Q.    Okay.  Would those sheets be identical

15    by person or did they vary by individual?

16        A.    They were individual.  They weren't a

17    general statement for general employees.  No; they

18    were personalized.

19        Q.    But you had them you think in some cases

20    but not in others?

21        A.    I think so.

22        Q.    Did you make specific inquiries of

23    Mr. Lonczak, for example -- I know we're off on a

24    tangent but that's the way I go sometimes -- as to

1  whether, for example, he had all the benefits that
2  Mr. Bettencourt may have had?

3          Did you go through that with each of the
4  plaintiffs to find out what benefits they did or
5  did not have while they were working at the
6  company?

7     A.    I don't recall specifically but my
8  impression is that the general benefits that were
9  listed by the company for the employees were
10  available to most or all employees and in some
11  cases I had the specifics -- personalized costs
12  and so on -- but in others I didn't but in general
13  the programs that were available were available to
14  all of these employees.

15     Q.    Would there be a difference to you in
16  terms of calculating damages or potential damages
17  so far as whether a benefit was available or
18  whether a benefit was actually utilized by a
19  particular employee?  Would that make a
20  difference?

21     A.    It depends.  It would just depend on the
22  situation or the particular employee.

23          The basis of damages is opportunity
24  cost.  If it's a particular benefit, whether they

1    took advantage of it or not but they had the

2    opportunity to take advantage of it if they wanted

3    to exercise it, that's a loss.  If there was -- if

4    there's a benefit that they are not eligible for,

5    it would not affect them.

6         For example, if Mr. Lonczak would have

7    been eligible for maternity leave, obviously he

8    couldn't have benefitted from that because he

9    couldn't have a baby, so it just depends on the

10   situation.

11       Q.   Let me bore into that slightly more in

12   terms of how you approach it in general and we'll

13   get to specifics of this opportunity cost in terms

14   of a benefit.

15       To you, then, the damages would be the

16   same for an employee who gets terminated -- if you

17   have two employees terminated, you would assess

18   the damages resulting from that termination

19   vis-a-vis health care, for example, as identical

20   regardless of whether the particular individual

21   did or did not opt in for health care while they

22   were employed?

23       A.   No; it would depend on the situation.

24       Q.   What varies and why?

1    A.    What varies is the amount of information

2  I have about the particular individual's benefits

3  and what they receive and what their costs are.

4  In some cases you have it; some cases you don't.

5         In some cases -- I'm talking in

6  general -- I would estimate what the general

7  package of benefits for the typical employee in

8  that industry would be because there are no

9  specifics for that person or even that company.

10   Q.    I'm right now focusing on the

11 information that you obtained or thought was

12 relevant to making individualized damage reports.

13        I think I asked whether or not it

14 mattered to you whether a particular plaintiff was

15 utilizing a particular benefit and you indicated

16 no, because the opportunity cost of the benefit

17 was available.  Am I misstating that?

18   A.    No; that's true.

19   Q.    Is it fair to say from your experience

20 that health care, for example, now that virtually

21 all companies charge employees some contribution

22 for health care, that's your experience?

23   A.    Yes; it is.

24   Q.    And employees typically choose whether

1    or not to accept health care benefits from a

2    particular employer based on their personal needs

3    and goals, whether their spouse has one that's

4    better or cheaper or whatever?

5        A.    Also within an employer is a choice of

6    programs and different levels of contributions.

7    You may or may not have that information.

8        Q.    I'm asking now whether you seek that

9    information and whether you think it matters?

10       A.    If it's available -- I get whatever

11    information is available in as much detail and

12    particularized as much as possible but it's not

13    always available.

14       Q.    Let me state -- for example, we're

15    reading Mr. Lonczak; I don't want to pick on him

16    but to use him as an example.

17            Did you ever ask Mr. Lonczak -- you met

18    with him, you communicated with him:  While you

19    were employed by Callaway Golf Ball Manufacturing

20    or its predecessors, at the time of your

21    termination did you have health care coverage.

22    Did you ask him that?

23       A.    I may have asked him that.  I don't

24    specifically recall asking him that sitting here

1    right now.

2         Q.   Would it have affected -- should it have

3    affected your report in terms of -- strike that.

4    Let me rephrase.

5              Would his answer to that question have

6    an impact on your assessment of his damages by

7    virtue of his losing his position?

8         A.   What particular answer I got from that?

9         Q.   Yes.

10        A.   Sure.

11        Q.   So if he has, for whatever reason -- and

12   again I'm not trying to pick on Mr. Lonczak --

13   Mr. Lonczak says to you, no, I didn't pick their

14   plan, I wasn't on it before, would that then

15   reduce your estimate of damages compared to if he

16   had said oh, yes, I had health insurance and I

17   lost it?

18        A.   I think that would depend on the other

19   aspects of his situation.

20             What were his alternatives?  Did he have

21   a spouse who could have gotten coverage?  Did he

22   have a spouse who had a risk of being unemployed

23   and losing coverage and being able to get that

24   benefit, in effect, of an insurance policy and

1    therefore it has value.

2        Q.    Are any of those things reflected in

3    Mr. Lonczak's report?

4        A.    I don't know.  You jump back and forth

5    between asking me about Mr. Lonczak and generally

6    how do I typically deal with benefits questions.

7    They are two different things.

8            If you want to look at the specific

9    report and questions, let's do that.  If you want

10   to talk about my general approach, let's do that.

11   Let's not jump back and forth.

12       Q.    I can ask the questions.  Looking at

13   Mr. Lonczak's report if you want; feel free.

14           I'm just asking whether someone reading

15   that report can ascertain whether Mr. Lonczak did

16   or did not have health insurance at the time he

17   was terminated by the Defendant -- and feel free

18   to look at the report?

19           MR. CAHILLANE:  Objection; you're

20   asking in context of a report which is in

21   evidence.

22           THE WITNESS:  This says -- I'm

23   quoting from my report, "Mr. Lonczak lost all of

24   his benefits upon termination by Top-Flite.  This

1    included health insurance, life insurance,

2    short-term and long-term disability insurance,

3    401(k) contributions, paid vacation, paid time

4    off, sick leave, employee stock purchase plan, and

5    employee discounts for company products.  He was

6    also eligible for bonus payments based on company

7    performance."

8        Q.    (BY MR. PRESSER)  I have read that.  My

9    question then:  Does that mean to you that when

10   you did your calculations it was premised on the

11   idea that Mr. Lonczak had health insurance at the

12   time he left the company or not?

13       A.    He either had coverage or had the

14   opportunity to be covered and he lost that

15   opportunity.

16       Q.    But there's no distinguishing in your

17   mind or in the report whether it was just an

18   opportunity that he could have bought the coverage

19   or he actually had coverage.

20             There's no way to tell from your

21   calculations?

22       A.    There's no way to tell from my report

23   what Mr. Lonczak's situation was in regard to

24   those particular circumstances.

1      Q.   We have the documents being copied so I
2  won't ask you any more questions about Mr. Lonczak
3  specifically.
4           Is it fair to say then -- and correct
5  me, I'm just using Mr. Lonczak as an example now
6  but going to the general -- that you in terms of
7  calculating damages for health care, for
8  example -- the health care component -- to you the
9  damages are the same whether someone has exercised
10  the opportunity to buy health care coverage or
11  someone who has opted out of the health care
12  coverage at the time of the termination?
13      A.   Yes; it's part of the compensation
14  package.
15      Q.   Does it make a difference to you
16  generally -- we're talking generally -- whether or
17  not someone has actually gone out and replaced
18  health care coverage or some other benefit?
19      A.   It can.  In a particular situation if
20  someone is terminated and they had to go out and
21  by a COBRA policy -- COBRA coverage -- and it's
22  more expensive than the contribution from the
23  employer, then the damages are greater.
24      Q.   Well, with the exception of Mr. Duval --

1   maybe we're better off doing it individually.  Let
2   me ask you:  I couldn't tell from the other
3   reports whether any of those individuals had had
4   actually purchased alternative health care
5   coverage or were covered by their spouse or gone
6   without coverage.

7           Is that a question you would normally
8   ask of a plaintiff when trying to ascertain their
9   damages for health care costs?

10      A.   That is information I would try and
11  ascertain typically in some way.

12      Q.   Is that reflected anywhere in the
13  reports that I'm missing?

14      A.   I don't know.  I would have to go
15  through each report, I'd have to look at it and
16  look at the files and see what is in there.

17          MR. CAHILLANE:  A general objection.
18  I don't mean to tell you how to ask the questions
19  but I do understand now a little bit about what
20  Craig was worried about.  Like the last question
21  really goes to three different reports at once.

22          I don't mind doing all the depositions
23  at once but I do object to a question about three
24  different reports at once.

1          MR. PRESSER:  The question was more

2     general.  I'm trying to see when he does the

3     reports in general whether it would be identified

4     somewhere.

5          Q.   (BY MR. PRESSER)  I didn't see it.  I'm

6     asking whether you put that into a report?

7          A.   I don't necessarily identify those

8     specific facts; no.

9          What I will do, much as I did in these

10    reports, these are the reports -- these are the

11    benefits that were available to these employees

12    before they were terminated.  In the cases where I

13    know specifically what their value was, I have a

14    statement from their employer regarding them, I'll

15    use that.

16          If I don't -- in the case of

17    Mr. Lonczak, what I believe -- I'm not sure; I'd

18    have to go back and look at the file -- what I

19    believe I did, I took a look at the statements

20    that other plaintiffs were using and that was a

21    guide to what the employer was paying for those

22    benefits.

23          Q.   I understand and that's one issue is

24    what does the employer pay for these benefits and

```
 1    we'll talk about that individually.
 2              My question isn't as to whether an
 3    employee pays; it goes beyond that.  I think I
 4    asked you -- I did ask you and I think you said
 5    you tried to get information about whether the
 6    Plaintiff has replaced those benefits?
 7         A.    I typically do; yes.
 8         Q.    And typically, would that appear in a
 9    report if they did or did not?  Would you normally
10    put that into a report?
11         A.    Sometimes I would; sometimes I wouldn't.
12    It just depends on the focus -- how important that
13    aspect of the case is and how detailed my report
14    needs to be.
15         Q.    Let me ask:  Why do you ask the person
16    if they actually have alternative coverage or have
17    spousal coverage?
18         A.    Because -- let me answer your question
19    by starting with this:  I view salaries and
20    earnings of all types as part of a compensation
21    package an employee gets from an employer.
22              I also view all of the benefits or
23    potential benefits or programs that that employee
24    receives or could receive as part of the
```

1    compensation package.  If you take any of those

2    away, the compensation package is worth less to

3    the employee.

4         Now, let me continue.  If in addition to

5    those earnings and benefits -- in addition to that

6    compensation package -- if it is taken away

7    completely and as a result of that, that employee

8    having been terminated has to incur extra costs

9    over and above what their cost to receive that --

10   those benefits and compensation package were, then

11   those are additional damages.

12        In cases where they are significant I

13   would typically include them.  If they're not very

14   significant -- if we're dealing with a case with

15   where the numbers are very great and for a couple

16   of months there was some extra premiums for COBRA

17   coverage -- I might not include them because in

18   the greater scheme of things they're really not

19   significant, so it just depends on the situation.

20        Q.   Let me just represent to you that some

21   courts have said that what is important is not

22   what the company pays but what the employee pays

23   to replace them.

24        Are you aware as an expert of any of

1    those court decisions?

2         A.    I'm not a lawyer.

3         Q.    I understand.

4         A.    And I don't follow the Court decisions

5    but as an economist -- that's what I am -- I look

6    at it from the standpoint of lost opportunity cost

7    and damages.

8         Q.    My question is:  Are you aware that

9    there were some court cases?

10        A.    I have been in cases in other

11   jurisdictions where that's been the case.

12             When I was dealing with all the wrongful

13   death cases I did for the 9/11 Commission there

14   was specific formulas that had to do with the way

15   benefits had to be handled and in those cases they

16   specifically had to have documented evidence of

17   replacement of benefits and other things as well.

18             That was a very special set of

19   circumstances governed by federal statute.  It was

20   a formula I followed because it was laid out by

21   statute and the special magistrate said this is

22   the way you have to do it.

23        Q.    When you do any of these reports or

24   reports in general, is there a way to ascertain

1    from your reports what the replacement costs were?

2        A.    You're asking me in general?

3        Q.    Yes.

4        A.    In general there are cases where I've

5    done that.

6        Q.    Other than the 9/11 cases, when have you

7    done that?

8        A.    I've done that in other cases that I can

9    recall that involved -- primarily wrongful death

10   cases and primarily in other jurisdictions.

11       Q.    How do you decide, when you're doing a

12   report, whether to utilize the cost replacement

13   methodology or not?

14       A.    I usually ask counsel.

15       Q.    Did you do that in these cases?

16       A.    Not that I recall.

17       Q.    So in this instance or these four

18   instances, you made the determination yourself as

19   to what methodology to use?

20       A.    Yes; what I did was I tried to evaluate

21   what the lost compensation was to these employees.

22       Q.    I understand, sir.  There are different

23   methods -- you've indicated that you used

24   different methods depending on the type of cases

1    and jurisdictions and so forth.

2        A.    Sure.

3        Q.    I'm asking whether you determined on

4    your own the methodology that you used in these

5    four cases?

6        A.    Yes.

7        Q.    Did you receive any guidance from

8    counsel?

9        A.    Regarding that issue?

10       Q.    Regarding any issue related to damages?

11       A.    Not that I recall and I've never had

12   that issue come up or had any counsel in any other

13   case tell me differently.

14       Q.    We'll come back to specifics but -- I

15   know I keep going off on tangents.  I probably

16   should let you finish reading Exhibit 5 and I'll

17   try to keep my questions to a minimum or

18   non-existent until you finish the presentation of

19   the document.

20            I think you were on page two.  You read

21   "liquidated some assets."

22            Do you know what that means or have a

23   recollection on that -- "liquidated some assets"?

24       A.    I don't specifically recall, sitting

1    here.  I know that he talked about selling his

2    home.

3        Q.   Why don't you continue.  Is there

4    anything else that Mr. Lonczak told you on that

5    day that you recorded?

6        A.   Again, I'm not positive as we go down

7    this page further that all of these things were

8    from Mr. Lonczak.  I believe they generally were.

9        Q.   I thought that's what you said.

10       A.   Someone else might have chimed in and

11   said -- the last item here -- "Callaway stock

12   purchase, see contract, merchandise fifty percent

13   discount."

14       Q.   You don't know the source?

15       A.   Probably he mentioned these as I was

16   talking specifically to him.  That doesn't mean

17   someone else didn't chime in and bring something

18   else up.

19            Again, this was an initial meeting to

20   get acquainted with these people.

21       Q.   I don't mean to cut you off.  If I cut

22   you off at any time, it's inadvertent, raise your

23   hand and I'll let you finish.

24       A.   Go ahead.

```
 1        Q.   That was the only time that you actually
 2   met with these individuals?
 3        A.   That I recall.
 4        Q.   Why don't we turn to page three.  It
 5   says "Mike B" which I assume is Michael Behaylo?
 6        A.   Mmm-hmm.  It says "6/99 DOH" -- date of
 7   hire -- "senior cost accountant, work on SAP,
 8   10/02, accounting on copy store, golf ball
 9   costing, replaced with" --
10        Q.   (Interposing) Would that be "company
11   store" by any chance?
12        A.   Yes; company store.
13        Q.   I know we had a company store at one
14   point; we didn't have a copy store.
15        A.   "Replaced with two younger accountants,"
16   something "bonus plus service for them."
17        Q.   Is that word "severance"?
18        A.   Severance for them; yes.  "Date of
19   birth, 4/20/56.  Date of termination, 4/15/04.
20   Real estate Coldwell Banker, approximately
21   July, '04, no benefits, health from spouse."
22        Q.   What does that mean?
23        A.   It means that he was now getting health
24   coverage from his spouse.
```

1    Q.   In Mr. Behaylo's case you were informed

2    that he was covered by his spouse's plan?

3    A.   Yes; then it says below that, "Health,

4    forty-five days to join COBRA."  Then it went on

5    for eighteen months, "will get commissions to

6    date.  Cost of real estate license, joining

7    boards, et cetera."

8    Q.   I promised to try to keep quiet so I

9    will do so.

10    A.   If you want to jump in, you can.  The

11    next page says on the top "John."

12    Q.   I assume that means John Bettencourt?

13    A.   Yes; John Bettencourt.  "Date of birth,

14    1/26/55, date of termination, 4/15/04.  Date of

15    hire, thirty years, 1973.  Real estate, dash,

16    Ideal Real Estate in Ludlow, no benefits,

17    commission, will get 2007" -- meaning he will get

18    commission information for 2007.  That's all it

19    says for Mr. Bettencourt.

20    Q.   The last page?

21    A.   My own personal notes from business

22    publications.  They say "Russell Corp. purchased

23    Spalding. "

24    Q.   Oddly enough, I can read that page and

 1      that's what you said you got from the Internet,

 2      anyway?

 3          A.    Yes; it wasn't during the meeting.  It

 4      was notes I was taking.

 5          Q.    Let the record show there is another

 6      page that is actually readable and you won't have

 7      to read that into the record.

 8          A.    Okay.

 9          Q.    Let me ask another general question

10      before we turn to specifics.

11              When you are preparing a report, you're

12      concerned, I take it, with accuracy, to make it as

13      accurate as possible?

14          A.    Sure.

15          Q.    And that in turn is going to be

16      dependent on you getting information from the

17      plaintiffs as accurate as possible or as current

18      as possible?

19          A.    Yes.

20          Q.    Do you insist upon getting that

21      information as a condition to doing an accurate

22      report?

23          A.    I think that's assumed.

24          Q.    Well, for example, I notice in most of

1    these instances you have tax returns that were

2    fairly current through the time you did the report

3    but then if I look at, very quickly, Mr. Duval's,

4    Exhibit 3, it appears that you received tax

5    returns -- the latest tax return record that you

6    had been provided with or that you looked at was

7    2004?

8        A.    Correct.

9        Q.    Presumably he filed in 2005 and 2006.

10   Did you ever receive those documents?

11       A.    If you bring back his folder we can look

12   at it but I don't believe they're in there.

13       Q.    Would you as a general principle then

14   require that they provide those to you before you

15   sign your name to a report as accurate?

16       A.    I don't understand your question.

17       Q.    Well, I think you said the more current

18   the information they provide to you the more

19   accurate your report can be?

20       A.    No, I didn't say that; you said that.

21       Q.    You wouldn't agree with that?

22       A.    I didn't agree or disagree.  I just

23   didn't make that statement.

24       Q.    Do you agree with that?

1      A.    I agree that the more current the

2 information that I can get and prepare the case in

3 general the more accurate it is if in fact the

4 current information bears on the case.

5           There are cases that are historical that

6 go back a period of time where the current

7 information certainly isn't relevant.

8      Q.    Well in general though, would you insist

9 that an employee in an age discrimination case

10 bring you tax records through the time of your

11 preparing the report?

12     A.    Generally, yes.

13     Q.    Mr. Duval, for example, had not

14 presented you tax records for several years?

15     A.    That's correct.

16     Q.    Do you have any recollection or

17 knowledge as to why?

18     A.    Sitting here right now at this moment,

19 no.

20     Q.    Would you in general make an effort to

21 get more updated information prior to making a

22 report than tax information for 2004 for a report

23 being done in December of 2007?

24     A.    Yes.

1    Q.   But you don't have a recollection as to

2    whether you did in this case?

3    A.   Oh, I'm sure that I asked for whatever

4    tax records he had available and to make them

5    available to me.  I always do; sure.

6    Q.   Let's begin specifically on the

7    individual reports.  I guess Number 1 is the

8    report from Mr. Behaylo.

9         Before we get to that, a more general

10   question.  You said you use -- you don't generally

11   use replacement costs or you didn't in these cases

12   use replacement costs for health insurance, for

13   example?

14        You didn't try to ascertain that

15   information or use that information?

16             MR. CAHILLANE:  The same objection I

17   had before.  It is really four questions at once.

18   Q.   (BY MR. PRESSER)  If you can't answer it

19   for the four, that's fine.  Let me withdraw that

20   question.

21        Did you use different methodology in the

22   four cases to any extent?

23   A.   I generally used the same methodology.

24   Q.   Did you use the same methodology

1    vis-a-vis fringe benefits?

2        A.    Generally; not specifically, no.  I had

3    different information on different cases.

4        Q.    Well, the different information would

5    affect numbers, I take it, but would it affect the

6    methodology?

7        A.    Sure.

8        Q.    How so?

9        A.    Because if you have one set of

10   information you can use one particular method to

11   evaluate and if you have a different set, you can

12   use a different methodology or you may be forced

13   to.

14       Q.    Is there a methodology that you believe

15   is more accurate than the other?

16       A.    In general, speaking generally, not to

17   any of these cases, okay?  If I'm evaluating

18   employee benefits the first thing that I try and

19   ascertain is whether or not the employer regularly

20   provides an employee benefit statement to each

21   employee that lays out each benefit and lays out

22   what the employee and the employer's contributions

23   are for those benefits.

24            That is typically not available.  In

1   some cases it is; in some cases it is not.  It

2   typically is not.  Most companies unless they were

3   very large companies don't do that.  It is

4   expensive and they don't bother with it.  Very

5   large employers, larger corporations tend to.

6   Smaller companies, medium-sized companies tend not

7   to but I always ask to see if that's available.

8           If it is not available then what I ask

9   is can you please indicate for me the specific

10  benefits that you were offered by your employer.

11  They go down and from their memory give me that

12  list.  I then suggest other benefits to them and

13  say well, in addition to that, did you get a

14  uniform allowance or did you get any kind of an

15  expense account and so on and so forth, depending

16  on the case to see if I can ascertain all the

17  things that were covered.

18          Then what I will do is I will go to the

19  U.S. Department of Labor and look at the breakdown

20  of benefits that are evaluated by a couple of

21  different sources and places, by employer cost and

22  by value as a fraction of total compensation in

23  different ways.

24          Sometimes, depending on how accurate the

1    information is and what kind of benefits they are,

2    I can put a dollar price on them.  Sometimes I

3    have to estimate that by using a ratio based on

4    DOL data.  It just depends on the particular

5    situation but there is more than one way to

6    evaluate employee benefits.

7         Q.    I'm just trying to, again, get to what

8    you are evaluating.  Whether you do it based on

9    the employee's statement or generalized

10   information from the Department of Labor, in both

11   of those cases what you are dealing with is the

12   benefits costs to the employer?

13        A.    That's correct.

14        Q.    Do you then -- when I'm talking about

15   methodology or difference in methodology as you

16   generally use it, do you always try to assess in

17   your evaluation of fringe benefits the cost to the

18   employer?  Is that the common methodology?

19        A.    I try and ascertain that or estimate

20   that if I can because I view that as cost to the

21   employer along about salaries and earnings as the

22   value of the compensation package.

23              It's what it costs -- it's what that

24   employer really pays to employ that individual in

1  their company; and having been an employer, I know

2  what that costs so I know it's a very real cost to

3  me.

4      Q.   Again, I don't want to argue but

5  wouldn't it be even more important, if you're

6  trying to assess the employer's costs, to find out

7  specifically what benefits a particularly employee

8  did or did not have at the time of their

9  termination?

10     A.   Unless they had the opportunity to take

11 advantage of a benefit that they didn't, because

12 that opportunity has value and it is part of the

13 compensation package and it's part of the offer

14 that the employer makes to the employee and to

15 entice them to go to work for them.

16     Q.   So in some cases when you're statutorily

17 required like 9/11, you might actually do

18 replacement costs?

19     A.   That was a very individualized

20 situation.

21     Q.   Alternatively you may use the actual

22 cost to the employer of the benefits as revealed

23 by that employer in a cost benefit sheet or if

24 necessary just a listing of the benefits and the

1   Department of Labor's estimate about what

2   employers pay for such costs?

3       A.    Yes.  If an employee in a specific case

4   has the opportunity to get that benefit but never

5   has, you still put that in -- even though it is

6   not costing the employer anything -- as a loss to

7   the employee especially if I'm looking at forward

8   pay because at some point in the future they could

9   take advantage of that or if, for example, in the

10  example we discussed earlier, if their spouse lost

11  their job and they needed that, that would be

12  something that they could take advantage of?

13      Q.    But just so I'm clear, on the way your

14  methodology -- and we'll stick to health care --

15  you may have a situation where the employee has

16  not purchased replacement cost and the employer

17  actually was not paying a dime for the employee's

18  health insurance when he was terminated because

19  the employee had not chosen health care cost, you

20  will still put in a value as a lost benefit for

21  those health care benefits?

22      A.    Probably, especially in Massachusetts

23  under the current health insurance dictate where,

24  if you're not current, you have to pay a penalty.

1      Q.    I'll modify my question.  If you're not

2    paid by the spouse?

3      A.    I would include anything offered to the

4    employee as a benefit as a condition of their

5    offer for employment.

6          It's a compensation package and that's

7    what they're agreeing to when you go to work for

8    that employer.

9      Q.    Do you use that same methodology in any

10   type of wrongful discharge case, whether it's

11   breach of contract --

12     A.    (Interposing) For damages?

13     Q.    Yes.

14     A.    In general, yes.

15     Q.    And that's the opportunity cost concept?

16     A.    Absolutely; yes.  That's the concept in

17   economics that damages comes from.  It's the value

18   of lost opportunity.

19     Q.    Let's turn if we could to Exhibit

20   Number 1.  You list eleven items that you looked

21   at in making your damages assessment.

22          Did you look at any point at anything

23   other than that or your notes reflected in

24   Exhibit 5?

```
 1            A.   No; I think those -- these are the
 2       things I relied on, these eleven things.
 3                 MR. PRESSER:  This we'll call
 4       Exhibit 6, this comes from your notes -- your
 5       documents relating to Mr. Behaylo.
 6            Q.   (BY MR. PRESSER)  It's not technically
 7       marked yet but can you look at Exhibit 6 and
 8       identify what that document is? (Indicating.)
 9            A.   It is information from -- sent from the
10       Human Resource Department at the Top-Flite company
11       that contains a personalized benefits statement
12       for 2003, the 2002 SERA pension statement, and
13       their employee confidentiality statement.
14                 It's dated 5/20/2003 and it's prepared
15       for -- it says prepared for Michael Behaylo.
16            Q.   Is that the item number nine on
17       Exhibit 1, where you say employee benefit
18       statement is Exhibit 6?
19            A.   Yes.
20            Q.   For what purposes did you use Exhibit
21       Number 6?
22            A.   I used it to estimate what the value of
23       his lost employee benefits were based on that 2003
24       statement.
```

1          Q.   You utilized Exhibit 6 to do your

2    calculations about the value of the fringe

3    benefits lost by Mr. Behaylo?

4          A.   Best estimate; yes.

5          Q.   Did you use this statement, if you

6    recall, Exhibit 6, for any of the other

7    plaintiffs, because you said some of them did not

8    have them and you used others.

9               I'm asking whether Exhibit 6 if you

10   recall was used, for example, for Mr. Lonczak or

11   the other individuals?

12         A.   I may have consulted it in looking at

13   some of the other individuals.

14         Q.   How did you obtain Exhibit Number 6?

15         A.   From Mr. Behaylo.

16         Q.   Do you recall having any conversations

17   with Mr. Behaylo at the time?

18         A.   I don't recall that.  I believe that --

19   I recall and it says in my notes here back at

20   Exhibit 5 that at that time I became aware -- on

21   page two it says "benefit sheets, get those."

22              I asked people in the room at that time

23   if they had any of those, to please give them to

24   me or send them to me and this is the one that he

CRAIG L. MOORE, PH.D.
JANUARY 24, 2008

1  sent me.

2      Q.    I understand.  You used that in his

3  case?

4      A.    Yes; I did.

5      Q.    But what I'm asking you is you said some

6  of the others did not have them or couldn't get

7  them to you?

8      A.    Yes; again -- yes.

9      Q.    Did you use the information from

10 Exhibit 6 in preparing your calculations for any

11 of the other three?

12     A.    Well, I had one from Mr. Bettencourt so

13 I assume that I used Mr. Bettencourt's statement

14 in doing his and in fact in Mr. Bettencourt's case

15 I included a table -- table two in the report --

16 that shows what the annual costs was to replace

17 those benefits.

18     Q.    I understand but my question is

19 whether --

20     A.    (Interposing) I'm just trying to answer

21 it so give me a chance.

22     Q.    Sure.

23     A.    In the case of Mr. Duval -- in

24 Mr. Duval's case it says that I did have a benefit

1    statement and that I used that same ratio but only

2    for the three months he was unemployed after which

3    time I assumed that they had been replaced so

4    Mr. Duval's report obviously didn't rely on

5    Mr. Behaylo's statement which I believe only

6    leaves us Mr. Lonczak's.

7              As we've said earlier, I don't believe

8    that I received a statement from Top-Flite

9    regarding the value of Mr. Lonczak's benefits.

10        Q.    I guess my question is --

11        A.    (Interposing) I'm still answering your

12   question.

13        Q.    Go ahead.

14        A.    I believe what I did -- though I'd have

15   to take a calculator and check it -- I believe

16   what I did was I used the same ratio of benefits

17   to earnings in Mr. Lonczak's case for benefits as

18   were reflected in the 2003 statement of

19   Mr. Behaylo's.

20        Q.    The 2003 statement being Exhibit

21   Number 6, this document?

22        A.    Exhibit Number 6.  I'm not a hundred

23   percent positive of that only because I may very

24   well have had another one of these statements for

1    someone else and I may have compared them to see

2    if they were approximately the same or I might

3    have used one or the other.

4            I think I probably used the figures in

5    Exhibit Number 6 but I'm not one hundred percent

6    sure.

7        Q.    Let me just make sure how you used the

8    figures in Number 6 for a moment.  Why don't we

9    take 6 and 1 and thumb back and forth a little.

10           The first column shows lost benefits in

11   2004 for Mr. Behaylo in the amount of ninety-five

12   forty-seven, is that correct?

13       A.    Yes.

14       Q.    That's what you allege there he lost in

15   2004 in benefits?

16       A.    That's correct.

17       Q.    And that was based on the value of

18   benefits reflected in Exhibit 6?

19       A.    Yes.

20       Q.    Let me ask you some preliminary

21   questions.

22           How did you get from Exhibit 6 to the

23   number nine five four seven?

24       A.    Very carefully.

1    Q.    We'll see.

2    A.    I don't have my computer, my

3    spreadsheets, so I can't look at the formulas but

4    I assume, based on what my normal procedure is and

5    what I think happened here is that for all of the

6    years proceeding from the time of the termination

7    up until the present both the earnings and the

8    corresponding value of benefits are increased by

9    the Consumer Price Index to put them in constant

10   dollars -- real dollars -- so they all have a

11   value in the same base year which is the year I'm

12   doing the report, not the 2007.

13        Starting in 2007 on you'll notice that

14   the numbers stay constant; they don't change any

15   more.  That's because they are all indexed to

16   2007.

17    Q.    I'm not sure what that means so I'm

18   going to have to explore it.

19    A.    Okay.

20    Q.    When you say lost benefits, in this

21   column on table two that doesn't reflect your

22   assessment of what Mr. Behaylo spent to replace

23   those benefits or even the cost of benefits to the

24   employer in that year they had avoided paying

```
 1    Mr. Behaylo?
 2                    MR. CAHILLANE:  Objection.
 3                    THE WITNESS:  Why do you say that?
 4    I don't know how to answer that.  It is what it
 5    is.
 6         Q.   (BY MR. PRESSER)  But I don't understand
 7    what it is.
 8         A.   So ask me some questions.
 9         Q.   How do you get to the nine five four
10    seven.  You say you don't have the spreadsheets;
11    explain it.
12         A.   I started with the prior earnings in
13    2004.
14         Q.   Earnings?
15         A.   Prior earnings, 2004, which is
16    forty-eight thousand nine fifty-seven.
17         Q.   Okay.
18         A.   The lost benefits is a percentage of
19    that based on the benefit statement.
20         Q.   You took the earnings, the wages that he
21    lost in that year, forty-eight thousand dollars?
22         A.   Yes.
23         Q.   And then you applied a percentage based
24    on Exhibit 6?
```

1        A.    That's correct.

2        Q.    Do you know what that percentage is?    Is

3    that written somewhere?

4        A.    That's what I said -- if I had my

5    spreadsheet on the computer I could tell you.

6        Q.    But what were the factors in Exhibit 6

7    that you considered into the equation?

8            Does everything listed here as a wage or

9    benefit description get counted?

10       A.    No; because I do not count certain

11   things as benefits that other people do.

12       Q.    Tell me what was not counted?

13       A.    Let's see, employer FICA match.  I don't

14   include any contributions to Social Security

15   whatsoever; it is not a benefit, it's a tax.

16   Federal unemployment is an insurance premium, it's

17   not a benefit.  Unemployment, not a benefit;

18   worker's comp, it's an insurance program, it's a

19   premium.

20           All of those things I never take in any

21   case.  I take them right off the top.

22       Q.    They're taxes?

23       A.    Or insurance premiums and there's no way

24   to directly link the amount paid to benefit

1    received.  It's not a benefit and by a matter of

2    law they're dictated; they are not offered.

3         Then what I did was I took the company

4    costs for the remaining benefits for the things

5    other than the ones I netted out and I took those

6    as a percentage of his salary.  No, in fact I

7    didn't because those figures -- I can do this in

8    my head.

9         Those figures wouldn't be the same.  The

10   figure that's used for -- the number that's used

11   for lost benefits in this column is too high.  It

12   should be adjusted.

13        Q.   Based on what?

14        A.   Based on netting out those things that I

15   just mentioned.

16        Q.   Does that figure then include those

17   things you mentioned?

18        A.   It appears to.  It is not the exact

19   number but the number that's there is too high.

20        Q.   So the number that's there is too high.

21   Can you ascertain what it should have been if I

22   gave you a calculator?

23        A.   Give me a calculator and I'll tell you.

24             MR. PRESSER:  Why don't we take a

1    short break.

2                    (A recess was taken.)

3                    MR. PRESSER:  Why don't we mark this

4    as Exhibit 6.

5                    (Defendant's Deposition Exhibit
                     No. 6 offered and marked.)
6

7        Q.    (BY MR. PRESSER)  I guess we're back on

8    the record and Doctor Moore, I think you said that

9    in your report regarding Mr. Behaylo, Exhibit

10   Number 1, you now concluded that at least the

11   first number of 2004 under the column lost

12   benefits is incorrect?

13       A.    Well, having taken a break and used the

14   calculator and looked at it what I can say about

15   it is that I don't know how it was calculated, if

16   there is some other information that I relied on

17   or something else that I put in the formula that I

18   can't tell by looking at the table.

19            There is no way for me to know that

20   unless I go back and look at the spreadsheet.

21   It's an embedded file.

22       Q.    Isn't the report, under the federal

23   rules, supposed to explain how you did the

24   calculation so I can verify the accuracy?

1      A.    That's true and how I've explained it

2    here is that I've taken a particular ratio based

3    on Exhibit 6 to come up with these numbers.  That

4    explains how I did it.

5           The question I believe is whether or not

6    the ratio that I used to calculate it, the 19.5

7    percent, is an accurate reflection of the benefit

8    statement that I based it on for Mr. Behaylo.

9      Q.    Let me ask you a different question --

10   let me ask a follow-up.

11          If you continue down the column lost

12   benefits for subsequent years?

13     A.    Yes.

14     Q.    They too are a reflection or built upon

15   the calculations for lost benefits in 2004, is it

16   not?

17     A.    They use the same ratio, 19.5 percent.

18     Q.    So if that lost benefits is wrong, every

19   year's calculations is wrong?

20     A.    Yes.  For example, if instead of being

21   nineteen and a half percent it is instead fifteen

22   percent, then all of those numbers are going to be

23   slightly lower.

24     Q.    Let me ask it a different way.  If you

1    look at Exhibit Number 6, I think it reflects the

2    total benefit cost as being $9,561.98?

3         A.    $9561.98.

4         Q.    Right.  But you have already indicated

5    that the first four items should not be put into

6    that calculation, ninety-five hundred sixty-one

7    dollars as benefits because they are really taxes?

8         A.    Yes.

9         Q.    So that alone would bring it down to

10   what?  Fifty-five hundred or something?  Feel free

11   to use the calculator.

12        A.    It would bring it down to $5669.77.

13        Q.    That's not an insignificant difference

14   on the total ninety-five forty-seven, is it?

15        A.    Well, we're not done.

16        Q.    Well, we've just figured out one year so

17   far?

18        A.    That's right but we're still not done.

19        Q.    All right.

20        A.    Because what I then am not clear about

21   is what I did with the bonus as a benefit.

22        Q.    You don't know whether you included a

23   bonus or not?

24        A.    That's why I said I would have to get

1  back to the computer and find out how I calculated

2  this.

3      Q.    Would you have information about the

4  reasons he received any bonus that year or the

5  circumstances that he may or may not have received

6  a bonus in subsequent years?

7      A.    I don't recall.  There's a section about

8  the bonuses -- I don't recall the information

9  about the bonus sitting here right now.

10     Q.    So you don't know whether --

11     A.    (Interposing) So I don't know whether I

12 included it or I didn't or what I did with it.

13     Q.    And without information would it be fair

14 to say for not knowing the reason for the bonus,

15 you don't know whether it should or should not be

16 included as a benefit?

17     A.    I'm saying as I sit here right now I

18 don't recall.

19     Q.    Would you have to know the reason for

20 receiving the bonus in 2003 to know whether it

21 should be something that is carried as a fringe

22 benefit every year?

23     A.    I would have to know more about the

24 bonus.

1    Q.   If in fact you don't have information

2  about the bonus, it probably should not be carried

3  as a continuing benefit?

4    A.   I agree with that.  I don't know if I

5  have information in my file on that.

6    Q.   Even with the bonus, it doesn't come out

7  to ninety-five sixty-one?

8    A.   No; it doesn't.

9    Q.   Let's for the moment leave aside the

10  bonus and the numbers fifty-six seven-nine?

11    A.   $5669.77.

12    Q.   Okay.

13    A.   It is what it is.

14    Q.   You're aware -- and that would be the

15  benefits for the entire year?

16    A.   That's correct.

17    Q.   Are you aware that he was employed and

18  receiving full benefits through the end of April?

19    A.   April; that's correct.

20    Q.   Wouldn't that then, even using those

21  numbers, really mean that he would only be

22  entitled for that year at least to the benefits

23  for a fraction of the year?

24    A.   For that year it should be less than the

1    whole year.  Some of it should be mitigated;

2    that's correct.

3        Q.    Was it mitigated in table one?

4        A.    Table one?

5        Q.    Table one --

6        A.    (Interposing) Table two.

7        Q.    Table two; excuse me, you're right.

8        A.    Again it doesn't appear that it was but

9    I don't have those computations in front of me.

10            The earnings for the remainder of that

11   year were mitigated.  It appears that they were

12   not.

13       Q.    Going back to Exhibit Number 1, the

14   front page, you discussed the background.

15            Do you normally include background in

16   your reports?

17       A.    Virtually always.

18       Q.    Why do you do that?

19       A.    I just do it as a matter of practice.

20   No particular reason.

21       Q.    Is it relevant in some way to the

22   calculation?

23       A.    It's just to let the reader have some

24   idea of what it's about.

 1         Q.    Are you careful preparing the narratives
 2    as well as the tables?
 3         A.    I try to be.
 4         Q.    Let me ask you, if you direct your
 5    attention to the bottom of page one, it says,
 6    "Mr. Behaylo was terminated on April 15th, 2004 by
 7    Top-Flite prior to the company being sold to
 8    Callaway Golf Company."  What is the source of
 9    that statement?
10         A.    I don't recall.
11         Q.    On your footnote that you added to the
12    report, you say, "In September of 2004 the
13    Callaway Golf Corporation purchased Top-Flite out
14    of Chapter 11 bankruptcy"?
15         A.    Yes.
16         Q.    The source of that information?
17         A.    It's public knowledge.
18         Q.    Do you recall where you got that
19    information to put into your report?
20         A.    From public business publications.
21         Q.    Were you careful in assessing that
22    information or in gleaning that information?
23         A.    I believe I was.  I try to be.
24         Q.    In your basis for economic damages you

1    have a discussion there about emotional stress and

2    considerable stress and anxiety.  Why is that

3    included in your report?

4              MR. CAHILLANE:  I'm sorry, where are

5    you referring to?

6              MR. PRESSER:  Basis for economic

7    damages.

8              THE WITNESS:  Because I'm pointing

9    out to the reader that this report doesn't cover

10   the quantification of emotional stress or anything

11   outside of economic damages.

12        I'm saying this can't be assessed in an

13   accounting sense.

14        Q.   (BY MR. PRESSER)  Did you happen to

15   include the phrase "his termination caused

16   considerable stress and anxiety" to show that your

17   report does not reflect a calculation for

18   emotional distress?

19        A.   Could you repeat that, please?

20        Q.   You said you're trying to clarify that

21   the report doesn't assess or put a dollar figure

22   on the emotional stress?

23        A.   That's right; that is up to a jury.

24        Q.   And you indicate that this report

1    doesn't cover that.

2           I'm asking why you specifically put in,

3    "He tells me that he suffered emotional distress."

4    Why is that included in your expert damage report?

5       A.   Just as no particular reason.  To me

6    it's a way to let the reader know it's not going

7    to cover emotional damages or anything that can't

8    be accounted for in an accounting sense.

9       Q.   I think we've -- can you explain in

10   layman's terms as best you can the distinguishing

11   characteristics of opportunity cost compared to a

12   straightforward back pay?  Let's leave aside front

13   pay, for example.

14          Let's say an individual has now gotten a

15   job that pays better and higher benefits so

16   there's no front pay.  Would there be a different

17   methodology or calculation used to determine what

18   the individual's damages calculated by opportunity

19   costs were as opposed to back wages or lost wages

20   and benefits?  Is there a distinction between

21   those two?

22      A.   No.

23      Q.   So would it be fair to say then in terms

24   of opportunity costs backwards, all you needed to

1    do was calculate how much the person would have

2    been paid compared to what he has been paid?

3         A.    That's correct.

4         Q.    So if we look at table two for a moment

5    on this report just for example, there's no

6    separation in the charts themselves between front

7    and back pay, looking at the chart, itself?

8         A.    Well, there is actually.

9               MR. CAHILLANE:    Objection.

10        Q.    (BY MR. PRESSER)  Looking at the chart?

11        A.    Well, if you understand how the numbers

12   work in the chart, sure.

13        Q.    All right.

14        A.    Obviously when you look at the chart it

15   includes past periods and forward periods.

16              You'll notice that the net loss and the

17   present value are equal up through actually

18   November -- well, I think through the eleventh

19   month of 2007 and then from there -- you'll notice

20   starting in 2007 the present value is different

21   than the net loss because it's being discounted

22   because in every period it's being discounted it's

23   the future.  If it's not being discounted, it's

24   the past.

1    Q.    Would it be fair to say that in terms of

2    calculating the back pay period -- back pay, not

3    the future -- if I wanted to look, for example, at

4    Mr. Behaylo's back pay for the years 2004, 2005 I

5    could just calculate your net loss figures at

6    least once they're adjusted correctly for lost

7    benefits -- so for back pay issues?

8    A.    They're not reduced by present value.

9    Q.    Is that the only difference between --

10   A.    (Interposing) No; the other difference

11   is what I have done is I've increased what he was

12   earning when he was terminated over those years by

13   the Consumer Price Index to in effect give him an

14   anticipated raise for the cost of living so he's

15   not losing any purchasing power.  He's still

16   earning what he was earning.

17   Q.    You do that in all cases -- all four of

18   these cases?

19   A.    Yes; I believe I did.

20   Q.    I'm only asking as a general question to

21   save some time.

22   A.    I believe so.  It's certainly true in

23   Mr. Lonczak's case.  It is certainly true in

24   Mr. Bettencourt's case.  The same in Mr. Duval's

1    case.

2        Q.    So the back pay component has an

3    adjustment for cost of living increases to keep

4    pace?

5        A.    Yes.

6        Q.    According to your numbers, if we assume

7    for a moment that the lost benefits were

8    correct -- even though they're not in this case --

9    if I were trying to say what in back pay did

10   Mr. Behaylo lose in the years 2004, 2005, I could

11   just add together those two numbers on the far

12   right present value and get a number for back pay

13   for those two years?

14       A.    Yes.

15       Q.    Thank you; just making sure I

16   understand.

17       A.    Let me say one more thing about that:

18   You would also have to include part of 2007.

19       Q.    Well, my question says for those two

20   years; I understand.

21       A.    The present value calculations are

22   actually done on a monthly basis, not on an annual

23   basis.  As long as you understand.

24       Q.    Thank you.  When you do your

1    calculations in general, do you factor in a

2    particular plaintiff's employment record in terms

3    of whether the employee has frequently -- has a

4    history of frequently changing jobs?

5        A.    You mean in the calculation?

6        Q.    Yes.

7        A.    Do I use a number for that?

8        Q.    Well, do you factor it in at all?

9        A.    If I do it would only be a matter of

10   judgment in terms of what other assumptions I made

11   in terms of the damages that would be reflected in

12   some way in the calculations, but there's not a

13   specific number you would use to reflect that.

14       Q.    I've seen some reports in projecting how

15   long out somebody would get front pay that would

16   take into account the fact that this particular

17   plaintiff has changed jobs every five years

18   regularly.

19            My question is whether you use that as a

20   factor in doing your calculations?

21       A.    There are times when I have reduced

22   either the time horizon or the probability of

23   employment under special circumstances but not

24   very often and I'd say rarely but there have been

1    cases where that's true.

2         Q.   What justified it to you in those

3    circumstances?

4         A.   Someone had terminal cancer and a lower

5    life expectancy.

6         Q.   Did the employee -- did the plaintiff's

7    past employment record ever factor into it?

8         A.   I think, yes, if -- in some cases I've

9    done it where it was a particular occupation.

10   It's changed because in that particular occupation

11   there is a different actuarial occurrence, not

12   based on how often they held their job but -- let

13   me give you an example.

14              I believe sometime back, a number of

15   years ago I did a case that involved a man who was

16   severely injured who was a bridge worker who did

17   outside bridge construction.  He specialized in

18   some particular task building bridges.  He lived

19   here in New England.  That work couldn't be done

20   regularly during every part of every year so I

21   assumed in my calculations that he didn't work

22   full time in every year but reduced it based on

23   what his record had been in terms of when he

24   received unemployment compensation, how many

1    months he typically worked or didn't which could

2    vary by the weather and so I did make an

3    adjustment to that.

4           There are circumstances where, yes, you

5    try and be reasonable in terms of if you have

6    something specific that changes your assumptions.

7        Q.    Well, have you ever made adjustments in

8    terms of projections either back pay or front pay

9    when you found out that the employer being sued

10   had shut down the facility where the plaintiff had

11   worked?

12       A.    Not that I recall.

13       Q.    Do you think that that would ever be

14   justified in terms of a calculation?

15       A.    "Ever" is -- I suppose you could come up

16   with a hypothetical that would justify it but in

17   general I'd say no.

18       Q.    So that even if the evidence was that

19   there was no operations in Chicopee whatsoever,

20   you would have projected out Mr. Behaylo's

21   earnings or front pay to 2023?

22       A.    Yes; but with the caveat that I'm

23   frequently asked or directed to make computations

24   over a particular time horizon with the

1     understanding that they give people a range or a

2     benchmark within which there's contention.

3              What I'm doing is establishing kind of a

4     worst case scenario or best case scenario,

5     depending on how you look at it, that people can

6     use to evaluate based on what their side of the

7     table thinks as to damages; not uncommon.

8         Q.    Did you use any alternative calculations

9     for Mr. Behaylo or the others, if you recall,

10    other than projecting out through their normal --

11    or age sixty-seven I think in each case?

12        A.    No; I wasn't asked to.

13        Q.    So that you gathered no information or

14    were provided with no information as to whether

15    for example their jobs did or did not remain in

16    Chicopee at any point?

17        A.    The only thing I was asked to consider

18    was the actual real mitigation that they were

19    receiving or likely to receive based on their

20    current employment.

21        Q.    You said the only thing you were asked

22    to consider.  Who asked you to consider that?

23        A.    What I was asked to do was to project

24    what their loss would be under the current

1    circumstances and that's what I did.

2        Q.    When you say current circumstances, that

3    relates to what, though?

4        A.    If they were now employed earning money,

5    that that was the mitigation I would use.  If they

6    were not, then -- I mean you just at some point

7    you either do or don't.

8            Now in one case here you simply don't

9    know if the future, what's going to happen with

10   this man financially or whether he's going to get

11   another job at some point and if it would have to

12   be mitigated or not but if he doesn't, at least

13   you know what the worst case scenario is.

14       Q.    When you said you were asked, who asked

15   you these things?  Who set the parameters?

16       A.    It was -- I don't know if I was

17   specifically asked or not asked.

18            It was my understanding in my

19   conversations that that's what was being looked

20   for and would be helpful and I was being asked to

21   do.

22       Q.    So your reports in no case reflect any

23   impact on changes that may or may not have

24   occurred in Chicopee regarding the jobs that were

```
 1    performed by these individual plaintiffs?
 2         A.    That's correct; that's right.
 3         Q.    That's fine.  On page three of Exhibit
 4    Number 1?
 5                   MR. CAHILLANE:  Is this still
 6    Behaylo?
 7                   MR. PRESSER:  Yes; this is still
 8    Behaylo.
 9                   THE WITNESS:  Page number three?
10         Q.    (BY MR. PRESSER)  Yes; page number
11    three.  Do you have it?
12         A.    I do now.
13         Q.    You wrote, "Mr. Behaylo's annual salary
14    prior to his termination was eighty-one thousand
15    five hundred thirty-five dollars according to
16    company records."  Can you tell me what records
17    those are?
18                   Here is Mr. Behaylo's -- the documents
19    that you brought from Mr. Behaylo and from there
20    we took out Number 6.  (Indicating.)
21         A.    (Witness examining documents.)
22                   MR. CAHILLANE:  In the interest of
23    saving time isn't it obvious that it's just a
24    mistake?  He didn't use that number.
```

1           MR. PRESSER:  He can testify.  He

2    said it's the company records.  It goes to the

3    care that he uses in preparing these reports.

4           MR. CAHILLANE:  I suppose it does

5    but you can point that out.

6           MR. PRESSER:  If he says that,

7    that's fine but you're not testifying.

8           THE WITNESS:  Based on the company

9    records that I have in my file, as Attorney

10   Cahillane points out that's obviously not the

11   right number.  It's a typo.

12       Q.    (BY MR. PRESSER)  A typo?

13       A.    Sure.

14       Q.    And the real number or accurate number

15   is what?

16       A.    The accurate number is the number that I

17   used.

18       Q.    The forty-eight thousand?

19       A.    Forty-eight -- according to one company

20   record it's forty-eight thousand nine fifty-seven.

21   That's this one right here, this document.

22   (Indicating.)

23           I guess that's the company record that

24   I'll point to; yes.

1      Q.    That's the one you used in table two?

2      A.    That's correct.

3      Q.    Let me ask then on table number one,

4    2005, those are interim earnings or actual

5    earnings in each of those years, is that your --

6    what that's supposed to reflect, table number one?

7      A.    Those should be earnings from tax

8    returns.  I have W-2s here which should show me

9    that.

10          The first one for 2002 shows earnings of

11   forty-seven thousand ninety-five which is in the

12   table.  2003 we have several -- we have a couple

13   that have to be added together that I assume

14   equals the forty-eight thousand seven-seventy.

15   For 2004, it's $20,796.23.  That's what it's in

16   the table.

17      Q.    I'm really focusing on 2005.

18      A.    2005, the only thing on his income tax

19   record that shows is unemployment compensation of

20   nine hundred seventy-six dollars.  That's all he

21   received in income.

22      Q.    Well, did you read his deposition that

23   he earned about forty thousand in real estate

24   commissions that year?  You indicated that you

1    read his deposition.

2         A.    My understanding is that he is not an

3    employee but that would have been income from --

4    as a contract worker.

5         Q.    As a real estate agent?

6         A.    Yes.

7         Q.    Would that not count as income?

8         A.    If it was, it should show up in his

9    Schedule C.

10        Q.    On his tax statement for 2005 he has a

11   profit or loss from business showing gross

12   receipts of thirty-seven thousand nine hundred

13   twenty-three dollars?

14        A.    No; not true.  It shows gross receipts

15   of thirty-seven thousand nine hundred

16   twenty-three.

17        Q.    That's what I said, gross receipts.

18        A.    And it says returns and allowances

19   earned -- I'm sorry.  It does say returns and

20   allowances and then it says gross income -- that's

21   what his gross income was.

22             He then has expenses for his business

23   that, when you total those, those are thirty-seven

24   thousand nine hundred twenty-three dollars and his

1    net profit is zero.

2        Q.    So because he was able to write off his

3    gross receipts, because he was a sole proprietor

4    you count it as zero income?

5        A.    That is what he gets taxed on.  That is

6    his income as far as the U.S. government is

7    concerned.

8        Q.    What was his depreciation, car expenses?

9        A.    I'm not measuring his cash flow.  I'm

10   measuring his net earnings.

11       Q.    But that's the profit or loss for the

12   company, correct, not him?

13       A.    He is the company.  It's an individual

14   proprietorship.

15       Q.    What he is paying to himself shows up as

16   a loss -- as an expense to the company, correct?

17       A.    Sure -- say that again?

18       Q.    The business name from this report is

19   NRT New England, Inc.  NRT New England, Inc. made

20   about thirty-eight thousand in gross income?

21       A.    That's correct.

22       Q.    Part of that he paid wages and things of

23   that, benefits?

24       A.    Where are the wages and benefits?

1    Q.    Car and truck expenses, was that for his

2    car and truck?

3    A.    You'd have to ask him, I guess.

4    Q.    Did you make any effort to ascertain

5    whether the business he started paid himself

6    benefits, wages, any income?

7    A.    There is nothing listed on here as wages

8    that were paid on his expense.

9    Q.    Did you make any effort to find out what

10    happened in terms of any wages or benefits to him?

11    What went to him, in other words -- the truck?

12    A.    I looked at his tax return.

13    Q.    Is that his personal truck?  Was it his

14    personal truck that he can now write off because

15    he's a sole proprietor?

16    A.    It doesn't matter to me.  His net income

17    from his business is zero.

18    Q.    Because he is able to write all of this

19    off on his tax return?

20    A.    That's right; sure.  There is no

21    indication on here of any wages he paid to himself

22    or benefits or to any other employees; not at all,

23    other than advertising and his car and truck

24    expense and the depreciation.

```
 1            Q.    What was the depreciation for?

 2            A.    I would have to go look at the schedule.

 3    I don't know.  He lists his business expenses.  He

 4    lists other expenses.

 5            Let's see.  Well, he depreciates the

 6    computer and he depreciates --

 7            Q.    (Interposing) I can look at his tax

 8    return.

 9            You are saying because he's allowed as a

10    sole proprietor to write off things and net out

11    his thirty-nine thousand in commissions, you

12    treated it as if he made no money during that

13    year?

14            A.    I'm saying that his income based on what

15    he lists as his expenses and revenues, that his

16    net profit from running this business is zero.

17    That's what I'm saying.

18            It is what it is and there's no wages or

19    benefits deducted as a business expense to him.

20            Q.    Do you then use the zero in your future

21    calculations on table two, the fact that you have

22    him as having no earnings?

23            A.    On table two I have --

24            Q.    (Interposing) Your table two says
```

1    mitigated earnings of nineteen thousand nine

2    hundred fifty-six, correct?

3         A.    It does.

4         Q.    Where does that number come from?

5         A.    I don't know because the next number it

6    shows comes right off of his 2006 tax return so I

7    don't know why that number is what it is or where

8    it came from.  I'll have to find out.

9         Q.    Where are the 2006 tax returns?  Should

10   I look for his 2006 mitigated earnings, which

11   column are you using?

12        A.    2006, his return says that his

13   Schedule C income, his earnings were twenty-eight

14   thousand nine hundred seventy-seven.

15        Q.    And his gross receipts that year for

16   sales were fifty-five thousand?

17        A.    Fifty-five thousand one hundred

18   thirty-nine dollars, correct.

19        Q.    Again those numbers throughout then, at

20   least to the extent they're based on actual

21   records, show what he has reported as a sole

22   business as profit after he's taken all the tax

23   benefits that are not available to a wage earning

24   employee?

 1        A.    Right; and the unemployment compensation

 2   was listed as income to him for that year.

 3        Q.    In what year?

 4        A.    2005.   The nine hundred seventy-six

 5   dollars that's in table one is unemployment

 6   compensation.

 7        Q.    We still don't know where the balance of

 8   that comes from?

 9        A.    No; I don't know where the balance of it

10   comes from but I'll find out.

11        Q.    Then from there you have -- I guess I'm

12   a little confused; I'm sure you can explain it --

13   you say that for projected income you go up only

14   the cost of living.

15              Was that the earnings that you think he

16   would have had with an increase in cost of living?

17        A.    The problem with analyzing Mr. Behaylo's

18   earnings in the future is there's just a great

19   deal of uncertainty as to what those mitigated

20   earnings actually will be.

21        Q.    There always is but I'm asking you your

22   assumptions regarding what you assumed he would

23   increase -- or what if any assumptions that you

24   used about his increased earnings?  How did you

1    calculate it?

2         A.   I made assumptions of what he believed

3    he would be able to earn going forward as he got

4    more experience and more connections in the real

5    estate business and I grew those year by year and

6    made them bigger and bigger.

7         Q.   And these are based on what?

8         A.   His expectations.  That's what he

9    expects he can earn in the future.

10             Now given the way the real estate market

11   has gone since I wrote this report, it's probably

12   a downfall.

13        Q.   People are going to buy houses at some

14   point?

15        A.   But we just hit the lowest sales since

16   1982 for 2007 so it doesn't look real bright or

17   optimistic, does it?

18        Q.   If you project it out to 2023 don't you

19   think people are going to be buying homes?

20        A.   I hope so.  This is what he believed he

21   could realistically earn going forward.  I think

22   it's a little optimistic but that's what he

23   thought.

24        Q.   Getting back to the employee benefits

```
 1    section where you say -- and we discussed this at

 2    some length -- you say in the last sentence of

 3    employee benefits, "The value given in 2003 by

 4    Top-Flite employee benefits was 19.5 percent of

 5    earnings in that year"?

 6        A.    That's what I said; yes.

 7        Q.    And that's what you discussed before

 8    about lost benefits?

 9        A.    Yes.

10        Q.    That again is taken from Exhibit

11    Number 6?

12        A.    That's correct.

13        Q.    Are you aware that Exhibit 6 is a

14    document that does not reflect the benefits that

15    were offered by the Defendant in this case but a

16    prior company?

17        A.    I'm sorry?

18        Q.    Well, do you assume when you did your

19    calculations that Exhibit 6 reflected the benefits

20    being offered by the Defendant in this case?

21        A.    I guess I did.

22        Q.    Would you agree then that if the

23    Defendant -- if the company that prepared

24    Exhibit 6 went bankrupt and that the company that
```

1  laid off Mr. Behaylo was a different company with

2  different benefits, would you agree that Exhibit 6

3  is useless as a way to assess fringe benefits?

4  A.   If the new owner dramatically changed

5  the benefits program, then it would be less

6  useful.

7  Q.   Well, did you make any inquiries at any

8  point in time of these individuals whether, for

9  example, when they were employed by the Defendant

10  they had the same type of pension plan that they

11  had from the prior owners?

12  A.   I do recall some discussion of that.

13  Q.   Did they tell you it was the same plan?

14  A.   No.

15  Q.   Did you make any adjustments to the fact

16  that the pension plan reflected in Exhibit 6 is

17  not offered by the Defendant?

18  A.   No.

19  Q.   Why not?

20  A.   I don't remember if I did or not.  I

21  don't think that I did.

22  Q.   Would that not have been appropriate, to

23  make it more accurate?

24  A.   If I knew what the new plan or the

 1    replaced kind of benefit might have been.

 2        Q.    But you think it's appropriate otherwise

 3    just to use a benefit plan by a different company

 4    to assess benefits for a defendant?

 5        A.    I think what I was trying to do was -- I

 6    think what I assumed was that the benefits being

 7    offered by the new employer were not dramatically

 8    different than the old employer.

 9        Q.    And that assumption was based on?

10        A.    Discussions with the plaintiffs.

11        Q.    But did you know it was a different

12    company?

13        A.    Well, yes, I knew it was legally a

14    different company, yes; sure.

15        Q.    But I thought in the beginning of your

16    report you indicate that you thought Callaway took

17    over the company after the termination of these

18    employees?

19        A.    My understanding is that there were a

20    number of different -- there were a number of

21    different transactions that took place and the

22    first one I believe is that Spalding as a holding

23    company was purchased by the Russell Corporation

24    in 2003.

1        Q.    And the source of that information?    The

2    Internet?

3        A.    Yes.

4        Q.    That the holding company itself was

5    purchased, is that your understanding?

6        A.    That's what I saw in published sources.

7        Q.    That you can't specifically identify

8    here?

9        A.    No; but there were a number of them and

10    they all seemed to agree and that sale did not

11    include Top-Flite or Ben Hogan or Strata brands.

12    Those brands were retained by Top-Flite, by the

13    Top-Flite Golf Company and in September of 2004

14    Callaway purchased Top-Flite out of Chapter 11.

15        That's my understanding of how it

16    transpired.    If it is not accurate, it's not

17    accurate but that is my understanding.

18        Q.    Directing quickly your attention to

19    Exhibit 1, you have two pages of prior testimony

20    that you provided.

21        Are those cases where you testified at

22    trial or where you were retained and may or may

23    not have testified?

24        A.    I either testified at trial, in

1  deposition or both and/or sometimes in an

2  arbitration.

3       Q.   Can you quickly -- or can you by memory

4  identify the ones where you actually testified at

5  trial?

6       A.   Well, let me start with the most recent

7  and go backwards.  The Ene Inyang case I testified

8  at trial.

9       Q.   What kind of a case was that?

10      A.   That was a death case.  Sally Wilson

11 case was an arbitration that I testified at -- and

12 I don't even recall what it was about to be honest

13 with you.

14          The Brooks case I testified in.  That

15 was a divorce case.  The Beebe case I was deposed

16 in.  I can't remember if I testified or not but

17 that was an employment case.

18      Q.   You don't know if you testified at trial

19 or not?

20      A.   At trial or not but I definitely was

21 deposed on it.  I remember the deposition.  The

22 Haddad case I testified in at both deposition and

23 trial.

24      Q.    I'm just asking you which you testified

 1    at trial?

 2        A.    The Haddad case I testified at trial.

 3    Orban I was deposed, I didn't testify at trial.

 4    Waters I did testify at trial.  Rodriguez I did

 5    testify at trial.  Mendonsa I've been deposed in.

 6    I haven't testified at trial but that trial is

 7    coming up.  Cormier --

 8        Q.    (Interposing) Since we're doing it this

 9    way, if you identify also -- on the ones you've

10    mentioned were you always on plaintiff's side or

11    defendant's side or both?

12        A.    Both.

13        Q.    Both?

14        A.    Yes; on different cases I testify on

15    different sides.  I will say most of the time I

16    testify it's usually for plaintiffs.

17        Q.    Were they all employment cases or just

18    some of them?

19        A.    No.

20        Q.    Why don't we shorten this somewhat and

21    just tell us the employment cases at which you

22    testified at trial?

23        A.    Okay.

24        Q.    If in your own mind you know you didn't,

1    you don't have to say anything, just go on to the

2    next one so she doesn't have to write it down?

3        A.    Haddad was an employment case that I

4    testified at trial.  Orban was an employment case;

5    I was deposed but didn't testify at trial.  I

6    can't remember what kind of a case Rodriguez was

7    but I testified at trial.

8            The next one isn't employment; it's

9    discrimination not employment.  This was a death

10   case.  The next one is a criminal case; product

11   liability.  I don't remember what kind of a case

12   Gilbert was.  I testified but I don't recall what

13   kind of a case it was.

14           I testified in trial on the Doherty case

15   and I believe that was an employment case.  I'm

16   not a hundred percent sure but I think it was.

17   Manning was an arbitration.  That was an

18   employment case.  It wasn't a trial, it was an

19   arbitration.  That was business; that was

20   arbitration.

21           The Diaz case was an employment

22   discrimination case that I was deposed in.  I

23   don't remember if I testified in trial or not.  I

24   testified at trial in the Simonds, in the Larsen

```
 1    case; that was an employment case.  Parsons, I
 2    don't know if I testified at the trial or not;
 3    that was an employment case.  Did I testify in the
 4    Cosmos trial?
 5               MR. CAHILLANE:  I could answer the
 6    question but I'm not really allowed to.
 7               THE WITNESS:  I may have testified
 8    in the Cosmos trial.  That was going back aways so
 9    I'm not sure.
10    Q.    (BY MR. PRESSER)  Now moving on to your
11    curriculum vitae, you retired from UMass. in?
12    A.    December 31st, 2003.
13    Q.    Then you took a job as a chief operating
14    officer for a couple of years?
15    A.    The same day.  I started the same day I
16    retired; yes.
17    Q.    What generally was the nature of your
18    duties there?
19    A.    I ran the company.  I had full
20    responsibilities for the company.  The owner
21    literally gave me the keys and went to Florida and
22    said don't call me.
23    Q.    Why did you leave there in 2006?
24    A.    I actually was responsible for managing
```

1    the company for a period of time after which I

2    became an executive consultant to the company

3    because I didn't want to be responsible for all

4    the detail day-to-day operations and for some

5    other reasons.

6         I stayed out of the company for a period

7    of time and at some point I had done everything

8    that the owners wanted me to do and there wasn't

9    anything more that they needed for me to do for

10   them as an executive so I stopped working for them

11   as a consultant full time and since then have just

12   been doing other consulting, which I've always

13   done.  Even when I was working for them I was

14   doing other consulting.

15        Q.   And even while you were working for them

16   you continued as an expert witness?

17        A.   Yes; I didn't do as much of it but I

18   did.

19        I've always worked as an expert witness

20   doing more or less depending on what else I was

21   doing, what my duties were at the university, what

22   I was doing since then.

23        Q.   Just quickly if we turn to publications,

24   you have it by various sections.  Are these, the

1    books and monographs, are these the books you

2    published?

3        A.    I don't publish them, but books that

4    have been published; sure.

5        Q.    Can you identify the ones and only the

6    ones that specifically relate to damage

7    calculations for employment?

8        A.    I don't believe that there's any books

9    or monographs in that category.

10       Q.    Now the general articles, the same

11   question?

12       A.    Well, under journal articles there is

13   one article here somewhere, on page four, the

14   "Utilizing an Economist to Establish Damages

15   Through Expert Testimony."  That obviously is one.

16       Q.    Any other ones in that section?

17       A.    No.

18       Q.    Were the published case studies relating

19   to --

20       A.    (Interposing) No; none of those.  Book

21   reviews, no.  Other publications -- well, if you

22   skip ahead to page eight on legal expertise and

23   consulting you'll see there's been a number of

24   things that I did with MCLE that they published

```
 1    that were related to workshops on damages and
 2    things.
 3         Q.    Where are you looking?  In the middle
 4    section there?
 5         A.    Page eight.  Well, it is scattered
 6    throughout here.  There's various things.
 7              For example, there's a number of things
 8    that I did on statistical evidence in employment
 9    discrimination cases.
10         Q.    My question was on damages.
11         A.    They related to employment.  Some other
12    things related to damages by MCLE.
13         Q.    Those were seminars that you
14    participated in?
15         A.    Those were seminars where I participated
16    in where I wrote things that were included and
17    became available for lawyers to buy.
18         Q.    I've done that and I don't consider
19    myself an expert in anything.
20              MR. CAHILLANE:  I'll stipulate to
21    that, then.
22         Q.    (BY MR. PRESSER)  Anything else on the
23    remaining pages?
24         A.    I don't think so.
```

1      Q.    Why don't we turn to Number 2 which is

2   Mr. Bettencourt's.  Some of the narrative is

3   identical, for example footnote one and the end of

4   the first paragraph on footnote two that you

5   testified about in relation to the report for

6   Mr. Behaylo.

7         Similarly on any of these that has that

8   information, you don't have any other additional

9   sources of information to show when Callaway

10  bought it or anything that you had not said?  The

11  testimony would be identical?

12     A.    Right.

13     Q.    In all four cases?

14     A.    I believe so.

15     Q.    All right; that's fine.  I'll direct

16  your attention to page three.

17         You indicate gross earnings for 2004 and

18  then at the very last sentence you say, "He also

19  received sixteen thousand seven hundred forty

20  dollars from Top-Flite in that year."

21         What's the basis for that assertion?

22  And let me return your documents in case you want

23  to look at them.  This is for Bettencourt.

24     A.    Now, would you please repeat the

1    question?

2         Q.   I'll return all of them to you and I

3    won't have to keep doing this.  Here is

4    Mr. Duval's and Mr. Lonczak's.

5              I've returned to you the files that you

6    brought for all of the plaintiffs at this point so

7    I'm specifically asking now, Exhibit Number 2,

8    Mr. Bettencourt, you have a statement that he

9    received, on page three --

10        A.   (Interposing) Where on page three?

11        Q.   Top paragraph.

12        A.   Top paragraph.

13        Q.   The last sentence.

14        A.   (Witness examining document.)  There's a

15   typo.  It should be "he" with one "E."

16        Q.   I understand that.  I didn't ask you

17   about that.

18        A.   This was in 2004 so without looking I'm

19   assuming that it was either deferred comp or it

20   was part of severance or whatever it was.  I can

21   look it up and find it.

22        Q.   If you could, please.

23        A.   Okay.

24        Q.   Because I have tried to find it and

1  haven't been able to.

2      A.   Okay. (Witness examining documents.)

3  Well, I'm not sure what that statement refers to

4  either.

5           The figure that is for 2004 in table one

6  is his earnings on his W-2 from Top-Flite.

7      Q.   So the statement that he received this

8  sixteen thousand seven hundred forty is either --

9      A.   (Interposing) It may have been something

10  that he -- that's part of the seventy-seven

11  thousand that was included but I would have

12  thought I would have said what for.

13      Q.   You did say above that he received

14  seventy-seven thousand six seventy-nine?

15      A.   Which is correct, that's what he

16  received.

17      Q.   But then you added in that he received

18  an additional amount from Top-Flite.  Do you have

19  any basis for saying he received the sixteen seven

20  forty from Top-Flite?

21      A.   Not sitting here.  If I go through here,

22  maybe he had some money in some kind of a fund

23  that was returned to him.  I don't know.

24           Without going through here and reading

1    his deposition and looking at everything, I mean I

2    don't know.

3        Q.    Did you read his deposition when you

4    prepared the reports?

5        A.    I did; it's here.

6        Q.    Let me then direct your attention to

7    table one and for 2003 it shows earnings of

8    fifty-four thousand eight hundred seven?

9        A.    Seventy.

10       Q.    Eight hundred seventy.  Do you remember

11   at his deposition that he said that was not

12   accurate for the full year and might be because he

13   had two W-2's that year, on page twenty-nine?

14       A.    He says that there was another W-2.

15       Q.    Was that reflected anywhere in table

16   one?

17       A.    Well, the figure in table one for that

18   year comes from the W-2 from Top-Flite, not from

19   Callaway so there may be another W-2 in here.

20       Q.    So you used a number in table one that

21   plaintiff's deposition says is insufficient, is

22   inaccurate?

23       A.    I don't know unless I go through here

24   and check and spend more time.  It would appear --

1  now let's see.

2         Oh, found it.  That's the -- the sixteen

3  thousand seven hundred forty -- he didn't receive

4  that from Top-Flite that year.  That's how much he

5  received that year in unemployment compensation.

6  That's where it came from.

7         Q.   Okay.

8         A.   It's on his 2004 return but I still

9  don't find any additional, so far, W-2s that he

10  mentioned in his deposition.

11        From what I can see from the deposition

12  exhibits there wasn't one produced.

13        Q.   I only get what I get from you.

14        A.   That's what he says on page twenty-nine

15  of his deposition.

16        I don't have any record of it and I

17  don't see any record of it on his tax return.  The

18  tax return shows what it shows.

19        Q.   His tax return or his W-2?

20        A.   On both.  His wages and salaries for

21  2004 show a hundred two thousand five hundred and

22  two so --

23        Q.   (Interposing) So that's wrong?

24             MR. CAHILLANE:  What's wrong.

1           THE WITNESS:  Apparently there's

2    another W-2.

3        Q.    (BY MR. PRESSER)  That was my only

4    question.  Let's talk employee benefits.

5           You at one point say in the first

6    paragraph, employee benefits, you indicated that

7    he was eligible for bonus payments based on a

8    company performance.  Did you quantify that

9    anywhere in your calculations as a benefit that

10   you think he would have received had he not been

11   terminated by the Defendant?

12       A.    His ten percent bonus was included in

13   the figure that I used.

14       Q.    Which ten percent?  Is that the one that

15   you're referring to in the line I just read, that

16   he's eligible based on company performance, or you

17   also say he earned another ten percent bonus that

18   was included.  That's later in the same paragraph.

19          You seem in the narrative to refer to

20   two different bonuses?

21       A.    The only bonus that I included was a ten

22   percent bonus.

23       Q.    So you did not include the one based on

24   company performance?

1    A.    That's correct.

2    Q.    Then directing your attention to the

3    narrative on employee benefits you say, "He also

4    earned another ten percent bonus that was included

5    in that year that I have not included as a

6    benefit"?

7    A.    Right.

8    Q.    Did you in fact include that as a

9    benefit in table two?

10    A.    As a replacement cost. (Witness

11    examining document.)

12            I included a ten percent bonus.

13    Q.    So the narrative says you did not

14    include it and yet you did?

15    A.    I said before, I included a ten percent

16    bonus.  On table two you can clearly see it.

17    Q.    But on the narrative it clearly says "I

18    am not including it as a bonus"?

19    A.    It said that that additional bonus was

20    not included.

21    Q.    Well, that's the bonus that you say you

22    did not include.  Then what one did you include?

23            If you didn't include the ten percent in

24    the narrative then why is the ten percent bonus

1    listed on table two?

2            MR. CAHILLANE:  Objection.

3            THE WITNESS:  I'd have to go back

4    and see what the other ten percent that he was

5    eligible for refers to.  He was eligible

6    apparently for two different plans, two different

7    bonuses.

8    Q.    (BY MR. PRESSER)  Do you think you gave

9    a value for a bonus plan potentially for a company

10   that went bankrupt?

11   A.    I'd have to go back.

12   Q.    You don't know what that reflects?

13   A.    It ten percent of his earnings, the

14   seventy-seven six ninety-nine.  It's a ten percent

15   bonus.

16           I can't tell you for sure what that

17   bonus was based on.

18   Q.    And you don't know if it would be a

19   repeating bonus or a one-time bonus?

20   A.    I've assumed that if you were going to

21   replace, the opportunity to have that bonus would

22   cost you seventy-eight hundred dollars.

23   Q.    But you didn't know, if he continued to

24   be employed, if he would have gotten or was

1    eligible for that ten percent bonus each year?

2        A.    I can't predict.  I don't have a crystal

3    ball.

4        Q.    We're now in 2007 or 2008.  Do you have

5    any knowledge that the company has given that ten

6    percent bonus to employees in any of the

7    subsequent years?

8        A.    I have no knowledge of what their bonus

9    performance has been since then.

10       Q.    So because of that one-year bonus in

11   2003, you included that as a bonus in all

12   subsequent years as a fringe benefit?

13       A.    Actually it was based on what the

14   company said in 2002.

15       Q.    But again, it is a different company, is

16   it not, than Callaway?

17       A.    At some point -- yes; it is a different

18   company than Callaway.  That's correct.

19       Q.    And he received that ten percent bonus

20   not from Callaway but from the defunct company,

21   correct?

22       A.    That's correct.

23       Q.    Nevertheless -- do you have any evidence

24   that Callaway gave anyone this ten percent bonus

1  in any of the years which you have included it

2  amongst your annual costs of benefits?

3         A.    I don't recall if I did or not.  Not

4  that I recall.

5         Q.    Earlier in talking about Mr. Behaylo's

6  statement that was issued by the prior company,

7  you said some of those things should not be

8  treated as fringe benefits because they're

9  mandated in their taxes?

10        A.    That's correct.

11        Q.    Things such as payroll taxes and the

12  like, correct?

13        A.    That's correct.

14        Q.    And yet on table two from

15  Mr. Bettencourt, you included in your annual

16  fringe benefits values, nine thousand three

17  hundred sixty in payroll taxes.

18               You've already indicated earlier that

19  that's not appropriate so why is that ninety-three

20  hundred included in this?

21        A.    It shouldn't be.

22        Q.    It shouldn't be?  All right.  The health

23  insurance factor in Mr. Bettencourt's case, do you

24  know whether Mr. Bettencourt purchased insurance

```
 1    elsewhere or was he covered by anyone else without
 2    additional cost?
 3         A.    Right now, off the top of my head I
 4    don't remember.
 5         Q.    You can look at the records that you
 6    have that you relied on in making the report?
 7    That's why I gave them back to you.
 8         A.    Okay.  The figures in table two are what
 9    he's spending at his present job so those are the
10    replacement costs for his current employer.
11         Q.    Do you have evidence that
12    Mr. Bettencourt is spending that on health costs?
13         A.    That's my understanding.
14         Q.    Where is the document to support that?
15         A.    Well, let's see. (Witness examining
16    document.)  There. (Indicating.)
17         Q.    What is that document?
18         A.    This is a list of the amounts spent for
19    benefits after termination per year that was given
20    to me by John Bettencourt.
21         Q.    So you didn't prepare the document or
22    review any documents to glean the accuracy of
23    this.  This is just what he says?
24         A.    This is what he said and it is listed on
```

1    the front.

2          I asked people for specific information

3    and this is some of what I got.

4          Q.    In this case at least what you're saying

5    is that those costs are reflective of replacement

6    costs?

7          A.    Yes.

8          Q.    So it's a different methodology than in

9    Behaylo's case where you used the value to the

10   company?

11         A.    That's because I had replacement costs.

12         Q.    What Mr. Bettencourt said it was?

13         A.    Yes; I assumed that he can back that up.

14         Q.    Just an assumption that he can back that

15   up?

16         A.    I assume that he can back that up with

17   records; sure.

18         Q.    But he produced no records to that

19   effect?

20         A.    I asked him to give me the information

21   on what he was spending now for -- to replace his

22   benefits working as a real estate agent.  This is

23   what he gave me.  That's what I based it on.

24         Q.    There's nothing here, for example --

1    well, it says holidays, thirteen days.  I'm

2    looking at your sheet?

3         A.    He had I think five weeks vacation

4    before he was terminated.

5         Q.    Well, but he wouldn't receive his salary

6    plus twenty-eight hundred dollars for holiday.

7    Those would be days off that he would be paid for?

8         A.    But in a compensation package you value

9    time off.

10        Q.    Does he work every single day as a real

11   estate agent?  Every day of the week he's working?

12        A.    You'd have to ask him.

13        Q.    But does that assume that he takes

14   holidays or vacations if you're adding it in?

15        A.    It assumes that he's only getting paid

16   for thirteen days rather than five weeks.

17        Q.    Thirteen days over five weeks.  He has

18   two different figures there.  He has five weeks'

19   vacation -- he has seventy-five hundred dollars of

20   vacation benefits.

21             In fact, if you're a salaried employee

22   and you're paid your salary for the year, the

23   seventy-eight thousand dollars, that gross amount

24   includes time off for vacation, correct?

1     A.    Correct.

2          Q.    You don't get seventy-eight thousand

3     dollars plus at the end of the year another

4     seventy-five hundred for vacation?

5          A.    That's not true.  There's lots of

6     employers who buy back vacation time because

7     that's what it is worth to them.

8          Q.    Do you know whether or not this employer

9     gave the employee options of buying it back?

10         A.    I do not but that is not an uncommon

11    practice.

12         Q.    Did you ask any of these employees

13    whether they did it or not?

14         A.    I'm not particularly interested whether

15    they did it or not, to be honest with you.  That

16    time off has a value.

17         Q.    This would only be accurate as an

18    additional expense or value that he would not have

19    had if in fact he takes no vacation presently and

20    takes no holidays, he works every single day?

21         A.    What he is implying to me is that he

22    can't take off these holidays or vacations because

23    he doesn't get compensated for them.

24         Q.    But that's reflected in comparison of

1    the net earnings or gross earnings in both places,
2    correct?
3        A.    He is getting a certain amount of
4    earnings in this job and a certain amount of
5    earnings in that job.
6            In his old job he can take time off and
7    he will still get those earnings.  In this job he
8    can take time off but he doesn't because he works
9    on commissions.
10       Q.    In your calculations, factored in you
11   are saying he is going to get paid in the new job
12   exactly what he said in the old job?
13       A.    But it's commissions, not salary.
14       Q.    But in the column --
15       A.    (Interposing) I said this is what he
16   would get in commissions.  That's different than
17   salary.
18       Q.    I certainly understand that, sir, but
19   you've already adjusted that in the column for
20   earnings, the differential for salary and
21   earnings?
22       A.    And for him to replace and to take time
23   off he would have to have extra earnings to
24   compensate him.

1       Q.    What?  Say that again?

2       A.    If he doesn't work a certain number of

3    days or weeks.

4       Q.    Which you do not know whether he does or

5    does not?

6       A.    But if he does, he would lose

7    commissions on sales he would have made during

8    those times.

9       Q.    So again that presumes, if you're going

10   to put a full value on every hour, every week,

11   that he took no time off while he was working as a

12   real estate agent.

13            That's the only way, if he had five

14   weeks, if he took a week off while he was selling

15   real estate it should be four weeks, correct or

16   three weeks or two weeks?

17      A.    What he is telling me is that he can't

18   afford to take vacations.

19      Q.    Where does he tell you that?

20      A.    This is complied in the numbers he gave

21   me.  This says replacement costs.  This is --

22      Q.    (Interposing) The only place he, quote,

23   implied or said that to you was he gave you this

24   one-page sheet?

```
 1              A.    Yes.

 2                    MR. PRESSER:  Why don't we mark this

 3       as Exhibit 7.

 4              Q.    (BY MR. PRESSER) And you have no

 5       documents backing this up one way or the other,

 6       what he has actually spent?

 7              A.    Nope.

 8                    MR. PRESSER:  Will you mark this as

 9       7?

10                        (Defendant's Deposition Exhibit
                          No. 7 offered and marked.)
11

12              Q.    (BY MR. PRESSER)  While we were off the

13       record, we've marked now as Exhibit 7 a one-page

14       sheet which has John Bettencourt written on the

15       top and I think you testified that this was not

16       prepared by you but solely by Mr. Bettencourt and

17       you don't have the underlying documentation one

18       way or another about what's written here.  Is that

19       accurate?

20              A.    That's correct.

21              Q.    Is this supposed to be reflective of

22       what Mr. Bettencourt's replacement costs were in

23       all respects or in some things or in others?

24                    What is this supposed to be reflective
```

 1    of?

 2         A.    I'm sorry?

 3         Q.    Are the items that he chose to list here

 4    that you then used yourself indicative of things

 5    he told you he is now spending to replace

 6    benefits?

 7         A.    Yes.

 8         Q.    So when he puts down here bonus ten

 9    percent seventy-eight hundred dollars, that was

10    his decision to include that seventy-eight-

11    hundred-dollar bonus?

12         A.    You're saying if I was -- for him to

13    replace the ten percent bonus it would cost him

14    seventy-eight hundred dollars.

15         Q.    So he made the decision to include that

16    even though you said in your narrative that you

17    were not including that ten percent?

18         A.    That's what I said.  I'm not sure --

19    yes.

20         Q.    Payroll taxes, twelve percent.  Does

21    that reflect what the company was paying in

22    payroll taxes or was he working off of Exhibit 6

23    or something like that for him, do you know?

24         A.    What he is assuming is that now he has

```
 1    to pay payroll taxes because he's a single

 2    proprietor that when he had an employer he didn't

 3    have to pay.

 4         Q.   But those payroll taxes of twelve

 5    percent that he is paying or claims he is

 6    paying --

 7         A.   (Interposing) Claims he is paying.

 8         Q.   -- reflects what in his change of

 9    income?

10         A.   Run that by me again?

11         Q.   When you listed his earnings, his

12    mitigating earnings in the fourth column on table

13    three?

14         A.   Yes.

15         Q.   What does that reflect, the number for

16    example ninety-five thousand nine hundred

17    ninety-three in 2006?

18         A.   That's what it shows as earnings for

19    2006.

20         Q.   What kind of earnings?  Gross receipts

21    or earnings after taxes for the corporation?

22         A.   (Witness examining documents.)

23         Q.   Did you find it?

24         A.   I'm still looking.
```

```
 1          Q.    Let me just reflect that the documents
 2     that I copied don't seem to have 2006 tax returns.
 3          A.    I know; I can't find them either.
 4     That's what I'm looking for.
 5                I find 2005 and I find some other
 6     documents after that but not taxes.  I've got a
 7     Schedule C for 2005.
 8          Q.    Your report though indicates that you
 9     looked at income tax records?
10          A.    Yup.
11          Q.    2002 through 2006?
12          A.    That's right.
13          Q.    Those have not been produced today?
14          A.    They should be here in this file unless
15     they fell out but they should be here.
16          Q.    I don't see the 2005 income tax either.
17          A.    The 2005 Schedule C is there but the
18     income tax return I don't see.
19                At some point I'm pretty sure I had
20     those numbers -- I had those documents. (Witness
21     examining documents.)
22          Q.    If you have it, if you can show me the
23     Schedule C that you say is included?
24          A.    You should have a photocopy of that.
```

```
 1        Q.    That's why I'm asking; I don't see it.
 2        A.    It's in there.  2005 and 2006, I don't
 3   know where -- those numbers should be based on his
 4   tax returns.
 5              I'll find the Schedule C for you.
 6   (Witness handing document.) My guess is that the
 7   complete return was here, too.  For example, it
 8   says on the top --
 9        Q.    (Interposing) Let's stick with the
10   report.
11              Do you have those reports that you said
12   you referred to?
13        A.    I referred to them and the text gives
14   the numbers from them.  I don't see them in my
15   file.
16        Q.    Where does the text --
17        A.    (Interposing) Well, on page three,
18   middle of the second paragraph, "During 2005 his
19   gross revenue from real estate was seventy-five
20   thousand six ninety-seven" -- as you can see from
21   what I gave you -- "and net income of sixty-four
22   thousand twenty-nine."  Again that's reflected in
23   Schedule C.
24              He also received unemployment
```

1    compensation included in the seventy-seven

2    thousand six hundred ninety-nine for that year so

3    obviously I had that number from a tax return.

4        Q.    Let's explore that.  That

5    seventy-seven -- wait a minute.  The seventy-seven

6    six nine nine?

7        A.    Right.

8        Q.    Is what you have listed though for 2004,

9    not 2005, correct?

10       A.    Yes; that should be for -- that is for

11   2004 but if you look at --

12       Q.    (Interposing) What is for 2004?

13       A.    His tax return for 2004 should show

14   unemployment compensation of six thousand one

15   hundred forty-six dollars.

16       Q.    You say included in the seventy-seven

17   six ninety-nine for that year?

18       A.    Yes; it may have been a mistake.  We can

19   see what the correct statement is.

20       Q.    So his gross revenue from real estate in

21   2005 was seventy-seven thousand, right -- in 2005,

22   the year we don't have a tax return for, you're

23   saying his gross was seventy-five thousand six

24   hundred ninety-seven?

1      A.    That's correct; that's what the

2  Schedule C for 2005 says.

3      Q.    But if you look at the earnings for 2005

4  in your table two, you don't have any figure for

5  2005 of seventy-five thousand six hundred

6  ninety-seven?

7      A.    No; I don't.  I have seventy thousand

8  one hundred seventy-five.

9      Q.    Where is that number?

10      A.    I believe it's sixty-four thousand

11  twenty-nine dollars from Schedule C for that year

12  plus six thousand one hundred forty-six dollars in

13  unemployment compensation.

14      Q.    So you used the net income --

15      A.    (Interposing) Mmm-hmm.

16      Q.    -- for his real estate business?

17      A.    Just like Mr. Behaylo.

18      Q.    And you used gross income for the

19  company throughout?  You're not using net wages,

20  you're using gross?

21      A.    Yes.

22      Q.    So you're using net for Mr. Bettencourt

23  and Mr. Behaylo and from the net, for example, to

24  get from his Schedule C -- to get from his income

1    of seventy-five thousand six hundred ninety-seven

2    to his sixty-four thousand, he's already taken off

3    all his payroll taxes and other taxes, isn't that

4    how he changes it?

5        A.    Let's see.

6        Q.    (Indicating.)

7        A.    He doesn't list it there as expenses at

8    all; no.

9        Q.    So once again, though, you have

10   deducted --

11       A.    (Interposing) They would be in a

12   separate form; they wouldn't be on this.  They

13   wouldn't be on the Schedule C.

14       Q.    So the things that you have allowed him

15   not to take as -- to lessen his income as a real

16   estate agent include for example sixty-three

17   hundred dollars for his car that he was able to

18   write off?

19       A.    That's correct.

20       Q.    Is there an economic value to having a

21   car that you can write off?

22       A.    Well, that depends, I suppose.

23       Q.    On?

24       A.    On how much you use it for doing what.

1    If he's using it primarily for going out and doing

2    a real estate business and seeing clients and so

3    on, not much advantage to it at all; no.

4         Q.    And depreciation, if he wasn't an

5    independent employee he wouldn't be able to write

6    off any depreciation, correct?

7         A.    No; the company writes that off.

8         Q.    But he is the only employee of the

9    company?

10        A.    That's right, but the company gets the

11   break.

12        Q.    I'm not saying it's illegal but as a

13   private company he has several write-offs to his

14   gross earnings that you have already taken off his

15   earnings when you list them as mitigating

16   earnings, including depreciation, car, deductible

17   meals and other expenses?

18        A.    You'll notice that the government labels

19   those as cost of doing business, as expenses, not

20   income.

21        Q.    I'm just clarifying what's included.

22   That is coming off because he is allowed to take

23   it off on his --

24        A.    (Interposing) Because it reflects the

CRAIG L. MOORE, PH.D.
JANUARY 24, 2008

```
 1    real cost of doing business.  Your defendants
 2    write all of that off as their cost of doing
 3    business, don't they?
 4         Q.    I've also seen cases that say the
 5    advantages have to be factored in by an expert --
 6    the tax advantages have to be factored in.  Did
 7    you do that at any point?
 8         A.    Absolutely not. (Witness handing
 9    document.)
10         Q.    Okay; thank you.  Where was that?
11         A.    It was faxed by his insurance agency and
12    this is page two and it was faxed on November 10,
13    2007 so I think there is more to this.
14         Q.    Does it say two of what?
15         A.    No; it doesn't.
16         Q.    I don't seem to have Schedule C.  Let me
17    just make a quick copy of that.
18         A.    Sure.
19                   (Pause in proceedings.)
20         Q.    (BY MR. PRESSER)  The actual earnings
21    from Mr. Bettencourt when he first started as a
22    real estate agent increased substantially more
23    than the four percent increase that you factored
24    into your projected increases, correct?
```

1        A.    I used what it was.  I used -- the

2    numbers I used were the numbers he earned.

3        Q.    In terms of projecting --

4        A.    (Interposing) Forward; I used four

5    percent.

6        Q.    Right; you used four percent?

7        A.    Yes, because his expectations were, at

8    that point in November of 2007, that he wasn't

9    going to be earning as much money as last year and

10   in fact that's probably borne out given the real

11   estate market.  It went down a lot.

12       Q.    His commission sales are going to change

13   year to year?

14       A.    Sure they're going to change year to

15   year.

16       Q.    In fact you jumped from seventy thousand

17   one year to ninety-five thousand the next year?

18       A.    That's correct; and we don't really know

19   what 2007 is.

20             That's an estimated number that he gave

21   me back in the fall.

22       Q.    That was estimated for the full year?

23       A.    Yes; he said by the end of the full year

24   maybe I'll make seventy thousand.  That was kind

1    of his optimistic estimate.

2        Q.   You're projecting for him to reach an

3    income level as a real estate agent that he had in

4    2006 is going to take until 2015?

5        A.   Yes; pretty much.

6        Q.   Did you have any discussions whether he

7    planned to stay as real estate agent or change

8    careers?

9        A.   He gave me the impression that he was

10   going to; yes.

11       Q.   Would the same be true for Mr. Behaylo?

12       A.   Yes; again given this market they may

13   change their mind.  I don't know.

14       Q.   Why don't we turn to Exhibit Number 3.

15   That's Mr. Duval.

16            Once again the background information is

17   the same sources as the other two reports?

18       A.   Pardon?

19       Q.   The background information about the --

20       A.   (Interposing) Yes; it's the same.  I

21   mean it's different in that it talks about -- the

22   first paragraph talks about him but the rest of it

23   is pretty much the same, yes.  The next few

24   paragraphs are the same.

```
 1            Q.   Page three, though, you indicate that

 2    his position at the time of his layoff or

 3    termination was director of Sales and Promotion.

 4            Do you know what documents supports

 5    that -- do you have a document to support that he

 6    was director of Sales and Promotion?

 7            A.   I can look in the folder for you.  Maybe

 8    I do.

 9            Q.   Or any other source?

10            A.   I didn't make it up so it came from

11    someplace.

12            Q.   I'm asking for the basis of that

13    assertion, that that was his position?

14            A.   I would have to go look through the

15    folder to find the basis.

16            Q.   All right; that's fine.

17            A.   You want me to?

18            Q.   Yes, please.

19            A.   (Witness examining documents.)  What was

20    the title?

21            Q.   You said director of Sales and

22    Promotion.

23            A.   Well, one document here that is his CV

24    or his résumé says -- lists director of
```

1   International Sales and Marketing and then the

2   other one says director of Sales and Operations so

3   that's on his own résumé.

4        Q.   So you're treating director of Sales and

5   Operation as the equivalent?

6        A.   I'm pointing out and telling you I have

7   documents that states his title.

8        Q.   But this is wrong; his title is not

9   director of Sales.

10          I'm asking you the basis for you saying

11  he was director of Sales?

12       A.   Director of Marketing and director of

13  Sales would be considered pretty much synonymous.

14  There's a memo that shows he became director of

15  International Sales.

16       Q.   You referred to that earlier in that he

17  changed jobs?

18       A.   I'm just going through this.

19       Q.   So I'm asking specifically about the job

20  he was in in July when he was terminated?

21       A.   Current position of director of Sales,

22  Promotion, Planning International Markets.  That's

23  2003.

24       Q.   I'm looking specifically for any

1    document you relied upon where you talk about all

2    of those jobs and say at the time of his

3    termination he was director of Sales and

4    Promotion?

5        A.    Okay. (Witness examining documents.)

6    What's the title that's in the report?

7        Q.    You said director of Sales and

8    Promotion.

9        A.    According to company records when he was

10   terminated his title was International Sales and

11   Marketing Director.

12       Q.    What company records are you looking at?

13       A.    Pardon?

14       Q.    What company records are you referring

15   to?

16       A.    These are -- I think these are company

17   records.  They are in with all of these other

18   company records.

19       Q.    I'm sorry, they are what?

20       A.    No; this is -- this is another copy of

21   his résumé.  That's what he lists as his title.

22       Q.    Can I see that for a minute, what you're

23   looking at?

24       A.    Yes; this is part of a packet of

```
 1    materials that he gave me in response to a list of
 2    questions that -- that was part of a fax that he
 3    sent me.  (Indicating.)
 4        Q.    But it doesn't show where in 2004 that
 5    he had that title on this document.  All right,
 6    you don't have --
 7        A.    (Interposing) I'm going to keep looking.
 8    There's stuff in here.  There's thirty-three pages
 9    of this stuff.
10                MR. CAHILLANE:  I'm willing to
11    stipulate that it's not that important that he
12    keep looking.
13                MR. PRESSER:  Will you stipulate
14    that that's not his title at the time of his
15    termination?
16                MR. CAHILLANE:  I'm pretty sure that
17    wasn't his title.  I think he has one word in
18    there that might be inaccurate.
19                MR. PRESSER:  It's not an
20    insignificant word given what happened.
21                MR. CAHILLANE:  Well, I don't think
22    so.
23                THE WITNESS:  Which word is that?
24                MR. CAHILLANE:  No; don't ask
```

1    questions.

2         Q.   (BY MR. PRESSER)   Have you been able to

3    put your hands on any company document or any

4    document that that shows that at the time of his

5    termination he held that title, director of Sales

6    and Promotion?

7         A.   Not that title but there's a description

8    of his duties which would reflect that that's not

9    an inaccurate title.

10        Q.   Who prepared the description of his

11   duties that you're talking about?

12        A.   He did.

13        Q.   You said in your report that you looked

14   at the deposition and exhibits from the

15   deposition.

16             Let me show you Duval Deposition Exhibit

17   Number 10.  Did you look at that document when you

18   prepared his report? (Indicating.)

19        A.   I don't know -- I think I have a copy of

20   this in here.

21        Q.   Does that -- is that in fact a company

22   record to your knowledge from the deposition?

23        A.   Yes; it is.

24        Q.   Does that show his title as manager of

1    Sales Promotions, effective June of --

2          A.    (Interposing) No; it says Sales

3    Operations Manager.

4          Q.    Sales Operations Manager; thank you --

5    Sales Operation Manager, and it says job

6    classification, director of Sales and Promotion,

7    Planning International?

8                That was the prior position.  If you

9    look at the document, correct, it shows what you

10   were and what you become, on the two sides of the

11   page?

12         A.    Yes.

13         Q.    So he had been one and he became the

14   other?

15         A.    The date of this action was -- the

16   effective date was May 17th, 2004.

17         Q.    And he was let go in July of 2004?

18         A.    So up until May he was director of

19   Sales, Promotion and Planning International and

20   then he became Sales Operations Manager from May

21   until he was terminated.

22         Q.    Thank you.

23         A.    Okay.

24         Q.    What was his salary at the time?

1      A.   A hundred nineteen thousand seven

2 hundred seventy-three dollars.

3      Q.   I'll ask you again to look at Exhibit

4 Number 3.  You just said that his salary was a

5 hundred nineteen thousand and you say here his

6 salary at the time he was terminated was

7 approximately a hundred twenty-seven thousand

8 dollars.  That's about an eight-thousand-dollar

9 difference.

10      Where did the hundred twenty-seven come

11 from?

12      A.   I probably should have said his

13 earnings, not his salary, because the numbers here

14 are based on his tax returns.

15      Q.   So the numbers -- the tax return would

16 include, though, any accrued vacation pay when he

17 was terminated as a result of his termination?

18      A.   They may have given value to vacation

19 time and paid him for it; yes.

20      Q.   The earnings would show up at whatever

21 he accrued if you only get paid when you're

22 terminated?

23      A.   That's correct.

24      Q.   Under state law you have to pay --

1          A.    (Interposing) Of course you do.

2          Q.    And you don't know if the company does

3     or does not pay for vacation otherwise.

4               Would it be fair to say that his salary

5     based on the information that you've seen is a

6     hundred nineteen thousand seven hundred

7     seventy-three dollars at the time he was

8     terminated?

9          A.    It would appear that's what it was at

10    that change of classification.

11         Q.    And you have no information that between

12    May 17th of '04 and the time of his termination he

13    got a salary increase above that amount?

14         A.    I don't believe he did.

15         Q.    Then if you looked at your table one for

16    2004 for the Top-Flite income?

17         A.    Not salary; income.

18         Q.    Earnings, annual earnings?

19         A.    Yeah.

20         Q.    Well then, is your prior earnings -- do

21    you factor into each of the successive years the

22    accrued vacation pay he received in 2004 by virtue

23    of his termination?

24         A.    Say that again?

```
 1          Q.    Well, if his salary is one hundred
 2    nineteen thousand -- and we're talking about
 3    income at this point, we're not talking about
 4    benefits -- wouldn't that be the appropriate
 5    measure to determine what he would have earned as
 6    salary or back wages compared to what he did earn
 7    in salary or wages at Russell -- not a hundred
 8    twenty-six but the hundred and nineteen?
 9          A.    I don't follow your question; sorry.
10          Q.    Well --
11          A.    (Interposing) I don't know what you
12    mean.
13          Q.    Let me rephrase it for you then.
14          A.    Okay.
15          Q.    If your salary is a hundred nineteen
16    thousand, shouldn't that be the baseline for
17    earnings?
18          A.    Unless he had other sources of earnings.
19          Q.    Right; and if there are other sources of
20    earnings which were one-time payouts based on the
21    termination such as the payout of accrued
22    vacation, that should not be calculated in as what
23    your earnings would have been the following year
24    or the year after that or the year after that?
```

1    A.    I'd agree with that.

2    Q.    So that really you should use in the

3    basis of a hundred nineteen thousand seven

4    hundred -- whatever the exact amount is -- for

5    calculating what he would have earned as Top-Flite

6    if he had not been terminated in July of 2004?

7    A.    If in fact that number -- that change of

8    position is accurate; yes.

9    Q.    If it is accurate, then would each and

10   every number in table number two in terms of prior

11   earnings be inaccurate?

12   A.    They'd be -- they would be slightly

13   higher.

14   Q.    Well, slightly --

15   A.    (Interposing) Yes; sure.

16   Q.    At least --

17   A.    (Interposing) Seven thousand dollars.

18   Q.    And then you have increases to that

19   first couple of years?

20   A.    Seven, eight thousand dollars; yes.

21   Q.    Then let's talk somewhat about how you

22   calculated his benefits because we've heard two

23   different ways for the others.

24        In the narrative for employee benefits

 1    you indicated that an annual benefit statement --

 2    you reference an annual benefits statement for

 3    Mr. Duval and you say you've used that to base

 4    what his lost benefits were for the period he had

 5    lost benefits?

 6         A.    Three months.

 7         Q.    What were you using?  What statement?

 8         A.    I believe I just went past it a minute

 9    ago. (Indicating.)

10         Q.    So the year 2002?

11         A.    That's the ones I have here was for

12    2002, I think.

13         Q.    That is from the employer prior to

14    Callaway or maybe two employers prior to Callaway?

15         A.    I guess; yes.

16         Q.    It refers -- a portion of this is a

17    pension plan that to your knowledge Callaway never

18    had for Mr. Duval or any other employee?

19         A.    As far as I know.

20         Q.    And yet you included that in your

21    calculations for his benefits as well?

22         A.    Yes; I did.

23         Q.    Somehow I guess for three months you

24    calculate -- well, his benefits lost for that

```
 1    three months -- let me get it accurately --

 2    forty-six hundred seventy-five dollars?

 3         A.    Yes.

 4         Q.    So you would estimate his lost benefits

 5    for the year as seventeen thousand something?

 6         A.    About seventeen, eighteen thousand, say

 7    eighteen thousand.

 8         Q.    Based on the statement he received in

 9    2002 from then Spalding Company?

10         A.    Yes.

11         Q.    Do you know what percentages you used in

12    calculating that -- what percentage for your

13    benefits?

14         A.    I can tell you.  14.8 percent.

15         Q.    Let me just make sure I'm clear.  If you

16    look at table two for Mr. Duval, would it be -- if

17    you assume for the moment that his actual salary

18    at the Defendant at the time of his termination

19    was the hundred nineteen thousand nine hundred

20    seventy-seven and for years 2004 and 2005 he would

21    in fact have had no diminished income for those

22    two years?

23         A.    I think that's correct; and in fact I

24    show that he didn't have a loss in 2004.
```

PERLIK and COYLE REPORTING

```
 1              MR. PRESSER:  Why don't we take a
 2    two-minute break.
 3                  (A recess was taken.)
 4       Q.    (BY MR. PRESSER)  For Mr. Lonczak's
 5    situation, do you have his full tax returns?
 6       A.    I have his full tax returns for some
 7    years.
 8       Q.    For what years do you have his full tax
 9    returns?
10       A.    I've got a lot of tax information for
11    him.
12       Q.    Specifically I think you indicated that
13    you -- in your report that you saw tax returns
14    for '99 through 2006.  I don't see those in my
15    files.
16       A.    Here's 1999, here's 2000, 2001, 2002,
17    2003, 2004, 2005.
18       Q.    You have the full tax return for those
19    years -- 2005 and 2004?
20       A.    Here's 2005, here's 2006.
21       Q.    What do they look like?
22       A.    They are stapled together like a regular
23    1040, and there's addendums for 2006, 2007 for
24    medical.
```

1          Q.   I see medicals.

2          A.   I have a 2004 amended return, 2005 total

3     return, and 2006.  I've got them all.

4               The 1999 is an electronic filing

5     summary; it's not a full return but I've got

6     everything else.

7          Q.   Let me, if I could -- actually let me

8     borrow that for a moment and make copies.  Is this

9     an amended for 2005?

10         A.   The only amended one I have is for 2004.

11         Q.   Can you give me the 2004 and 2005?

12         A.   Sure.

13         Q.   If you have them in front of you that

14    might be a good start.

15              Directing your attention to Exhibit

16    Number 4 --

17         A.   (Interposing) Did you want to look at

18    these tax returns?

19         Q.   No; I've got them.

20         A.   2004 is an amended return and 2005 is

21    here.

22         Q.   Okay; let me just direct you to my

23    questions.  Let me go through the report.

24              Your information -- your report

1    indicates that Mr. Lonczak was let go in the same

2    period of time and you based your salary

3    information on earnings based on what?  The same

4    W-2 that may have shown his accrued payments or

5    did you base it on something that showed his

6    actual salary at the time?

7        A.    Well, what I based on 2004 was

8    eighty-one five hundred thirty-five and --

9        Q.    (Interposing) Where is that number

10   coming from?

11       A.    It is clear from this -- it says --

12       Q.    (Interposing) Just tell me where you're

13   reading?

14       A.    I'm down at the bottom of page two,

15   earnings history.

16             "Mr. Lonczak's earnings, based on

17   federal tax returns, are shown on table one below.

18   It is clear from this information that the

19   termination by Top-Flite had a very negative

20   impact on his income that continues to present.

21   Mr. Lonczak's annual salary prior to his

22   termination was eighty-one thousand five hundred

23   thirty-five dollars according to company records."

24       Q.    What company records did you look at to

```
 1   determine what his salary was or did you use, as
 2   you did for Mr. Duval, just his W-2 statement for
 3   the year that may have included accrued vacation
 4   paid to employees being terminated?
 5        A.    Let's take a look at the amended 2004.
 6   The adjusted gross income is a hundred thirty-five
 7   thousand seven ninety-one.
 8        Q.    Is that for both of them?
 9        A.    That's what I'm looking for.  That's for
10   both of them.  That's all of it so you have to
11   look at W-2s.
12        The W-2s for Top-Flite -- there's a
13   separate W-2 for severance and there's a W-2 for
14   gross and the gross is fifty-five thousand six
15   hundred sixty-three.
16        Q.    Did that include, if you know, the
17   accrued -- any accrued vacation he may have had?
18        A.    It does not indicate that it does.
19        Q.    But you don't know -- would it not have
20   to be indicated somewhere on the W-2?
21        A.    And I don't see it indicated there.
22        Q.    The income wouldn't necessarily have to
23   be segregated out but would the income on the W-2
24   include accrued vacation paid at the time of
```

1   termination?

2       A.   It just gives the gross, deferred comp

3   of $4,311.92.  This is -- that's all 2004.

4           New annual salary, eighty-one thousand

5   five hundred thirty-five dollars.

6       Q.   So you used --

7       A.   (Interposing) This is April 22nd, 2003,

8   Spalding merit increase.  2003 compensation.  I

9   used the number from their statement.

10      Q.   And then as part of the offsets you had

11  interim earnings, there was the part time

12  employment at Barnes?

13      A.   Yes; he did some work at Barnes.

14      Q.   Was there an offset for any unemployment

15  he made?

16      A.   I think he did earn -- I'm pretty sure

17  he had a small unemployment comp.

18      Q.   So those are the offsets in table one?

19      A.   Yes; bonus, they're all listed there.

20      Q.   So he earned at Barnes about twelve

21  thousand dollars and another fifteen or so in

22  unemployment compensation?

23      A.   Yes; sixteen.

24      Q.   Do you know the circumstances of his

1    departure from Barnes?

2         A.    Not the particulars of it; no.

3         Q.    He took himself out of the job market as

4    an employee to invest in a business, is that your

5    understanding?

6         A.    Yes; I don't know any of the details

7    about Barnes in particular.

8              MR. CAHILLANE:   Objection.

9              THE WITNESS:   That's my

10   understanding.   He went and got together with the

11   manager of the Fort Worth plant and started a

12   business in Texas -- a miniature golf business.

13        Q.    (BY MR. PRESSER) That was my next

14   question, a miniature golf business?

15        A.    Yes.

16        Q.    Have you seen a tax return from the

17   business?

18        A.    Not that I recall.

19        Q.    Have you seen any documents about the

20   liquidation of that business that you referred to?

21        A.    No; I haven't.

22        Q.    Do you know what the assets of that

23   business may be?

24        A.    No.

1      Q.   Would it be unusual with a start-up

2  business that rather than paying the owners in the

3  first couple of years you're paying off banks and

4  the like to buy the equity and the land and

5  whatever you might need to buy the business?

6      A.   That happens sometimes.

7      Q.   You don't know whether or not the reason

8  he had no reported income from the golf business

9  was because they were essentially buying equity in

10  the assets of the business?

11      A.   I believe that either in his deposition

12  or in a conversation I had with him -- I don't

13  know which -- but I did get some information like

14  that about the business.

15          He did indicate, to the best of my

16  recollection, that he had an agreement with his

17  partner that they would put a certain amount of

18  money back into the business at the start-up and

19  that they would invest some money and they would

20  limit the amount of money that they could take out

21  in the first couple of years.

22      Q.   And that was to grow the business?

23      A.   Yes; that is a common choice.

24      Q.   Why is that a common choice?  What is

1    the advantage of doing that?

2         A.    Well, the alternative to doing that is

3    to go out and borrow that money so you can

4    continue the operations and expand payroll and buy

5    things and you have to pay interest on it.

6         Q.    So rather than borrowing money to pay

7    operation costs, property, equipment, whatever the

8    business might need as a golf course, they took it

9    out of their salaries?

10        A.    It's an implicit loan.

11        Q.    They loaned it to themselves?

12        A.    Yes; they loaned it to themselves.

13        Q.    To some extent that bought things of

14   value in terms of land for a golf course, perhaps?

15        A.    Yes; certainly there are assets in the

16   business they were hoping to build up by doing

17   that.

18        Q.    Well, my question is whether or not you

19   have any idea what the assets of the business are

20   that when they get liquidated he may not receive,

21   frankly, substantial amounts of money from the

22   liquidation?

23        A.    My understanding is that they don't

24   expect to get anything from it.

1      Q.    How do you know that?  What document

2  have you seen?

3      A.    I had a conversation with him.  That's

4  what he said.

5      Q.    Have you seen any documents?

6      A.    No; I've seen no documents about it.

7      Q.    Did he buy land or property with the

8  loan to themselves?

9      A.    I don't know -- I think that they bought

10  some property but I'm not sure.  I just can't

11  remember.  I wasn't that focussed on that

12  business.

13      Q.    So whatever value that business has

14  really is not factored into your calculations

15  here?

16      A.    He said it was going bankrupt and that

17  was it so there wasn't much to deal with.

18      Q.    Did he indicate when?  Did he indicate

19  when?

20      A.    That process, last time I spoke with him

21  about this, was ongoing so at that time I don't

22  know.

23           He said he was going back to Texas to

24  deal with it -- to deal with the liquidation of

```
 1    the business.
 2        Q.    He didn't give you any information
 3    regarding his income for 2007?
 4        A.    No.
 5        Q.    Or his income from the business for
 6    2007?
 7        A.    No; from what he said I surmised that it
 8    was zero.
 9        Q.    That's only a surmise?
10        A.    Yes.
11        Q.    You also surmise that he will not -- in
12    terms of your projections, that he will have no
13    earnings from now through the year 2020?
14        A.    Not really.
15        Q.    What's that?
16        A.    Not really; no.
17        Q.    Do you have an assumption that he will
18    earn something?
19        A.    No; I did the calculation, as I
20    explained much earlier in this deposition, to show
21    what the impact would be if he didn't.
22            I fully assume that at some point this
23    man is going to get some other income and it will
24    be mitigated but at this point there is nothing to
```

1    base that on so there just isn't sufficient

2    information.  At some time if there's reasonable

3    information I would change those numbers and

4    mitigate it.

5        Q.    Then you don't think in terms of what is

6    likely that the projected number here is accurate

7    in terms of his likely costs through 2020?

8        A.    No; I don't.

9        Q.    The tax returns have different medical

10   costs listed.  Do you know why that is?

11       A.    No.

12       Q.    Is that deductions?

13       A.    Probably just for medical deductions;

14   yes, but I didn't investigate that.

15             I wasn't paying a great deal of

16   attention to his medicals.  They were there for a

17   couple of years.

18       Q.    I think you indicated that his wife was

19   or is working for MassMutual?

20       A.    My understanding is that she is, that

21   she has a job with MassMutual.

22       Q.    Did you factor in whether she and her

23   husband receive health insurance from MassMutual?

24       A.    I don't know.

1        Q.    You don't know whether you factored it

2    in?

3        A.    I don't know if I factored it in or not.

4        Q.    Let's look at -- how did you

5    calculate -- let me ask, how did you calculate the

6    lost benefits in his case?

7        A.    What I did, based on information I had,

8    is I used a ratio between what his salary was and

9    what his benefits would have been.  I can tell you

10   what that is in a minute.

11       Q.    Where did you get the information about

12   what his benefits would have been?

13       A.    From the listing of the other benefits

14   that the other employees also were getting from

15   that employer.

16       Q.    So the benefit sheets from either 2002

17   or 2003 from the prior company?

18       A.    That's correct; yes.

19       Q.    And you did not take into account what

20   benefits Callaway was giving or what benefits

21   Mr. Lonczak, himself, may have personally

22   received?

23       A.    That's right.

24       Q.    So if I suggested to you the company

1    records showed that Mr. Lonczak at the time of his

2    termination was not receiving any health insurance

3    benefits, to you that would not justify a change

4    in the percentage used to calculate the value of

5    his benefits compared to somebody who was in fact

6    receiving health care benefits?

7        A.    Given the information I have sitting

8    here right now, no.  I'd have to look at it more

9    closely.

10       Q.    What information would you need beyond

11   my question?

12       A.    I don't know.  I haven't seen any

13   documentation about what benefits he is getting,

14   how he is getting them and so -- I don't have any

15   of that.  Maybe you do but I don't.

16       Q.    I understand that but you're the one who

17   did the projections of lost benefits for the next

18   fifteen, twenty years?

19       A.    I did it based on the information I had.

20       Q.    But my question doesn't even go to the

21   accuracy of those numbers, it goes to a constant?

22       A.    I know.

23       Q.    You used figures you said from other

24   employees, not from Mr. Lonczak?

1      A.    Correct.

2      Q.    Other employees received statements from

3  another company in different years for what the

4  value of their benefits were, correct?

5      A.    Yes.

6      Q.    And those other employees may have had

7  health insurance through Spalding?

8      A.    They may have.

9      Q.    Would it be appropriate in your view to

10 use the same percentage as a value or cost of a

11 fringe benefit to Mr. Duval who may have had

12 health insurance through Spalding, to Mr. Lonczak

13 who was not on Spalding's health plan?

14     A.    Let me answer this way:  I think it

15 would be appropriate to apply a percentage that

16 included the opportunity to get health coverage if

17 you wanted to opt for it.

18     Q.    Would that be identical to Mr. Duval, my

19 example?  There would be no difference in

20 percentages?

21     A.    I don't know.

22     Q.    Can you tell me what percentage you used

23 in Mr. Lonczak's case and how you chose to use

24 that percentage?

1      A.    That's what I was doing.

2      Q.    I'll give you that chance.

3      A.    We can do that.  It is 14.8 percent

4   which is the same percentage we used in the last

5   one.

6      Q.    Mr. Duval?

7      A.    That's right.

8      Q.    So you used the same exact percentage

9   for the two of them without regard to whether

10  Mr. Lonczak actually was on a health insurance

11  plan through his employer --

12     A.    (Interposing) That's correct.

13     Q.    -- at the time of his termination?

14     A.    That's correct.

15     Q.    Do you have any idea of your

16  percentage -- the 14.5 or whatever you used --

17  what percentage of that would have been for health

18  care?

19     A.    No.

20     Q.    Is it typically a substantial portion of

21  the employer's fringe benefit package?

22     A.    Typically -- I don't know what you mean

23  by "substantial" but it's a reasonable share of

24  it.

JANUARY 24, 2008

1      Q.    Most employers say that is the highest

2   percentage of their fringe benefits.  Is that your

3   experience or not?

4      A.    Well, it depends on which employers you

5   talk to and what they say.  Some of them tell you

6   something else but that's okay.  They don't tell

7   you that their taxes that they pay for Social

8   Security is more.  I don't consider them a

9   benefit, they do, so they'll say that's the

10   biggest thing they pay.

11          Health care is clearly expensive for

12   employers and it does contribute -- it's a major

13   component in the benefits that employees receive.

14          MR. PRESSER:  Why don't we take a

15   short break.

16              (A recess was taken.)

17          MR. PRESSER:  I have no further

18   questions at this time.

19          MR. CAHILLANE:  I have no questions.

20              (The deposition was concluded.)

21                  * * * * *

22

23

24

1          SIGNATURE PAGE - ERRATA SHEET

2          To be signed by deponent and returned to
   counsel within thirty (30) days.
3
          I, the undersigned, CRAIG L. MOORE,
4    PH.D., do hereby certify that I have read the
   foregoing transcript of my testimony given in the
5    matter of MICHAEL BEHAYLO ET AL vs. CALLAWAY GOLF
   BALL OPERATIONS, INC., on JANUARY 24, 2008 and
6    that, to the best of my knowledge, said transcript
   is true and accurate (with the exception of the
7    following corrections listed below:)

8
     PAGE:   LINE:   CHANGE AND REASON
9
10   _____:_____:_____

11   _____:_____:_____

12   _____:_____:_____

13   _____:_____:_____

14   _____:_____:_____

15   _____:_____:_____

16   _____:_____:_____

17   _____:_____:_____

18   _____:_____:_____

19   DEPONENT'S SIGNATURE: _____

20   Signed under the pain and penalties of perjury
   this_____ of _____ , 2008.
21
   _____
22   NOTARY PUBLIC

23   My Commission expires: _____

24

          PERLIK and COYLE REPORTING

1 COMMONWEALTH OF MASSACHUSETTS
    COUNTY OF HAMPDEN
2
         I, JOANNE COYLE, a Notary Public within and
3 for the Commonwealth of Massachusetts at large, do
    hereby certify that I took the deposition of CRAIG
4 L. MOORE, PH.D., pursuant to the Federal Rules of
    Civil Procedure, at the offices of Skoler, Abbott
5 & Presser, P.C., One Monarch Place, Springfield,
    Massachusetts, on JANUARY 24, 2008.
6
         I further certify that the above-named
7 deponent was by me first duly sworn to testify to
    the truth, the whole truth and nothing but the
8 truth concerning his knowledge in the matter of
    the case of MICHAEL BEHAYLO ET AL vs. CALLAWAY
9 GOLF BALL OPERATIONS, INC., now pending in the
    United States District Court, Western District of
10 Massachusetts.

11       I further certify that the within testimony
    was taken by me stenographically and reduced to
12 typewritten form under my direction by means of
    COMPUTER ASSISTED TRANSCRIPTION; and, I further
13 certify that said deposition is a true record of
    the testimony given by said witness.
14
         I further certify that I am neither counsel
15 for, related to, nor employed by any of the
    parties to the action in which this deposition was
16 taken; and further, that I am not a relative or
    employee of any attorney or counsel employed by
17 the parties hereto, nor financially or otherwise
    interested in the outcome of the action.
18
         WITNESS my hand and seal this _26th_ day of
19 JANUARY, 2008.

20              _____
                Joanne Coyle
21              Notary Public
                Certified Shorthand Reporter
22              License No. 106693

23 My Commission Expires
    May 12, 2011
24

# John Bettencourt

Cell# 237-4836

Estimated 2007 earnings as real estate agent        $70,000

Amount spent  for benefits after  termination:        Per Year

| | | |
|---|---|---|
| Health Insurance | | $4,576 |
| Dental Insurance | | $936 |
| Vision | | $312 |
| 401K matching | 3% | $2,340 |
| Vacation | 5 wks | $7,500 |
| Holidays | 13 days | $2,778 |
| Payroll taxes | 12% | $9,360 |
| Bonus | 10% | $7,800 |
| Long term Disabilty | ???? | |
| Life insurance | | $720 |
| Employee purchase plan 25% of whc | | $500 |
| Accidental death Insurance ???? | | |

Total Benefits        $36,822





The
**TOP-FLITE**
——— Golf Company

September 15, 2003

Paul F Duval
42 Fairway Dr
Chicopee, MA 01020

Dear : Paul

With the sale of the assets of The Top-Flite Golf Company (for convenience "Spalding/Former Top-Flite") to the Callaway Golf Company now complete we are pleased to announce that your new company, The Top-Flite Golf Company, a wholly-owned subsidiary of Callaway Golf Company, is pleased to be offering you new employment at your current position of Dir Sls Promo/Plan Intl Mkts and annualized compensation of $116,172. Your employment with the new company is effective September 15, 2003.

Because Spalding/Former Top-Flite is still in bankruptcy, it is important that we all work together to make sure that all claims and liabilities that belong to the old company stay there, and that we start our new company with a clean slate. We are asking for your help to make The Top-Flite Golf Company successful by getting your claims for health care benefits and other matters to Human Resources as soon as possible so that they can be forwarded to Spalding/Former Top-Flite before it liquidates and ceases to exist.

Callaway Golf has determined that your pre-existing seniority, compensation, and title will carry over to your new employer. You will soon be offered an opportunity to participate in the Callaway Golf 401K plan, which has a substantial matching component. Your former SERA pension, retiree medical, and retiree life insurance coverage will terminate as a result of the bankruptcy and sale of the assets of the Spalding/Former Top-Flite entity. The termination date of those benefits will be determined by the Company during the bankruptcy process. We are pleased to inform you that other benefits that you previously received from Spalding/Former Top-Flite will be offered by your new employer. Additionally, as we get more familiar with Callaway Golf's existing policies, procedures and benefits, we will adopt them here at The Top-Flite Golf Company as it make sense to do so. Until we make those decisions, you will continue to be governed by the current policies and procedures found on the Human Resources intranet site.

Attached you will find the Employee Invention and Confidentiality Agreement, Information Security Policy and Agreement, Sexual Harassment Policy, and Privacy Act Agreement. Similar to most employers, Callaway Golf requires the completion of these forms as a condition of your employment. Please sign these forms and return them to Human Resources by September 18, 2003.

In order to complete the enrollment process we are asking all employees to sign this letter, as indicated below and return it to Human Resources by September 18, 2003.

Sincerely,

*Vaughn F Rist*

Vaughn F. Rist
Vice President
Human Resources

VFR/dmb

Attachments

DEFENDANT'S DEPOSITION
EXHIBIT
PENGAD 800-631-6989
12 Duval
5/4/06

RECEIVED AND ACCEPTED

_Paul F. Duval_                    DATE: _9-17-2003_
Signature

Office –Duval, Paul                                    Page 1 of 2181

## EMPLOYEE INVENTION AND CONFIDENTIALITY AGREEMENT

This Employee Invention and Confidentiality Agreement ("Agreement") is entered into by and between The Top-Flite Golf Company, a subsidiary of Callaway Golf Company (collectively referred to herein as "the Company") and Paul F Duval *[print name]* ("Employee") effective the date signed by Employee.

This Agreement replaces any and all former employee invention and confidentiality agreements ("Prior Agreements") entered into between any predecessor employer and Employee. For convenience, the seller of assets to the Company shall be referred to as "Spalding/Former-Top-Flite." Any obligation to assign any invention or work for hire pursuant to a Prior Agreement with Spalding/Former Top-Flite shall continue to bind Employee but shall benefit the Company. To the extent there is a conflict or inconsistency between the provisions of a Prior Agreement and this Agreement, this Agreement shall prevail.

For and in consideration of the Company's obligations hereunder, the mutual covenants, conditions and promises contained herein, for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as a condition of employment by the Company or, if Employee is already employed by the Company, in consideration for the continued employment of Employee by the Company, Employee understands and agrees as follows:

1.     "Confidential Information" includes the Company's trade secrets and proprietary information comprising, but not limited to, all patented, copyrighted and/or trademarked materials, lab notebooks, graphic and/or written records, manufacturing techniques, programs, processes, formulas, codes, research and development-related information, non-public product information, business plans and strategies, marketing data, cost of materials data, customer lists, supplier lists, employee lists, the terms or contents of all contracts or negotiations, and third party information that the Company has agreed to keep confidential.

2.     Employee will not, at any time, whether during or subsequent to the term of Employee's employment with the Company, in any fashion, form, or manner, unless specifically consented to in writing by the Company, either directly or indirectly, use for Employee's own benefit, or divulge, disclose, or communicate to any person, firm, entity or corporation, in any manner whatsoever, any Confidential Information or Invention of any kind, nature, or description concerning any matters affecting or relating to the business of the Company, unless the party to whom the information is revealed has a need to know and is bound by a similar Company confidentiality agreement. The Confidential Information and Invention(s) are important material and represent confidential trade secrets, proprietary information and confidential business information of the Company, and affect the successful conduct of the Company's business and its good will. Any breach of any term of this section is a material breach of this Agreement.

3.     "Invention," regardless of whether it has been patented, trademarked or copyrighted, includes, but is not limited to, any invention, design, innovation, improvement, discovery, idea, process, sources of and uses of materials, apparatus, plans, systems and computer programs, as well as all related notebooks, documentation, and all proprietary information and rights, relating to the design, manufacture, use, marketing, distribution, and management of the Company's products.

4.     Employee transfers and assigns to the Company all of Employee's right, title and interest in all Inventions which Employee conceives or reduces to practice during Employee's employment with the Company to the extent the Inventions either (a) result from any work performed by Employee for the Company, or (b) relate to the Company's business or the Company's actual or anticipated research and development. Employee agrees to disclose to the Company all Inventions subject to this Agreement and to help the Company properly document its rights to such Inventions, and to assist in the preparation of any and all U.S. and/or foreign applications for patents, trademarks, copyrights and assignments to the Company which relate to such Inventions. Employee will sign whatever documents are deemed necessary by the Company in order to fully vest in the Company ownership to all Inventions.

5.     Employee agrees to disclose to the head of Employee's department, or other officer or director of the Company, any Invention (a) resulting from any work performed by Employee for the Company, or (b) relating to the Company's business or the Company's actual or anticipated research and development, which Employee develops, conceives and/or reduces to practice, either alone or with anyone else, during Employee's employment and/or within one (1) year of the termination of Employee's employment. Employee shall disclose such Inventions to the Company, even if Employee does not believe that Employee is required under this Agreement to assign Employee's interest in such Inventions to the Company. If the Company and Employee disagree as to whether or not an Invention is included within the terms of this Agreement, it will be the responsibility of Employee to prove that it is not included and/or that assignment to the Company is not required.

6.     Employee shall not divulge to the Company any confidential information or trade secrets belonging to others, including Employee's former employers (but excluding Spalding/Former Top-Flite), nor shall the Company seek to elicit from Employee any such information. Consistent with the foregoing, Employee shall not provide to the Company, and the Company shall not request, any documents or copies of documents containing such information.

7.     All equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondences, lists, programs, documentation, and/or other related materials acquired by Employee as a result of Employee's employment with the Company, as well as copyrights, trademarks, and patents resulting from any work performed by Employee during the term of Employee's employment with the Company, other written graphic records, and the like, affecting or relating to the business of the Company, which Employee shall prepare, use, construct, observe, possess, or control, shall be and remain the Company's sole property. In the event of termination of Employee's employment with the Company for any reason, Employee agrees to deliver promptly to the Company all the foregoing which are then or have been in Employee's possession or under Employee's control, and will not take with Employee the originals or copies of the Company's documents and/or documentation relating to the Company's Confidential Information and/or Inventions, except with the Company's prior written consent.

8.     Employee agrees to permit the Company, and persons or other organizations authorized by the Company, to use, publish and distribute internal communications or advertising or sales promotional literature concerning the products of the Company or its affiliated companies, or the machinery and equipment used in the manufacture thereof, in which Employee's name and/or pictures of Employee taken in the course of Employee's employment with the Company, appear. Employee hereby waives and releases any claim or right Employee may otherwise have arising out of such use, publication or distribution.

9.     In the event Employee violates this Agreement, the Company may terminate Employee's services to the Company immediately, bring litigation in any court of competent venue and jurisdiction to enjoin Employee's breach of this Agreement, and recover costs of such litigation, including attorneys' fees, in the event the Company is successful in the litigation. This Agreement shall be governed by the laws of Employee's place of legal residence and shall benefit and bind any successor to Employee or the Company.

10.     Each term, condition, covenant or provision of this Agreement shall be viewed as separate and distinct, and in the event that any such term, covenant or provision shall be held by a court of competent jurisdiction to be invalid, the remaining provisions shall continue in full force and effect.

Dated: ___9 – 17 – 2003___          _Paul F Duval_
                                                     Employee – **Sign** Name

                                                     Badge Number: _012240

Office –Duval, Paul                                          Page 3 of 2181



## INFORMATION SECURITY POLICY AND AGREEMENT

Callaway Golf Company and its subsidiaries and affiliates, including its newest subsidiary, The Top-Flite Golf Company (hereinafter collectively referred to as "Callaway Golf" or "the Company"), maintain a comprehensive network of computers for processing data and sharing information. These systems are critical to the Company's business and it is important that we all do our part to ensure the integrity of the systems and the information contained in them. You are accountable for all of your activities connected with these computers and information systems. The following are Callaway Golf's policies for you to follow as you use communications tools and information systems at The Top-Flite Golf Company. Please read and familiarize yourself with these policies, then sign the Acknowledgment at the end of the document and return this form to the Human Resources Department. Violation of this policy, which covers use of all the Company's communications, computer and information systems, including e-mail and voice mail, may result in disciplinary action including, but not limited to, suspension or termination.

1.  **Company Right of Access: Information stored or transmitted on Company computer systems, including e-mail, is not private to you. All information stored or transmitted on Company computer systems is, and remains at all times, the property of the Company. The Company reserves the right, at all times, and without prior notice to you, to access, review, copy and/or delete any information, data, file, or e-mail message on any Callaway Golf information system for any reason, and to disclose the same to any party (inside or outside the Company) that it deems appropriate. As a result, you have no expectation of privacy with respect to this information. As a Company authorized user, you are allowed personal use of Company computers only if it does not interfere with Company business. The use of Company computer systems will be monitored. You must understand that information created, stored, or transmitted by the Company computer systems, including information you might consider personal, is available for review by authorized Company representatives for any purpose. Please note that even when an e-mail message or other computer file is erased, it may be possible to recreate the message or file.**

2.  **Controlling Your User ID and Password:** Your user ID is what identifies you to the computer system. The password(s) associated with your user ID is what keeps your user ID unique only to you. It is your responsibility to keep your password(s) secret. You may not share your passwords(s) with anyone, and you are responsible for all activity performed with your personal user ID. User IDs may not be utilized by anyone but the persons to whom they have been issued, although the Company has the right to override your user ID. You must not allow others to perform any activity with your user ID. Similarly, you are forbidden from performing any activity with IDs belonging to other users. You will be held accountable for the activities performed by anyone using your user ID, and you may be subject to disciplinary action, including termination. Disclosure of your password(s) is expressly prohibited. When selecting password(s), try to choose passwords that are not easily guessed by others. You are required to use a password-protected screen saver to lock your workstation when you leave your work area during business hours. Also, you are required to log off the network and turn off your computer when you leave the Company. These measures help protect the Company from unauthorized access by hackers and

other third parties. If you do not have a password-protected screen saver enabled, an I.S. representative can help you get one. The Company may override any applicable passwords or codes to inspect, investigate, or search your files and messages, or otherwise monitor your use of Company computer systems.

3. **Protecting Company Information:** You are responsible for protecting Company information and must follow Company guidelines for the appropriate use, storage, transmittal, and destruction of Company information. This includes information stored on, or transmitted by, the Company's computer systems. Company trade secrets and work product, including any software files and confidential information, should never be transmitted or forwarded to outside individuals or companies not authorized to receive that information and should not be sent or forwarded to anyone inside the Company who does not need to know the information. IF YOU ARE UNCERTAIN WHETHER YOU ARE AUTHORIZED TO SEND OR FORWARD SUCH INFORMATION, YOU SHOULD CHECK WITH THE PERSON TO WHOM YOU REPORT. Company information stored on personal computing devices (including laptop and hand-held computers) should not be removed from Company premises without authorization from the person to whom you report and must be protected from loss or theft.

4. **Copying Software for Home/Other Use:** Only software for which all applicable license fees have been paid may be installed on Company owned computers and networks. You are encouraged to have the software loaded by the I.S. Department or other designated personnel. You may not copy software without the written permission of the owner. Please be aware that using non-standard software, not reviewed at a project level by your department, can compromise the efficiency and integrity of the systems chosen by the Company. You should only use software deemed acceptable by the Company for its business use. The Company's computer systems are not to be used to copy and/or transmit documents, software, or other information protected by copyright laws, without written permission of the copyright owner.

5. **Non-Business Usage:** You may use the Company's communication and information systems for incidental personal, non-commercial purposes provided such use in no way interferes with Company business and is not excessive. You should use common sense. The e-mail system and Internet access is generally for business related uses. You may use these systems for incidental personal communications, provided this privilege is not abused. For example, personal use of a Company computer to listen to music or watch videos downloaded from the Internet uses considerable network resources and violates this policy. Note: All use of the Company's systems, including Internet use, may be monitored by the Company, and any such information or communication may be accessed by the Company (see Company Right of Access, below). As such, you have no expectation of privacy with respect to any personal use of Company's communication and information systems.

6. **Internet Access:** The Company uses the global Internet ("Internet") for business purposes.

Approvals and use:
- You may be granted Internet access if there is a legitimate business justification. The Vice President of the department to which you are providing services must approve Internet access
- Only I.S. may install Internet access through its network systems and firewalls
- For security reasons, if you use a Company-provided laptop or home computer, you must utilize the Company-provided firewall software on the laptop or computer
- Many web sites offer software downloads from the Internet. Software may only be downloaded from sites that allow downloading or copying of information. If such a statement does not exist,

copying the material is prohibited.  Additionally, software that will reside on the Company's networks or Company-provided computers may not be downloaded without the approval of the departmental Vice President; such approval can be delegated to an authorized staff member. Downloaded material can contain computer "viruses" which the Company's systems are not designed to protect.  Please refrain from downloading except from well-established sites.  Be particularly careful of executable files

- Company-sponsored Internet access is provided for Company business purposes.  Personal use of Company-sponsored Internet access that interferes with Company business is prohibited
- Use of the Internet may be monitored from time to time including, but not limited to, duration, frequency, and specific site visits, to determine compliance with Company policies

Examples of inappropriate Internet use include, but are not limited to, the following:
- Engaging in communication or commerce that is in violation of public policy or Company policy
- Accessing or downloading pornographic materials
- Accessing entertainment or game sites
- Accessing gambling sites
- Accessing other companies' trade secrets
- Disseminating the Company's trade secrets or confidential information
- Making indecent remarks or proposals
- Transmitting defamatory, obscene, offensive or harassing messages
- Unauthorized downloading of copyrighted, protected materials, including software
- Soliciting for personal gain or profit
- Using Telnet services without prior approval
- Intentionally interfering with any company's (including the Company's) Internet gateway

7. **Participation in Chat Rooms or Message Boards:**  The Company does not wish to become involved in any way in the possible misuse of Internet chat rooms or message boards.  The Company does not authorize or encourage the use of such posting, or any inappropriate participation in chat rooms or message boards, including those relating to Callaway Golf or its competitors.  Any personal participation in such activities must be just that: personal.  You may not use a Company computer or Company Internet access for such activities, and you may not engage in such activities during work time.  If you choose to participate in such activities on your personal time, you should remember not to "hype" stock or business, or attempt to affect the stock price in any way.  You should avoid any false or misleading postings.  It is the Company's view that disguising your identity as a Company employee, consultant, or the like when posting comments about Callaway Golf or its competitors may tend to mislead others.  We appreciate your compliance with these guidelines and policies.

8. **E-mail:**  E-mail messages may be read by someone other than the addressee, and may eventually have to be disclosed to outside parties or in a court of law.  Accordingly, your messages will reflect on both you and the Company, and should always be courteous, professional, careful, and businesslike.  It is the Company's policy that all e-mail messages are deleted after 120 days.  The Company does not archive or store e-mail messages after 120 days.  The Company also discourages personal storage on local computer drives of large numbers of e-mail messages because they frequently contain Company trade secrets or confidential information and they consume expensive computer resources.  E-mail messages and attachments, including personal e-mails may be monitored (See "Company Right of Access, below) Prohibited use of the e-mail system include, but are not limited to, the distribution of chain letters, inappropriate humor, and abusive comments.

E-mail sent outside of the Company travels over the Internet and is not encrypted without the use of encryption technology.  Encryption technology "scrambles" the message so that it is not readable, except by the intended recipient, after verification.  Do not send Company sensitive information over the Internet unless the information has been encrypted.  Appropriate care should be taken to protect Company information sent over the Internet.

If you receive unsolicited, inappropriate e-mails (See "Prohibited Uses", below), you are encouraged to notify the sender that such e-mails should not be sent to the Company. You should not store such material in Company computers. If you forward or store inappropriate e-mails, you may be subject to disciplinary action.

9. **Service and Repair:** Company computer equipment and software is to be serviced and repaired only by I.S. personnel or other trained technicians designated or approved by the I.S. Department.

10. **Prohibited Uses:** Company authorized users are provided access to the Company's computer and communications systems to assist them in carrying out Company business in an efficient manner. Company's computer systems are not to be used to engage in any activities that are in violation of Company policy. Prohibited uses include, but are not limited to, the distribution of chain letters, inappropriate humor, defamatory, obscene, offensive or harassing messages or files, and audio, video graphics or images of nudity or a sexual nature.

11. **Updates:** I understand that from time to time this Information Security Policy and Agreement will be updated. Continued use of the Company's computers shall constitute user agreement to the updated policies.

12. **Repeat of Company Right of Access:** **Information stored or transmitted on Company computer systems, including e-mail and Internet usage, is not private to you. All information stored or transmitted on Company computer systems is, and remains at all times, the property of the Company. The Company reserves the right, at all times, and without prior notice to you, to access, review, copy and/or delete any information, data, file, e-mail message or Internet usage on any Company information system for any reason, and to disclose the same to any party (inside or outside the Company) that it deems appropriate. As a result, you have no expectation of privacy with respect to this information. As a Company authorized user, you are allowed personal use of Company computers only if it does not interfere with Company business. The use of Company computer systems will be monitored. You must understand that information created, stored, or transmitted by the Company computer systems, including information you might consider personal, is available for review by authorized Company representatives for any purpose. Please note that even when an e-mail message or other computer file is erased, it may be possible to recreate the message or file.**

---

Acknowledgment: I understand and agree to abide by this Information Security Policy and Agreement.

Print Name: Paul F Duval    Badge #: 012240

Signature: _Paul F. Duval_                    Dated: _9-17-2003_

---

Memorandum

To: Paul F Duval

From:  Bob Bourdeau – Labor Relations Manager

Date:   Monday, September 15, 2003

Re:      Corporate Sexual Harassment Policy

Visit the HR Intranet to read the Policy on Sexual Harassment or if you do not access to the Intranet request from your Supervisor or Humans Resources Department a hard copy of the policy.

In the interest of promoting and ensuring a safe and comfortable work environment for all our employees, customers, vendors and guests, the attached sexual harassment policy will be distributed to each employee on an annual basis. The policy is also issued to each new employee at the time of hire. This distribution is being made in accordance with amended Massachusetts legislation covering Chapter 151B, Sexual Harassment in the Workplace.

Please review the attached policy. Upon completion of your review, please sign the acknowledgement form below and return the form to Human Resources. It is essential every employer verify communications with employees through such signed acknowledgment statements.

If you have any questions, please direct them to myself or Vaughn Rist.

My signature below acknowledges that I have read and agree to abide by the Sexual Harassment Policy of The Top-Flite Gold Company.

Signature _____ *Paul F. Duval* _____

Date _____ 9-17-2003 _____

Employee # 012240

Office –Duval, Paul